UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK RESIDENTIAL CUSTOMER BILLING DISPUTES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to ALL ACTIONS | **DEFENDANTS' BRIEF PURSUANT TO PRETRIAL ORDER NO. 1** |

Pursuant to Pretrial Order No. 1 (ECF No. 7), Section N, Defendants CenturyLink, Inc. and certain of its subsidiaries (collectively "CenturyLink") hereby submit the following Brief as the Court requested.

These consumer lawsuits are a textbook example of overreach by class-action counsel. They have improperly attempted to transform unrelated, individualized billing disputes into a company-wide, management-approved, conspiratorial assault on consumers' rights. Relying (to date) on stories from 24 named Plaintiffs, and other anecdotal accounts from a miniscule percentage of CenturyLink's millions of customers, Plaintiffs allege (falsely) that "the heart of [CenturyLink's] business model" is a "widespread," "Wells Fargo-like" scheme that uses an alleged "secret, intra-corporate-employee-incentive program" (otherwise called "sales commissions") that Plaintiffs say "systematically" caused sales agents to misrepresent prices and assess unauthorized charges. Plaintiffs used their dramatic, fabricated allegations to fuel a social media and public relations campaign designed to sensationalize their lawsuits and smear the Company.

Despite Plaintiffs' headline-grabbing accusations, CenturyLink never employed any "systematic," "widespread," or "intentional" "business model," or "scheme" to overcharge customers. Nor did management design or foster a company-wide culture that encouraged cheating and misbilling customers. CenturyLink has for years maintained vigorous policies prohibiting the very conduct that Plaintiffs allege, and has trained, reviewed and disciplined employees if it discovered such conduct. Nonetheless, like all nationwide telecommunications carriers serving multi-millions of customers, a wide variety of disputes (and sometimes errors) inevitably arise in the sales and billing process. Many such disputes arise when customers fail to read or recall CenturyLink's express disclosure of terms, fees and surcharges associated with its services. These lawsuits starkly reflect that reality: the experiences that Plaintiffs allege do not describe uniform, systemic misconduct, but instead allege a hodgepodge of widely varying alleged sales and billing issues under the generic banner of "overcharges."

In addition to being ill conceived from the outset, the Complaints also suffer from numerous substantive and procedural defects. First and foremost, this Court is not the proper forum for these disputes. Plaintiffs (all customers who have subscribed to CenturyLink's various communications services) agreed in their contracts with CenturyLink that they would (1) arbitrate any disputes, and (2) waive the right to participate in a class action. Thus, the Court lacks jurisdiction over these claims. The Court should compel Plaintiffs to bring these claims in the proper forum to which they agreed.

Second, basic and well-settled principles of law bar most of these claims. Customers who consistently paid their bills – for months or years – have waived their claims and cannot now sue to recover for alleged overcharges that repeatedly appeared on their bills for months or years since they started their service.

Third, regardless of the merits of any individual claim, these types of sales and billing disputes cannot be litigated on a class-wide basis. Even if a customer had a valid claim, the claim would depend on a multitude of individualized factors that make class-wide litigation impossible. And for customers who might have valid claims, each state agency maintains a consumer complaint process that is far superior to expensive and time-consuming federal court litigation.

Finally, out of many millions of transactions and customer contacts a month, it would be impossible to identify which charges customers did not authorize. Whether any particular customer might have a valid claim, depends on a litany of highly-individual facts, such as:

- Whether the customer authorized each particular charge in his or her bills;
- What statements were made to the customer during each phone or sales call with CenturyLink;
- Whether the customer saw the Company's disclosures and which ones;
- Whether the customer voluntarily paid CenturyLink's bills or waived any claims even knowing about the purported overcharges; and
- Whether CenturyLink provided credits or other benefits to the customer to resolve a customer's dispute.

All these defects in Plaintiffs' claims will be addressed in various contexts in the months ahead.

