```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
 2

 3      ------------------------------------------------------------
                                      )
        In re:  CenturyLink           )   File No. 17MD2795
 4      Residential Consumer Billing  )       (MJD/KMM)
        Disputes Litigation           )
 5                                     )
                                      )   Minneapolis, Minnesota
 6                                     )   December 14, 2017
                                      )   1:30 P.M.
 7                                     )
                                      )
 8                                     )
        ------------------------------------------------------------
 9

10

11

12           BEFORE THE HONORABLE JUDGE MICHAEL J. DAVIS
                   UNITED STATES DISTRICT COURT
13                      (STATUS CONFERENCE)

14

15

16

17

18

19      Court Reporter:           Kristine Mousseau, CRR-RPR
                                  300 South Fourth Street
20                                Suite 1005
                                  Minneapolis, MN 55415
21

22

23

24          Proceedings recorded by mechanical stenography;
        transcript produced by computer.
25
```

```
 1      APPEARANCES

 2      For the Plaintiffs:        Gustafson Gluek PPLC
                                   DANIEL C. HEDLUND, ESQ.
 3                                 MICHELLE LOOBY, ESQ.
                                   LING WANG, ESQ.
 4                                 120 South Sixth Street
                                   Suite 2600
 5                                 Minneapolis, MN 55402

 6                                 Geragos & Geragos
                                   LORI G. FELDMAN, ESQ.
 7                                 BENJAMIN MEISELAS, ESQ.
                                   644 South Figueroa Street
 8                                 Los Angeles, CA 90017

 9                                 OlsenDaines PC
                                   MICHAEL FULLER, ESQ. (PHONE)
10                                 111 Southwest Fifth Avenue
                                   Suite 3150
11                                 Portland, OR 97204

12                                 Gardy & Notis
                                   ORIN KURTZ, ESQ.
13                                 126 East 56th Street
                                   Tower 56
14                                 New York, NY 10022

15                                 Fernald Law Group
                                   BRANDON C. FERNALD, ESQ.
16                                 510 West Sixth Street
                                   Suite 700
17                                 Los Angeles, CA 90014

18                                 Zimmerman Reed LLP
                                   HART ROBINOVITCH, ESQ.
19                                 CAROLYN ANDERSON, ESQ.
                                   BRIAN GUDMUNDSON, ESQ.
20                                 BRYCE RIDDLE, ESQ.
                                   80 South Eighth Street
21                                 Suite 1100
                                   Minneapolis, MN 55402
22
                                   ALFRED SANCHEZ, ESQ.
23                                 400 Gold Avenue Southwest
                                   Suite 240
24                                 Albuquerque, NM 87102

25
```

```
 1    For the Plaintiffs:              O'Mara Law Group
                                       MARK M. O'MARA, ESQ.
 2                                     CHANNA LLOYD, ESQ.
                                       ALYSSA FLOOD, ESQ. (PHONE)
 3                                     22 Northeast Ivanhoe Blvd.
                                       Suite 200
 4                                     Orlando, FL 32804

 5                                     Roxanne Conlin & Associates PC
                                       ROXANNE BARTON CONLIN, ESQ.
 6                                     319 Seventh Street
                                       600 Griffin Building
 7                                     Des Moines, IA 50309

 8                                     Hellmuth & Johnson
                                       ANNE REGAN, ESQ.
 9                                     RICHARD HAGSTROM, ESQ. (PHONE)
                                       8050 West 78th Street
10                                     Minneapolis, MN 55439

11                                     Heninger Garrison Davis LLC
                                       JAMES F. McDONOUTH, III, ESQ.
12                                     3621 Vinings Slope
                                       Suite 4320
13                                     Atlanta, GA 30339

14                                     Hodge & Langley
                                       TIMOTHY LANGLEY, ESQ.
15                                     229 Magnolia Street
                                       Spartanburg, SC 29306
16
                                       Stolle Berne
17                                     KEITH S. DUBANEVICH, ESQ.
                                       209 Southwest Oak Street
18                                     Suite 500
                                       Portland, OR 97204
19
                                       Bernstein Litowitz Berger &
20                                     Grossmann LLP
                                       MICHAEL BLATCHLEY, ESQ.
21                                          (PHONE)
                                       1251 Avenue of the Americas
22                                     New York, NY 10020

23

24

25
```

```
 1    For the Defendants:          Cooley LLP
                                   DOUGLAS LOBEL, ESQ.
 2                                 DAVID A. VOGEL, ESQ.
                                   DANA MOSS, ESQ.
 3                                 JEFFREY GUTKIN, ESQ. (PHONE)
                                   11951 Freedom Drive
 4                                 Suite 1500
                                   Reston, VA 20190
 5
                                   Winthrop & Weinstine PA
 6                                 WILLIAM McNAB, ESQ.
                                   DAVID AAFEDT, ESQ.
 7                                 225 South Sixth Street
                                   Suite 3500
 8                                 Minneapolis, MN 55402

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                              1:30 P.M.

 2

 3                        (In open court.)

 4          THE COURT:  Good afternoon.  Please be seated.

 5   Let's call this matter.

 6          THE CLERK:  In Re:  CenturyLink Residential

 7   Consumer Billing Disputes Litigation, which is MDL case

 8   number 17MD2795.

 9          Counsel, please state your appearances for our

10   record.

11          MS. ANDERSON:  Good morning, Your Honor.  Carolyn

12   Anderson from Zimmerman Reed on behalf of plaintiffs.

13          THE COURT:  Good afternoon.

14          MR. O'MARA:  Good afternoon, Your Honor.  Mark

15   O'Mara from O'Mara Law Group also on behalf of the

16   plaintiffs.

17          MS. FELDMAN:  Good afternoon, Your Honor.  Lori

18   Feldman, Geragos & Geragos, on behalf of plaintiffs.

19          THE COURT:  Good afternoon.

20          MR. GUDMUNDSON:  Good afternoon, Your Honor.

21   Brian Gudmundson from Zimmerman Reed also on behalf of

22   plaintiffs.

23          THE COURT:  Good afternoon.

24          MS. REGAN:  Good afternoon.  Anne Regan from

25   Hellmuth & Johnson on behalf of plaintiffs.
```

```
 1              THE COURT:  Everyone turn on their microphones.
 2              MR. HEDLUND:  Hello, Your Honor.  Dan Hedlund,
 3     Gustafson Gluek, on behalf of plaintiffs.
 4              MS. CONLIN:  Good afternoon, Your Honor.  Roxanne
 5     Conlin from Des Moines, Iowa, on behalf of the plaintiffs.
 6              THE COURT:  Good afternoon.
 7              MR. McDONOUGH:  Good afternoon.
 8              THE COURT:  When you go back to Des Moines, say
 9     hi to Judge Pratt for me.
10              MS. CONLIN:  I will, Your Honor.  Thank you.
11              MR. McDONOUGH:  Good afternoon, Your Honor.  Jim
12     McDonough from Heninger Garrison Davis on behalf of
13     plaintiffs.
14              THE COURT:  Good afternoon.
15              MR. DUBANEVICH:  Good afternoon, Your Honor.
16     Keith Dubanevich with Stoll Berne on behalf of the State of
17     Oregon, the securities case.
18              THE COURT:  Welcome.
19              MR. DUBANEVICH:  Thank you, Your Honor.
20              MR. SANCHEZ:  Good afternoon, Your Honor.  Alfred
21     Sanchez from Albuquerque, New Mexico, on behalf of the
22     plaintiffs.
23              THE COURT:  Welcome.
24              MR. SANCHEZ:  Thank you.
25              MR. LOBEL:  Good afternoon, Your Honor.  Douglas
```

```
 1        Lobel on behalf of CenturyLink and the affiliates.

 2                   THE COURT:  Welcome.

 3                   MR. LOBEL:  Thank you.

 4                   MR. McNAB:  Good afternoon, Judge Davis.  Bill

 5        McNab, Winthrop & Weinstine, on behalf of the CenturyLink

 6        defendants.

 7                   THE COURT:  Good afternoon.

 8                   MR. VOGEL:  Good afternoon, Your Honor.  David

 9        Vogel from Cooley on behalf of defendants.

10                   THE COURT:  Good afternoon.

11                   MR. MOSS:  Good afternoon, Your Honor.  Dana Moss

12        from Cooley on behalf of the defendants.

13                   MR. AAFEDT:  Good afternoon, Your Honor.  David

14        Aafedt from Winthrop & Weinstine on behalf of defendants.

15                   THE COURT:  Good afternoon.

16                   MS. LLOYD:  Channa Lloyd at the O'Mara Law Group

17        on behalf of the plaintiffs.

18                   MR. MEISELAS:  Good afternoon, Your Honor.  Ben

19        Meiselas, M-e-i-s-e-l-a-s, Geragos & Geragos from Los

20        Angeles, on behalf of the plaintiffs.

21                   THE COURT:  Welcome.

22                   MS. LOOBY:  Good afternoon, Your Honor.  Michelle

23        Looby from Gustafson Gluek on behalf of the plaintiffs.

24                   THE COURT:  Good afternoon.

25                   MS. WANG:  Good afternoon, Your Honor.  Ling Wang
```

