**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| | CONSOLIDATED CLASS ACTION COMPLAINT |
| This Document Relates to ALL ACTIONS | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................. 1

II. PARTIES ......................................................................................................................... 3

  A.  DEFENDANT .............................................................................................................. 3

  B.  PLAINTIFFS ............................................................................................................... 7

III. JURISDICTION AND VENUE ........................................................................................ 10

IV. FACTUAL BACKGROUND COMMON TO ALL CLAIMS .................................................. 11

  A.  Federal Regulators ................................................................................................. 23

  B.  State Attorneys General Investigations and Related Consent Decrees ................... 24

V. PLAINTIFFS' EXPERIENCES WITH CENTURYLINK .......................................................... 27

VI. CLASS ALLEGATIONS ................................................................................................... 69

VII. CLAIMS FOR RELIEF .................................................................................................... 76

        COUNT I
        VIOLATIONS OF 47 U.S.C. §§ 201, *et seq.* and 47 C.F.R. § 64.2401 ............................ 76

        COUNT II
        BREACH OF CONTRACT .............................................................................................. 79

        COUNT III
        BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING ............................................ 81

        COUNT IV
        VIOLATION OF STATE CONSUMER PROTECTION STATUTES ...................................... 82

        COUNT V
        VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION
        LAW, LA. REV. STAT. ANN. §§ 51-1401-1430 ("LUTPA") ........................................... 90

        COUNT VI
        NEGLIGENT MISREPRESENTATION ............................................................................. 95

        COUNT VII
        FRAUDULENT INDUCEMENT ..................................................................................... 97

        COUNT VIII
        UNJUST ENRICHMENT .............................................................................................. 98

VIII. PRAYER FOR RELIEF ................................................................................................. 100

i

Plaintiffs bring this action on behalf of themselves and all others similarly situated, and file this Consolidated Class Action Complaint against CenturyLink, Inc. ("CenturyLink," "Defendant," or "the Company"). Plaintiffs allege the following based on information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves.

## I. INTRODUCTION

1.      Thousands of residential and business customers join together in this action accusing CenturyLink of running an aggressive boiler room sales operation and a sham customer service process. Through its model, CenturyLink routinely promised low prices during the sales process only to charge higher amounts and add unauthorized charges during billing. These practices bilked customers out of tens of millions of dollars.

2.      CenturyLink has sought to minimize its customers' concerns as mere "billing disputes." But this action is not about mere billing disputes. It is about CenturyLink's uniform business model; the generate-sales-at-all-costs programs it forced on its sales offices and employees, the reckless incentive programs it perpetuated, and the rampant customer abuses that necessarily resulted.

3.      CenturyLink employed its hyper-aggressive sales model across its call centers, where "customer service representatives" were actually sales employees, well-trained to meet draconian sales quotas and revenue targets through any means necessary.

4.      CenturyLink's chosen business model yielded predictable results by encouraging and rewarding deceptive and other unlawful conduct. Thousands of its

1

customers have complained of virtually uniform treatment by the Company's sales, billing, and customer service departments.

5.      Specifically, customers have routinely reported: (1) being promised one rate during the sales process but being charged a higher rate when actually billed; and (2) being charged unauthorized fees, including billing for services not ordered, for fake or duplicate accounts, for services ordered but never delivered, for services that were canceled, for equipment that was properly returned, and for early termination fees.

6.      When customers complained—and many thousands have—CenturyLink not only encouraged but rewarded its agents to deny remedying the wrongful charges and keep as much of the overcharges in the Company as possible.

7.      To retain those overcharges, CenturyLink had a pervasive and persistent practice of: denying that original prices quoted had ever in fact been quoted, that the prices or services previously offered were impossible to provide, refusing to honor price promises, denying that returned modems had in fact been returned, claiming that the company's computer systems did not show what customers had been promised, blaming the computer system for making accounts inaccessible, and threatening that any attempt to cancel service would result in termination fees.

8.      Even where CenturyLink representatives might, when pressed, agree to credit a customer's account for an improper charge, those credits were routinely rejected by supervisors and not applied after the fact. Supervisors were incentivized to reject those credits as their compensation was inversely impacted by credits they approved for customers.

2

9.      As a consequence, CenturyLink now faces dozens of lawsuits accusing it of consumer fraud, deceptive sales practices, breach of contract, negligent misrepresentation, fraudulent inducement, and unjust enrichment. Two state attorneys general, from Minnesota and Arizona, have brought suit against CenturyLink and entered into consent decrees requiring the Company to immediately cease and desist from engaging in the same conduct Plaintiffs here have alleged. Additionally, CenturyLink shareholders have brought actions against the Company for allowing this misconduct and seeking to recover for the negative impact that misconduct had on the share price.

10.     Through this Consolidated Class Action Complaint, Plaintiffs seek to recover damages, injunctive relief, and all other remedies available at equity and law on behalf of themselves and all other similarly situated current and former CenturyLink customers.

## II.  PARTIES

### A.    DEFENDANT

### CenturyLink, Inc.

11.     Defendant CenturyLink, Inc. (NYSE: CTL) is a telecommunications company. It is a Louisiana corporation, headquartered in Monroe, Louisiana.[1] The Company describes itself as "the second largest U.S. telecommunications provider to global enterprise customers…[w]ith customers in more than 60 countries and an intense focus on the

---

[1] 100 CenturyLink Drive, Monroe, LA 71203 (318.388.9000)

customer experience."[2] The Company purports to provide communications and data service to residential, business, governmental, and wholesale customers in 37 states.[3]

12.     In Court, counsel for CenturyLink has protested that CenturyLink, Inc. is improperly named as a defendant in this action, claiming, "CenturyLink, Inc. is a parent holding company.  It's a public company that issues stock in the New York Stock Exchange. It does not have any employees. It does not offer any services.  It's inappropriately named. We are going to need to address those issues, Your Honor."[4]

13.     The facts contradict CenturyLink's contention and instead show that Plaintiffs and the Class only communicated to and did business with an entity that represented itself as CenturyLink.

14.     The Company has made concerted efforts to emphasize its brand name and to hold itself out to its customers/class members as CenturyLink.

15.     The name CenturyLink and its logo are emblazoned across the Company's website, where the Company assures customers that it "understands the power of the digital world is related to our customers' specific needs."[5]

16.     The Company equates "CenturyLink" with "CenturyLink, Inc." On its website, the Company explicitly references the name "CenturyLink" with CenturyLink, Inc.'s trading symbol. For example, the Company website touts: "CenturyLink (NYSE: CTL) is a

---

[2] *See* https://www.linkedin.com/company/centurylink;
http://www.centurylink.com/aboutus/company-information.html.
[3] *See* http://broadbandnow.com/CenturyLink.
[4] Dec. 12, 2017 Hr'g Tr. 29:19-23.
[5] *See* http://www.level3isnowcenturylink.com/en/.

global communications and IT services company focused on connecting its customers to the power of the digital world."[6]

17.     In response to allegations of CenturyLink's overcharging and cramming, it was CenturyLink, Inc.—not some other subsidiary—which hired "independent counsel" to conduct the investigation and report the results. On December 7, 2017, it issued a press release confirming—contrary to its counsel's representations in court—that CenturyLink, Inc., in fact has: (1) "policies, procedures and practices relating to consumer sales, service, and billing;" (2) "outside directors;" (3) "employees" and "former employee(s);" (4) "customers;" (5) "management;" and (6) "products, pricing and promotions."[7]

18.     When other subsidiaries—such as Embarq—have been added to the Company, the Company has confirmed those subsidiaries will operate "under the corporate name CenturyLink…" CenturyLink did so to assure its customers that they were dealing with a large, national, public company who would stand behind its word and commit to linking the country together.[8]

19.     The CenturyLink name is on every uniform, truck, envelope, an NFL Stadium, and confirmed in telephone conversations with its customers. Customers write their checks to CenturyLink. Plaintiffs and the Class reasonably believed they received representations,

---

[6] *See* http://ir.centurylink.com/ir-home.
[7] *See* https://www.prnewswire.com/news-releases/centurylink-announces-conclusion-of-special-committee-investigation-300568194.html.
[8] CenturyLink, Inc.: Form 8K. June 4, 2009. Exhibit 99.1. Press Release, quoting Glen F. Post, III, CEO.

promises, and services from CenturyLink and no one else. And that was the Company's intention.[9]

**Doe Defendants**

20.      Doe Defendants 1-100.  Plaintiffs at all times did business with the Company that called itself CenturyLink. To the extent there are any entities other than CenturyLink who made the promises, representations, and maneuvers complained of herein, they did so on behalf of CenturyLink and to the customer base that only knew them to be CenturyLink. Plaintiffs by their own experience have been unable to identify any other defendant other than CenturyLink that has been engaged in the improper conduct alleged in this Complaint. Defendant has argued that other entities are the proper parties and responsible in some manner for the occurrences and acts alleged, and that any damages alleged were proximately caused by these other entities. If any other entities are liable for the alleged misconduct, Plaintiffs are unaware of the true names and capacities of those entities sued herein as Does 1 through 100, inclusive, and therefore sue these Defendants by such fictitious names. If such entities exist, Plaintiffs will amend this Complaint to allege their true names and capacities when the same is ascertained in discovery. When used herein, the term "Defendant" is inclusive of CenturyLink, Inc. and DOES 1 through 100.

---

[9] *See* http://www.centurylink.com/aboutus/company-information.html: "CenturyLink (NYSE: CTL) ….. The company also serves as its customers' trusted partner…"

B.     PLAINTIFFS

21.     The following Plaintiffs were either CenturyLink customers who were offered services by the Company, agreed to and paid for those services, and were subject to the wrongful conduct alleged herein, or individuals who were otherwise billed by the Company.

22.     Plaintiff Elizabeth Faulkner ("Faulkner") is a citizen of Arizona, residing in Peoria, Arizona.

23.     Plaintiff Luke Allison ("Allison") is a citizen of Arizona, residing in Phoenix, Arizona.

24.     Plaintiff Andrea Bornholdt ("Bornholdt") is a citizen of Arizona, residing in Chandler, Arizona.

25.     Plaintiff Anthony Chavez ("Chavez") is a citizen of Colorado, residing in Denver, Colorado.

26.     Plaintiff Sue Ann Fitch ("Fitch") is a citizen of Colorado, residing in Denver, Colorado.

27.     Plaintiff Katherine Parkes ("Parkes") is a citizen of Colorado, residing in Windsor, Colorado.

28.     Plaintiff Tajuana Dahib ("Dahib") is a citizen of Colorado, residing in Aurora, Colorado.

29.     Plaintiff Bonnie Marino ("Marino") is a citizen of Florida, residing in Summerfield, Florida.

30.     Plaintiff Donald Fournier ("Fournier") is a citizen of Florida, residing in Punta Gorda, Florida.

7

31.     Plaintiff Michael Maguire ("Maguire") is a citizen of Florida, residing in Longwood, Florida.

32.     Plaintiff Rod Stucker ("Stucker") is a citizen of Idaho, residing in Boise, Idaho.

33.     Plaintiff Ed Weigt ("Weigt") is a citizen of Idaho, residing in Boise, Idaho.

34.     Plaintiff Ben Jeske ("Jeske") is a citizen of Idaho, residing in Nampa, Idaho.

35.     Plaintiff Susan Remmele ("Remmele") is a citizen of Idaho, residing in Salmon, Idaho.

36.     Plaintiff Deanne Tyler ("Tyler") is a citizen of Idaho, residing in Boise, Idaho.

37.     Plaintiff Peter Denniston ("Denniston") is a citizen of Iowa, residing in Anamosa, Iowa.

38.     Plaintiff Jon Lodestein ("Lodestein") is a citizen of Iowa, residing in Davenport, Iowa.

39.     Plaintiff Deen Dodge ("Dodge") is a citizen of Minnesota, residing in Duluth, Minnesota.

40.     Plaintiff Jeff Landahl ("Landahl") is a citizen of Minnesota, residing in Spring Lake Park, Minnesota.

41.     Pamela Romero ("Romero") is a citizen of Minnesota, residing in Rockford, Minnesota.

42.     Plaintiff Christina Scott ("Scott") is a citizen of Missouri, residing in Holden, Missouri.

8

43.     Plaintiff David Garten ("Garten") is a citizen of Nevada, residing in Clark County, Nevada.

44.     Plaintiff Richard Lucero ("Lucero") is a citizen of New Mexico, residing in Albuquerque, New Mexico.

45.     Plaintiff Ralph Aragon ("Aragon") is a citizen of New Mexico, residing in Albuquerque, New Mexico.

46.     Plaintiff Maria Ochoa ("Ochoa") is a citizen of Nevada, residing in Las Vegas, Nevada. At the time she was a customer of CenturyLink, Ochoa was living in Chaparral, New Mexico.

47.     Plaintiff 528 Sushi and Asian Cuisine ("528 Sushi") is a citizen of New Mexico, located in Albuquerque, New Mexico.

48.     Plaintiff Bunnie Clayton ("Clayton") is a citizen of North Carolina, residing in Hurdle Mills, Person County, North Carolina.

49.     Plaintiff Robert Marchese ("Marchese") is a citizen of North Carolina, residing in Wake Forest, North Carolina.

50.     Plaintiff Laurie A. Raymond, Attorney at Law, ("Raymond") is a citizen of Oregon with her principal place of business in Portland, Oregon.

51.     Plaintiff Rebecca Lavelle-Register ("Lavelle-Register") is a citizen of Oregon, residing in Portland, Oregon.

52.     Plaintiff Kathryn O' Donnell ("O'Donnell") is a citizen of Oregon, residing in Portland, Oregon.

9

53.     Plaintiff Rebeca Rocha ("Rocha") is a citizen of Oregon, residing in Portland, Oregon.

54.     Plaintiff Hollie Richman ("Richman") is a citizen of Utah, residing in Nephi, Utah.

55.     Plaintiff Bob Glodowski ("Glodowski") is a citizen of Utah, residing in Salt Lake City, Utah.

56.     Plaintiff Jubilee Lawhead ("Lawhead") is a citizen of Washington, residing in Yacolt, Washington.

57.     Plaintiff Sara Young-Buck ("Young-Buck") is a citizen of Washington, residing in Seattle, Washington.

58.     Plaintiff Michael Anderson ("Anderson") is a citizen of Washington, residing in Olympia, Washington.

59.     Plaintiff Jason Malueg ("Malueg") is a citizen of Wisconsin, residing in Larson, Wisconsin.

### III.  JURISDICTION AND VENUE

60.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

61.     This Court also has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). This is a class action in which: (1) there are more than one hundred (100) members in the proposed class; (2) various members of the proposed class are citizens of states different from where Defendant is a citizen; and (3) the

10

amount in controversy, exclusive of interest and costs, exceeds $5,000,000.00 in the aggregate.

62.     This Court has personal jurisdiction over CenturyLink because it conducts business in this District and has sufficient minimum contacts in this District. CenturyLink intentionally avails itself of this jurisdiction by transacting business and deriving substantial revenues from business activity in this District.

63.     Venue is proper in this forum pursuant to 28 U.S.C. § 1407 and based upon Conditional Transfer Orders issued by the Judicial Panel on Multidistrict Litigation in MDL 2795.[10] Venue would also be proper pursuant to 28 U.S.C. § 1391 because CenturyLink transacts business and may be found in this District and because a substantial portion of the allegations complained of herein, including transactions between CenturyLink and one or more Plaintiffs, occurred in the District of Minnesota.

## IV.  FACTUAL BACKGROUND COMMON TO ALL CLAIMS

### CenturyLink's Acquisitions Resulted in a Cobbled-Together Operations Platform

64.     For decades, CenturyLink operated as a small rural telephone operator. In 1989, CenturyLink began a period of aggressive acquisitions to add customers and revenue.[11]

65.     Most notable of these acquisitions were the 2009 and 2011 acquisitions of Embarq Corporation and Qwest Communications International, Inc., respectively, which gave CenturyLink market presence in 37 states.[12]

---

[10] The Judicial Panel on Multidistrict Litigation issued Conditional Transfer Orders on October 5, 2017, October 16, 2017, and October 25, 2017.
[11] *See* http://news.centurylink.com/company-history?cat=3205, http://news.centurylink.com/company-history?cat=3206, and http://news.centurylink.com/company-history?cat=3207 (last accessed Jan. 23, 2018).



Figure 1: CenturyLink coverage map after acquiring Qwest Communications International, Inc. in 2011.

66.     Ultimately, CenturyLink's aggressive acquisition campaign made it the third largest telecommunications provider in the United States. The Company sells a variety of products and services to its customers in thirty-seven states, including high-speed internet, local and long distance telephone services, using the local and regional networks it has acquired over time.[13]   In its most recent SEC annual filing, CenturyLink reported annual revenue of $17.47 billion.