## I. CLAIMS AND DEFENSES

> *"(a) the primary facts, allegations, claims, and defenses involved in this litigation, together with any other pertinent legal and factual background"*

This Multidistrict Litigation ("MDL") Proceeding presently consists of 15 putative class actions asserting various consumer-protection and contract claims (the "Consumer actions"). Each lawsuit was brought by between one and four named Plaintiffs.[1]

### 1. *Primary Facts*

Through a family of affiliates, CenturyLink provides local phone, Internet (also known as "broadband"), and TV ("video") services to residential and small-business customers in 37 states. CenturyLink has approximately 11 million phone customers, 6 million high-speed Internet ("HSI") customers, and about 325,000 customers of its TV service ("Prism").

Plaintiffs are, or were, customers of CenturyLink's various services. All of them subscribed to HSI; some also purchased local phone service and/or Prism service.

The lawsuits all make allegations about CenturyLink's sales and billing practices. Customers can purchase CenturyLink's services through a variety of "channels" – online, by phone, and sometimes in person. CenturyLink employs over a thousand sales agents and customer service representatives working at over a dozen call centers throughout the

---

[1] The Judicial Panel on Multidistrict Litigation (the "Panel") is currently considering whether to transfer four putative class-action cases filed under the federal securities laws (the "Securities actions"). The Panel likely will decide that question soon. If the Securities actions are transferred into this MDL Proceeding, CenturyLink would welcome the opportunity to submit a supplemental brief to address the impact of those actions.

country. It also contracts with third-party vendors for these functions. Each month, CenturyLink has many millions of individual communications with customers.

CenturyLink provides a variety of different disclosures to customers that govern their purchases. These disclosures vary depending on numerous factors, including type of service, time period, sales channel, and location. Before they can order or initiate HSI and Prism services, customers are typically required to agree affirmatively to the terms of CenturyLink's standard contracts. These contracts contain mandatory arbitration agreements. For example, CenturyLink's standard **HSI** contract includes this broad, mandatory arbitration clause:

> *You agree that any dispute or claim arising out of or relating to the Services, Equipment, Software, or this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be resolved by binding arbitration.*

Its standard contract for **Prism** service includes a similar mandatory arbitration clause:

> *You and CenturyLink agree to arbitrate any and all claims, controversies or disputes . . . including but not limited to claims arising out of or relating to this Agreement, or CenturyLink's services, software, billings, advertisings, or equipment. This agreement to arbitrate is intended to be broadly interpreted and applies to, among others: all claims regardless of whether they are based in contract, tort, statute, fraud, misrepresentation or any other legal theory.*

Other relevant contracts, such as agreements allowing automatic monthly payments, contain similar arbitration clauses and class-action waivers.[2] Pursuant to state regulatory

---

[2] For example, the HSI customer agreement states: "Both you and CenturyLink also . . . waive any right to pursue any claims on a class or consolidated basis or in a representative capacity."

laws, CenturyLink's local phone services are governed exclusively by tariffs filed with the relevant state public utility commissions, each of which sets the rates and charges pursuant to state laws.

### 2. *Plaintiffs' Allegations and Claims*

To date, Plaintiffs have alleged a wide variety of disparate and unrelated sales and billing disputes, all under the unifying banner that "CenturyLink is overcharging customers." [3]

Plaintiffs' individual claims run the gamut of potential sales or billing disputes that any customer might have with any telecommunications company. As but a few examples:

- M. Hanifen (D. Idaho) alleges her Internet speed was too slow;

- D. Garten (D. Nev.) alleges that CenturyLink promised it would bill him towards the end of each month, but it billed him early in the month;

- A. Chavez (D. Colo.) alleges that CenturyLink added a phone line he did not request; and

- S. Miller (W.D. Wis.) alleges that her rates were increased, and that her bills included a fee that was never disclosed.