1    with Gustafson Gluek on behalf of the plaintiffs.

2              THE COURT:  Good afternoon.

3              MR. RIDDLE:  Good afternoon, Your Honor.  This is

4    Bryce Riddle with the law firm of Zimmerman Reed on behalf

5    of the plaintiffs.

6              THE COURT:  Good afternoon.

7              MR. ROBINOVITCH:  Good afternoon, Your Honor.

8    Hart Robinovitch, also from Zimmerman Reed, from our

9    Arizona office.

10              THE COURT:  I could tell.  He is the only one who

11    has got a tan from the Zimmerman Reed Law Firm.

12              MR. FERNALD:  Good afternoon, Your Honor.

13    Brandon Fernald from the Fernald Law Group from Nevada on

14    behalf of plaintiffs.

15              THE COURT:  Okay.

16              MR. LANGLEY:  Good afternoon.  Ryan Langley from

17    Spartanburg, North Carolina, on behalf of plaintiffs.

18              THE COURT:  Welcome to the north.

19              MR. LANGLEY:  Thank you.

20              THE COURT:  The winning side.

21              MR. KURTZ:  Good afternoon, Your Honor.  Orin

22    Kurtz for the plaintiffs from the law firm of Gardy & Notis

23    in New York.

24              THE COURT:  Welcome.  All right.  Let's proceed.

25              Who is going to take the lead here?

 1          MS. ANDERSON:  Your Honor, Carolyn Anderson again

 2     from Zimmerman Reed on behalf of plaintiffs.  First of all,

 3     we just want to thank the Court.  We are pleased to be able

 4     to be here to do the initial hearing for this important

 5     case.  We had originally decided to -- we wanted to make

 6     sure the Court was introduced to those in the plaintiffs'

 7     group that had leadership roles, but we were able to do

 8     that.

 9          So we wanted to first look at some of the issues

10     that the Court invited in the PTO, looking at the

11     leadership structure and the Case Management Order, and so

12     we have decided that among some of our counsel to be able

13     to address some of those issues that we expected the Court

14     would want to hear on and then possibly respond to some of

15     the Court's questions or agenda items that we might not

16     have prepared for.