67.     But as CenturyLink expanded, it chose not to adequately invest in technologies that would integrate the platforms from its various acquisitions into one cohesive sales and billing system.

68.     The ongoing corporate decision not to integrate the internal computer systems has resulted in a byzantine system where it was impossible to uniformly access and share

---

[12] *See* http://news.centurylink.com/company-history?cat=3208 and
http://news.centurylink.com/company-history?cat=3209 (last accessed Jan. 24, 2018).
[13] *See* http://news.centurylink.com/company-history?cat=3209 (last accessed Jan. 23, 2018).

12

information across the myriad platforms and computer systems that comprise CenturyLink. As counsel for Defendant represented to the Court:

> [i]t happens to be the case that these systems have, in many cases, are [sic] not combined, and so those of us that have worked for the company for many years have been surprised at times to see how difficult it is to retrieve information because there is not a push of a button, as one might think there is.[14]

69.    This admission by CenturyLink is precisely what its customers have experienced for many years.

70.    Rather than hindering the Company's sales, its non-integrated, convoluted computer systems, comprised of numerous sales, marketing, and billing platforms across the footprints of CenturyLink's various acquisitions, actually help the Company generate revenue. Here's how.

71.    When a CenturyLink sales representative needs to quote a price to land a sale, they may or may not have access to accurate service and pricing data for that customer based on their geographic location. Despite this limitation, the sales reps are taught to do whatever it takes to land the sale – namely, quote the best price for the best services, regardless of the customer's need or CenturyLink's ability to provide that service in that location.

72.    Any conditions required to qualify for the lowest quoted price, such as signing up for autopay, agreeing to modem rental, or payment of additional fees and taxes, are routinely omitted from the sales pitch, either because the sales agent wishes to present the price as low as possible to land the sale or because the system itself does not provide all of the needed information.

---

[14] Tr. of Initial Status Conference, on Dec. 14, 2017, by CenturyLink counsel, Doug Lobel, at page 35.

73.     After the sale, the non-integrated billing system may or may not be able to recognize the services and price terms offered to and agreed upon by the customer.

74.     This leads to the rampant practice across CenturyLink of promising one price, only to have a higher price billed to the customer.

75.     No sufficient precautions are in place Company-wide to protect customers from these practices. Even the Company's own investigation found that its consumer sales monitoring lacked sufficient safeguards to detect and quantify these unauthorized charges from being added to customers' bills.[15]

76.     When customers called to dispute their bills, CenturyLink representatives lacked access to full information about that customer's account and what services CenturyLink had previously agreed to provide and at what price. The representatives, therefore, were left to assuage the customer on the fly and in the cheapest way possible, including by denying the agreed upon price was ever possible, by arguing that there was no error and convincing the customer to simply accept the charges, or to issue a credit in an amount small enough to get the customer off the phone.

77.     CenturyLink's non-integrated sales and billing systems allowed the Company to train its sales representatives to quote whatever price was needed to get a sale, regardless of whether it could ever be provided as promised, and to evade complaining customers through confusion and deferral. In this way, CenturyLink not only avoided the expense of integrating its various acquisitions' systems, but did so with the affirmative knowledge that it would benefit financially from failing to do so.

---

[15] CenturyLink Press Release. December 7, 2017. "CenturyLink announces conclusion of Special Committee investigation."

14

**CenturyLink Designed its Business Model to Maximize Profits by Overcharging Customers and Avoiding Accountability**

78.     With access to over 48 million potential customers across 37 states, CenturyLink has attempted to outbid existing competitors and lure customers by promising subscribers simple, low rates for its services and products. Yet as countless customers have experienced, the simple, low rates CenturyLink promises are seldom the actual amount owed when their bill arrives each month.

79.     While the Company now offers the option of product bundling to retain or attract customers, that practice has lowered profit margins. According to the Company, "While we believe our bundled service offerings can help retain customers, they also tend to lower our profit margins in the consumer segment due to the related discounts.[16]

80.     To draw in customers, CenturyLink advertises its products and services at market-competitive prices. Despite these quoted rates, CenturyLink's unintegrated sales and billing platforms, coupled with its carefully designed system of promotions, exclusions, and conditions all but guarantee that those competitive rates will not be honored.

81.     At the same time, CenturyLink encourages and rewards hyper-aggressive sales tactics by implementing performance expectations and incentive programs for its sales representatives.

82.     These systems and practices are designed to create a situation in which the customer is guaranteed to lose.  On one hand, sales representatives, who have a personal incentive to open as many accounts as possible, lack the business motivation, technological ability, and time required to perform appropriate diligence to ensure correct prices are

---

[16] CenturyLink, Inc.: Form 10-Q. September 30, 2017 at p 44.

quoted, exclusions do not apply, and conditions for eligibility are met. On the other, CenturyLink enables the very sales representatives who are incentivized to maximize customer account creation to indicate the total number of services the customer signed up for in the CenturyLink system with the click of a button, without the need for customer review or approval.

83.     The foreseeable result has been that countless CenturyLink customers were, and continue to be, promised lower prices than they were ultimately charged or charged for services never agreed to, or both.

84.     CenturyLink is not only aware of such practices, it promotes those practices through its employee compensation scheme. Rather than rectifying such mistakes or refunding any monies in excess of what customers agreed to pay, CenturyLink doubles down and, if customers reject whatever "workaround" the Company is willing to offer, it either charges a termination fee or sends disputed amounts to collections.

**CenturyLink Quoted Deceptive and Misleading Prices**

85.     Plaintiffs and the Class purchased CenturyLink's services based on the Company's deceptive representations and promises.

86.     CenturyLink advertises the products and services it sells in various media, including television, newspapers, the internet, and flyers left at consumers' homes.

87.     CenturyLink promoted fixed monthly rates for certain stand-alone and bundled services, including high-speed internet and local and long distance telephone services. While the Company routinely promoted its simple, low rates to customers, it was fully aware that those low rates would not be delivered.

16

88.     Plaintiffs' experiences, alleged in detail below, highlight a pervasive pattern of CenturyLink quoting one price at the point of sale, only to charge a higher price during billing.

89.     For example, Plaintiff Young-Buck was offered a bundled rate of $90 per month by CenturyLink. When her bills arrived, CenturyLink consistently charged her over $160 per month. Her experience is not an anomaly, as discussed more fully below.

90.     CenturyLink's improper overcharging of quoted prices has been further explained as a result of an investigation and ongoing litigation by the Attorney General for the State of Minnesota ("Minnesota AG").[17]

91.     That investigation showed that CenturyLink's "overview" pricing documents revealed a complex and elaborate pricing system where thousands of conditions, exceptions, and exclusions affected rates charged to customers.

92.     These pricing policies revealed that, despite the straightforward prices CenturyLink advertised to its customers and offered on sales calls, its true base rates are contingent upon several undisclosed factors, including, but not limited to, the speed of the customer's internet connection, the presence or absence of CenturyLink email service, and the manner in which CenturyLink connects a customer's home to the internet.

93.     CenturyLink has also admitted that the prices quoted to customers were actually often subject to numerous conditions and exceptions that were undisclosed to the customer.  In fact, each quoted price includes a matrix of complex and subtle information,

---

[17] *See State of Minnesota v. CenturyTel Broadband Services et al.*, No. 02-CV-17-3488 (Anoka Cty. Dist. Ct. July 12, 2017).

including further actions the customer must take—or cannot take—after their purchase to actually obtain the quoted price.

94.     CenturyLink's non-integrated sales and billing platforms, high pressure sales quotas, and call time maximums made it all but certain that the rate quoted to customers would not be the billed rate. This is particularly true in light of the fact that CenturyLink fails to disclose the various conditions, exclusions, and exceptions at the point of sale.  In fact, CenturyLink has taken the position with the Minnesota AG that its prices are a "trade secret" that need not and cannot be disclosed to customers.

95.     Thus, when CenturyLink offered Plaintiffs and the Class goods and services at certain prices, it knew that it could not deliver them for certain.

96.     CenturyLink knew or had reason to know that customers in a competitive market base their choice of telecommunications services on the quoted price, and that customers rely on the prices quoted to them.

**CenturyLink Promoted Overbilling Customer Accounts with Unauthorized Charges**

97.     In addition to deceptively quoting prices to customers, CenturyLink incentivized its sales representatives to bill customer accounts with unauthorized charges.

98.     CenturyLink's hyper-aggressive sales requirements and compensation structure created an environment where its sales representatives were excessively incentivized to add unauthorized products, services, and charges to customers' accounts while enabling them to input such charges into CenturyLink's system with the click of a button.

18

99.     Specifically, CenturyLink tied its sales representatives' and their supervisors' compensation and job security to revenue generation, requiring them to meet unrealistic quotas or face termination.

100.    As a result, customers were routinely billed for charges that were neither disclosed, authorized, nor warranted.

101.    For example, CenturyLink routinely charged internet service customers for modems that had not been requested or that had been properly returned.

102.    CenturyLink also added unauthorized charges, such as insurance, "internet cost recovery fees," and termination fees to customers' accounts. In addition, CenturyLink charged its customers for services that were never ordered, were canceled, or where customers were not receiving CenturyLink's services during specific periods of time.

103.    Plaintiffs' allegations are supported by a recent whistleblower's complaint against CenturyLink.

104.    In 2017, a former CenturyLink employee, Heidi Heiser, filed a whistleblower complaint alleging that she was terminated as a sales representative for refusing to take part in the Company's unlawful billing practices.[18]

105.    Heiser alleged that CenturyLink imposed performance requirements, sales quotas, and call time maximums on its sales representatives while simultaneously authorizing its sales representatives to falsely indicate what terms a customer purportedly agreed to. This led sales representatives to add additional products or services to customers' accounts without the customers' knowledge or consent.

_____

[18] *See Heiser v. CenturyLink, Inc.*, No. CV2017-008928 (Maricopa Cty. Super. Ct. June 14, 2017) (hereinafter "Heiser" or "Heiser Complaint").

19

106.     According to her complaint, Heiser "learned from her work that the system and practices used by CenturyLink with its sales and other agents allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services, which would then inure to the direct or indirect benefit of such CenturyLink agents or their superiors" and that the "additional lines or services resulted in additional charges not authorized by the customer."

107.     Any unauthorized charges crammed onto customer accounts could not be known to customers until after their bills arrived and, even then, could be difficult to detect. CenturyLink therefore put the onus on its customers to detect its mischarges and verify the accuracy of CenturyLink's invoices, challenging them to locate and dispute wrongful charges and prove what they agreed to.

108.     CenturyLink was at all times not only aware that sales representatives were adding improper charges to customer accounts, but condoned the behavior. Sales representatives, such as Heiser, who reported unlawful conduct to their superiors and management were disregarded or punished. Such reports did nothing to change the culture of CenturyLink's boiler room style business model.

**CenturyLink Minimized or Denied Customer Complaints**

109.     CenturyLink's business model involved not only deliberately overcharging customers' accounts but also keeping the ill-gotten revenue in house after it was obtained. This meant that complaining customers were subjected to stringent practices imposed by the business model.

110.    CenturyLink had policies for dealing with customers who disputed their wrongful invoices. As a general matter, the Company trained its sales representatives to "park the need and plant the seed." This meant ignore the customer's problem, or "park" it, and move to selling them something more (or for longer), or do whatever necessary to keep that customer's revenue in-house.

111.    To prevent sales representatives from taking the time needed to properly investigate and remedy wrongful invoices, CenturyLink imposed mandatory call time maximums (called "Average Handling Times" or "AHTs") of only a few minutes. Sales representative who violated these AHTs when trying to address customer concerns were punished, up to and including termination.

112.    CenturyLink also based compensation for sales representatives and their supervisors on how many account credits were issued and services canceled. For example, sales representatives were authorized to issue credits to customer accounts for things such as properly returned modems, time without service, or for overcharges. However, supervisors were required to approve any credit exceeding a certain amount, and CenturyLink docked those supervisors' compensation based on the amount of credits approved. This led to supervisors routinely reducing or denying credits that had been properly issued by sales representatives.

113.    But credits were a last resort. The Company trained its sales staff to explain away overcharges and take aggressive measures to keep the revenue in house by telling customers that the system did not reflect the price the customer claimed they were entitled

21

to; that the system indicated a modem had not been returned; that the price the customer was quoted was impossible; and other excuses.

114. According to the whistleblower Heiser, in her experience, customers who complained about unauthorized charges were simply told that Company records indicated the customer did in fact agree to the charges, and it was the customer's word against CenturyLink's.

115. The Minnesota AG also reported that when customers complained of being overcharged, CenturyLink would inform the customer that they had been "misquoted" or that "no one at CenturyLink can get you that price." One CenturyLink employee admitted that "maybe 1 out of 5 [customers] are quoted correctly or close enough" and that "in many cases, the customer calls in for several months and promised callbacks, [is] passed around, or cut off before going to" various consumer protection agencies.

116. If a customer was fed up enough to cancel their service because of CenturyLink's improper sales and billing practices, the Company would charge the customer a previously undisclosed "early termination fee."

117. Even worse, CenturyLink routinely sent customers to collections for refusing to pay unlawful overcharges.

118. These practices reflect CenturyLink's deliberate practice of keeping as many customers on the hook for improper charges as possible rather than fulfilling its duty to bill customers according to the price and terms promised.

**Regulatory Authorities Have Targeted These Practices as Unlawful, Harmful, and Nationally Pervasive**

119.    The uniform misconduct Plaintiffs have alleged is not a figment of their imagination, nor is it a collection of isolated incidents.  In fact, the Federal Communications Commission ("FCC") is currently confronting the pervasive practice of cramming. The Arizona Attorney General and the Minnesota Attorney General have also challenged CenturyLink over the Company's deceptive sales and billing practices, and have entered into consent decrees requiring CenturyLink to cease and desist engaging in the misconduct.

**A.    Federal Regulators**

120.    The FCC has identified the need to reform hyper aggressive, boiler room-type sales operations in the telecommunications industry. Specifically, the FCC has focused on curtailing "cramming" in the telecommunications industry, which it defines as the placement of unauthorized charges on a consumer's bill.[19] The FCC has described cramming as a longstanding and "continuing problem" for consumers across the country, requiring the "need for increased consumer protection."[20]

121.    In a comment to the FCC's October 2017 Notice of Proposed Rulemaking, the Communications Worker of Americas ("CWA"), a labor union representing 75,000 sales

---

[19] *See* FCC Fact Sheet, *In the Matter of Protecting Consumers from Unauthorized Carrier Charges and Related Unauthorized Charges*, CG- Docket No. 17-169 (available at https://apps.fcc.gov/edocs_public/attachmatch/DOC-345475A1.pdf)(last visited February 12, 2018).

[20] *Id.* at 3. State attorneys general have confirmed that cramming violates state consumer protection laws.  *See e.g.*, Arizona Attorney General website ("Cramming is the illegal practice of adding features to your existing service and charging for them on your cell phone or landline bill without your permission. Both are illegal under Arizona's Consumer Fraud Act:") https://www.azag.gov/consumer/slam-cram; In the Matter of Qwest Corporation, d/b/a/ CenturyLink QC, No. CV2016-002842 (Maricopa Cty. Super. Ct. Apr. 4, 2016) (confirming future violations will violate Arizona Consumer Fraud Act).

and service employees in the telecommunications industry—including CenturyLink's employees—spoke out against boiler room-type sales models and their relationship to customer abuses.  According to the CWA:

> Companies that impose unrealistically high sales quotas on sales and service representatives are responsible for driving unethical sales practices. Certainly, that was the conclusion reached by the Consumer Financial Protection Bureau in its investigation of Wells Fargo's infamous fraudulent account scandal….
> Similar to Wells Fargo, many telecommunications carriers have adopted unrealistically high sales quotas, incentive pay compensation plans, and performance management systems that force sales and service representatives to engage in unethical sales practices in order to meet the quotas or earn sales incentives. Aggressive performance management systems discipline sales employees for failure to make the sales quota and revenue benchmarks.[21] Typically, failure to meet sales quotas for three time periods can lead to termination. The constant pressure to sell privileges sales over attention to quality customer service and leads to high rates of stress-related illness for employees."[22]

## B.   State Attorneys General Investigations and Related Consent Decrees

122.    The Arizona Attorney General asserted allegations of deceptive sales and billing practices against CenturyLink that were fundamentally similar to those asserted by Plaintiffs here.