Based on these varying disputes, Plaintiffs claim that CenturyLink had a policy or culture of imposing unauthorized charges on customers, or misrepresenting their services

---

[3] Plaintiffs are preparing a Consolidated Amended Complaint and have suggested that it will vary to a greater or lesser degree from the filed Complaints. Until that occurs, CenturyLink will not know if the Consolidated Complaint follows the same pattern as the individual Complaints.

to induce sales. Plaintiffs' Complaints identify many different types of alleged sales and billing practices they consider to be examples of these practices:

- "Billing consumers higher rates than the rates quoted during sales calls";

- "Billing consumers early termination fees when they cancelled the services due to higher rates";

- "Billing consumers when they cancelled their service upon learning the quality was not how CenturyLink had represented it";

- "Billing consumers for periods of service before the service was connected, products never received, and consumers received no credit for these charges";

- "Billing consumers for phone lines or service items never requested by consumers";

- "Billing consumers for services and products that the consumer never requested without giving the consumer a credit for these charges";

- "Failing to process consumers' service cancellation requests in a timely manner and billing them for the period of the time the service remained connected following the request for cancellation, without providing a credit for this time period"; and

- "Charging consumers full price for leased modems that consumers returned to CenturyLink within the required timeframe, and then referring the consumers account to collections when the consumer refused to pay for the returned modem."

*E.g.*, Complaint ¶ 11, *McLeod v. CenturyLink, Inc.*, No. 17-4614 ("*McLeod* Complaint") (originally filed in C.D. Cal.). No Plaintiff alleges that he or she experienced all of these issues.

Based on these allegations, Plaintiffs allege similar claims in each action under state consumer-protection laws, as well as for fraud, breach of contract or quasi-contract, and for "accounting." Each lawsuit seeks relief for a class consisting of customers in

- 7 -

each Plaintiff's home state.  The class definitions in Plaintiffs' Complaints largely fall into two categories:  either (1) a class of all customers in a state who were billed unauthorized charges, or (2) a class of all customers of CenturyLink in that state.

### 3. *CenturyLink's Position*

The Court will ultimately reject these class-wide claims for the simple reason that they are false.  No company-wide policy or culture existed to overbill customers.

Plaintiffs' conspiratorial theories of Wells Fargo-like systematic abuse of customers are based on widely varying, individualized billing disputes, anecdotal Internet complaints and fictitious allegations from a terminated employee.  It is neither surprising nor troubling that, for any service provider with **millions** of customers, sometimes customers will dispute whether CenturyLink handled their billing accurately and properly.  Even if inaccuracies occurred, they were not caused by intentional attempts to increase revenues, but rather by mistakes or errors on the part of either Company employees, or in many cases by the complaining customers.

Plaintiffs assert that these overcharges are not "rare" events, but instead are "systematic," supposedly demonstrated by the assertion that 1,500 customers have contacted Plaintiffs' counsel to complain that they were allegedly overcharged.  But basic math rebuts their theory of an overarching corporate scheme.  Even if these complaints are some day proven true, fifteen hundred customers constitutes less than 0.03% of CenturyLink's customer base and an even more-miniscule percentage of its overall corporate revenues.  This would hardly indicate an overarching, fraudulent corporate scheme.

The central tenet of Plaintiffs' lawsuit appears to be that CenturyLink has created a "culture" of overcharging customers by paying commissions to its sales agents. Of course, sales commissions are a standard part of many industries, and are standard fare in the communications industry. Plaintiffs perversely twist this standard business practice by calling it a "secret, intra-corporate-employee-incentive program," which they believe is even more wrongful because it was "done without the knowledge, consent, authorization, or agreement" of customers. Amended Complaint ¶ 42, *Williams v. CenturyLink, Inc.*, No. 17-4943 ("*Williams* Am. Complaint") (originally filed in S.D. Ala.). Plaintiffs thus ask this Court to adopt the unprecedented rule that paying sales commissions inherently encourages employee malfeasance, is *per se* illegal and violates consumer-protection laws. In making this argument, Plaintiffs ignore CenturyLink's long-standing, written policies and sales scripts – on which its employees are extensively trained, reviewed, graded, and even terminated for violating – that prohibit employees from adding unauthorized services or charges to customers' orders. If these actions ever reach the merits, the Court will see that no "cultural" problem exists; reports to the contrary are ill intentioned and inaccurate, and the use of sales commissions has not produced "systematic" or "widespread" overcharges.