17          I am going to be asking Lori Feldman from

18     Geragos & Geragos to be able to speak about the background

19     of the case, some of those issues that are pertinent to

20     this status conference and then the leadership structure,

21     and we will also take into account some of the discussion

22     we have had with the Court already.

23          Brian Gudmundson from my firm would be speaking

24     about the CMO and discussing issues around that and

25     informal exchange of information that we are working out

1    with defendants on that and giving the Court an update on

2    some of the efforts that have been engaged in already with

3    the parties.

4         And then finally, Mr. O'Mara will be looking at

5    highlighting issues for discussion that, you know,

6    occasions that we believe the Court would be interested in,

7    as well as talking about some of the coordination and

8    scheduling.

9         So with that, Lori Feldman will start on the

10   background of the case.  Thank you.

11        THE COURT:  You may begin.

12        MS. FELDMAN:  Good afternoon, Your Honor.  Lori

13   Feldman from the Geragos firm.  The first complaint filed

14   in this MDL was filed in June of 2017 by the Geragos firm.

15   Law firms across the country then began being contacted by

16   CenturyLink customers who experienced similar losses and

17   struggles by the same deceptive conduct as alleged in the

18   Geragos complaint.

19        Our firm alone was contacted by more than a

20   thousand CenturyLink customers.  This is quite striking.

21   Many of us have been in this practice for more than 20

22   years.  We began coordinating with counsel from across the

23   country.  First, in the various cases, we were coordinating

24   with various counsel, and we heard people telling us

25   stories.

1          It's important to note.  The cases were initiated

2     by virtue of a former CenturyLink employee who is a

3     whistleblower.  She, and her name is Heidi Hozler, and her

4     complaint was attached to the initial complaints, told her

5     story, and her story was ratified by several other stories

6     that we had been told by other whistleblowers.  You will

7     see some of these stories in our consolidated complaint.

8          In addition, the case has gotten national

9     interest by other attorneys general, but in particular by

10    Attorney General Lori Swanson here in this great state of

11    Minnesota.  Here, she was able to obtain an injunction by

12    CenturyLink, an agreement by CenturyLink with respect to

13    eliminating certain of the deceptive conduct that we're

14    alleging.

15         Again, the conduct that we are hearing concerns

16    repetitive consistent patterns of improper deceptive

17    practices, and the company itself had set up its own

18    internal investigation of the practices.  Now, you will

19    hear two sides of the story, and I believe you already

20    have, Your Honor, heard two different sides of the story.

21         Defendants in their papers, they have indicated

22    that the thousands of consumers who have contacted us and

23    the representatives who have stepped forward are really

24    just an aberration, that it's a minuscule portion of the

25    customer base.

1        But for the attorneys that were fielding these

2    calls, we see something different, and we see something

3    deeply disturbing and striking.  So it's going to be for

4    discovery to show whether the defendants' arguments that

5    their overcharges and mischarges were not widespread or

6    systemic or whether our story, which we believe is deeply

7    compelling, are accurate, whether the AGs' allegations

8    which defendants consented to on an injunction are accurate

9    or whether these whistleblowers and the consumers stepping

10   forward who are exposing these allegations about what was

11   really going on were accurate.

12        These form the core allegations of our case, and

13   we are looking forward to litigating those allegations

14   expeditiously, efficiently and aggressively.  We have

15   before us, Your Honor, a lease structure which we discussed

16   a few minutes ago.  We understand that Your Honor --

17        THE COURT:  Excuse me.  We forgot to identify the

18   people that are on the phone.

19        THE CLERK:  That's true.  Sorry about that.

20   Those on the phone, if you don't mind announcing your name

21   and the firm you're from.

22        MR. FULLER:  Michael Fuller from OlsenDaines for

23   plaintiffs.

24        MR. WALSH:  Bonner Walsh, Walsh PLLC, for

25   plaintiffs.

1       MR. GUTKIN:  Jeff Gutkin from the Cooley firm for

2    defendants.

3       MR. BLATCHLEY:  Mike Blatchley of the firm of

4    Bernstein Litowitz Berger & Grossmann on behalf of the

5    State of Oregon and lead plaintiff in the CenturyLink

6    securities class action.

7       MR. HAGSTROM:  Richard Hagstrom, Hellmuth &

8    Johnson, for plaintiffs.

9       THE COURT:  Welcome.  I apologize for not calling

10   you earlier.

11       Proceed.

12       MS. FLOOD:  I'm sorry.  This is Alyssa Flood from

13   the O'Mara Law Group for the plaintiff.

14       THE COURT:  Welcome.

15       MR. O'MARA:  If I may interrupt, an instruction

16   to the people on the phone to mute their calls will avoid

17   the almost unavoidable interruption when something like

18   that does happen, Your Honor.

19       THE COURT:  Please mute your phones.  Thank you.

20       MS. FELDMAN:  Our proposed leadership structure

21   is cohesive.  We have been meeting regularly for months.

22   It's collaborative.  We have been dividing our work into

23   meaningful projects.  It's filled with experienced lawyers.

24   We have been in this business for many years, I myself for

25   more than, I hate to say, 25 years, and we know what to do

1      in these kind of cases.

2              We have been in MDLs before.  We will do it again

3      here, again efficiently, hopefully effectively.  We will

4      make sure that time reports are collected monthly, and we

5      will do our best to, without overlap, work this case in

6      such a way to bring about a successful resolution.

7              We respectfully submit that we believe that our

8      leadership slate is appropriate with respect to the

9      modification that Your Honor would like, when a particular

10     firm for which to have a voice.  That will be proposed.

11     With that modification, we ask that the Court approve that

12     particular leadership structure, and thank you, Your Honor.