---

[21] See, *In the Matter of Wells Fargo Bank, Consumer Financial Protection Bureau*, Consent Order (Sept. 8, 2016). Available at: http://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf *See also*, "Consumer Financial Protection Bureau Fines Wells Fargo $100 Million for Widespread Illegal Practice of Secretly Opening Unauthorized Accounts," Consumer Financial Protection Bureau, press release (Sept. 8, 2016) Available at: https://www.consumerfinance.gov/about-us/newsroom/consumer-financial-protection-bureau-fines-wells-fargo-100- million-widespread-illegal-practice-secretly-opening-unauthorized-accounts/.
[22] Reply Comments of Communications Works of America, *In Matter of Protecting Consumers from Unauthorized Carrier Charges and Related Unauthorized Charges*, CG- Docket No. 17-169, October 13, 2017 (available at https://ecfsapi.fcc.gov/file/10132178310677/CWA%20Reply%20Comments%20-%20Slamming%2C%20cramming%20-%2010-2017.pdf).

123.    On April 6, 2016, CenturyLink entered into an Assurance of Discontinuance with the Arizona Attorney General relating to that conduct.[23]

124.    Among other things, the Assurance of Discontinuance required CenturyLink to:

a.    Comply with the Arizona Consumer Fraud Act;

b.    In response to customer orders, provide a written confirmation within three business days setting forth all material terms and conditions applicable to the customers' order, free from additional advertisements;

c.    Investigate customer allegations of overcharging rather than sending a customer's account to an outside collection agency, until such investigation is complete;

d.    Refrain from misrepresenting the speed of internet service available;

e.    Process a customer's service cancellation request within three business days; and

f.    Provide a summary of this Assurance of Discontinuance to all employees and third parties who perform customer sales or service functions for CenturyLink in the State of Arizona.

125.    Similarly, on July 12, 2017, the Minnesota Attorney General filed a complaint against CenturyLink for its unlawful sales and billing practices involving similar allegations as Plaintiffs have raised here.

---

[23] *See In the Matter of Qwest Corporation, d/b/a/ CenturyLink QC*, No. CV2016-002842 (Maricopa Cty. Super. Ct. Apr. 4, 2016).

126.     On October 23, 2017, CenturyLink entered into a Stipulated Order with the Minnesota Attorney General.  Among other things, CenturyLink agreed to:

    a.  Not make any false statement of material fact or omit any material fact in connection with the sale of internet and/or television services to Minnesota consumers; and

    b.  Provide, at the time of sale:

        i.     The monthly base price of the services purchased;

        ii.    The amount of each monthly recurring fee in addition to the monthly base price;

        iii.   The amount of monthly access recovery charges;

        iv.    All one-time fees charged to the initial bill;

        v.     The amount of the first invoice;

        vi.    Recurring total costs;

        vii.   Total duration of the agreement; and

        viii.  Any restrictions or conditions on a consumer's ability to receive the quoted price.

127.     The Minnesota Attorney General's action remains ongoing in Anoka County District Court as of the date of this Consolidated Class Action Complaint.

128.     Despite entering into these Agreements with the Arizona and Minnesota Attorneys General, CenturyLink has failed to make its customers whole for overcharges and unauthorized fees and, upon information and belief, continues to engage in this same misconduct.

26

## V.  PLAINTIFFS' EXPERIENCES WITH CENTURYLINK

### Arizona Plaintiff: Elizabeth Faulkner

129.     Plaintiff Elizabeth Faulkner ("Faulkner") has been a CenturyLink customer and lives in Peoria, Arizona.

130.     When Faulkner contacted CenturyLink about establishing home internet service in September 2016, a sales representative offered her $29.95 a month for 12 months. Faulkner agreed to those terms.

131.     On her first bill, CenturyLink charged Faulkner over $25 more than the rate she had agreed to.  Among the overcharges were previously undisclosed "Related Monthly Charges" totaling $1.99 and "Service Additions & Charges" totaling $23.14.

132.     Faulkner disputed the bill with CenturyLink, who agreed to credit her $19.95 for an "Internet Installation Fee" on her next bill.  However, when her October 2016 bill arrived, CenturyLink had charged her $39.95 for internet services and $3.99 for an "Internet Recovery Fee".

133.     Faulkner contacted CenturyLink numerous times to remove the excessive charges on her account to no avail.  For the remainder of her contract, she was billed and paid approximately $43.94 per month.

134.     In August 2017, Faulkner contacted CenturyLink about her service and potential new pricing.  CenturyLink stated that the price for internet services alone would be $85.00 per month, but if she signed up for a "CenturyLink Choice Package," comprised of internet and DirecTV, her price would drop to $67.95 if she stayed with the package for two

years.  CenturyLink stated that the internet portion of the bundle would be $29.95 per month and DirecTV portion would be $37.99 per month.

136.    Based on CenturyLink's representations, Faulkner agreed to the terms and signed up for the CenturyLink Choice Package.

136.    In September 2017, CenturyLink billed Faulkner $192.70 for the CenturyLink Choice Package.

137.    Faulkner called CenturyLink to dispute the charges and spent over five hours on the phone trying to resolve the issue.  During the call, CenturyLink transferred her numerous times to multiple CenturyLink departments. CenturyLink ultimately told her she needed to pay the $192.70 presently due on the account, but that CenturyLink would credit her account the following month.  During that call, CenturyLink also informed her that, going forward, it would not honor the offered rate of $63.95 per month, and that her new rate would be $79.99 per month.  The new price included charges for "receivers and miniboxes" for the DirecTV service, which CenturyLink failed to inform her about when offering her a price of $63.95 at the point of sale.

138.    Faulkner could not afford the new prices being demanded by CenturyLink and sought to cancel the DirecTV portion of her subscription.  CenturyLink told her that if she cancelled her that service, she would be assessed a termination fee of $440.00.

139.    Left with no recourse, Faulkner filed a complaint with the Arizona Attorney General, detailing CenturyLink's bait and switch tactics.

140.    While the Arizona Attorney General reviewed her complaint, Faulkner paid her CenturyLink bills from October 2017 through December 2017, despite each bill charging

more than the stated price of $79.99: $83.25 in October 2017; $119.22 in November 2017; and $96.02 in December 2017.

141.    On December 28, 2017, Faulkner received a letter from the Arizona Attorney General that attached CenturyLink's response to her Complaint.  CenturyLink stated that "unfortunately, it was found that our rep misquoted Faulkner for DirecTV service" and that "she will need to call Direct TV . . . to drop the service."  It also stated that the termination fee would be waived if she chose to cancel, and that CenturyLink would be crediting her account $40 per month for the following six months, for a total credit of $240.00, or approximately a 66% partial credit of the total CenturyLink had overcharged her.

142.    As a result of CenturyLink's misconduct, Faulkner has been damaged and incurred financial loss in an amount to be determined at trial.

**Arizona Plaintiff: Luke Allison**

143.    Plaintiff Luke Allison ("Allison") has been a CenturyLink internet subscriber since January 2011 and lives in Phoenix, Arizona.

144.    In 2013, Allison changed residences and sought to have his internet services transferred with him.  When transferring his account, a CenturyLink sales representative offered Allison better rates if he enrolled in their automated payment feature, which he agreed to do.

145.    Once enrolled in auto pay, Allison began noticing CenturyLink was taking funds out of his checking account that were not authorized and varied between $30-60 per month. Allison's bills also included an internet cost recovery fee and sometimes an "internet security" fee, which CenturyLink did not disclose and which Allison did not request.

29

146.     Allison has spent approximately 10-20 hours on the phone with CenturyLink since 2011 disputing the unauthorized charges taken from his account. Rather than reversing the overcharges, CenturyLink tried to sell him additional services and asserted the discounts he was promised either did not exist or had expired. Allison requested verified email responses from CenturyLink confirming this, but never received any such confirmation. CenturyLink continued to overcharge Allison's account.

147.     In mid-2016, Allison went into a CenturyLink retail store and demanded to speak with a manager about their sales and billing practices. After waiting for approximately one hour, he spoke with a CenturyLink manager. The manager stated that he should not have relied on the representations of CenturyLink's sales representatives, as they are trained that "if they are not selling you something to get you off the line."

148.     As a result of CenturyLink's misconduct, Allison has been damaged and incurred financial loss in an amount to be determined at trial.

**Arizona Plaintiff:  Andrea Bornholdt**

149.     Plaintiff Andrea Bornholdt ("Bornholdt") has been a CenturyLink customer and lives in Chandler, Arizona.

150.     Bornholdt is a CenturyLink internet and phone services customer and paid approximately $68.00 per month for both internet and phone services. On or around May 12, 2015, a CenturyLink sales representative came by Bornholdt's residence offering to add CenturyLink's Prism TV to her existing telephone and internet services.   The sales representative offered her the following price for bundling all three services: (1) First Month: $121.93; (2) Months 2-6: $112.13; and (3) Months 7-24: $117.12. The CenturyLink sales

representative confirmed the prices with a call center employee, and stated that the prices included taxes, fees, and installation of Prism TV.

151.    Bornholdt agreed to the offer.

152.    The CenturyLink sales representative stated that Prism TV services would begin on May 26, 2015. However, on or around May 13, 2015, CenturyLink called Bornholdt and stated it could not install the Prism TV services until July 22, 2015.

153.    On or about July 13, 2015, CenturyLink charged Bornholdt $22.78 in prorated Prism charges which she had not yet begun receiving.  Shortly thereafter, a CenturyLink agent contacted her and informed her that her monthly bill would not be the $121.93 as originally offered, but would in fact be approximately $140.00 exclusive of taxes and fees.

154.    In September 2015, CenturyLink sent Bornholdt a bill for $284.55: $99.93 for Internet and Phone, and $193.62 for Prism TV.

155.    Bornholdt called CenturyLink to dispute the bill and spent 1.5 hours speaking to multiple CenturyLink customer service representatives. Ultimately, a CenturyLink representative stated that he would issue Bornholdt a credit in the amount of $136.49 on the following bill.  However, CenturyLink still required her to pay the remaining balance of $148.06, which represented a pro-rated portion of the Prism TV package she had been receiving for the last month and a half.  At the end of this conversation, the CenturyLink sales representative told Bornholdt that he agreed her originally offered price of $112.13 was too high and that he would lower the bundled package price to $96.26 inclusive of all taxes and fees.  The sales representative also stated that the billing cycle would start that day and

that her bills would be $96.26 going forward.  Bornholdt agreed to these revised terms and immediately paid the remaining balance of $148.06.

156.    When Bornholdt's October 2015 bill arrived, it did not reflect the credit of $136.49 or her payment of $148.06, and showed that she owed $184.26.

157.    On November 9, 2015, CenturyLink suspended Bornholdt's Prism TV services.  That day, Bornholdt spent 2 hours on the phone with CenturyLink disputing the charges.  She was again informed by a sales representative that CenturyLink would credit all overcharges and that her new monthly bill would be approximately $96.00 including taxes and fees.  Bornholdt immediately paid $96.00 on November 9, 2015.

158.    On November 13, 2015, Bornholdt received a bill for $241.04.  On December 3, 2015, she called CenturyLink and spoke with a manager who told her to continue paying only the $96.00 she was offered, despite the bills continually reflecting higher prices than originally offered.

159.    In or around November 2016, Bornholdt contacted a CenturyLink customer representative via online chat to reduce her monthly charges.  At that time, CenturyLink offered, and Bornholdt accepted, to drop her telephone service and start another 12 month promotion for internet and television services at a price of $65.96 per month.

160.    However, when the first bill arrived CenturyLink charged Bornholdt $126.66, and still included the telephone service she had canceled.

161.    Bornholdt called CenturyLink regarding the overcharge, and a sales representative stated that she would be credited $55.22 on her next bill and agreed to lower her monthly rate to $71.97.

32

162.     Over the course of the following six months, CenturyLink continually overcharged for which it has provided no refund.

163.     As a result of CenturyLink's misconduct, Bornholdt has been damaged and incurred financial loss in an amount to be determined at trial.

**Colorado: Anthony Chavez**

164.     Anthony Chavez ("Chavez") has been a CenturyLink customer and lives in Denver, Colorado.

165.     In or about January 2017, Chavez signed up for television and internet services from CenturyLink.

166.     CenturyLink, without Chavez's authorization or request, added telephone service to his account. In one instance, CenturyLink charged him $49 for a single week of telephone service from February 17-22, 2017.

167.     CenturyLink repeatedly charged Chavez for telephone service until he switched service providers.  Chavez refused to pay for the unauthorized telephone service, was billed by CenturyLink after he canceled his service, and still has an outstanding balance of over $1,000 for services he did not request or had canceled.

168.     As a result of CenturyLink's misconduct, Chavez has been damaged and incurred financial loss in an amount to be determined at trial.

**Colorado: Sue Ann Fitch**

169.     Plaintiff Sue Ann Fitch ("Fitch") has been a CenturyLink customer and lives in Denver, Colorado.

170.     In or about December 2016, Fitch signed up by phone for CenturyLink internet service for a purported one-year promotional price of $29.95 per month, exclusive of taxes and fees.

171.     CenturyLink had offered the rate on its website and during the sales process, informed Fitch that she would receive the rate from January 3, 2017 through January 3, 2018.  CenturyLink sent Fitch a letter confirming the rate shortly after she signed up.

172.     CenturyLink billed Fitch the agreed-upon rate of $29.95 the first month.

173.     However, on her second bill, CenturyLink charged Fitch $10 more than the agreed upon rate.  Fitch called CenturyLink, which told her that to receive the $29.95 rate, she would have to sign up for "autopay" whereby CenturyLink would automatically debit her checking account for her monthly charges.   Fitch was surprised by this requirement, as neither the website, sales person, confirmation letter, nor the customer service representatives she had spoken with subsequent to the initial sales call had ever mentioned anything about autopay being a requirement.

174.     Fitch did not pay the extra $10 per month, and by the end of her contract CenturyLink claimed that she had accumulated a balance owed of approximately $130.

175.     On or about December 12, 2017, after repeated calls to CenturyLink to complain about being billed more than she was offered, Fitch agreed to continue her internet service with CenturyLink for $40 per month inclusive of some fees, in exchange for CenturyLink removing the approximately $130 in late fees and back charges it contended she owed.

176.     One month into her new agreement, CenturyLink informed Fitch that her $130 credit would be denied.  Fitch complained to the Better Business Bureau.

177.     Fitch's January 7, 2018 bill showed a "previous balance" of $163.44, which includes the false back charges and/or late fees relating to those charges from her first contract with CenturyLink.  This bill also showed additional charges in the amount of $5.80 for "Service Additions & Changes" and a $9.00 "Late Payment Charge."  Fitch had not requested the addition of any services, and the only purported late payment was in connection with the inflated charges that she refused to pay.

178.     In or about January 2018, Fitch requested that CenturyLink cancel her account.  CenturyLink did not do so, and as of February 2018, CenturyLink's asserted Fitch owed an account balance of $74.24.

179.     As a result of CenturyLink's misconduct, Fitch has been damaged and incurred financial loss in an amount to be determined at trial.

**Colorado: Katherine Parkes**

180.     Plaintiff Katherine Parkes ("Parkes") has been a CenturyLink customer and lives in Windsor, Colorado.

181.     In or about July, 2016, Parkes signed up for "bundled" internet, phone and television service with CenturyLink, with television provided by DirecTV.

182.     CenturyLink's internet service did not work and, after many attempts by CenturyLink to fix it, Parkes canceled her service in July 2017, with service being discontinued on July 23, 2017.  On September 13, 2017, CenturyLink sent Parkes a statement showing a "New Charges Summary" of $0 along with a refund check in the

amount of $83.59 for overpayments made after Parkes canceled her service.   Parkes also received a refund check from DirecTV in the amount of $21.06.

183.   Then, on September 22, 2017, CenturyLink sent a bill to Parkes for $359.59. Despite having refunded Parkes for overcharges, this new bill claimed she had a previous balance of $240.63, with new charges of $152.96 for claimed television service.  The bill also had an additional charge of $46.99 for a service Parkes had never ordered, "NFL Sunday Ticket 2017," with a note stating "early renewal in 6 payments."

184.   Parkes and/or her husband called CenturyLink and were told that CenturyLink would take care of the "mistake" on her bill.

185.   CenturyLink never did so, and instead sent Parkes another bill for television service the next month, which continued to include the NFL Sunday Ticket charge of $46.99.  CenturyLink now claimed that Parkes owed $536.92 for services she had canceled and/or not requested.

186.   Parkes called CenturyLink several more times to no avail.  In a letter dated January 24, 2018, CenturyLink threatened to send Parkes' false charges to collections if she did not pay by February 5, 2018.

187.   As a result of CenturyLink's misconduct, Parkes has been damaged and incurred financial loss in an amount to be determined at trial.

**Colorado: Tajuana Dahib**

188.   Plaintiff Tajuana Dahib ("Dahib") has been a CenturyLink customer and lives in Aurora, Colorado.

189.    In or about August, 2014, Dahib signed up for CenturyLink internet service after seeing an offer for a rate of $19.95 per month, exclusive of taxes and fees.