### 4. *Jurisdictional, Procedural and Affirmative Defenses*

Apart from the lack of any factual bases, the Court should reject Plaintiffs' claims for a number of other reasons:

**<u>Lack of Personal Jurisdiction</u>.** The Court lacks personal jurisdiction over certain individual Defendants, many of which never provided any services to Plaintiffs and are

not incorporated or headquartered in Plaintiffs' home states. For example, in the *McLeod* case filed in California, no party is from California: Plaintiffs reside in Alabama and Kansas, and CenturyLink's affiliates that provided services to Plaintiffs were not located in California. Because California law is not extraterritorial, the Court lacks personal jurisdiction over the Defendants in that action.

***Lack of Standing.*** Plaintiffs raise numerous claims about alleged sales and billing issues that they did not personally experience – or they raise claims against CenturyLink affiliates from which they did not receive any services. They have no standing to assert any such claims. *Cf. In re Gen. Mills Glyphosate Litig.*, No. 16-2869, 2017 WL 2983877, at *4 (D. Minn. July 12, 2017) (plaintiffs lacked standing to allege claims about mislabeled products that they did not intend to purchase).

***Arbitration.*** Every HSI and Prism contract contains a mandatory arbitration clause, to which each Plaintiff agreed. Every customer who agreed to automatic bill-pay, or online management of his or her account, also agreed to mandatory arbitration. CenturyLink will move the Court to compel arbitration of the claims of all Plaintiffs who entered into these contracts.

***Filed Tariff Doctrine.*** For customers of CenturyLink's tariffed phone services, all rates and charges are contained in CenturyLink's filed tariffs. The law does not permit any deviation from the tariffs whatsoever, regardless of Plaintiffs' assertions of fraud, misrepresentation or oral agreement to the contrary.

***Disclosures.*** Rebutting any notions of fraud, CenturyLink provides numerous written and/or oral disclosures regarding its billing policies and its various charges.

Disclosures vary by product type, geographic location, carrier, sales channel, and over time. That information is also readily available on CenturyLink's website. Furthermore, CenturyLink's disclosures create customer-by-customer issues about whether each individual customer knew about and approved the charges of which Plaintiffs now complain.

***Voluntary Payment and Waiver.***  CenturyLink's bills – as well as its website, contracts, and other disclosures – expressly state the charges that customers paid and about which Plaintiffs now complain. Plaintiffs voluntarily paid their CenturyLink bills – often for months or years – without objecting to, or contesting, these clearly identified charges. Plaintiffs appear to suggest that it is an unfair, deceptive or even fraudulent practice to expect customers to review their bills and to notify CenturyLink of charges they dispute – sometimes calling it the "catch-us-if-you-can policy." *E.g.*, Complaint ¶ 24, *Romero v. CenturyLink, Inc.*, No. 17-2832 ("*Romero* Complaint") (filed in D. Minn.). However, in a variety of circumstances, the law requires consumers to review their bills as they receive them and decline to pay charges that they believe are illegal or improper. Customers who received and paid their bills are barred from seeking retroactive refunds.

***Accord and Satisfaction.***  Some Plaintiffs accepted credits or bill adjustments for the claims they assert, and thus are barred from asserting claims over the services at issue.

### 5. *Class Certification Issues*

Aside from the lack of merit and dispositive defenses, none of these Consumer actions presents a valid basis to certify a class.