13             THE COURT:  Thank you.  Let me tell the people

14     that are on the telephone, we had a conference prior to

15     coming into court and just introducing myself to lead

16     counsel for both sides, plaintiffs and defendant.  The one

17     aspect of the structure of the leadership for the

18     plaintiffs, there is three proposed co-counsel.

19             That's agreeable to me, but there has to be one

20     that is more equal than the other two that the Court will

21     be dealing with as lead counsel and will have the most

22     communication with dealing with for the plaintiffs' side.

23     So I just wanted people to understand that.

24             You may proceed.

25             MR. GUDMUNDSON:  Thank you, Your Honor.  Brian

1    Gudmundson from Zimmerman Reed, and I'm just going to make

2    a few remarks about the case management order that the

3    parties submitted.  As you may have been able to determine

4    from the submission, the parties did meet and confer on

5    that quite successfully and came to an agreement that came

6    before Your Honor.

7            In the chambers conference you just referenced,

8    the Court didn't express any concerns as of yet with that

9    yet, but we remain open to discuss any concerns that may

10   pop up.  A couple of things of note:  We do have some time,

11   as you'll note, between now and when the consolidated

12   complaint is proposed to be filed, 60 days, approximately

13   60 days from now on February 15th, followed by a status

14   conference in March.

15           I believe it was raised with Your Honor in

16   chambers that there is going to be some preliminary things

17   going on during that time so that we're not, we're making

18   good use of our time and that some issues may pop up.  I

19   wanted to highlight just a couple of those.

20           I know we referenced EESI, and one of the other

21   we referenced was the preliminary exchange of some informal

22   discovery to get some information moving.  One of the

23   things that has been requested of the plaintiffs by the

24   defendants is the account numbers, and on its face that's a

25   very reasonable request, and it would be hard, I would be

1    hard pressed to come up with an argument as to why we

2    shouldn't turn over our account numbers so that we may be

3    identified.

4          But the matter is a little bit more complicated

5    than that, Your Honor, and one of the things that we intend

6    to raise with defendants, as we have let them know and I'm

7    letting you know now, is that we would like all the

8    information they have about the plaintiffs as well because

9    among these allegations that we make and that the attorneys

10   general make are duplicate accounts, accounts that people

11   may not even know about and accounts that may have been

12   used to create billings that were unauthorized and that

13   were in fact billed and attempted to be collected on.

14         So we will be requesting the full files for each

15   of the plaintiffs who have been on file so far, including

16   any contracts that the defendants assert should be applied

17   to them that they argue the plaintiffs have agreed to, the

18   invoices and any communications with customer service, and

19   those are just a few things.

20         I'm sure there is more in the file than that.

21   One of the other things that we intend to ask of the

22   defendants is to turn over the documents that were produced

23   to the government in any of the governmental actions, and

24   that's something we have not produced to them yet, and I'm

25   sure they will have a fulsome response to that when we do.

1        So without any questions from the Court about the

2   CMO or anything, I will take my seat and allow Mark O'Mara

3   to address some other issues right now.

4        THE COURT:  Thank you.

5        MR. O'MARA:  A couple of issues to address, one

6   of which we had --

7        THE COURT:  Announce yourself so the people on

8   the phone know who is speaking.

9        MR. O'MARA:  Yes, Your Honor.  Mark O'Mara from

10   the O'Mara Law Group out of Orlando, Florida.  Good

11   afternoon.  One of the issues that we addressed with the

12   JPML was our concern over what seemed to be a particularly

13   pointed way of naming the MDL.  It's not particularly

14   relevant to almost anybody outside this courtroom, but it

15   does suggest that this is limited to residential.

16        The panel suggested that that be deferred, I

17   believe, to this Court and may even need to be deferred

18   further until a decision is made by the panel or by this

19   Court as to whether or not the securities cases will become

20   part of this MDL.

21        In either case, I'm going to avoid an overuse of

22   adjectives.  I think the pleadings today, particularly

23   defense pleadings, were replete with adjectives that didn't

24   really help move the case forward, but if we call this

25   simply the CenturyLink Billing Practices MDL if the

1    securities cases doesn't come, it does exactly that.  We

2    have known from our research and from contacts that about

3    10 percent or thereabouts of the cases are business cases.

4            We know, for example from CL's, CenturyLink's own

5    website, that they acknowledge they make about 60, 65

6    percent of their revenue from the business side as opposed

7    to the residential side.  So I believe as we go further

8    into this, we're going to find more and more business

9    clientele.

10           I just don't think there is any reason to suggest

11   that it is residential when it seems not to be.  I would

12   suggest that if it does, if this Court or the panel brings

13   the securities cases here, we just add those couple of

14   words, that it would then be the CenturyLink Billing

15   Practices and Securities MDL.  Again, it doesn't matter

16   much.

17           I just don't think that the initial suggestion

18   that it's residential would be necessary.

19           THE COURT:  Well, my understanding is that the

20   securities cases are before the panel in January, is that

21   correct?

22           MR. O'MARA:  Yes, Your Honor.

23           MR. LOBEL:  Your Honor, January 25th, I believe.

24           THE COURT:  Right.  And so until they arrive, I'm

25   not going to be worried about them.

1          MR. O'MARA:  Agreed.

2          THE COURT:  All right?

3          MR. O'MARA:  And I think it would be premature --

4          THE COURT:  I'm assuming that they're going to

5     show up here.

6          MR. O'MARA:  With that presumption, perhaps the

7     Court would consider once that is a final decision by the

8     panel that we consider this CenturyLink Billing Practices

9     and Securities Litigation MDL, our suggestion, and maybe

10    the defense can respond so that you at least have the

11    arguments before you.

12          There is also a question as to whether or not the

13    size of this, I think at least four times, but I may be

14    exaggerating by one, the term "minuscule" was used by the

15    defense in their pleadings before this Court, suggesting

16    that if we only have 2,000 clients to date, and they have

17    over 5.9 customers, that when you do the numbers, this is

18    minuscule.