190.    After contacting CenturyLink and agreeing to accept the offer, CenturyLink thereafter billed Dahib over $60 per month, exclusive of taxes and fees.

191.    Dahib called CenturyLink to dispute the charges, and rather than honor its promise, CenturyLink tried to upsell her.  CenturyLink told Dahib that if she wanted the deal they had agreed to, she would have to buy into a package deal with different or additional services.

192.    Dahib continued to pay the bills for her internet service despite not having agreed to those rates, because she needed internet service and was concerned that CenturyLink would cut off her service if she refused to pay the higher rate.

193.    In or about August, 2015, Dahib canceled her internet service with CenturyLink.

194.    As a result of CenturyLink's misconduct, Dahib has been damaged and incurred financial loss in an amount to be determined at trial.

**Florida: Bonnie Marino**

195.    Plaintiff Bonnie Marino ("Marino") has been a CenturyLink customer and lives in Summerfield, Florida.

196.    In 2016, Marino moved to Florida and contacted CenturyLink about receiving telephone, internet, and Prism television services. The CenturyLink sales representative offered her a price of $153 per month for all three services if she agreed to keep the services for two years. Marino agreed.

197.     When Marino began receiving her bills, CenturyLink charged her $187.78.

198.     Marino called CenturyLink to dispute her bill and spent a significant amount of time on the phone trying to resolve the issues. One CenturyLink representative she spoke to informed Marino that her price had increased because her two-year contract had ended. The representative promised Marino a new rate of $140 plus tax for one year for all three services. Again, however, when Marino received her next bill, CenturyLink had charged her $187.78, which was over $40 more than the price promised.

199.     Marino called CenturyLink to challenge the incorrect prices. CenturyLink gave no explanation for the overcharge.

200.     CenturyLink overcharged Marino for the next several months. Each month, Marino would call CenturyLink to dispute the incorrect billing. CenturyLink had a different explanation for the inconsistency in her bill, and continues to overcharge her.

201.     As a result of CenturyLink's misconduct, Marino has been damaged and incurred financial loss in an amount to be determined at trial.

**Florida: Donald Fournier**

202.     Plaintiff Donald Fournier ("Fournier") has been a CenturyLink customer and lives in Punta Gorda, Florida.

203.     In January 2017, Fournier established service with CenturyLink for internet and PRISM television services.

204.     During the sales process, the CenturyLink sales representative offered him a price of $89 per month.

205.    Fournier informed CenturyLink that he was a partial-year resident of Florida, whereupon CenturyLink offered him a "vacation mode rate" when he was outside the State of Florida.

206.    Fournier informed CenturyLink that he would be residing for a period in New Hampshire and obtained his "vacation mode status."  During this time, CenturyLink billed him $22.00 as a "vacation mode" rate.

207.    However, upon his return to Florida, CenturyLink informed Fournier that his activating "vacation mode" had cancelled his original contract, and that it would not honor the $89 per month price it had originally agreed to.  CenturyLink informed him that he would have to sign a new contract to obtain CenturyLink services in Florida.  Left with no other option, Fournier did so.

208.    Thereafter, Fournier's bill would fluctuate monthly without basis, and was above the rate promised by CenturyLink.

209.    Fournier threatened to discontinue service due to CenturyLink's constant fluctuation in billing and failure to honor its promised pricing. CenturyLink told Fournier that if he canceled, it would levy a termination fee against him.  Plaintiff did not cancel his service as a result.

210.    As a result of CenturyLink's misconduct, Fournier has been damaged and incurred financial loss in an amount to be determined at trial.

**Florida: Michael Maguire**

211.    Plaintiff Michael Maguire ("Maguire") has been a CenturyLink business customer and lives in Longwood, Florida.

212.     Maguire was a business customer of CenturyLink, with internet, telephone, international service, and smart connect service (which forwards calls to a cellphone). CenturyLink offered, and Maguire accepted, a rate of $140.00 per month for these services.

213.     In April 2017, Maguire requested to move his services to a new address. Instead of simply moving Maguire's services to the new address as requested, CenturyLink canceled his account and created a new one.

214.     Under the new account, CenturyLink altered the services Maguire agreed to receive (including changing his business phone number, which caused considerable business disruption) and began billing him more than agreed.  The overcharges fluctuated, and in some instances exceeded $100 more than the agreed-upon $140 price. In addition, CenturyLink charged him for modem rental, despite the fact he used his own modem rather than a CenturyLink-issued modem.

215.     As a result of CenturyLink's misconduct, Maguire has been damaged and incurred financial loss in an amount to be determined at trial.

**Idaho Plaintiff: Rod Stucker**

216.     Plaintiff Rod Stucker ("Stucker") has been a CenturyLink customer and lives in Boise, Idaho.

217.     Stucker called CenturyLink asking for a quote on their internet services and prices.  He discussed the matter with the CenturyLink representative but never agreed to commence service with CenturyLink.

218.     Thereafter, however, CenturyLink sent Stucker a modem box and began billing him $58 per month for internet services.

40

219.    Stucker contacted CenturyLink and stated he had not authorized their services and requested they retrieve their modem.

220.    CenturyLink stated its records indicated Stucker had activated the modem and his account, and that he was liable for the charges.

221.    To this day, CenturyLink's modem remains unopened at Stucker's home and he refuses to pay the alleged amounts owed.

222.    CenturyLink has threatened to turn Stucker's account over to collections, claiming he owes over $500 for internet services that he did not request and has not used.

223.    As a result of CenturyLink's misconduct, Stucker has been damaged and incurred financial loss in an amount to be determined at trial.

**Idaho: Ed Weigt**

224.    Plaintiff Ed Weigt ("Weigt") has been a CenturyLink customer and lives in Boise, Idaho.

225.    Weigt was a telephone and internet services customer of CenturyLink until December 2015, when he called to cancel his telephone service.

226.    At that time, CenturyLink offered Weigt a price of $40 per month to continue on with internet only, which he accepted.

227.    His next bill, however, was inflated.

228.    When his second consecutive bill was inflated, Weigt contacted CenturyLink to dispute the overcharges. A CenturyLink supervisor stated that they had no record of him cancelling his telephone services.   Weigt again requested cancellation of his telephone services during that call. Shortly thereafter, Weigt also cancelled his internet service.

41

229.     Approximately 3 or 4 months later, Weigt received a letter from a collections agency stating that he had an outstanding CenturyLink balance.  He informed the agency that he had cancelled all services, but it told him to contact CenturyLink.  Weigt contacted CenturyLink several times asking it to rectify the situation, which it refused to do.

230.     As a result of CenturyLink's misconduct, Weigt has been damaged and incurred financial loss in an amount to be determined at trial.

**Idaho: Ben Jeske**

231.     Ben Jeske ("Jeske") has been a CenturyLink customer and lives in Nampa, Idaho.

232.     In approximately 2015, Jeske signed up for CenturyLink internet service. CenturyLink offered Jeske a price of $25 per month for the first three months, and Jeske also signed up for autopay in order to receive an additional $10 per month discount.

233.     During billing, however, CenturyLink charged Jeske $40 or more per month.

234.     When Jeske called CenturyLink to dispute the charges, CenturyLink informed him that the additional fees and taxes were standard fees that were for upgrading infrastructure and for various other purposes, and that he would have to pay whatever amount was reflected on his bill.

235.     After two years of being charged more than originally agreed, Jeske attempted to cancel his service. In response, CenturyLink improperly charged him $150 for a router and withdrew that amount from his checking account without his consent.

236.     Jeske disputed the unauthorized $150 charge and CenturyLink agreed to credit his account.  However, CenturyLink applied the credit to his CenturyLink account (which it

had not closed as requested) rather than returning it to his bank account. Jeske was therefore forced to continue using CenturyLink's internet service until $150 value of the refund was exhausted.

237.    As a result of CenturyLink's misconduct, Jeske has been damaged and incurred financial loss in an amount to be determined at trial.

**Idaho: Susan Remmele**

238.    Susan Remmele ("Remmele") has been a CenturyLink customer and lives in Salmon, Idaho.

239.    In December 2015, Remmele called CenturyLink to change her internet plan due to constantly rising prices. A CenturyLink sales representative offered her a 12 month plan for $66.95 per month and assured her that there would not be a price increase for the following 12 months. The sales representative also stated that because Remmele had been a customer for so long, she was entitled to a loyalty discount that would be applied to each bill. Based on the offer, Remmele agreed to receive services pursuant to those terms.

240.    Remmele's January 2016 bill, however, did not reflect the loyalty discount. CenturyLink proceeded to deduct the higher amount each month from her account.

241.    When Remmele called CenturyLink to dispute her bill, CenturyLink stated that it would credit her account for the loyalty discount that she was promised but had not received.

242.    In February 2016, Remmele experienced technical issues with her internet and did not have internet service for days at a time. Also, her February bill did not reflect the loyalty discount or the credit that was promised. Remmele again called CenturyLink to

43

dispute the charges, and was promised that the issue would be fixed and that she would receive a credit for the previous two months' of service.

243.     In March 2016, CenturyLink again did not credit her account with the loyalty discount as promised. CenturyLink also withdrew an unauthorized $71.00 from her account. When Remmele contacted CenturyLink again, she spoke to a supervisor who refused to refund the improper $71.00 charge. To date, CenturyLink has refused to credit both the $71.00 unlawful charge and the loyalty discount Remmele was promised during the sales process.

244.     As a result of CenturyLink's misconduct, Remmele has been damaged and incurred financial loss in an amount to be determined at trial.

**Idaho:  Deanne Tyler**

245.     Deanne Tyler ("Tyler") has been a CenturyLink customer and lives in Boise, Idaho.

246.     In approximately 2015, Tyler inquired with CenturyLink about the price of telephone service.  Tyler did not agree to establish service with CenturyLink at that time.

247.     The following month, CenturyLink sent Tyler a bill for $45.00 for telephone service.  No CenturyLink technician ever came out to her house to connect it to CenturyLink's telephone network, and Tyler was never able to locate an active landline on her property.

248.     Tyler did not agree to receive CenturyLink's telephone services and was ultimately charged six months' worth of telephone services she neither used nor authorized.

CenturyLink refused to credit her account, and required her to pay for the unauthorized time periods in order to cancel the service, which she did.

249.    As a result of CenturyLink's misconduct, Tyler has been damaged and incurred financial loss in an amount to be determined at trial.

**Iowa: Peter Denniston**

250.    Plaintiff Peter Denniston ("Denniston") has been a CenturyLink customer and lives in Anamosa, Iowa.

251.    In 2015, Denniston placed an online order to establish internet service with CenturyLink.

252.    At the time of sale, CenturyLink promised Denniston rates and discounts that CenturyLink knew or should have known would never be honored

253.    After several months, Denniston noticed that CenturyLink was debiting approximately $40 dollars more from his account than the rate CenturyLink had agreed. Denniston called and spent numerous hours on the phone with CenturyLink. When he explained he wanted to correct his bill, he was treated rudely and transferred, with each successive representative attempting to sell him additional services at new rates. Finally, CenturyLink refunded some, but refused to return all, of the overcharges. Denniston subsequently cancelled his service.

254.    In or about January 2016, Denniston decided to give CenturyLink another chance and again signed up for internet service. CenturyLink promised PD a promotional rate of $29.95 per month for 12 months. His first 2016 monthly bill reflected the correct rate, but subsequent bills had a rate $10 per month higher. The bills also contained an

"Internet Cost Recovery Fee." He again called CenturyLink and again; instead of assisting him, CenturyLink representatives pitched him new or additional services and discounts. Disgusted, Denniston again cancelled his internet service despite CenturyLink's threat to charge him an early contract termination fee of approximately $200.

255.     In 2017, Denniston moved to Anamosa, Iowa. He was frustrated to discover that CenturyLink was one of the only providers of broadband service in that area. In or around February 2017, Denniston again established internet service with CenturyLink. He agreed to a rate of $19.99 per month for 24-months.

256.     Denniston's first 2017 monthly bill was $29.95, over seven dollars higher than the agreed rate of $19.99. His second 2017 bill was $39.95.  These bills also included an "Internet Cost Recovery Fee" of $3.99.  The bills contain no description that explains this fee and, further, this fee was not disclosed during the sales process. Denniston again called to correct this overcharge.

257.     While CenturyLink has (to this point) applied the promotional rate on PD's bills going forward, CenturyLink continues to charge Denniston the "Internet Cost Recovery Fee." CenturyLink has refused to reimburse Denniston for all monies he paid above the quoted prices by CenturyLink for his internet service.

258.     As a result of CenturyLink's misconduct, Denniston has been damaged and incurred financial loss in an amount to be determined at trial.

**Iowa: Jon Lodestein**

259.     Plaintiff Jon Lodestein ("Lodestein") has been a CenturyLink customer and lives in Davenport, Iowa.

46

260.     In late January 2017, Lodestein established service with CenturyLink for internet and telephone services.

261.     When he signed up, the CenturyLink sales representative offered Lodestein a rate of $64.95 for internet and telephone services for three years as part of CenturyLink's "3-Year Price-Lock" promotion. Lodestein agreed.

262.     In his first bill, CenturyLink charged Lodestein approximately $30 more than the price he had agreed.

263.     Lodestein's bills also included an "Internet Cost Recovery Fee." This fee was not disclosed by CenturyLink. .

264.     Lodestein called CenturyLink to challenge the incorrect price reflected on his bills and spent a significant amount of time on the phone trying to resolve the issue. During his telephone calls, CenturyLink routed Lodestein to multiple representatives who each tried to convince him to buy more services from CenturyLink. CenturyLink representatives informed Lodestein that the rate reflected on his bill was accurate and that he must be mistaken on the price he had agreed. One customer service representative informed him that the $30 in additional charges was required by law, even though his bills reflected less than $10 in taxes and related government charges. CenturyLink refused to correct the overcharging.

265.     When he received the subsequent bill, CenturyLink again overcharged him approximately $30 over the agreed rate. Again, Lodestein spent significant time on the phone with multiple CenturyLink representatives. Again, he was told that his higher than agreed upon rate was correct and that he was mistaken.

47

266.     Finally, after calling again, a CenturyLink representative admitted that CenturyLink had overcharged Lodestein.  CenturyLink told him, however, that it was impossible to refund him the money that he overpaid.  Despite admitting that it was charging him more than the rate he had agreed, CenturyLink refuses to change Lodestein's rates to reflect the agreed upon rate.

267.     As a result of CenturyLink's misconduct, Lodestein has been damaged and incurred financial loss in an amount to be determined at trial.

**Minnesota: Deen Dodge**

268.     Plaintiff Deen Dodge ("Dodge") has been a CenturyLink customer and lives in Duluth, Minnesota.

269.     Dodge is a former CenturyLink internet and phone services subscriber. When he signed up for CenturyLink's services, the sales representative offered him an initial price of $50.00 for both services.

270.     However, when Dodge received his CenturyLink bills, he was charged approximately $70.00 - $80.00.

271.     Dodge routinely called CenturyLink to dispute the charges on his monthly bills. Tired of calling CenturyLink every month to dispute his bill, Dodge cancelled his CenturyLink services in June 2016.

272.     After cancelling services, CenturyLink assessed Dodge a $200 cancellation fee, which he has refused to pay.

273.     CenturyLink has turned Dodge over to collections for this unpaid termination fee.

48

274.     As a result of CenturyLink's misconduct, Dodge has been damaged and incurred financial loss in an amount to be determined at trial.

**Minnesota: Jeff Landahl**

275.     Plaintiff Jeff Landahl ("Landahl") has been a CenturyLink customer and lives in Spring Lake Park, Minnesota.

276.     Landahl signed up for CenturyLink internet services in November 2016 when a CenturyLink sales representative offered him a price of $24.99 per month for 24 months.

277.     Instead, when his bills arrived, CenturyLink charged Landahl between $65.00 and $70.00 per month.

278.     When Landahl called CenturyLink to dispute his bills, he was repeatedly put on hold, cut off, transferred, and hung up on without obtaining any relief.

279.     When he did get through to someone, CenturyLink told him that he was locked into a two year agreement and there was nothing CenturyLink could do about the price.

280.     CenturyLink has refused to credit Landahl for amounts in excess of what he agreed to.

281.     As a result of CenturyLink's misconduct, Landahl has been damaged and incurred financial loss in an amount to be determined at trial.

**Minnesota: Pamela Romero**

282.     Plaintiff Pamela Romero ("Romero") has been a CenturyLink customer and lives in Rockford, Minnesota.

49

283.    In 2016, Romero contacted CenturyLink for internet services and was offered a price of $29.95 per month.  Romero agreed to those terms.

284.    When her bill arrived, instead of $29.95 per month, CenturyLink charged her $49.99 per month. Once Romero realized she was being overcharged, she and her husband spent considerable time and inconvenience disputing the charges with CenturyLink. Despite Romero's complaints and efforts, Defendant continued to overcharge for her services.