***Improper Class Definitions.***  Plaintiffs' Complaints seek indefensibly overbroad classes.  A majority of the Complaints define the class as ***all CenturyLink customers*** in each state – without any limitation as to whether each customer had any concerns about CenturyLink's services or charges:

- "All persons in the state of Arizona who contracted with Defendants for telephone, television and/or internet service during the relevant Class Period" (Complaint ¶ 44, *Allison v. CenturyLink, Inc.*, No. 17-4613 ("*Allison* Complaint") (originally filed in D. Ariz.));

- "All persons in the state of Minnesota who contracted with Defendants for telephone, television, and/or internet service during the relevant Class Period" (*Romero* Complaint ¶ 44);

- "All persons in the state of Florida who contracted with Defendants for telephone, television, and/or internet services during the relevant Class Period" (Complaint ¶ 45, *Carrillo v. CenturyLink, Inc.*, No. 17-4617 ("*Carrillo* Complaint") (originally filed in M.D. Fla.));

- "[A]ll persons residing in New Mexico . . . who were, or are, a customer of [CenturyLink], [and] were overcharged for services by [CenturyLink]." (Complaint ¶ 19, *Lucero v. CenturyLink, Inc.*, No. 17-4945 ("*Lucero* Complaint") (originally filed in N.M. state court and removed to D.N.M.));

- "Any person or public or private entity, who contracted with Defendants for telephone, television, or internet service in the state of Iowa during the relevant Class Period" (Complaint ¶ 59, *Denniston v. CenturyLink, Inc.*, No. 17-4944 ("*Denniston* Complaint") (originally filed in S.D. Iowa));

- "All persons in the state of Alabama who contracted with Defendants for telephone, television, and/or internet service during the relevant Class Period" (*Williams* Complaint ¶ 49);

- "Any person or public or private entity, who contracted with Defendants for telephone, television, or internet service in the state of Wisconsin during

the relevant Class Period" (Amended Complaint ¶ 53, *Miller v. CenturyLink, Inc.*, No. 17-4947 ("*Miller* Am. Complaint") (originally filed in W.D. Wis.));

- "Any person or public or private entity, who contracted with Defendants for telephone, television, or internet service in the state of Minnesota during the relevant Class Period" (Complaint ¶ 47, *Kramer v. CenturyLink, Inc.*, No. 17-5001) ("*Kramer* Complaint") (filed in D. Minn.); and

- "All persons in the state of North Carolina who contracted with Defendants for telephone, television, and/or internet service during the relevant Class Period" (Complaint ¶ 43, *Clayton v. CenturyLink, Inc.*, No. 17-5046 ("*Clayton* Complaint") (originally filed in M.D.N.C.)).

These class definitions reveal that Plaintiffs have a twisted vision of these lawsuits, viewing themselves as private attorneys general who seek to use the Court process to audit of all of CenturyLink's millions of sales to find whatever sales or bills they deem problematic, for whatever reason. That, obviously, is not how Rule 23 works.

Other Complaints seek to certify classes where highly-specific, individualized evidence is necessary to even identify class members, not to mention litigate the merits of their claims. These actions seek classes of customers who:

- "discovered that CenturyLink, Inc.'s [sic] had overbilled or charged a hidden fee that CenturyLink, Inc. had previously failed to disclose" (Complaint ¶ 18, *Gonsior v. CenturyLink, Inc.*, No. 17-4619 ("*Gonsior* Complaint") (originally filed in D. Or.));

- "made a payment to CenturyLink . . . where charges were assessed that were not owed" (Complaint ¶ 25, *Lawhead v. CenturyLink, Inc.*, No. 17-4622 ("*Lawhead* Complaint") (originally filed in W.D. Wash.); Complaint ¶ 33, *Hanifen v. CenturyLink, Inc.*, No. 17-4616 ("*Hanifen* Complaint") (originally filed in D. Idaho)); or

- "who were charged for services they did not request" (Amended Complaint ¶ 13, *Chavez v. CenturyLink, Inc.*, No. 17-4615 ("*Chavez* Am. Complaint") (originally filed in D. Colo.)).