19          To respond to this:  One, I don't believe that

20    any of those clients and customers believe that their loss

21    of money over a several year period is minuscule to their

22    pocketbook, but more importantly for your purposes, we just

23    don't know the numbers yet.  We do know that we have not

24    done any type of reach-out.  There has only been real

25    reach-in.

1          I do take issue with the suggestion that we are

2     headline grabbing.  I don't know why that's a relevant

3     consideration to the Court or why it showed up in the

4     pleadings.  Rest assured we're not going to be doing that,

5     just as we're not going to be illogical, another adjective

6     that was used, and we're not going to perversely twist

7     anything.

8          We are going to move forward and find out how

9     many of these cases are actually out there.  We're going to

10    do that as best we can staying within the confines that we

11    need to, and hopefully we will continue to work forward

12    with the defense and try and identify those because if we

13    are actually going to move this case forward, we truly do

14    need to identify how this happened.

15         My quick analogy, if I might.  If this was a

16    casino, we're trying to figure out what happened.  What we

17    can tell so far is the casino managers, CL, took it on to

18    have a system set up because we know, and I'm interested in

19    the defense response, we know that there were, because of

20    some collaboration and some mergers and whatnot, numerous

21    different billing platforms that are out there.

22         So if, in fact, you're playing what you believe

23    to be poker or blackjack with somebody, and across the

24    table comes the first card, and it's a jack, it might make

25    sense.  In this, the recipient are the customers.  However,

1    the next card is something out of Uno or the next card is

2    something like Park Place from Monopoly, and it doesn't

3    really make a lot of sense to the customer because they're

4    getting inundated with a bunch of different services

5    provided solely by the defense, CL, and their seemingly

6    inconsistent billing practice platforms.

7           That's what we're going to need to try and find

8    out and try and coordinate.  It is our position that it

9    wasn't happenstance.  It wasn't just one software not

10   talking to another because of a merger, that it goes up the

11   list, and we know that because of some of the

12   whistleblowers.  We know that because of these type of

13   activities we're having nationwide.

14          That is really going to be the focus of this

15   case, and that's sort of the context that we intend to stay

16   focused on because after all, once that hand is dealt and

17   the customers are trying to figure out what they have

18   purchased, it then goes to the billing, and it's at the

19   billing that the real problems exist.

20          And that's where we look into trying to get the

21   discovery we're going to be focused on is the customer

22   contact with CL, what they said, how they responded or

23   failed to respond, and what they did in response to what

24   were legitimate problems.

25          We know very recently their own, suggested to be

1    their independent own funded survey suggested problems

2    there.  That's what we're going to have to focus on.

3    Terabytes of information have already been identified by

4    the defense.  It's going to take a lot.  One issue this

5    Court is going to have to deal with, and I am sure we will

6    hear from the defense on this, there are potentially

7    arbitration clauses existing in these contracts.

8            If we are going to get to that point, for

9    example, the defense has suggested, as Mr. Gudmundson said,

10   we need to get the account numbers so we know who we're

11   talking about.  Legitimate and makes sense.  We need the

12   contracts.  We need to know what arbitration costs because

13   we know that there will be a few different categories.

14           One, there will be people who we allege very

15   simply do not have contracts, period.  Secondly, we presume

16   that there is going to be individual or different

17   categories of contracts that were begun by CL.  I give you

18   an example of a real concern that we have.  After this MDL

19   was identified by the panel, our clients received

20   communication from CenturyLink.

21           They are allowed to do that, but they are only

22   allowed to do it with certain conditions.  All they sent

23   out was a new arbitration clause and with an opt-in

24   provision that if you don't opt out within 30 days, you're

25   in.  Seemingly, that suggests that they acknowledged

 1   problems with previously existing arbitration clauses.

 2            We will get into that.  Today is not a closing

 3   argument day, but these are issues that we're going to have

 4   to look at.  If we're going to work together on trying to

 5   get some of this massive discovery done, let's not forget

 6   that CL has all of the discovery in this case.  Very few of

 7   the clients, like everybody else, keeps copies of bills

 8   going back months or years and keeps contracts.

 9            We'll get into the issue of whether or not the

10   arbitration clause is valid.  We're not going to -- we

11   understand that valid arbitration clauses are valid.  We

12   just contend that these arbitration clauses and how you

13   cannot find them when you try to find them should not be

14   enforced.  That's going to be a primary issue for this

15   Court to consider through motion practice and requests for

16   coming to arbitration.

17            Those are some of the primary issues that we sort

18   of need to get to.  We have already talked about the

19   coordination of the different cases, the state cases.  We

20   will talk amongst ourselves regarding leadership, to get

21   that figured out for the Court probably before the day is

22   up and also who we are going to use to liaise with some of

23   these other cases that we know are going to come up and

24   come out there.

25            That is my presentation.  I don't know if any of

24

1    that raised concerns or questions that the Court would like

2    answered.  Thank you very much for your time.

3              THE COURT:  No.  Thank you.

4              MS. ANDERSON:  One more minute, Your Honor.

5    Carolyn Anderson, again.  I just wanted to close the

6    plaintiffs' presentation with the fact, we believe there

7    are important issues that have been alleged in this case.

8    We believe there is going to be some very compelling and

9    interesting legal arguments being brought before the Court,

10   and there is also a variety of corollary actions.

11             We have got the securities cases with some of the

12   securities counsel sitting here today and on the phone, I

13   believe, with the attorneys general cases and also with

14   subsequent state court cases that might initiate.  As a

15   group, we're committed to keeping open channels of

16   communications with all those actions, and we also commit

17   to the Court, we have had prior experience with many of the

18   counsel representing CenturyLink here.