285.    CenturyLink also overcharged Romero for their bundling services.  When Romero asked CenturyLink to bundle DirecTV television service with their internet service, CenturyLink offered, and the parties agreed to, a price of approximately $130 per month. Instead, CenturyLink billed Romero $200 per month.

286.    In May 2017, Romero terminated CenturyLink's services. She understood CenturyLink billed for services one month in advance, and allowed CenturyLink to take any invoiced amounts out of her bank account.  However, after she terminated CenturyLink's services in May 2017, CenturyLink still billed them for that month.

287.    To date, CenturyLink refuses to refund the amounts it wrongfully took from Romero's bank account. CenturyLink has since sent her to collections to try and obtain the wrongful charges.

288.    As a result of CenturyLink's misconduct, Romero has been damaged and incurred financial loss in an amount to be determined at trial.

**Missouri: Christina Scott**

289.    Plaintiff Christina Scott ("Scott") has been a CenturyLink customer and lives in Holden, Missouri.

290.     In May 2015, Scott purchased CenturyLink Internet services after speaking to a CenturyLink sales representative that offered her a price of $50 per month.

291.     When the bill arrived, CenturyLink charged Scott approximately $70 per month.  Included on the bill were charges for a landline which she never ordered.

292.     Scott has called CenturyLink to dispute the charges and unauthorized services numerous times, which typically results in long times on the phone with little resolution. Scott has spent approximately 30 to 40 hours disputing her bills with CenturyLink, to no avail.

293.     As a result of CenturyLink's misconduct, Scott has been damaged and incurred financial loss in an amount to be determined at trial.

**Nevada: David Garten**

294.     Plaintiff David Garten ("Garten") is an individual living in Clark County, NV. He is a retiree on a fixed income.

295.     In or around April 2016, Garten established telephone and television services with CenturyLink. Garten signed up for automatic billing, which CenturyLink promised would be billed no earlier than the 21st of each month.

296.     Almost immediately, CenturyLink began auto-debiting Garten's bank account on or about the 10th of the month, causing his account to regularly overdraft.

297.     After extended periods of time on the phone with CenturyLink, Garten was advised that CenturyLink could not change the billing date. Garten confirmed that the cost to terminate the account was around $250, and in July 2016, terminated the account.

51

298.     CenturyLink subsequently assessed Garten a $470 early termination fee and a $16 disconnect fee for cancelling the telephone services, and another $470 early termination fee for canceling the television service.

299.     The final bill from Century Link was $951.56, which Century Link attempted to debit from Garten's account, once again causing him to incur overdraft charges.

300.     By reason of the foregoing, Garten has been damaged and incurred financial loss as a result of CenturyLink's unlawful and deceptive practices.

**New Mexico: Richard Lucero**

301.     Plaintiff Richard Lucero ("Lucero") has been a CenturyLink customer and lives in Albuquerque, New Mexico.

302.     In December 2016, Lucero established service with CenturyLink for internet service only.

303.     When he signed up, the CenturyLink sales representative offered Lucero a price of just over $29 per month for internet service.

304.     Thereafter, unbeknownst to Lucero, CenturyLink opened a second account in his name and began to bill him for this unauthorized account. This second account was, and is, a false account.

305.     When Lucero received his first bill on his authorized account, he was charged $90.34. Lucero paid CenturyLink the improper amount solely because he required the services.

306.     CenturyLink also improperly billed Lucero for a modem, even though Lucero was using his own modem. A CenturyLink representative went to Lucero's home and

confirmed that Lucero was using his own modem. Despite this, CenturyLink continued to bill Lucero for a modem.

307.     CenturyLink terminated Lucero's service in July 2017 for nonpayment. However, Lucero believed he was current on his account and was unaware of the double billing. Lucero continued to receive outstanding bills from CenturyLink after this cancellation.

308.     As a result of CenturyLink's misconduct, Lucero has been damaged and incurred financial loss in an amount to be determined at trial.

**New Mexico: Ralph Aragon**

309.     Plaintiff Ralph Aragon ("Aragon") has been a CenturyLink customer and lives in Albuquerque, New Mexico.

310.     In 2012, Aragon established service with CenturyLink for internet.

311.     Aragon canceled his internet service with CenturyLink in August 2017 and received confirmation of his cancellation.

312.     CenturyLink, without Aragon's knowledge, opened a second billing account in Aragon's name. Aragon inquired with CenturyLink regarding proof that he authorized the opening of a second account. CenturyLink failed to address the unauthorized account with Aragon.

313.     CenturyLink continuously billed Aragon without his permission under this unauthorized account.

314.     Aragon disputed all charges and CenturyLink threatened to send Aragon to Collections for failure to pay.

315.     As a result of CenturyLink's misconduct, Aragon has been damaged and incurred financial loss in an amount to be determined at trial.

**New Mexico: Maria Ochoa**

316.     Plaintiff Maria Ochoa ("Ochoa") has been a CenturyLink customer and lives in Las Vegas, Nevada. She lived in Chaparral, New Mexico at the time that she was a customer of CenturyLink.

317.     In early January 2013, Ochoa established service with CenturyLink for high-speed internet services.

318.     When she signed up for CenturyLink, Ochoa was offered approximately $69 per month for internet. Ochoa accepted and agreed to pay that price.

319.     Ochoa's bills were on average at least $40 more than the price that she was promised.

320.     CenturyLink, without Ochoa's knowledge or permission, added a third party long distance carrier to her account. Ochoa never authorized CenturyLink to add the third party long distance carrier to her account. CenturyLink also charged her additional fees relating to the third party long distance carrier that she never authorized.

321.     CenturyLink, without Ochoa's knowledge, also affiliated Ochoa's name with an address where she has never resided. CenturyLink billed that unauthorized account in her name on a monthly basis. She did not receive bills for that account because she did not ever reside at the address where CenturyLink claimed they were providing service. CenturyLink sent that account to collections, and as a result, Ochoa's credit score was negatively affected.

322.     During the time CenturyLink provided her service, Ochoa had a CenturyLink modem. When she returned the modem at the end of service, CenturyLink failed to register the return of the modem and sent Ochoa to collections for the fees associated with the modem.

323.     As a result of CenturyLink's misconduct, Ochoa has been damaged and incurred financial loss in an amount to be determined at trial.

**New Mexico: 528 Sushi and Asian Cuisine LLC**

324.     Plaintiff 528 Sushi and Asian Cuisine LLC ("528 Sushi") has been a CenturyLink customer and is a business located in Albuquerque, New Mexico.

325.     In August 2017, 528 Sushi established service with CenturyLink for internet and telephone services.

326.     When 528 Sushi signed up, the CenturyLink sales representative offered 528 Sushi a price of $69.99 per month, which was a $20 off promotion.

327.     When 528 Sushi received its first bill, it was charged $109.77.

328.     528 Sushi called CenturyLink to dispute the incorrect billing. Rather than addressing the issue, the CenturyLink sales representative upsold 528 Sushi, stating it was eligible for free DirectTV service for a one time fee of approximately $20. 528 Sushi accepted.

329.     Thereafter, however, CenturyLink charged 528 Sushi a rate of $28.38 a month for Direct TV. Upon inquiring, 528 Sushi learned that the CenturyLink sales representative had signed 528 Sushi up for a two year DirectTV contract without 528 Sushi's knowledge.

330.     By reason of the foregoing, 528 Sushi has been damaged and incurred financial loss as a result of CenturyLink's unlawful and deceptive practices.

## North Carolina: Bunnie Clayton

331.     Plaintiff Bunnie Clayton ("Clayton") has been a CenturyLink customer and lives in Hurdle Mills, North Carolina.

332.     When Clayton originally signed up for telephone and internet services, CenturyLink offered him a rate of $59.99 per month.

333.     When Clayton received his first bill, it was $10 more than the promised amount. Clayton's bill fluctuated each month, and eventually was approximately $40 a month more than the promised rate.

334.     Recently, Clayton signed up for CenturyLink's "price for life" internet service plan.  CenturyLink promised a rate of $25 per month, but has already risen. When he received his bill, he was charged $45 per month.  When he called to complain, CenturyLink did not give him a refund and stated that he was stuck with the higher rate because it was a "faster speed."

335.     CenturyLink is the only available home telephone and internet service provider available to Clayton.

336.     By reason of the foregoing, Clayton has been damaged and incurred financial loss as a result of CenturyLink's unlawful and deceptive practices.

## North Carolina: Robert Marchese

337.     Plaintiff Robert Marchese ("Marchese") has been a CenturyLink customer and lives in Wake Forest, North Carolina.

338.     In 2005, Marchese established service with CenturyLink for internet and telephone services.

339.     When he signed up, CenturyLink offered Marchese a price of approximately $88 per month. Two years ago, Marchese signed up for the "Price for Life" contract with CenturyLink. CenturyLink offered Marchese a price of $68 per month.

340.     Each month, Marchese's bill was higher than the $68 per month he was offered, and currently is $88 per month.

341.     Marchese called CenturyLink each month to dispute his bill. The CenturyLink representatives continuously offered Marchese the "Price for Life" contract for $89 per month. Marchese continued to inform the CenturyLink sales representatives that he was already under a contract for "Price for Life" at $68 per month. The CenturyLink sales representatives would explain that "Price for Life" was a new deal and there was no way that he could already be under that contract.

342.     CenturyLink refused to correct the overcharging. Marchese continued to be overcharged each month.

343.     As a result of CenturyLink's misconduct, Marchese has been damaged and incurred financial loss in an amount to be determined at trial.

**Oregon: Laurie A. Raymond, Attorney at Law**

344.     Plaintiff Laurie Raymond ("Raymond") has been a customer of CenturyLink and is the sole proprietor of a family law practice in Portland, Oregon.

345.     Prior to June 2015, Raymond was a CenturyLink telephone services customer.

346.     In June 2015, CenturyLink sent Raymond a solicitation by mail asking her to give them feedback on her current telephone services. When Raymond called, the sales representative informed her that her monthly cost could be lowered to approximately $128 per month if she signed up for a telephone and internet bundle. Raymond informed the representative that she did not need internet service as she already had it with another company. The representative informed Raymond that she could put it on her account to lower her rate and she could choose not to use the internet service.  Raymond did not agree to this offer.

347.     Three days later, CenturyLink technicians arrived at Raymond's law practice with a modem she did not authorize or require.  When Raymond received her bill, the monthly rate was approximately $22 more than she had been offered, and she was also assessed a monthly fee for the CenturyLink modem she did not request, use, or authorize.

348.     Each time Raymond called CenturyLink to complain, the representatives gave a different excuse for the unauthorized charge and refused to correct the billing. For four months, Raymond refused to pay the bill and sent monthly complaints and letters to CenturyLink about its deceptive practices.

349.     CenturyLink then informed Raymond that they would be cutting off her telephone service if she did not pay her bill. Raymond then informed CenturyLink's representative of its overbilling and was informed that CenturyLink would not cut off her service while it investigated the issue.

350.    A few days later, CenturyLink shut off Raymond's telephone service for non-payment. Raymond needed her business phone, and paid approximately $2,000 to CenturyLink to get the business telephone lines reconnected and running.

351.    Raymond's efforts to obtain a refund of CenturyLink's unlawful charges have been unsuccessful despite numerous phone calls and complaints.

352.     As a result of CenturyLink's misconduct, Raymond has been damaged and incurred financial loss in an amount to be determined at trial.

**Oregon: Rebecca Lavelle-Register**

353.    Plaintiff Rebecca Lavelle-Register ("Lavelle-Register") has been a CenturyLink customer and lives in Portland, Oregon.

354.    In approximately September 2015, CenturyLink sent door to door sales representatives to Lavelle-Register's residence. Based on CenturyLink's promises of lower rates than she was currently paying, Lavelle-Register signed up for CenturyLink's new fiber internet services.

355.    When Lavelle-Register received her first bill, it was approximately $10 more than CenturyLink's sales representatives had promised.

356.    Lavelle-Register's account was on auto-pay so she did not notice the overbilling immediately. When she did notice the overcharge, Lavelle-Register called CenturyLink and was informed that they would fix the billing. However, when she received the following month's bill, CenturyLink had not done what they promised.

357.    Lavelle-Register has called CenturyLink at least every other month to have them correct its overbilling. She has spent a significant amount of time on the phone with

59

various CenturyLink representatives explaining and disputing unauthorized charges. However, CenturyLink has only partially credited her for the overbilled amounts.

358.     As a result of CenturyLink's misconduct, Lavelle-Register has been damaged and incurred financial loss in an amount to be determined at trial.

**Oregon: Kathryn O'Donnell**

359.     Plaintiff Kathryn O' Donnell ("O'Donnell") has been a CenturyLink customer and lives in Portland, Oregon.

360.     In 2014, O'Donnell signed up for CenturyLink internet service for a 24 month term, at an agreed rate of $30.94 per month for the first 12 months.  Within a couple of months, CenturyLink increased her rate to $35.94. After 12 months, her rates increased to between $65.99 and $67.99.

361.     In March 2017, CenturyLink representatives solicited O'Donnell at her residence, promising her that if she switched to CenturyLink's new fiber internet, her monthly rate would be $20-30 per month.  O'Donnell agreed and switched to CenturyLink's fiber internet in June 2017.

362.     Thereafter, CenturyLink broke its promise and billed O'Donnell between $65 and $79 per month for fiber internet, with the charges constantly varying.

363.     When O'Donnell disputed the charges to CenturyLink, it informed her that she was in a minimum term agreement and that the only way she could lower her monthly rate was to downgrade her service. O'Donnell agreed to downgrade her service because she did not know what else to do.

364.     As a result of CenturyLink's misconduct, O'Donnell has been damaged and incurred financial loss in an amount to be determined at trial.

**Oregon: Rebeca Rocha**

365.     Plaintiff Rebeca Rocha ("Rocha") has been a CenturyLink customer and lives in Portland, Oregon.

366.     Rocha first signed up for CenturyLink's internet service in August 2015.

367.     In April 2016, Rocha moved to a new area. She contacted CenturyLink and was informed that CenturyLink did not offer service in her new area. CenturyLink informed Rocha that she could cancel her account without any termination fees. Rocha then returned her modem via mail to CenturyLink.

368.     Rocha later received a collections notice stating that she owed CenturyLink $99.99 for the modem she had properly returned.

369.     As a result of CenturyLink's misconduct, Rocha has been damaged and incurred financial loss in an amount to be determined at trial.

**Utah: Hollie Richman**

370.     Plaintiff Hollie Richman ("Richman") has been a CenturyLink customer and lives in Nephi, Utah.

371.     In February 2017, Richman signed up for CenturyLink internet service.

372.     CenturyLink sent Richman an advertisement for $19.95 internet, and when she called to inquire, a sales representative offered her a monthly rate of $9.95 upon providing CenturyLink proof of low income within 10 days. Richman agreed to the $9.95

rate and promptly sent CenturyLink documents showing that she had state assistance and was enrolled in Supplemental Nutrition Assistance Program (SNAP).

373.     Instead of the rate that CenturyLink promised, CenturyLink billed her $29.95 along with additional charges. When Richman called to complain, they told her she had to pay an initial $40 fee to activate the service—a fee which had not been disclosed to Richman —and that future bills would be corrected to reflect their initial agreement.

374.     Despite its assurances, CenturyLink continued to charge Richman $29.95 plus additional charges on subsequent bills.

375.     After CenturyLink's repeated refusals to correct the billing, Richman asked that her account be terminated. CenturyLink stated that she would be charged a $200 early termination fee. CenturyLink never previously disclosed that she was subject to a minimum term for service.

376.     CenturyLink has sent Richman's account to collections and continues to demand that she pay a balance of $579. The last time Richman spoke with CenturyLink, she explained the issue again and CenturyLink informed her it would hold off on trying to collect for a month while they sorted out the issue.  Once again, CenturyLink did not honor its promise.

377.     As a result of CenturyLink's misconduct, Richman has been damaged and incurred financial loss in an amount to be determined at trial.

**Utah: Bob Glodowski**

378.     Plaintiff Bob Glodowski ("Glodowski") has been a CenturyLink customer and lives in Salt Lake City, Utah.

379.     In December 2015, Glodowski contacted CenturyLink for internet services and signed up for 40Mbps internet service.

380.     In January 2017, after receiving consistently lower internet speeds than promised, Glodowski upgraded to CenturyLink's 100 Mb/s internet service at the offered price of approximately $32.98 per month. For a few months, there were no issues with their bill.

381.     In April or May 2017, Glodowski's internet service went down and CenturyLink sent technicians to resolve the issue. The following month, Glodowski received a bill for $43.98, instead of the $32.98 monthly rate that CenturyLink promised.