These definitions are improper because it is impossible to identify on a class-wide basis, using common evidence, which customers "discovered" any overcharges or "did not request" certain services. This is exactly the kind of customer-by-customer analysis that precludes showing commonality or predominance, and thus precludes class certification.

But even if the Court could define a class, it will end up rejecting all of Plaintiffs' motions for class certification, for numerous other reasons:

***Class-Action Waivers.*** In every HSI and Prism contract, the customer agreed to waive any right to proceed on a class-wide basis. That fact alone bars class certification.

***Individual Issues Predominate.*** Given the wide variety of potential billing disputes that Plaintiffs desire to litigate, the individualized facts of each customer overwhelm any purportedly common facts. Each customer's claim – arising from myriad different types of alleged sales and billing errors or practices – depends on a long list of unique facts known only to the consumer that would need to be part of an individualized analysis of each consumer's account records and individual interactions with CenturyLink, such as:

- The particular services the customer bought;

- The ads or written disclosures the customer saw prior to or during the transaction;

- If the sale was over the phone, the oral statements made by CenturyLink's sales agent to the customer;

- Disclosures the customer may have seen in written correspondence after the sale, such as in "Confirmation of Service" letters;

- Any oral statements between the customer and CenturyLink's service representatives in later phone calls;

- The quality of the services the customer received (if his or her claim is related to poor quality of service, such as allegedly slow HSI speeds);

- The information printed on CenturyLink's bills, identifying the specific charges the customer paid;

- The reasons the customer paid the bills, despite now allegedly having claims that the bills were improper;

- Whether the customer complained to CenturyLink and, if they did, if they agreed to receive credits or adjustments to satisfy their concerns; and

- Whether the customer complained to state agencies about their CenturyLink bills and, if they did, whether they received relief through those processes.

Without knowing all of these facts, it is impossible to know if a particular customer has a valid claim or if CenturyLink has a valid defense. It is simply not possible to litigate these types of claims on a class-wide basis.

***Non-Ascertainability and Un-Manageability.*** The Court also cannot certify any class because there is no objective way to define class membership. There is no way to tell systematically – out of the millions of customers – which customers may believe they did not authorize some of the charges on their bills. This would require mini-trials for each customer just to determine who might be a class member, contrary to the limits of Rule 23. Even if one wanted to undertake that enormous effort, it would require review of each customer's entire account record and, where possible, listening to recordings of sales or service calls. This is simply an impossibly burdensome and time-consuming proposition, both in discovery and at trial.

***Alternative Regulatory Procedures.*** Finally, state laws provide a ready and useful alternative to litigation by class action. Customers who have concerns with their bills

that cannot be resolved with CenturyLink can contact state regulatory agencies without needing to retain a lawyer.  Each month, CenturyLink handles disputes filed by its customers with these state agencies; these disputes typically lead to amicable resolutions of the claims, including bill adjustments and credits.  State governments – and the FCC – prominently describe these procedures for consumers on their websites.  These well-established, readily-available, and no-cost public processes are far superior to (highly problematic) litigation on a class-wide basis for the wide variety of sales and billing issues that Plaintiffs allege.

## II. PROCEDURAL STATUS

> ***"(b) an overview of the procedural status of all potential and actual MDL cases, including (1) the status of discovery to date, and (2) the status of motions, decisions, and other important events in the litigation, if any"***

The consumer actions are all in their infancy with no substantive motions pending or decided and no discovery started yet.  Thus, this Court has a "clean slate" and an opportunity to have all of the actions proceed on a unified schedule.

***Service of Process***.  Plaintiffs in the *Garten* (D. Nev.) and *McLeod* (C.D. Cal.) actions did not serve process before their respective 90-day deadlines.  Garten never attempted service.  Plaintiffs in *McLeod* attempted to serve process a day *after* the court in C.D. Cal. issued an Order to Show Cause re Dismissal for Lack of Prosecution because the 90-day deadline to serve the Complaint had expired.  However, their attempted service was improper and rejected by the third party on which they attempted to serve the Summons and Complaint.  The Court should dismiss these lawsuits.