19             We have had very positive and professional

20   relationships, and we're committed to that, and we're all

21   very thankful that the Court has been appointed in this

22   case, and we very much look forward to pursuing this case

23   before this Court.  Thank you.

24             THE COURT:  Thank you.

25             Good afternoon.

1          MR. LOBEL:  Good afternoon again, Your Honor.

2     Douglas Lobel on behalf of CenturyLink and its affiliates.

3          THE COURT:  Welcome.

4          MR. LOBEL:  Thank you.  It's clear from the

5     presentations that the plaintiffs feel very passionate

6     about their case and the allegations in their complaints,

7     and I can assure you we feel equally passionate about the

8     lack of validity of the allegations and also the defense in

9     this case, and this case will be hard fought, and there are

10    those defenses, and those will play out at the appropriate

11    time.

12         Let me just start addressing some of the comments

13    that Ms. Feldman made about the nature of the cases.  I

14    know the Court is very familiar with consumer protection

15    and deceptive practices cases, and these allegations in

16    these complaints, those so far, and we know we're going to

17    see many additional allegations that will evolve in the

18    consolidated complaint, are not the typical kinds of

19    allegations that you see in those kinds of cases, at least

20    in my experience, perhaps the Court's experience, because

21    here, in order to justify the class-wide litigation that

22    they are advocating, they're advancing an entirely false

23    premise.

24         And that is that CenturyLink engaged in a *Wells*

25    *Fargo*-like, and that's the name I think everybody

 1    understands, business model, that CenturyLink's business

 2    model was a fraudulent business model, that it was

 3    management driven to systematically bilk its customers out

 4    of money.  That's a rather extreme allegation.  It's far

 5    more than you often see, but that is what they are

 6    maintaining.

 7          It's complete fiction.  If we ever get to

 8    discovery, and there is many reasons we shouldn't, they

 9    will never be able to prove that, but that's what they have

10    alleged.  The claims in this case are anything but common

11    and typical or systematic.  They are not systematic in the

12    least, Your Honor.  In fact, there is no consistent theme

13    to the claims in the existing complaints.

14          There is not going to be a consistent theme to

15    the claims in the amended complaint.  Really, they fall

16    under the guise of customers with complaints about

17    CenturyLink.  That's about the only unifying theme that you

18    see coming out of these complaints.  For example, and these

19    come right out of the 21 accounts that are at issue in the

20    complaints in this MDL.

21          One customer alleged that he or she was charged a

22    monthly modem fee even though he or she had returned his

23    modem.  A second customer alleged that he or she was

24    promised to be billed at the end of the month but instead

25    was billed at the beginning of the month.  A third customer

1     alleged that his Internet speed was slower than he was

2     promised.

3            These are not uniform.  These are not common.

4     These are not systematic.  These disputes run the gamut of

5     every sales and billing issue you could have in a consumer

6     company with a -- for consumers.  Now, what the plaintiffs

7     have done is, they have aggregated all these disparate

8     claims running the gamut of every billing and sales issue,

9     all of which are based on individual communications and

10    individual circumstances.

11           And they have aggregated them into one lawsuit,

12    and the glue that we have used to keep those together to

13    salvage the class allegations that they have made here are

14    these *Wells Fargo*-like allegations, that there was common

15    conduct that affected all customers, and if we ever get

16    there, Your Honor is going to see that there is no

17    company-wide common conduct.

18           No one is saying that there weren't errors made,

19    that people didn't have billing problems that we have all

20    experienced as consumers in our lives, but there is no

21    common company-wide conduct here, and Mr. O'Mara just

22    referred to the independent funded survey that verified

23    that.

24           Well, Your Honor, it's a little bit different

25    than that.  The national law firm of O'Melveny & Myers,

1    highly respected law firm, was engaged by the company to do

2    an internal investigation, an independent investigation.

3    It came in.  It spent six months crawling over the records

4    of the company, interviewing people at the company, looking

5    at or considering at least almost ten million documents.

6         And they issued a public statement recently

7    indicating that there is no, they found no evidence of

8    fraud or wrongdoing in the company after six months of

9    full-time work and consideration of almost 10 million

10   documents and almost 200 interviews.

11        So there is a different story here, and that

12   story will come out at the appropriate time, but needless

13   to say, we believe that the hurdles that the plaintiffs are

14   going to have to sustain and overcome to ever make this

15   into a certifiable class action are vast, and it's not a

16   closing argument, as Mr. O'Mara said, but we will address

17   that at the appropriate time.

18        Now, the other theme that came out to me from the

19   plaintiffs' presentations is, they want to get right to

20   discovery.  They wanted the discovery to happen three weeks

21   ago.  They wish discovery was completed here, but lawsuits

22   don't start with discovery, Your Honor.  They start in an

23   orderly way, and they proceed in the order that the federal

24   rules have essentially laid out.

25        There are many, many deficiencies and problems

1    with these complaints.  There are many motions that need to

2    be addressed by Your Honor before, in our view, it's

3    appropriate to get to discovery.

4           There are problems of personal jurisdiction with

5    many of the defendant companies.  There are problems that

6    many of the defendant companies do not offer the services

7    that the plaintiffs allege are at issue here.  For example,

8    almost every complaint sues a company, and I can't recall

9    the exact wording, CenturyLink Communications or something

10   of that nature.  That is a company that offers prison pay

11   phone services.

12          To my knowledge, having read all the complaints,

13   there are no prisoner plaintiffs in this case that have

14   alleged that CenturyLink inappropriately billed them for

15   pay phone services in prisons.  It's just the wrong

16   defendant.  They don't offer those services.  They're

17   improperly in the case.