382.     Glodowski called CenturyLink numerous times and spent significant time on the phone trying to resolve the overbilling issues. It was during this time that Glodowski found out that CenturyLink had switched his service to the higher-priced 1GB internet service without his knowledge or consent.

383.     After many conversations, CenturyLink credited his account for past overbillings but again overcharged him in November 2017 for which CenturyLink has provided no credit.

384.     In December 2017, Mr. Glodowski called to cancel CenturyLink's services because he was frustrated with having to call them every month and their many empty promises to fix the billing.

385.     In January 2018, Glodowski called CenturyLink to confirm his account had a zero balance. CenturyLink informed Glodowski that he still owed $31.75. After explaining the situation yet again, CenturyLink promised to credit the account.

386.     As a result of CenturyLink's misconduct, Glodowski has been damaged and incurred financial loss in an amount to be determined at trial.

**Washington: Jubilee Lawhead**

387.     Plaintiff Jubilee Lawhead ("Lawhead") has been a customer of CenturyLink and lives in Yacolt, Washington.

388.     On or about March 3, 2017, Lawhead signed up for CenturyLink's internet and telephone services.  The CenturyLink sales representative offered her a price of $55.95 per month, which included a single residential line and 10 mb/s internet speed. Lawhead requested the services to begin on or about March 3, 2017, but CenturyLink did not start them until on or about March 24, 2017.

389.     Days after the services began, and before a landline was even connected to her home, Lawhead received a bill for $74.47, which she disputed and did not pay. The following month, Lawhead received a bill for $216.81, which included the previous months' disputed bill and included charges for an additional—and unauthorized—home and business line.

390.     Additionally, despite CenturyLink promising Lawhead internet speed of 10 mb/s, she has yet to receive the quality of service ordered. Using CenturyLink's own speed testing tools, Lawhead has often observed 1mb/s to 2 mb/s speeds and has never seen speeds that have exceeded 8.5 mb/s.

391.     Lawhead has called CenturyLink to complain about the quality and price of services received numerous times, totaling approximately 20 hours on the phone with

CenturyLink. Currently, CenturyLink is still billing her approximately $71.64 per month for her services, but has removed the unauthorized lines from her account.

392.     Each month, Lawhead continues to spend hours on the phone with CenturyLink regarding overcharges in her bills.

393.     As a result of CenturyLink's misconduct, Lawhead has been damaged and incurred financial loss in an amount to be determined at trial.

**Washington: Sara Young-Buck**

394.     Sara Young-Buck ("Young-Buck") has been a CenturyLink customer and lives in Seattle, Washington.

395.     Young-Buck is a former telephone, internet, and Prism TV CenturyLink customer. In February 2016, a CenturyLink sales representative came to Young-Buck's residence offering CenturyLink's services.  The sales representative offered all three services at a bundled rate of $90 per month.  Young-Buck agreed to the offered price and provided a "signature by phone" to a CenturyLink customer service representative who processed in-person sales on behalf of CenturyLink. No contract was ever received by Young-Buck.

396.     When her bills arrived, CenturyLink consistently charged Young-Buck in excess of $160 per month.

397.     Young-Buck called CenturyLink to dispute the charges and requested a copy of her original contract. The CenturyLink sales representative she spoke to informed her that her contract had been destroyed and that the promotional rate she was promised did not exist, despite a phone confirmation on the very day she "signed" her contract by phone in the presence of the door-to-door representative.

398.     During her time as a CenturyLink customer, Young-Buck spoke with various CenturyLink sales representatives, including those in the "Escalations" department, about the disputed charges. CenturyLink's explanations varied, and it never honored the price it had offered and agreed.  After filing a complaint with the Better Business Bureau, Young-Buck was able to reduce her final bill, but never received credits for previous overcharges.

399.     As a result of CenturyLink's misconduct, Young-Buck has been damaged and incurred financial loss in an amount to be determined at trial.

**Washington: Michael Anderson**

400.     Plaintiff Michael Anderson ("Anderson") has been a customer of CenturyLink and lives in Olympia, Washington.

401.     In October 2014, Anderson signed up with CenturyLink for telephone, internet, and DirectTV services at an agreed upon price of $146.90 per month.

402.     After a few months of correct billing, Anderson noticed a large jump in the charges on his CenturyLink bill.  When he contacted CenturyLink, he was informed that the hike was due to promotional prices for DirecTV movie channels expiring.  This increased his monthly bill to $206.67, though the amount would fluctuate up to $247.91.

403.     Anderson had never requested any movie channels when initially ordering the service from CenturyLink, never used them, and asked that they be immediately removed from his account. CenturyLink, however, informed him that he had signed up for a three year minimum term and was stuck with the deal being imposed on him. CenturyLink refused to alter the services and continued to bill him accordingly.

404.    In October 2017, Anderson contacted CenturyLink to remove the DirecTV services because he believed that the minimum three year service period CenturyLink had held him to had run. CenturyLink informed him that it could not cancel the DirecTV portion of the service and that he would need to contact DirecTV directly.

405.    When Anderson contacted DirecTV, it informed him that he was never bound to a three year term with DirecTV and that he had been able to cancel any DirecTV services at any time. Anderson requested a refund for the television services he had paid for after CenturyLink's lie about the existence of a three year term for DirecTV service. DirecTV escalated Anderson's request to CenturyLink, who summarily denied it.

406.    As a result of CenturyLink's misconduct, Anderson has been damaged and incurred financial loss in an amount to be determined at trial.

**Wisconsin: Jason Malueg**

407.    Plaintiff Jason Malueg ("Malueg") has been a customer of CenturyLink and lives in Larson, WI.

408.    Malueg has been a CenturyLink phone and internet subscriber since approximately 2010. In March 2016, he discontinued his CenturyLink phone service. At that time, he was offered and accepted a promotional rate of "$36.95 per month plus tax" for internet services only.

409.    Over the next 12 months, Malueg's total monthly bill fluctuated between $41 and $47 each month. When Malueg called to ask about the difference in prices, he was told that the changes were the result of taxes. He was charged a "Broadband Cost Recovery Fee" of $3.99 per month for all 12 months. Malueg understood this fee to be a tax, as he was

offered and accepted a promotional rate of "$36.95 per month plus tax". Malueg was also charged approximately $1.70 per month in service charges and taxes for all 12 months for "Voice," despite discontinuing phone service and accepting a promotional package that did not include phone service.

410. When his 2016 promotional rate expired, Malueg contacted CenturyLink to inquire about new promotional rates. In or around April 2017, Malueg was offered and accepted a new promotional rate of "$31.95 per month plus tax" for internet services only.

411. Malueg never received this rate. Instead, he was billed $64.95 per month for the month of May. Malueg called to complain about the overcharge, and after several hours on the phone, was told refund credits would be added to his June 2017 bill and that he would be charged the correct rate moving forward. Malueg's next bill contained seven credits in varying amounts, all labeled as or similar to "Billing Correction Credit 1 PtyResLine/Outbnd", but his base rate was still $64.95. Frustrated, Malueg cancelled his CenturyLink service.

412. The following month, Malueg received a bill with five miscellaneous charges, all labeled as or similar to "Reversal of Billing Correction Credit 1 PtyResLine/Outbnd". In response to his decision to cancel his service, CenturyLink reversed five of the seven overcharge refunds it had issued to him the previous month. To make matters worse, two months after he cancelled his CenturyLink services because CenturyLink was unwilling or unable to honor their promotional rate offers, CenturyLink sent him a bill with a $200 early termination fee. CenturyLink has refused to reimburse Malueg for all monies he paid above the promotional price for his internet service to which he agreed.

413.     As a result of CenturyLink's misconduct, Malueg has been damaged and incurred financial loss in an amount to be determined at trial.

## VI. CLASS ALLEGATIONS

414.     This action is brought, and may be properly maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure.  All requisite elements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) are satisfied; there is a well-defined community of interests in the litigation; the proposed Class and any subclasses are ascertainable; and a single class action is the superior manner to proceed when compared to the joinder of hundreds of thousands of plaintiffs or tens of thousands of individual cases challenging the same practices.

415.     Plaintiffs bring this action individually on behalf of themselves, and in a representative capacity on behalf of the Class and Subclass(s) defined below, for which Plaintiffs are members, under Rule 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure seeking damages, restitution, injunctive and declaratory relief pursuant to the applicable laws set forth in the state law counts below.  The Class is defined as:

> All persons or entities in the United States who, during the Class Period, had an account for telephone or internet services with Defendant.

416.     Within the Class are various state Subclasses. Each Subclass is defined as follows:

- **Arizona Subclass:**  All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Arizona ("Arizona Subclass" or "Arizona Subclass Member(s)").

- **Colorado Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with

69

Defendant in the State of Colorado ("Colorado Subclass" or "Colorado Subclass Member(s)").

- **Florida Subclass** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Florida ("Florida Subclass" or "Florida Subclass Member(s)").

- **Idaho Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Idaho ("Idaho Subclass" or "Idaho Subclass Member(s)").

- **Iowa Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Iowa ("Iowa Subclass" or "Iowa Subclass Member(s)").

- **Minnesota Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Minnesota ("Minnesota Subclass" or "Minnesota Subclass Member(s)").

- **Missouri Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Missouri ("Missouri Subclass" or "Missouri Subclass Member(s)").

- **Montana Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Montana ("Montana Subclass" or "Montana Subclass Member(s)").

- **Nevada Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Nevada ("Nevada Subclass" or "Nevada Subclass Member(s)").

- **New Mexico Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of New Mexico ("New Mexico Subclass" or "New Mexico Subclass Member(s)").

- **North Carolina Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of North Carolina ("North Carolina Subclass" or "North Carolina Subclass Member(s)").

- **Oregon Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Oregon ("Oregon Subclass" or "Oregon Subclass Member(s)").

- **Utah Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Utah ("Utah Subclass" or "Utah Subclass Member(s)").

- **Washington Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Washington ("Washington Subclass" or "Washington Subclass Member(s)").

- **Wisconsin Subclass:** All persons or entities who, during the Class Period, had an account for telephone and/or internet services with Defendant in the State of Wisconsin ("Wisconsin Subclass" or "Wisconsin Subclass Member(s)").

417.    The Class Period for the Class and each Subclass dates back to the longest applicable statute of limitations for any claims asserted on behalf of that Class or Subclass from the date this action was commenced and continues through the present and to the date of judgment.

418.    Excluded from the Class and any Subclass is Defendant, its current employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiffs; and the judge and court staff to whom this case is assigned. Plaintiffs reserve the right to amend the definition of the Class or Subclasses if discovery or further investigation reveals that they should be expanded or otherwise modified.

71

419.    This action satisfies the predominance, commonality, typicality, numerosity, superiority, adequacy, and all other requirements of Rule 23 of the Federal Rules of Civil Procedure.

- **Numerosity**: Each proposed Class and Subclass is so numerous that the individual joinder of all members is impractical under the circumstances of this case. Each proposed Class and Subclass consists of at least tens of thousands of Defendant's customers. This is shown, *inter alia*, by the state coverage statistics Century Link publishes on https://www.highspeedinternet.com/providers/centurylink.The widespread and pervasive impact of the challenged practices on Defendant's customers is shown, *inter alia*, by the Minnesota and Arizona Attorney General investigations and complaints; the statements of former CenturyLink employees, and other customer complaints. While the exact number of Class members and Subclass members is currently unknown, Plaintiffs are informed and believe, and thereon allege, that thousands of customers across the country and in each state CenturyLink operates have been victimized by CenturyLink's practices, in the manner described above.

- **Commonality**:  Common questions of law and fact exist as to all members of the Class and Subclasses, and predominate over any questions that affect only individual members of the Class and each Subclass.  The practices at issue are not isolated incidents but instead are widespread, common, and systematic practices affecting large groups of Defendant's customers in each

applicable state, as shown, *inter alia*, by the Attorney General actions brought against Defendant in Arizona and Minnesota, as well as other complaints and customer accounts.[24] The common questions of law and fact include, but are not limited to:

    i.    Whether Defendant charged Plaintiffs and the Class more than agreed upon prices;

    ii.    Whether Defendant made misrepresentations or omissions of material fact about its quoted monthly prices and the nature of its telecommunications services and billings;

    iii.    Whether Defendant breached implied or explicit contractual obligations to its subscribers or deceptively billed for services not being offered, not contemplated, or not agreed upon;

    iv.    Whether Defendant breached the implied covenant of good faith and fair dealing made part of all contracts;

    v.    Whether Defendant added unauthorized charges to Plaintiffs' and Class members' accounts;

    vi.    Whether Defendant opened or maintained duplicate or multiple unauthorized accounts in its customers' names;

    vii.    Whether Defendant maintained incentive programs which encouraged employees and agents to overcharge Class members for services Class members did not order or approve;

    viii.    Whether Defendant failed to provide safeguards to prevent the misconduct at issue;

    ix.    Whether Defendant engaged in a practice or act with intent to sell, distribute, increase the consumption of its services, or with intent to induce the public in any manner to enter into any contract or

---

[24] *See e.g.*, Ramos v. Qwest Corp dba CenturyLink, No. 16-cv-05642 (W.D. Wash.); *See also*, https://www.complaintboard.com/centurylink-l3215.html; https://www.reddit.com/r/Denver/comments/2s8ei5/illegitimate_collections_attempt_for _cancelled/; https://creditboards.com/forums/index.php?showtopic=542494; http://www.dslreports.com/forum/r28909565-being-charged-for-modem-i-returned.

73

obligation relating to its services, made, published, disseminated, circulated or otherwise placed before the public an advertisement, announcement, statement or representation of any kind to the public relating to such services or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive, or misleading;

x. Whether Defendant maintained a policy of shifting responsibility to its customers to discover overcharges as opposed to billing and collecting fees from consumers accurately and in good faith;

xi. Whether Defendant engaged in a practice or act that it knew or reasonably should have known to be an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact related to the advertisement, sale, or lease of equipment and telephone and internet services;

xii. Whether Defendant intended to cause confusion or misunderstanding among consumers regarding the prices of its telecommunications services and whether Defendant intended not to honor its offered prices;

xiii. Whether Defendant has been unjustly enriched;

xiv. Whether Plaintiffs and the Class were harmed and suffered damages as a result of Defendant's conduct and, if so, the appropriate amount thereof; and

xv. Whether, as a result of Defendant's misconduct, Plaintiffs and the Class are entitled to equitable relief, and if so, the nature of such relief.

- **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses to which they belong.  All Plaintiffs are members of the Class, as well as the respective Subclass for the state in which they reside. Plaintiffs were subjected to Defendant's common business practices, described above, and assert common legal claims that are typical of those of

74

the Class and each Subclass. Plaintiffs and the members of the Class and each Subclass sustained damages arising out of Defendant's wrongful and deceptive conduct as alleged herein, and face the risk of further harm unless enjoined. Resolution of the common issues presented in Plaintiffs' cases will resolve them in a common and typical manner for other members of the Class and Subclasses.

- **Adequacy of Representation**: Plaintiffs and the undersigned counsel will fairly and adequately protect the interests of the Class members. Plaintiffs are knowledgeable about their claims and practices complained of; are prepared to prosecute the claims in the best interests of the Class and each Subclass; have no interest that is adverse to the interests of the other members of the Class and Subclasses; and have hired counsel experienced in class actions and complex litigation to represent the Class and Subclasses. The undersigned counsel are sufficiently experienced in complex litigation; are prepared to prosecute this action in the best interest of the Class and Subclasses; and have no conflicts with the members of the Class or any Subclass.

- **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all Class members is impracticable, class action treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of

effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the Class and Subclasses to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to, and burden on, the court system by adjudicating individualized litigation would be substantial, and significantly more than the costs and burdens of a class action. Class litigation will also prevent the potential for inconsistent or contradictory judgments.

420.    A Class should also be certified under Fed. R. Civ. P. 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the Class and Subclasses, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes.

421.    In the alternative, this Class and each Subclass may be certified under Fed. R. Civ. P. 23(c)(4) with respect to particular issues.

## VII.  CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF 47 U.S.C. §§ 201, *et seq.* and 47 C.F.R. § 64.2401

### (On Behalf of All Class Members)

422.    Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

423.    CenturyLink is a common carrier engaged in interstate communication by wire for the purpose of furnishing communication services as defined in 47 U.S.C.§ 201(a) of the Federal Communications Act ("Communications Act").

424.    Carriers are responsible for the conduct of third parties acting on the carrier's behalf, *See* 47 U.S.C. § 217 ("In construing and enforcing the provisions of this chapter, the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person.").

425.    Section 201(b) of the Communications Act prohibits "unjust" and "unreasonable" practices "in connection with such communication service."   At all times relevant hereto, 47 U.S.C.§ 201(b), provided, in relevant part, as follows:

> All charges, practices, classifications, and regulations for and in connection with such communication service [*i.e.*, interstate or foreign communication by wire or radio], shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful…

426.    CenturyLink's practice of billing and collecting unauthorized charges from Plaintiffs and the Class is neither just nor reasonable and is, in fact, unjust and unreasonable, and violates 47 U.S.C. § 201,.