***Pleadings***.  CenturyLink has not answered any Complaints.  The Parties have agreed to propose that Plaintiffs file a Consolidated Complaint by February 15, 2018, to which CenturyLink can respond with appropriate initial motions.

***Discovery***.  No discovery has begun in any action.  In the *Chavez* action (D. Colo.), the parties filed a proposed scheduling order, but the Court never entered it.

***Motions***.  No substantive motions are pending.  CenturyLink filed a Rule 12(b)(2) motion in the *Chavez* action, but Plaintiff responded by filing an Amended Complaint, thereby mooting that motion.

***Decisions and Other Important Events***.  No transferor court entered any substantive decision, and no other "important events" have occurred.

## III. RELATED STATE COURT LITIGATION

*"(c) the status of any related state-court litigation"*

No consumer class actions are pending in state court.  Two of the actions in this MDL Proceeding (*Garten*, from Nevada and *Lucero*, from New Mexico) were filed in state court, but CenturyLink removed them pursuant to the Class Action Fairness Act ("CAFA").

The State of Minnesota, through its Attorney General, filed a lawsuit against several CenturyLink companies in Minnesota state court in Anoka County.  *State of Minn. v. CenturyTel Broadband Servs., LLC*, No. 02-CV-17-3488.  The case has been assigned to Judge Douglas Meslow.  The subject matter of that lawsuit is related to this MDL Proceeding:  the State alleges that CenturyLink violated Minnesota consumer-protection laws in its sales and billing practices.  Defendants have answered the

complaint, and discovery is just starting.[4]  On November 16, 2017, the court entered a scheduling order that requires discovery to close by May 15, 2018, and scheduled trial for July 30, 2018.

## IV. PREDICTION OF NUMBER OF CASES

> *"(d) prediction of the number of cases that may become a part of this MDL and the number of related cases that may remain in state courts"*

Plaintiffs' are best able to predict the total number of Consumer actions.  Plaintiffs have represented to both CenturyLink and the Panel that eventually claims will be filed "nationwide."  CenturyLink is unclear if Plaintiffs intend to amend existing cases to assert nationwide classes (none presently do), or if they intend to file a lawsuit in all 37 states in which CenturyLink provides service.  Two federal lawsuits have been filed in one state (Minnesota), although the second suit appears duplicative of the first.  As to state-court actions, any additional Consumer actions filed in state court will likely be removed and will join this MDL.  CenturyLink cannot predict if other state attorneys general intend to file additional state actions.

We thank the Court for its attention to these matters.

Date:  December 7, 2017                    Respectfully submitted,

/s/ Douglas P. Lobel
Douglas P. Lobel (VA Bar No. 42329)
David A. Vogel (VA Bar No. 48971)
COOLEY LLP
11951 Freedom Drive

---

[4]   Like Plaintiffs, the State wrongly relies on disparate, random complaints filed over several years – representing less than 0.4% of Minnesota customers – for the illogical proposition that CenturyLink is systematically violating consumers' rights.

Reston, Virginia 20190
Tel.: (703) 456-8000
Fax: (703) 456-8100
dlobel@cooley.com
dvogel@cooley.com

Jeffrey M. Gutkin (CA Bar No. 216083)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Tel.: (415) 693-2000
Fax: (415) 693-2222
jgutkin@cooley.com

William A. McNab (MN Bar No. 320924)
David M. Aafedt (MN Bar No. 27561X)
WINTHROP & WEINSTINE
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 604-6400
Fax: (612) 604-6800
wmcnab@winthrop.com
daafedt@winthrop.com

*Attorneys for Defendants CenturyLink, Inc. and Its Subsidiaries*

154093229