18          Every lawsuit sues CenturyLink, Inc.

19   CenturyLink, Inc., is a parent holding company.  It's a

20   public company that issues stock in the New York Stock

21   Exchange.  It does not have any employees.  It does not

22   offer any services.  It's inappropriately named.  We are

23   going to need to address those issues, Your Honor.

24          There are issues of standing that we're going to

25   need to address.  The plaintiffs seem to think that they

1      can take one consumer who had CenturyLink high speed

2      Internet service and perhaps had a problem with it, and

3      they can then be representative of a class of consumers who

4      allege that their Prism TV service was improperly billed,

5      or someone who was a customer of Embarq of Missouri Company

6      and that they can represent individuals who were a customer

7      of a Quest service in Colorado who alleges that they were

8      misbilled.

9              In other words, they are putting up as

10     representatives individuals who do not provide services for

11     certain companies, do not use certain services and hoping

12     that they can then aggregate those and represent all these

13     members in the class, and that's not the way it works, Your

14     Honor.

15             So individuals who had Embarq of Missouri service

16     may represent others who had that service but not people

17     that had Quest service in Colorado.  That's going to need

18     to be addressed, Your Honor.  Then really the elephant in

19     the room I think is the issue of arbitration.  It's not a

20     small issue.  It's a very large issue.

21             And I think it's going to dominate the beginning

22     of this litigation, Your Honor, because it's not uncommon

23     for consumer companies to have arbitration clauses, and

24     another thing that wasn't mentioned, class action waiver

25     clauses in their customer contracts.  Virtually all of the

1    customers that are in the putative classes had contracts

2    that contained those provisions.

3          We have a lot more discussion to do with the

4    plaintiffs about the issue of informal discovery and how we

5    proceed, but in my view, if we've got arbitration clauses

6    for the vast majority of these customers that are

7    enforceable, that are on the basis of U. S. Supreme Court

8    case law enforceable, and they will not be part of this

9    proceeding, then there is a question about whether we

10   should be providing informal discovery to the plaintiffs at

11   this point of all the records related to those customers

12   who may never be in this lawsuit and who may never even

13   file an arbitration if they're compelled to arbitration.

14         So, again, it's not as simple as the plaintiffs

15   make it seem.  We're not going to rush into discovery and

16   produce ten million documents to them.  I don't believe

17   that's the way anyone should proceed here.  I think we need

18   to take it step by step and file the appropriate Rule 12

19   motions, file the appropriate motions to compel, file

20   motions based on the voluntary payment doctrine and waiver

21   in which some of these customers may have received these

22   services for one to three years, received a bill in the

23   mail or on the Internet, paid their bill voluntarily and

24   are now seeking to come back and make claims for those

25   charges that they voluntarily paid with knowledge.

1          There is further issues.  There is people that

2     called up and complained about a problem with their bill

3     and received a credit, and essentially we've got an accord

4     and satisfaction situation.  Why should those people be a

5     member of the class?  Why should they now be able to come

6     in and sue to recover for moneys where they received a

7     credit and they agreed that that resolved their claim?

8          That's another issue that we're going to put

9     before the Court that the Court is going to have to

10    resolve.  So much more complicated.  Much more

11    deliberation.  Careful thought needs to be put into the

12    issue of informal discovery and then the discovery plan.

13         Now, I will say we are 100 percent committed to

14    working consensually with the plaintiffs and to doing

15    things that are most efficient and save the Court the need

16    to direct the parties or issue orders, assuming that

17    doesn't require us to sacrifice any of our rights or waive

18    any of our rights, and we're fully committed to doing that,

19    and we will do that.

20         Your Honor, a few other points with respect to

21    the name of the proceeding.  I agree with Mr. O'Mara on one

22    thing that I think it's only important to those of us in

23    the courtroom, but I do think it's appropriate to wait

24    until we see what the MDL panel does with the securities

25    cases until we address that issue.

1          I don't think we should be jumping ahead either

2     on that issue or on the discovery issue or any other issue.

3     I think we should be sensible and take things as are

4     appropriate, and, Your Honor, I don't think I have any

5     other points to make or to address, but I'm happy to answer

6     any questions the Court may have.

7          THE COURT:  Well, you just made this a big black

8     hole.  Everything is going to stop, and we're going to go

9     real slow.  Well, I'm telling everyone now, we're not going

10    to go real slow.  We're going to do it properly, and so you

11    start talking about informal discovery and start getting

12    that moving.

13         Let's not draw the line.  You're drawing the line

14    before we even get started, and if that's going to be the

15    way you're going to litigate, okay, I can deal with that.

16    I have been a judge for 34 years.  We can handle that.  So

17    but if we're going to talk about moving this MDL along and

18    handling it in an efficient fashion, you should start

19    talking about discovery.

20         MR. LOBEL:  Your Honor, and I wasn't suggesting

21    that we would not.  Certainly intend to do so.  There was

22    very little mentioned in the plaintiffs' presentations

23    about the procedural issues under Rule 12 that come early

24    in the case.

25         THE COURT:  Of course.

1          MR. LOBEL:  And I just thought it was important

2     for the Court to hear that, and of course it's always the

3     case in these consumer cases that discovery is very

4     one-sided, as it should be because we've got the records,

5     and the consumers of course have a bill maybe, and so there

6     is certainly --

7          THE COURT:  And the vast majority of your billing

8     is probably electronic anyway now, so that's why I'm

9     talking about it.  Let's -- you can sit down informally

10    start working on these issues, so CenturyLink can do it in

11    an orderly fashion, and the plaintiffs can get the

12    appropriate discovery so we can move forward.

13         MR. LOBEL:  Yes, Your Honor.  Let me just mention

14    one other thing which I think the plaintiffs have alluded

15    to, and I think it's just important for everyone to know a

16    little bit about the history of the way the company came

17    about because it very much affects the availability of

18    information and the accessibility of information.