427.    At all times relevant hereto, 47 C.F.R. § 64.2401, entitled "Truth-in-Billing Requirements," provided, in relevant part, as follows:

> (b) Descriptions of billed charges. Charges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered. The description must be sufficiently clear in presentation and specific enough in content so that customers can accurately

assess that the services for which they are billed correspond to those that they have requested and received, and that the costs assessed for those services conform to their understanding of the price charged…

(d) Clear and conspicuous disclosure of inquiry contacts. Telephone bills must contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill.

428.    The charges contained on CenturyLink's bills were not accompanied by "clear, non-misleading, plain language description of the service or services rendered" nor did they "contain clear and conspicuous disclosure of any information that the subscriber may need to make inquiries about, or contest, charges on the bill," in violation of 47 C.F.R. § 64.2401.

429.    CenturyLink is liable to Plaintiffs and the Class for damages and attorneys' fees, pursuant to 47 U.S.C. § 206, which provides as follows:

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee . . .

430.    As a direct and proximate result of CenturyLink's violations, Plaintiffs and the Class suffered damages, and pursuant to 47 U.S.C. § 207 are entitled to recover, as follows:

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may . . . bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction. . .

431.    488. As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages, restitution, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT II
## BREACH OF CONTRACT

### (On Behalf of All Class Members)

432.     Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

433.     Plaintiffs and each member of the Class received an offer for services from Defendant, agreed to pay, and did pay Defendant for the provision of services and products at agreed upon costs. In doing so, Plaintiffs and each member of the Class entered into a contract with Defendant.

434.     Defendant expressly and/or impliedly agreed to bill and collect only for authorized charges.

435.     Defendant breached these obligations by billing and collecting more than agreed upon, billing for unauthorized charges, and by providing bills that were unclear and misleading.

436.     Defendant's acts, imposing unauthorized charges on Class members' accounts, were intentional and willful.

437.     Defendant routinely overcharged Plaintiffs and the Class in breach of their offers and contracts, implied or express. Defendant failed to deliver telephone or internet services and related products at the promised price. Plaintiffs and Class members were charged excessive amounts that they did not agree to pay.

438.     Alternatively or additionally, Plaintiffs and Class members were charged for services or products that they did not purchase or had properly canceled.

439.    Alternatively or additionally, Plaintiffs and Class members were charged improper termination fees, or were charged for products they had returned, or had accounts prematurely sent to collections when they refused to pay wrongful fees.

440.    Plaintiffs and Class members paid Defendant for these services or products and in all other respects performed or substantially performed their obligations under the contracts.  Defendant was not authorized or justified in charging Plaintiffs and the Class for unauthorized amounts.

441.    An implied covenant of good faith and fair dealing is part of all contracts. Defendant breached its contractual obligation of good faith and fair dealing, implied in all contracts, by billing and collecting for unauthorized charges.

442.    Defendant's conduct in breaching the contracts in the above-described manner was not isolated but was rather systematic, pervasive, persistent, and a direct result of business policies and practices implemented to maximize Defendant's revenue.

443.    Plaintiffs and the Class were injured, harmed, and incurred financial loss by way of Defendant's above-described conduct in amounts to be determined at trial.

444.    Plaintiffs and the Class did not voluntarily pay the unauthorized charges in dispute.  At the time it occurs, most consumers are unaware that they have been subjected to unauthorized charges and/or have been a victim of cramming.  When Plaintiffs discovered the billings they protested and demanded refunds, including through this action.  Further, Plaintiffs were under duress to pay the improper amounts on threat of having their essential services cancelled and/or interrupted.

445.    As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages and all other relief deemed just and equitable by the Court.

## COUNT III
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

### (On Behalf of All Arizona, Minnesota, North Carolina, Oregon, and Wisconsin Subclass Members)

446.    Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

447.    This count is asserted by members of the Arizona, Minnesota, North Carolina, Oregon, and Wisconsin Subclasses ("Count III Subclasses").

448.    The laws of these states recognize that a separate duty of good faith and fair dealing arises out of a contractual relationship, the breach of which is a separate tort independent from any corresponding breach of contract.

449.    The implied covenant of good faith and fair dealing prohibits a party from acting in a manner to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.

450.    Defendant expressly and/or impliedly agreed to bill and collect only for authorized charges and for agreed upon prices, and expressly and/or impliedly agreed to provide clear and non-misleading phone bills.

451.    Defendant breached these obligations by billing and collecting unauthorized charges, by charging more than agreed upon, and by providing telephone bills that were unclear and misleading.

452.     Defendant's acts imposing unauthorized or excessive charges on Class member's accounts were intentional, willful, unfair, and conducted in bad faith.

453.     When engaging in the actions set forth above, Defendant acted with the intent to deprive Plaintiffs and members of the Subclasses of their contractual rights.

454.     By these actions, Defendant breached the implied covenant of good faith and fair dealing. Defendant breached its duties by failing to act fairly or in good faith.

455.     Plaintiffs and members of the Count III Subclasses were injured, harmed, and incurred financial loss by way of Defendant's conduct in amounts to be determined at trial.

456.     As a result of the foregoing, Plaintiffs and the members of the Count III Subclasses are entitled to, among other things, damages, restitution, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT IV
## VIOLATION OF STATE CONSUMER PROTECTION STATUTES

### (On Behalf of All Colorado, Minnesota, Florida, Washington, Oregon, Missouri, New Mexico, Iowa, Nevada, and Idaho Subclass Members)

457.     Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

458.     This count is asserted by members of the Colorado, Minnesota, Florida, Washington, Oregon, Missouri, New Mexico, Iowa, Nevada, and Idaho Subclasses only ("Count IV Subclasses.")

459.     Plaintiffs and members of the Count IV Subclasses assert this Count against Defendant for engaging in the conduct described herein, which violates state consumer protection statutes, including the following:

a. **Colorado:** Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101 *et seq.*;

b. **Minnesota:** Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.68 *et seq.* (actionable under Minn. Stat. § 8.31(3a)) and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43 *et seq.*;

c. **Florida:** Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§501.201 *et seq.*;

d. **Washington:** Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.020 *et seq.*;

e. **Oregon:** Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605 to 646.700;

f. **Missouri:** Missouri Merchandising Practices Act, Mo. Ann. Stat. §§ 407.010-407.309;

g. **New Mexico:** New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1*et seq.*;

h. **Iowa:** Iowa Consumer Frauds Act, Iowa Code Ann. §§ 714H.1-714H.8;

i. **Nevada:** Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0903 -598-0999 and Nev. Rev. Stat. § 41.600;

j. **Idaho:** Idaho Consumer Protection Act, Idaho Code §§ 48-601 *et seq.*

(Collectively the above referenced statutes are referred to herein as the "State Consumer Protection Statutes.")

460.    This Count is based on Defendant's deceptive and misleading conduct and common omissions of material fact.

461.    The foregoing State Consumer Protection Statutes are remedial in nature and all broadly prohibit deceptive, unfair, and misleading practices directed at consumers in the course of business, including those alleged to have been conducted by Defendant as described herein.

462.    Plaintiffs are all persons within the meaning of each State Consumer Protection Statute with standing to assert these claims on behalf of the state Subclass of which they are a member.

463.    The items for which Defendant charged Plaintiffs and Class are goods, services, and/or merchandise within the meaning of each State Consumer Protection Statute.

464.    Defendant charged Plaintiffs directly for the goods, services, and merchandise at issue.

465.    Defendant imposed and collected unauthorized and excessive charges from Plaintiffs and members of the Count IV Subclasses in a deceptive and misleading manner.

466.    As described above, Defendant systematically and regularly engaged in: (1) bait and switch tactics where customers were promised one price during the sales process and then charged a higher rate upon being billed; and (2) being charged unauthorized fees, including billing for services not ordered, for fake or duplicate accounts, for services ordered but never delivered, for services that were canceled, for equipment that was properly returned, and for early termination fees.

84

467.     These practices were not isolated incidents but rather the result of widespread, systematic, pervasive, and persistent conduct and business policies adopted by CenturyLink, which were aimed at maximizing Defendant's revenue at the expense of its customers.[25]

468.     The practices in which Defendant engaged were likely to cause confusion in Plaintiffs and members of the Count IV Subclasses.

469.     Unauthorized charges were difficult for customers in the Class to detect.  As reported in *USA Today*: "As many as 20 million people are crammed each year, but only about 1 in 20 realizes it, the Federal Communications Commission estimates. Cellphone and landline cramming could cost consumers up to $2 billion a year."[26]

470.     Each of the State Consumer Protection Statutes prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. The elements comprising a consumer claim for damages

---

[25] *See e.g.*, Assurance of Discontinuance between Qwest Corp. d/b/a/ Century Link QC and Attorney General of Arizona, *In the Matter of Qwest Corp. d/b/a CenturyLink QC*, No. CV 2016-002842 (Ariz. Sup. Ct. Apr. 13, 2016) (confirming that such practices, if continued to be engaged in, serve as prima facie evidence of a violation of the Arizona Consumer Fraud Act.).

[26] Prah, *'Cramming' phone scams targeted by state attorneys general*, USA TODAY (Dec. 19, 2013), *available at*: https://www.usatoday.com/story/news/nation/2013/12/19/stateline-cellphone-cramming/4129561/)(last visited Feb. 14, 2018); *See also* Kim, *How to Spot and Detect Unauthorized Telephone Bill Fees*, ABC NEWS (June 21, 2011), *available at*: http://abcnews.go.com/Business/95-percent-victims-detect-unauthorized-charges/story?id=13892850) (last visited Feb.14, 2018) ("About 15 to 20 million households are overcharged for their telephone landlines by third party companies and only 5 percent realize they are victims, according to the Federal Communications Commission."); Chen, *Now on Your Cellphone Bill, Services You Never Wanted, N.Y. Times* (July 4, 2014), *available at*: https://www.nytimes.com/2014/07/05/technology/unauthorized-charges-on-cellphone-bills-are-a-growing-nuisance.html) (last visited Feb. 14, 2018)("But how do you spot the charges if they are hidden? The Federal Communications Commission says cramming charges are often listed in a bill with generic terms like 'service charge,' 'service fee,' 'membership,' 'other fees,' 'usage fee' or 'voice mail.'").

under each of the State Consumer Protection Statutes are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

471.    Defendant engaged in unfair and deceptive acts and practices that violated each of the State Consumer Protection Statutes, causing Plaintiffs and members of the Count IV Subclasses injury and financial loss. Additionally, the risk of future injury remains unless enjoined.

472.    As alleged herein, CenturyLink, through its employees and agents, engaged in a pattern and practice of deceptive and misleading activity, and collection of monies by way of false pretenses. Defendant engaged in deceptive, unconscionable, and/or unfair business practices by, among other things: (a) causing Plaintiffs and members of the Count IV Subclasses to be billed for charges they did not request or authorize; and (b) billing at higher rates than those agreed upon.

473.    The amounts Defendant charged, collected, and auto-deducted from bank accounts (or otherwise billed and collected) are material terms to CenturyLink customers.

490.    Price is a material term to consumers. Deceptively overcharging consumers in a manner they are unlikely to detect within a short time period is a material misrepresentation or an omission of material fact to reasonable consumers in the Count IV Subclasses. As explained in the Heiser complaint, as well as in the proceedings brought by the Minnesota and Arizona Attorneys General, the misconduct described herein occurred in a regular and continuous manner and Class members were injured because Defendant maintained incentive programs for its employees and agents that provided financial incentives to engage in such conduct.

474.     Defendant never told the Class or any Subclass that they engaged in cramming and/or maintained internal incentive programs aimed at increasing its revenues by charging its customers with unauthorized and excessive fees. The omission of such facts was material, as reasonable consumers contemplating transactions with Defendant, either initially or on an ongoing basis, would have wanted to know about such practices prior to engaging in such transactions. Reasonable consumers, had they been made aware of such facts, would have acted differently, including but not limited to—if able—not purchasing the services or acquiring their telecommunication services or products from alternative providers.

475.     Defendant had a duty to disclose material facts to Plaintiffs and members of the Count IV Subclasses. The information concealed was in the exclusive possession of Defendant and not able to be obtained by Plaintiffs and Class members from other sources. Additionally, Defendant made partial statements about price in the form of sales representations and billing statements. Having spoken and provided partial information, Defendant had an affirmative duty to fully disclose all facts, including the existence of internal incentive programs aimed at overcharging Plaintiffs and the Class.

476.     The practices described herein were intended to, and were likely to, deceive consumers acting reasonably under the circumstances. Defendant intended Class members to rely on it to accurately sell and bill only for services and products requested. Defendant failed to do so and instead intentionally overcharged Plaintiffs and the Class.

477.     Under each State Consumer Protection Statute, an objective test is employed in determining whether a practice is likely to deceive a consumer acting reasonably. That is, a party asserting a deceptive trade practice claim need not show actual reliance on the

representation or omission of material fact at issue. Defendant acted with the intent that Plaintiffs and members of the Class rely on its concealment, suppression, or omission, in connection with the sale or advertisement of goods and services, and therefore engaged in unlawful practices in violation of each State Consumer Protection Statute. The amounts overbilled to each customer each month are relatively small (less than $200) and therefore, Defendant knows that certain customers may not immediately notice such discrepancies and immediately seek corrections when appropriate. Defendant seeks to exploit and take advantage of that dynamic. Defendant intended to harm competition be engaging in the foregoing conduct.

478.    By way of the foregoing, Defendant violated specific provisions of the State Consumer Protection Statutes, including, but not limited to, the following:

   a. **Colorado:** Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. § 6-1-105 (1)(e), (g), (i), (l), (n), and (u);

   b. **Minnesota:** Minnesota Prevention of Consumer Fraud Act, Minn. Stat. §§ 325F.69, subd. 1 and subd. 4 (actionable under Minn. Stat. 8.31(3a)), and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1 (5), (7), (9), and (13);

   c. **Florida:** Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204;

   d. **Washington:** Washington Consumer Protection Act, Wash. Rev. Code, § 19.86.020; § 19.86.90; § 19.86.93;

e. **Oregon:** Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.607(1), (2); § 646.608(1)(b), (e), (g), (i), (j), (s), (u);

f. **Missouri:** Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1);

g. **New Mexico:** New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-3;

h. **Iowa:** Iowa Consumer Frauds Act, Iowa Code Ann. §§ 714H.3(1);

i. **Nevada:** Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598.0915 (5), (7), (9), (13), (15); § 598.0917(6);

j. **Idaho:** Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (9), (11), (17), (18); § 48-603a(1), (2).

479.    Plaintiffs and the Class lost money and were injured by Defendant's deceptive, unconscionable, and/or unfair business practices in amounts to be determined at trial.

480.    The conduct described herein is continuing and will continue until enjoined. Defendant engaged in the conduct described herein for profit and as a deliberate corporate policy, rather than as an isolated incident. Defendant's conduct was morally wrong, callous, and/or oppressive.

481.    Plaintiffs have satisfied all prerequisites for filing such claims, including the provision of any pre-filing notice(s) and demand that Defendant stop engaging in the complained of practices, if and where required.  Any further delays in pursuing these claims would be futile as Defendant continues to engage in the practices complained of and has given no indication that it intends to change its practices, policies, or provide refunds and other relief to all Plaintiffs, Class, and Subclass members.

482.     As a result of the foregoing, Plaintiffs and the Count IV Subclasses are entitled to, among other things, under each State Consumer Protection Statute(s) that allows such recovery: compensatory damages, any statutory damages and penalties allowed by law, restitution, an accounting, injunctive and declaratory relief prohibiting any continuation of the practices complained of, and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs.

## COUNT V
## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, LA. REV. STAT. ANN. §§ 51-1401-1430 ("LUTPA")

### (On Behalf of All Class Members)

483.     Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

484.     This count is asserted in the alternative to Count IV and is asserted by Plaintiffs on behalf of members of the Class.

485.     Plaintiffs and the Class assert this claim against Defendant for engaging in the misconduct described herein, which violates the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51-1401-1430 ("LUTPA").

486.      This claim is based on Defendant's deceptive and misleading conduct and common omissions of material fact, including charging its customer more for services than agreed to and charging for unauthorized fees or services.

487.     LUTPA is remedial in nature and broadly prohibits deceptive, unfair, and misleading practices towards consumers in the course of business, including those alleged to have been conducted by Defendant as described herein.

488.     Plaintiffs are all persons within the meaning of LUTPA with standing to assert this claim.

489.     The items for which Defendant charged Plaintiffs and the Class are goods, services, and/or merchandise within the meaning of LUTPA.