19         This was a company that essentially cobbled

20    together from many, many acquisitions over many years.

21    Your Honor may be familiar with it.

22         THE COURT:  Sure.

23         MR. LOBEL:  Started out as CenturyTel, 70 rural

24    small phone companies.  Then they added Embarq, which was

25    mid sized phone companies, about a dozen or so.  Then they

1    added the regional Bell companies, the U. S. West, to the

2    conglomeration, which was Quest, and so now there is 80 or

3    so local phone companies in 37 states.

4            And it happens to be the case that these systems

5    have, in many cases, are not combined, and so those of us

6    that have worked for the company for many years have been

7    surprised at times to see how difficult it is to retrieve

8    information because there is not a push of a button, as one

9    might think there is.

10           So I just say that, and we will have many

11   discussions with the plaintiffs about that.  Things are not

12   necessarily as easy as they seem to retrieve.  I'm not

13   saying we are not going to do that.  We will do that, but

14   at times, more time is required than people would expect.

15           THE COURT:  Nothing different than the vast

16   majority of the business models that I see so --

17           MR. LOBEL:  Yes.

18           THE COURT:  -- you will start working on it.

19           MR. LOBEL:  We will, Your Honor.

20           THE COURT:  All right.

21           MR. LOBEL:  Thank you.

22           THE COURT:  Anything else?

23           MR. DUBANEVICH:  Your Honor, if I may.

24           THE COURT:  You may.

25           MR. DUBANEVICH:  My name is Keith Dubanevich.

1    I'm with the Stolle Berne Firm.  I'm here on behalf of the

2    lead plaintiff in the securities cases, the State of

3    Oregon.  By way of background, this case was transferred on

4    October 5.  The securities case was transferred on October

5    6.  About 14 days later, the State of Oregon was designated

6    to be the lead plaintiff in the securities cases.

7            Unfortunately, I find myself as a bit of a man

8    without a country presently.  We're very happy here in

9    Minnesota.  We think it's a great forum, and given that the

10   facts of the securities case are closely intertwined with

11   the fraudulent and misleading billing practices case, it's

12   a perfect forum for us to have all of the issues in front

13   of one judge.  We therefore are happy being here.

14           CenturyLink has asked the JPML to change its mind

15   and not send the securities case here.  So we're waiting to

16   determine where that -- our case is going to end up.  At

17   the same time, a competing movant for lead plaintiff in the

18   securities cases has challenged the magistrate judge's

19   decision to appoint the State of Oregon.

20           That matter is fully briefed and is pending

21   before Judge Hicks in the Eastern District of Louisiana.

22   So at this point, I'm not sure I'm still going to be in

23   this case, but if I am in the case, I'm not sure if I'm

24   going to be here in Minnesota or in Louisiana.  So at this

25   point, it's premature for us to even engage in discussions

```
 1        about a scheduling order.

 2               While we actually have had discussions about

 3        that, I think we need to get rulings on those two other

 4        motions first, and then we can decide who is going to

 5        proceed forward and in what jurisdiction.

 6               THE COURT:  Oh, you're going to love Minnesota.

 7               MR. DUBANEVICH:  I do.  I do, Your Honor.

 8               THE COURT:  I don't see -- well, we're trying to

 9        be as efficient as possible.  My understanding, rumor has

10        it, at least, everybody wanted -- at least one side wanted

11        to be down in the Eastern District of Louisiana, and now

12        that it's in Minnesota, some part of it doesn't want to be

13        in Minnesota, but I think it's going to be in Minnesota.

14               So I will see you soon.

15               MR. DUBANEVICH:  Great.  Thank you, Judge.

16               THE COURT:  All right.  Anything else?

17               And plaintiffs are going to get a new format to

18        me dealing with the, dealing with the order of --

19               MS. ANDERSON:  Leadership.

20               THE COURT:  -- of the leadership.

21               MS. ANDERSON:  Yes, Your Honor.

22               THE COURT:  So how soon will you get that to me?

23        How much time do you need?

24               MS. ANDERSON:  We should be able to have that to

25        you tomorrow.
```

1          THE COURT:  Okay.  Well, tomorrow is Friday.

2          MS. ANDERSON:  We will do it Monday.

3          THE COURT:  Next Wednesday.  It's the holiday

4    season.  So I will give you to next Wednesday to get

5    something to me.

6          MS. ANDERSON:  Great.

7          THE COURT:  All right.  Anything else for the

8    defense?

9          MR. LOBEL:  No, Your Honor.

10         THE COURT:  All right.  Welcome.  It's -- I'm

11   glad you're here, and I think we'll be able to handle this

12   litigation in a fair and efficient manner.  I have been

13   speaking at MDL conferences, and I know the lawyers don't

14   like to come into MDLs because it becomes a black hole, and

15   I try not to have my MDLs become a black hole, but

16   sometimes they do last a long time.

17         But I think we can move this one along, and I

18   appreciate the efforts for both sides of meeting informally

19   and solving some of these problems.  I hope you hear me

20   dealing with the discovery.  Let's not draw the line in the

21   sand, so I don't have to hear a number of motions dealing

22   with the discovery issues that should have easily been

23   agreed to without the judge's ruling.

24         All right?  If there is nothing else, I've got to

25   go back to my trial.  So safe travels, everyone, that is

1      leaving, and I'll see you in March, if not before.

2              MS. ANDERSON:  Thank you.

3                      *        *          *

4              I, Kristine Mousseau, certify that the foregoing

5      is a correct transcript from the record of proceedings in

6      the above-entitled matter.

7

8

9

10     Certified by:  s/  Kristine Mousseau, CRR-RPR
                          Kristine Mousseau, CRR-RPR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25