490.     Defendant charged Plaintiffs and the Class for the goods, services and merchandise at issue.

491.     As described in this Complaint, Defendant systematically and regularly engaged in: (1) bait and switch tactics where customers were promised one price during the sale and then charged a higher price at billing; and (2) imposing unlawful charges for services or products never ordered, for services that had been canceled, for equipment that was never ordered, for products that were properly returned, for improper termination fees, and for other unauthorized charges. These practices were not isolated incidents but rather the result of widespread, systematic, pervasive, and persistent conduct and business policies adopted and aimed at maximizing Defendant's revenue.[27]

492.     LUTPA prohibits unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. The elements comprising a consumer claim for damages under LUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

---

[27] *See e.g.*, Assurance of Discontinuance between Qwest Corp. d/b/a/ Century Link QC and Attorney General of Arizona, *In the Matter of Qwest Corp. d/b/a CenturyLink QC*, No. CV 2016-002842 (Ariz. Sup. Ct.,  Apr. 13, 2016) (confirming that such practices, if continued to be engaged in, serve as prima facie evidence of a violation of the Arizona Consumer Fraud Act.).

493.    Defendant here intended to outbid its competitors and lure customers by engaging in the foregoing deceptive conduct.

494.    Defendant engaged in unfair and deceptive acts and practices that violated LUTPA, causing Plaintiffs and the Class injury and financial loss. Additionally, the risk of future injury remains unless Defendant is enjoined.

495.    As alleged, CenturyLink, through its employees and agents, has engaged in a pattern and practice of deceptive and misleading activity, and collection of monies by way of false pretenses. Defendant engaged in deceptive, unconscionable, and/or unfair business practices by, among other things: (a) causing Plaintiffs and the Class to be billed for charges they did not request or authorize; and (b) billing at higher rates than those quoted.

496.    Price is a material term to consumers. The amounts charged, collected, and auto-deducted from bank accounts (or otherwise billed and collected) are material terms to CenturyLink customers. Deceptively overcharging customers in a manner that is difficult to detect within a short time period is a material misrepresentation or an omission of material fact to reasonable consumers. As explained in the Heiser complaint and in the proceedings brought by the Minnesota and Arizona Attorneys General, the practices at issue occurred in a regular and continuous manner that injured Plaintiffs and the Class.

497.    Defendant never informed Plaintiffs and the Class that it maintained internal incentive programs aimed at increasing its revenues by charging customers unauthorized charges. The omission of such facts was material, as reasonable consumers contemplating transactions with Defendant, either initially or on an ongoing basis, would have wanted to know about such practices prior to engaging in such transactions. Reasonable consumers,

had they been made aware of such facts would have acted differently, including but not limited to—if able—acquiring their telecommunication services or products from alternative providers.

498.    Defendant had a duty to disclose material facts to Plaintiffs and the Class. The information was in the exclusive possession of Defendant and not obtainable by Plaintiffs and Class members from other sources.  Additionally, Defendant made partial statements about price in the form of sales representations and billing statements.  Having spoken and provided partial information, Defendant had an affirmative duty to fully disclose all facts.

499.    The practices described herein were intended to, and were likely to, deceive consumers acting reasonably in the same circumstances.  Defendant intended Class members to rely on it to accurately sell and bill them only for services requested and at prices promised. Defendant failed to do so and instead intentionally overcharged Plaintiffs and the Class.

500.    Under LUTPA, an objective test is employed in determining whether a practice is likely to deceive a consumer acting reasonably. That is, a party asserting a deceptive trade practice need not show actual reliance on the representation or omission at issue.

501.    Defendant acted with the intent that Plaintiffs and the Class rely on its concealment, suppression, or omission, in connection with the sale or advertisement of its products and services, and therefore engaged in unlawful practices in violation of LUTPA. The amounts Defendant overcharged each customer each month are relatively small (less

than $200). Defendant knows that customers may not immediately notice such discrepancies and seek corrections. Defendant sought to exploit and take advantage of that dynamic.

491.   By engaging in this misconduct, Defendant violated LUTPA, including, but not limited to, La. Rev. Stat. Ann. § 51-1403 ("Any consumer contract, express or implied, made by any person, firm, or corporation in violation of this Chapter is an illegal contract and no recovery thereon shall be had."), and § 1405 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

502.   LUTPA applies to transactions between a Louisiana-based merchant, like CenturyLink, and out-of-state consumers.  La. Rev. Stat. Ann. § 51-1418(A).

503.   Plaintiffs and the Class lost money and were injured by Defendant's deceptive, unconscionable, and/or unfair business practices in amounts to be determined at trial.

504.   The misconduct alleged is continuing and will continue until Defendant is enjoined. Defendant engaged in the misconduct described for profit and as a deliberate corporate policy, rather than as an isolated incident. Defendant's conduct was morally wrong, callous, and/or oppressive.

505.   Plaintiffs have satisfied all prerequisites for filing this claim, including the provision of any pre-filing notice. Any further delays in pursuing this claim would be futile as Defendant continues to engage in the practices complained of and has given no indication that it intends to change its practices, policies, or provide refunds or other relief to all Plaintiffs, Class, and Subclass members.

94

506.     As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages, any statutory damages and penalties allowed by law, restitution, an accounting, injunctive and declaratory relief, and all other relief deemed just and equitable by the Court, including but not limited to reasonable attorneys' fees and costs.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

### (On Behalf of All Class Members)

507.     Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

508.     This Count is asserted on behalf of the Class.

509.     One who, in the course of business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

510.     Throughout the course of its business, Defendant incorrectly and unlawfully represented sales and billing information to Plaintiffs and the Class. Defendant frequently billed Plaintiffs and the Class at rates higher than those quoted, and similarly, inappropriately billed Plaintiffs and the Class for unrequested services, inapplicable fees, and incorrectly bundled services, among other improper charges.  Defendant represented one price for its services and products but then regularly charged higher rates than originally disclosed.

511.     Defendant's omissions of material fact toward Class members, as described herein, were deceptive and misleading.

95

512.   Defendant was in a superior position to know material facts regarding its sales and billing practices, but failed to disclose them to Plaintiffs and the Class.

513.   Due to its superior position, exclusive knowledge, and partial disclosures, Defendant had a duty to disclose the material facts it concealed from Plaintiffs and the Class regarding the described misconduct.

514.   Defendant knew of the misleading nature of its statements because it concealed  material facts. Defendant induced Plaintiffs and the Class to pay more than agreed.

515.   CenturyLink was negligent and reckless in making its omissions, as it had a duty to provide accurate and complete information with care to its customers, who had a right to rely on that information. CenturyLink breached that duty by providing inaccurate information and concealing material facts without exercising due care to ensure Class members were fully and accurately informed.

516.   Plaintiffs and the Class justifiably relied on Defendant's omissions of material fact.  Had Defendant informed Plaintiffs and the Class of material facts, they would have acted differently, including but not limited to—if able—taking steps not to transact with Defendant and/or to obtain their internet and telephone services from alternative  providers who did not engage in cramming and other deceptive practices.

517.   CenturyLink's negligent misrepresentations and omissions proximately caused harm to Plaintiffs and the Class.

518.     As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT VII
## FRAUDULENT INDUCEMENT

### (On Behalf of All Class Members)

519.     Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

520.     This count is asserted on behalf of the Class.

521.     CenturyLink falsely represented and/or omitted material facts that were susceptible of knowledge, with the intent of inducing Plaintiffs and Class to act.

522.     Plaintiffs and the Class justifiably relied on the representation and/or omissions, and suffered damages as a proximate cause of that reliance.

523.     Here, CenturyLink falsely and unlawfully represented and/or omitted material facts to Plaintiffs and the Class, namely in its billing and sales practices, that it engaged in cramming and employee incentive and bonus programs which incentivized employees to engage in such deceptive practices. CenturyLink billed Plaintiffs and the Class at rates higher than those promised, and similarly, inappropriately billed Plaintiffs and the Class for unrequested services, inapplicable fees, and incorrectly bundled services, among other unauthorized charges.

524.     CenturyLink's representations were untrue, misleading, unfair, and susceptible of knowledge. Further, Century Link's material omissions were deceptive.

525.    CenturyLink had superior knowledge and was in exclusive control of the material facts at issue. It had a duty to disclose them to Plaintiffs and the Class.

526.    CenturyLink made its false representations and omissions with the intent of inducing Plaintiffs and the Class to obtain and continue paying for services from CenturyLink.

527.    Plaintiffs and members of the Class justifiably relied on CenturyLink's false information and omissions.

528.    CenturyLink's false information and omissions proximately caused harm to Plaintiffs and the Class.

529.    As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT VIII
## UNJUST ENRICHMENT

### (On Behalf of All Class Members)

530.    Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

531.    This Count is asserted on behalf of the Class.

532.    As a result of Defendant's unlawful, unfair, deceptive, and wrongful acts and omissions, customers bore the brunt of the excessive and unauthorized charges and ended up paying millions of dollars while the Company unjustly reaped profits.

533.    As alleged herein, Defendant was unjustly enriched at the expense of Plaintiffs and Class members, who were grossly and inequitably overcharged for Defendant's telecommunications products and services.

534.    Defendant unjustly deprived Plaintiffs and Class members of money they overpaid due to the Company's deceptive sales and billing practices.

535.    Defendant's retention of this ill-gotten revenue is unjust and inequitable because Defendant used illegal, deceptive, and unfair business practices to induce or otherwise mislead customers to open, purchase, and/or retain Defendant's products and services.

536.    Defendant's retention of this revenue is also unjust and inequitable because Defendant used illegal, deceptive, and unfair business practices to bill customers for services neither requested nor provided. Many Plaintiffs had to pay these unauthorized charges in order to move, and to avoid collections and/or adverse consequences to their credit rating. Defendant received a benefit for products and/or services that Plaintiffs did not bargain for.

537.    Defendant was aware of the benefit it was receiving as a result of its unlawful, unfair, deceptive, and wrongful acts and omissions, and has enjoyed the benefits of its financial gains to the detriment and at the expense of Plaintiffs and Class members.

538.    Defendant's retention of the non-gratuitous benefits conferred by Plaintiffs and Class members is unjust and inequitable. Plaintiffs and Class members are entitled to seek restitution and all other relief as deemed just and equitable, including but not limited to, an order requiring Defendant to disgorge all profits, benefits, and other compensation obtained by virtue of its wrongful conduct.

539.     This claim is asserted as an alternative to Plaintiffs' claim for breach of contract and in recognition that any contracts executed by Plaintiffs and Class members may be void or voidable.

540.     Plaintiffs and the Class directly conferred a benefit upon Defendant through their overpayments.

541.     Defendant was aware of the benefit it was receiving as a result of its unlawful, unfair, deceptive, and wrongful acts and omissions, and has enjoyed the benefits of its financial gains to the detriment and at the expense of Plaintiffs and members of the Class.

542.     Defendant's retention of the improper amounts gained through its wrongful acts and practices was inequitable and unjust. Plaintiffs and the Class paid these improper amounts to Defendant in reliance on its material misrepresentations and omissions of fact.

543.     Plaintiffs and members of the Class have no adequate remedy at law.

544.     Plaintiffs and members of the Class are entitled to seek restitution and other relief from Defendant, including but not limited to, an order requiring Defendant to disgorge all profits, benefits, and other compensation obtained through and for its wrongful conduct.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class, and all Subclasses, respectfully request that the Court:

1.   Certify the Class and Subclasses pursuant to Fed. R. Civ. P. 23 and appoint Plaintiffs and their counsel to represent the Class and Subclasses pursuant to Fed. R. Civ. P. 23(g);

2. Award Plaintiffs, the Class, and Subclasses monetary damages as allowable by law;

3. Award Plaintiffs, the Class, and Subclasses pre-judgment and post-judgment interest as allowable by law;

4. Award Plaintiffs, the Class, and Subclasses reasonable attorneys' fees and costs as allowable by law;

5. Award Plaintiffs, the Class, and Subclasses all appropriate equitable relief; and

6. Award Plaintiffs, the Class, and Subclasses all such further relief as allowable by law and equity.

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves, the Class, and all Subclasses, demand a trial by jury on all issues so triable.

Date: February 15, 2018                         Respectfully submitted,

**ZIMMERMAN REED LLP**

 *s/ Carolyn G. Anderson*
Carolyn G. Anderson (MN 275712)
Brian C. Gudmundson (MN 336695)
Bryce D. Riddle (MN 398019)
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 641-0844
carolyn.anderson@zimmreed.com
brian.gudmundson@zimmreed.com
bryce.riddle@zimmreed.com

101

**ZIMMERMAN REED LLP**
Hart L. Robinovitch
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
Telephone: (480) 348-6400
Facsimile: (480) 348-6415
hart.robinovitch@zimmreed.com

*Plaintiffs' Interim Co- Lead and Liaison Counsel*

**O'MARA LAW GROUP**
Mark M. O'Mara
Channa Lloyd
Alyssa J. Flood
Caitlin Frenkel
221 NE Ivanhoe Blvd., Suite 200
Orlando, FL 32804
Telephone: (407) 898-5151
Facsimile: (407) 898-2468
mark@omaralawgroup.com
channa@omaralawgroup.com
alyssa@omaralawgroup.com
caitlin@omaralawgroup.com

**GERAGOS & GERAGOS, APC**
Mark J. Geragos
Benjamin J. Meiselas
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, CA 90017-3411
Telephone: (231) 625-3900
Facsimile: (231) 232-3255
mark@geragos.com
meiselas@geragos.com

**GERAGOS & GERAGOS, APC**
Lori G. Feldman
7 West 24th Street
New York, NY 10010
Telephone: (917) 388-3121
lori@geragos.com

*Plaintiffs' Interim Co-Lead Counsel*

102

**GUSTAFSON GLUEK PLLC**
Daniel C. Hedlund (#258337)
Michelle J. Lobby (#388166)
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
dhedlund@gustafsongluek.com
mlooby@ gustafsongluek.com

*Plaintiffs' Executive Committee Chair*

**HELLMUTH & JOHNSON, PLLC**
Richard M. Hagstrom, (MN 039445)
Anne T. Regan, (MN 333852)
Nicholas S. Kuhlmann, (MN 33750)
Jason Raether, (MN 394857)
8050 West 78th Street
Edina, MN 55439
Telephone: (952) 941-4005
Facsimile: (952) 941-2337
rhagstrom@hjlawfirm.com
aregan@hjlawfirm.com
nkuhlmann@hjlawfirm.com
jraether@hjlawfirm.com

**ROXANNE CONLIN & ASSOCIATES, PC**
Roxanne Barton Conlin
3721 S.W 61st St.
Des Moines, Iowa, 50321
Telephone: (515) 283-1111
roxlaw@aol.com

**HENINGER GARRISON DAVIS, LLC**
Francois M. Blaudeau
W. Lewis Garrison, Jr.
Christopher B. Hood
2224 1st Ave North
Birmingham, AL 35203
Telephone: (205) 326-3336
Facsimile: (205) 380-0145
francois@southernmedlaw.com

103

lewis@hgdlawfirm.com
chood@hgdlawfirm.com

**HENINGER GARRISON DAVIS, LLC**
James F. McDonough, III
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Telephone: (404) 996-0869
Facsimile: (205) 326-3332
jmcdonough@hgdlawfirm.com

*Plaintiffs' Executive Committee*

**HODGE & LANGLEY LAW FIRM, P.C.**
T. Ryan Langley
229 Magnolia St.
Spartanburg, SC 29306
Telephone: (864) 585-3873
Facsimile: (864) 585-6485
rlangley@hodgelawfirm.com

**FERNALD LAW GROUP LLP**
Brandon C. Fernald
6236 Laredo Street
Las Vegas, NV 89146
Telephone: (702) 410-7500
Facsimile: (702) 410-7520
brandon.fernald@fernaldlawgroup.com

**ATTORNEY ALFRED M. SANCHEZ**
Alfred M. Sanchez
400 Gold Ave. SW, #240
Albuquerque, NM 87102
Telephone: (505) 242-1979
lawyeralfredsanchez@gmail.com

**OLSEN DAINES PC**
Michael Fuller, OSB No. 09357
Olsen Daines PC
US Bancorp Tower
111 SW 5th Ave., Suite 3150
Portland, Oregon 97204
Telephone: (503) 201-4570
michael@underdoglawyer.com

**WALSH PLLC**
Bonner C. Walsh
PO Box 7
Bly, OR 97622
Telephone: (541) 359-2827
Facsimile: (866) 503-8206
bonner@walshpllc.com

**GARDY & NOTIS, LLP**
Orin Kurtz
126 East 56th Street, 8th Floor
New York, NY 10022
Telephone: (212) 905-0509
Fax: (212) 905-0508
okurtz@gardylaw.com

*Counsel for Plaintiffs' and the Proposed Class*

104