```
1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2
     ------------------------------------------------------
3                              )
     In Re: CenturyLink Residential  )  File No. 17-MD-2795
4    Consumer Billing Disputes       )         (MJD/KMM)
     Litigation                      )
5                              )
                              )  Minneapolis, Minnesota
6                              )  May 2, 2018
                              )
7                              )
                              )
8                              )
     ------------------------------------------------------
9
              BEFORE THE HONORABLE MICHAEL J. DAVIS
10             UNITED STATES DISTRICT COURT JUDGE
                      (MOTION HEARING)
11

12

13

14

15

16

17

18

19   Court Reporter:              STACI A. HEICHERT
                                  RDR, CRR, CRC
20                                1005 U.S. Courthouse
                                  300 South Fourth Street
21                                Minneapolis, Minnesota 55415

22

23

24       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25
```

```
 1     APPEARANCES:

 2     For the Plaintiffs:          ZIMMERMAN REED LLP
                                    Brian C. Gudmundson, ESQ.
 3                                  Bryce Riddle, ESQ.
                                    1100 IDS Center
 4                                  80 South Eighth Street
                                    Minneapolis, MN 55402
 5
                                    GUSTAFSON GLUEK PLLC
 6                                  Daniel C. Hedlund, ESQ.
                                    120 South Sixth Street
 7                                  Suite 2600
                                    Minneapolis, MN 55402
 8
                                    GERAGOS & GERAGOS
 9                                  Lori G. Feldman, ESQ.
                                    Joanna Ogunmuyiwa, ESQ.
10                                  644 South Figueroa Street
                                    Los Angeles, CA 90017
11
                                    O'MARA LAW GROUP
12                                  Mark O'Mara, ESQ. (Phone)
                                    Alyssa Flood, ESQ. (Phone)
13                                  Caitlin Frenkel, ESQ. (Phone)
                                    221 NE Ivanhoe Blvd.
14                                  Suite 200
                                    Orlando, FL 32804
15
                                    HELLMUTH & JOHNSON PLLC
16                                  Anne Regan, ESQ.
                                    8050 West 78th Street
17                                  Edina, MN 55439

18                                  ATTORNEY ALFRED SANCHEZ
                                    Alfred Sanchez, ESQ. (Phone)
19                                  400 Gold Avenue Southwest
                                    Suite 240
20                                  Albuquerque, NM 8702

21                                  BERNSTEIN LITOWITZ BERGER &
                                    GROSSMANN LLP
22                                  Michael Blatchley, ESQ. (Phone)
                                    1251 Avenue of the Americas
23                                  New York, NY 10020

24

25
```

```
 1                                  LOCKRIDGE GRINDAL NAUEN PLLP
                                    Gregg Fishbein, ESQ. (Phone)
 2                                  100 Washington Ave. S.
                                    Suite 2200
 3                                  Minneapolis, MN 55401

 4                                  STOLL STOLL BERNE LOKTING &
                                    SHLACHTER P.C.
 5                                  Keith Dubanevich, ESQ. (Phone)
                                    209 SW Oak Street
 6                                  Suite 500
                                    Portland, OR 97204
 7

 8      For the Defendants:         WINTHROP & WEINSTINE PA
                                    William McNab, ESQ.
 9                                  225 South Sixth Street
                                    Suite 3500
10                                  Minneapolis, MN 55402

11                                  COOLEY LLP
                                    Douglas P. Lobel, ESQ.
12                                  David Vogel, ESQ.
                                    11951 Freedom Drive
13                                  Suite 1500
                                    Reston, VA 20190
14
                                    COOLEY LLP
15                                  Elizabeth Wright, ESQ.
                                    500 Boylston Street
16                                  14th Floor
                                    Boston, MA 02116
17
                                    COOLEY LLP
18                                  Patrick Gibbs, ESQ.
                                    101 California Street
19                                  Suite 5
                                    San Francisco, CA 94111
20
                                    WHEELER TRIGG O'DONNELL LLP
21                                  Carolyn Fairless, ESQ.
                                    370 Seventeenth Street
22                                  Suite 4500
                                    Denver, CO 80202
23

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1          The COURTROOM DEPUTY:  This is MDL in re

CenturyLink Sales Practices and Securities Litigation.  MDL

Case No. 17-MD-2795.

          Counsel in the courtroom, will you please state

your appearances for the record.

          MR. GUDMUNDSON:  Good morning, Your Honor.  Brian

Gudmundson, Zimmerman Reed, on behalf of plaintiffs.

          THE COURT:  Good morning.

          MS. OGUNMUYIWA:  Joanna Ogunmuyiwa, Geragos &

Geragos, on behalf of the plaintiffs.

          THE COURT:  Good morning.

          MS. FELDMAN:  Good morning.  Lori Feldman, Geragos

& Geragos, on behalf of consumer plaintiffs.

          THE COURT:  Good morning.

          MR. HEDLUND:  Good morning, Your Honor.  Dan

Hedlund, Gustafson Gluek, on behalf of plaintiffs.

          THE COURT:  Good morning.

          MS. REGAN:  Good morning, Your Honor.  Anne Reagan

from Helmuth & Johnson on behalf of plaintiffs.

          THE COURT:  Good morning.

          MR. RIDDLE:  Good morning, Your Honor.  Bryce

Riddle of Zimmerman Reed here on behalf of consumer

plaintiffs.

```
 1              THE COURT:  Good morning.

 2              MR. LOBEL:  Good morning, Your Honor.  Douglas

 3    Lobel on behalf of CenturyLink and the proposed interveners.

 4              THE COURT:  Good morning.

 5              MR. MCNAB:  Good morning, Judge Davis.  Bill

 6    McNab, Winthrop & Weinstine, also on behalf the defendants.

 7              THE COURT:  Good morning.

 8              MR. VOGEL:  Good morning, Your Honor.  David Vogel

 9    from Cooley on behalf of the defendant intervenors.

10              THE COURT:  Good morning.

11              MS. FAIRLESS:  Good morning, Your Honor.  Caroline

12    Fairless of Wheeler Trigg O'Donnell on behalf of the

13    defendants and intervenors.

14              THE COURT:  Good morning.

15              MS. WRIGHT:  Good morning, Your Honor.  Elizabeth

16    Wright from Cooley LLP on behalf of the defendant

17    intervenors.

18              THE COURT:  Good morning.  Do we have anyone on

19    the phone?

20              THE COURTROOM DEPUTY:  We do have some attorneys

21    on the phone, if you would please state your appearances for

22    the record.

23              MR. SANCHEZ:  Good morning, Your Honor.  This is

24    Alfred Sanchez in Albuquerque, New Mexico, for the consumer

25    plaintiffs.
```

 1                    THE COURT:  Good morning.  Anyone else?

 2                    MS. FLOOD:  Good morning, Your Honor.  Alyssa

 3          Flood on behalf of the consumer plaintiffs.

 4                    THE COURT:  Good morning.

 5                    MS. FRENKEL:  Good morning, Your Honor.

 6                    MR. O'MARA:  Good morning --

 7                    MS. FRENKEL:  Caitlin Frenkel on behalf of the

 8          consumer plaintiffs.

 9                    THE COURT:  Good morning.

10                    MR. O'MARA:  Good morning, Your Honor.  Mark

11          O'Mara, also from O'Mara Law Group, on behalf of the

12          consumer plaintiffs.  Good morning.

13                    THE COURT:  Good morning.

14                    MR. BLATCHLEY:  Good morning, Your Honor.  Michael

15          Blatchley from Bernstein Litowitz on behalf of the state of

16          Oregon, the lead plaintiff in the securities case.

17                    THE COURT:  Good morning.

18                    MR. GIBBS:  Good morning, Your Honor.  Patrick

19          Gibbs from Cooley on behalf of the defendants in the

20          securities case.

21                    THE COURT:  Good morning.

22                    MR. DUBANEVICH:  Good morning, Your Honor.  Keith

23          Dubanevich for the state of Oregon, the lead plaintiff in

24          the securities case.

25                    THE COURT:  Good morning.

```
1              MR. FISHBEIN:  Good morning, Your Honor, Gregg

2     Fishbein, Lockridge Grindal Nauen, also on behalf of the

3     state of Oregon.

4              THE COURT:  Good morning.  All right.  Let's

5     proceed with the arguments.

6              MR. LOBEL:  Your Honor, good morning again.  I do

7     believe we are making progress.  We didn't bring any snow

8     with us this time, so that's a positive.

9              THE COURT:  That's for sure.  It's good weather

10    now.

11             MR. LOBEL:  Your Honor, I think it makes sense to

12    start with the Court's standard of review on this motion,

13    and to state the obvious, we're not here to argue the

14    arbitration motion today.  We don't intend to do that.  We

15    don't have to decide if we win that motion.  We're not here

16    on likelihood of success or anything of that nature.  The

17    standard I believe that governs this motion today is simply

18    whether there's a basis to temporarily stay discovery while

19    we resolve that motion that we filed over the weekend, and I

20    think that we quoted in our brief, and I think the

21    plaintiffs agree with us, that if our motion has substantial

22    grounds and if -- if the arbitration motion is not

23    unfounded, then, under the standard, that Your Honor could

24    exercise the discretion and decide to temporarily stay

25    discovery.
```

1          So in our motion, we made a showing initially

2     before we filed Saturday's filing which was our motion to

3     compel arbitration and all declarations and supporting

4     exhibits, the plaintiffs criticized our showing in the

5     initial motion.  They said it was weak.  They said we didn't

6     supply evidence.  They said that there was no evidence of

7     actual assent by the consumers.  In fact, they even said

8     that some people realized they hadn't assented.  And I think

9     that the filing on Saturday cures any questions that the

10    Court may have about the nature and the scope and the

11    strength of the evidence that we have regarding these

12    arbitration agreements and these class action waivers.  We

13    presented reams of evidence to the Court in the Saturday

14    filing.  We, in some ways, I was concerned that it would

15    harm the ECF system somehow it was so much material.  And,

16    of course, the Court doesn't have to take our word.

17               THE COURT:  I think it did shut down our system.

18               MR. LOBEL:  I think the system shut down before we

19    filed, Your Honor.

20               THE COURT:  We were trying to usurp the motion.

21               MR. LOBEL:  Maybe an upgrade in anticipation of

22    our filing.

23               THE COURT:  Right.

24               MR. LOBEL:  In any event, Your Honor, you don't

25    have to take our word.  The plaintiffs don't have to take

1    our word.  We filed, in summary, four declarations of

2    company personnel that included 96 pages of fact

3    declarations, 203 paragraphs of fact declarations, 95

4    exhibits that covered 650 pages.  And in that

5    material -- and, of course, we don't win on size and number

6    of pages and we don't make our showing on that, but we

7    presented in those materials actual evidence for each of the

8    38 plaintiffs, the governing contracts in their relationship

9    with the operating companies, screenshots of specific

10   screens that they would have had to view in order to process

11   certain transactions, and click to accept terms and

12   conditions of the arbitration class action waivers in those

13   screenshots.  We produced those.  And we produced electronic

14   records of the very moment that these consumers, 34 of the

15   38, actually provided assent to these arbitration

16   agreements, class action waivers.

17          Now, we have evidence relating to all 38, but we

18   actually have click to accept records in the record now

19   before the Court of almost all of the 38 plaintiffs.  So,

20   again, we're not arguing the motion today.  We feel like

21   we've made our showing.  We feel like we met the standard

22   that's appropriate that both sides have agreed is the proper

23   standard.

24          So what are the ramifications of that?  Well, Your

25   Honor, with respect to this particular motion today, we

1    think there should be no class wide discovery.  When 38 of

2    38 plaintiffs affirmatively assented to waive class action

3    treatment in this case, and when 37 of 38 plaintiffs

4    affirmatively assented to arbitrate their claim, we think

5    that counsels against going forward with class wide

6    discovery.

7            Now, I want to make the point that these were not

8    just single touches, Your Honor.  It's not like oh, that we

9    showed the plaintiffs one agreement and they clicked and now

10   here we're in court.  The records that we produced reflect

11   that most of these consumers assented to these provisions

12   multiple times.  And you may ask, well, why would they have

13   done that?  Well, the company processes seek to put in front

14   of the consumers and seek their assent of these provisions

15   as many times as possible in as many separate touches as

16   possible because it's part of -- the arbitration agreements

17   and class action waivers are part, an important part of how

18   the company manages its business.

19           And so what you've got in the record and what the

20   company did, these are not sort of one-time events.  These

21   are multiple events and multiple touches, multiple consents

22   and clicks to accept that we've presented.  And that jumps

23   out when you look at the records of the individual consumer.

24           So when I'd like to do, which I think would be

25   helpful for the Court and the plaintiffs, is in our briefs

1    that we filed on Saturday, and I'm sure, given the scope and

2    your schedule, Your Honor, you haven't had a chance to

3    review it very much, if at all, we included a chart where we

4    listed the names of the individual consumers and we

5    identified the multiple touches across the different

6    services that apply to each of those consumers.  And with

7    the Court's permission, I'd like to hand that up and just

8    walk you through it and show you the nature of the evidence.

9              THE COURT:  All right.  Have you given it to

10   opposing counsel?

11             MR. LOBEL:  We will do that now, Your Honor.  This

12   is, by the way, this is page 3 of our moving brief, so it's

13   in the possession of the plaintiffs.

14             So, Your Honor, for the record, you've been handed

15   a demonstrative which is an enlargement of page 3 for our

16   motion to compel arbitration and enforce class action

17   waivers.  And this demonstrative is a chart, and I'd like to

18   just walk you through it and explain what the chart

19   represents.  So if you look at the far left column under

20   plaintiff name, these are the 38 named plaintiffs in the

21   consolidated class action complaint.  If you look across the

22   document from left to right, you'll see six different

23   columns.  And these are the six different ways in which

24   these plaintiffs agreed to the arbitration and class action

25   waiver provisions in the evidence that we provided to the

1    Court on Saturday.

2            You'll see there's a reference to click in four of

3    the six.  Clicked is a reference to the process of click

4    wrap which is common these days in which electronic terms

5    and conditions are presented, I'm sure Your Honor is well

6    aware of this, presented to consumers and the consumer

7    clicks a mouse or clicks the computer to indicate consent.

8    And I recall that the plaintiffs in their brief in

9    opposition said and actually in the hearing that we had the

10   last time that this is not a click wrap case, that this is a

11   case of door to door sales and telephone sales.  Well, in

12   fact, Your Honor, that's not true.  The records reflect, as

13   you can see if you scan down, many, many clicks of these

14   terms and conditions that these consumers engaged in.  And

15   so the plaintiffs are just wrong in terms of the nature of

16   the contact between the company and their clients.  And all

17   the checkmarks that you see on this demonstrative are based

18   on records of the company that we presented in our motion on

19   Saturday.

20           So just quickly working through it, clicked

21   internet service is -- occurs when a consumer is utilizing a

22   modem that's company provided and the consumer is logging on

23   to their internet, getting their internet up and running.

24   As part of that process, they are presented with terms and

25   conditions, including the arbitration, class action waivers,

1    and they are asked if they agree in order to proceed with

2    the installation process.  And the checks indicate that all

3    of these consumers clicked yes that they did consent to

4    those provisions.

5           You may ask yourself, why are there multiple

6    checks with, say, Mr. Allison or some of the other

7    consumers?  Occurs in situation where there's a reboot or

8    there's a new modem installed or there's a change of address

9    or some other circumstance.  So some of these -- some of

10   these plaintiffs multiple times clicked on the modem

11   installation.

12          Moving to the right to payment features, these are

13   common features that CenturyLink offers as convenience to

14   plaintiffs.  Auto pay is one where you have an automatic

15   withdrawal from your bank account monthly.  Click bill pay

16   is where you choose to pay a bill over the internet

17   electronically.  And my account is simply an account

18   registration service where you have your name recorded with

19   CenturyLink and you can do certain features through my

20   account.  And in order to sign up for each of those three

21   electronic payment features, the company, consistent with

22   its practice, presents these arbitration class action

23   waivers and asks the consumers if they will consent.  If the

24   consumers choose not to content, they cannot go forward with

25   the process and sign up for these payment features.  So in

1    each case where you see the checkmark, it indicates that

2    these consumers signed up for these payment features,

3    obtained the payment features, and then assented to the

4    arbitration class action waiver provisions.

5         Moving further to the right, received mail

6    confirmation.  That is what the company refers to as a

7    confirmation of service letter.  It is a letter that's sent

8    out after a customer places an order.  It confirms the date

9    of the order, the order number, the specific items that were

10   ordered, and it also has some verbiage and that I could show

11   you, would like to show you later, indicating that the

12   customers referred to a hyperlink involving company terms

13   and conditions, and the customer is notified that

14   arbitration is one of those terms and conditions and given a

15   30-day right to cancel if they do not assent to those terms

16   and conditions.  And these checkmarks indicate that each of

17   these consumers received this confirmation of service

18   letter.

19        Moving further to the right, clicked TV services

20   is another click wrap operation in which Prism TV was

21   ordered as well in connection with a package involving

22   high-speed internet, so when the modem is activated for the

23   high-speed internet and someone has CenturyLink's

24   proprietary Prism TV service, they're presented with the

25   Prism terms and conditions which contain the arbitration

1    agreement and the class action waiver, and that applied to

2    four of the consumers.

3           Moving further to the right, another click wrap

4    operation, when a consumer places an on-line order, for

5    example, I don't order my internet over the telephone, I

6    order it strictly online, no customer rep involved, the

7    company has a process where it asks for the consumer -- it

8    presents the terms and conditions, it presents the language,

9    and asks the consumer to consent before the order is

10   finalized, that applied to two of the consumers.

11          And finally, Your Honor, there has been some

12   reference to a modified 2017 agreement that the company sent

13   out to all existing customers.  These four customers were

14   sent the amended contract, they got notice of a new

15   arbitration agreement, they were given a right to opt out of

16   that agreement, none of them chose to opt out, and that

17   particular agreement for these consumers is applicable to

18   them.

19          So in sum, this summarizes all of the different

20   evidence in the declarations we've attached to our motion to

21   compel to all 38 consumers.

22          And what I'd like to do next, with Your Honor's

23   permission, is we've just tabulated the numbers because it's

24   hard to make much of all of these checkmarks, and so I've

25   got a document that we've prepared, I'll share with

1    plaintiff, that's simply the addition and reflecting the

2    number of consumers and the number of operations and in

3    each -- for each one of them.  Would that be okay with the

4    Court?

5              THE COURT:  That's fine with me.

6              MR. LOBEL:  Thank you, Your Honor.

7              Your Honor, I've handed you a demonstrative that's

8    entitled summary of evidence totals, plaintiffs' acceptance

9    of arbitration class action waiver provisions.  Again, this

10   is all information that's contained within the motion to

11   compel arbitration.  This all reflects information that was

12   provided to the plaintiffs, just so we're clear on that.

13             And I'm not going to take the time to walk through

14   the whole document, Your Honor, but what this simply

15   tabulates the checkmarks on the other demonstrative and

16   shows that 34 of 38 plaintiffs clicked to accept at least

17   one agreement and that 25 of the 38 plaintiffs clicked more

18   than one time.

19             And if you scan down the document, it shows the

20   one, two, three, four, that simply shows the number of

21   plaintiffs that clicked for different services, and they

22   don't add up to 38 because, as I mentioned, some clicked

23   more than once or had multiple services so the numbers won't

24   add up.  They overlap actually.

25             Moving to the middle of the document, 35 of 38

1    plaintiffs received this mail confirmation of service that I

2    mentioned earlier that identified their --

3            THE COURT:  When you say mail, is that e-mail or

4    snail mail?

5            MR. LOBEL:  I believe it's snail mail, Your Honor.

6    I will turn to the guru who can tell me for sure.

7            MS. WRIGHT:  It can be both.

8            MR. LOBEL:  Apparently it can be both, Your Honor.

9    So Ms. Wright is the, as I say, the guru of all of this

10   information.  That -- and I have a sample of that document

11   that I'd like to show the Court.  It does expressly mention

12   arbitration, gives the option to cancel, and no plaintiffs

13   canceled.  And finally, I mentioned the amended internet

14   agreement, there were four plaintiffs, and none of them

15   opted out.

16           So the Court has, in its possession, as do the

17   plaintiffs, affirmative evidence of all 38 plaintiffs

18   agreeing to these various provisions in multiple ways.  And

19   if it's important to the Court's resolution of our motion, I

20   think it would be helpful, I would like to just walk you

21   through a few examples of these actual agreements so you can

22   see what these documents look like.

23           THE COURT:  Please.

24           MR. LOBEL:  Thank you, Your Honor.

25           Your Honor, I've handed you a demonstrative book,

1    and just to be clear for the record, all of the documents

2    contained in this book have been produced to the plaintiffs

3    and all of these documents are in the record.  And what

4    we've simply done is we've just selected randomly three

5    plaintiffs, and I just thought it would be useful for the

6    Court to see what these actual records look like.

7          So, Your Honor, if you would turn to -- well, the

8    first consumer is Mr. Garten.  Mr. Garten is a Nevada

9    resident.  He was one of the initial plaintiffs.  He

10   complains that his auto pay was promised to be -- the money

11   was promised to be taken out of his bank account late in the

12   month but in fact it was taken out early in the month and he

13   suffered damages as a result of that.  And the plaintiffs

14   have represented that Mr. Garten and others did not assent

15   to any form of the arbitration or class action waivers.

16          If you turn to Exhibit 1, Your Honor, which is

17   Mr. Garten's first exhibit, tab 1.

18          THE COURT:  I'm there.

19          MR. LOBEL:  Your Honor, this is a document from

20   CenturyLink's electronic records.  This is the actual

21   evidence of assent.  In the old days, of course, we'd have a

22   signature.  We rarely have that anymore.  So this is a

23   computer generated record that tracks Mr. Garten's use on

24   the internet.  And I could walk you through and show where

25   Mr. Garten assented to the arbitration and class action

waiver provisions.

Your Honor, if you look on the exhibit at the billing account item that's four from the left, do you see where it says billing account?

THE COURT: I see it.

MR. LOBEL: That is Mr. Garten's account number. I'm not going to read it into the record. This document is marked highly confidential because it does contain consumer information.

If you go three to the right from there, Your Honor, four to the right, it says agreement name. That indicates that Mr. Garten was subject to the CTL consumer high-speed internet subscriber agreement. And the document even records to the right of that the agreement version number, So it indicates that Mr. Garten was presented with agreement version 12.

And now if you move all the way to the left, second to the far left, Your Honor, I want to make sure, under the tab agreement, acceptance, DTTM.

THE COURT: Right.

MR. LOBEL: That -- that means agreement acceptance date and time. And what that shows is that in the records of CenturyLink, Mr. Garten accepted the terms and conditions of the consumer high-speed internet subscriber agreement on May 12th, 2016, at 6:30 p.m. and one

1    second.  Now, if you move down one row --

2              THE COURT:  Wait a minute.

3              MR. LOBEL:  -- you'll see that Mr. --

4              THE COURT:  Say that again.

5              MR. LOBEL:  I'm sorry, Your Honor?

6              THE COURT:  Say that again.

7              MR. LOBEL:  That Mr. Garten accepted the terms and

8    conditions of --

9              THE COURT:  May 12th.  Okay.

10             MR. LOBEL:  Click to accept I should say.

11             THE COURT:  Go ahead.

12             MR. LOBEL:  That that is actually the time that he

13   clicked within the computer system and that's what the

14   computer is reflecting.  And so that's actual evidence of

15   affirmative assent to the terms and conditions, including

16   the arbitration agreement.

17             If you move down one row, Your Honor, you see that

18   Mr. Garten was also a customer of the CenturyLink Prism TV

19   service.  He also was presented with the Prism terms and

20   conditions which also included a separate arbitration

21   agreement and class action waiver.  And if you go back to

22   the left under agreement acceptance date and time, it shows

23   that Mr. Garten, five seconds later, after he accepted the

24   HSI subscriber agreement, he accepted the Prism TV services

25   residential agreement terms and conditions.  And that was

 1   version 20, according to the records.

 2         Now, the records for the other consumers look

 3   similar.  They're slightly different and obviously different

 4   dates and times and different agreements and different

 5   versions, so this --

 6         THE COURT:  Speed reader, huh?

 7         MR. LOBEL:  I'm sorry, Your Honor?

 8         THE COURT:  He was a speed-reader.

 9         MR. LOBEL:  Well, either that or he didn't read

10   the terms and conditions, and I suspect we're all guilty of

11   that at various times in our lives, but that's what the

12   records indicate.

13         THE COURT:  Go ahead.

14         MR. LOBEL:  Your Honor, if you would flip to the

15   next tab, what the next tab shows, tab 2, is these are the

16   actual -- this is the actual language that Mr. Garten

17   consented to when he clicked his mouse or his computer and

18   accepted the HSI subscriber agreement.  So if you look to

19   the left side, these are -- this is the arbitration

20   agreement that was presented to him and to which he assented

21   at 6:30.  And if you look to the right, this is the language

22   of the class action waiver provision that he assented to at

23   6:30 and 5 seconds later.  So based on this evidence,

24   Mr. Garten agreed to arbitrate and he agreed to waive class

25   action treatment in any dispute he had with the company

1    broadly.  Are you ready to move on, Your Honor?

2         THE COURT:  Please.

3         MR. LOBEL:  So if you flip to the next tab, tab 3,

4    in addition, I mentioned these payment features earlier when

5    we were going through the chart.  Mr. Garten enrolled in two

6    payment features where he also agreed to arbitrate his

7    claims.  Tab 3 is my account which is akin to an on-line

8    registration process, and what you're looking at is a

9    screenshot of the website that all customers need to work

10   through in order to sign up for my account.  And you'll see

11   there in the middle, Your Honor, that all customers are

12   presented with links to these two different agreements, the

13   website user agreement and the payment agreement.  They can

14   read -- they can click on those links, read that agreement,

15   print it, save it, whatever they choose to do, they are

16   agreeing that by registering to use the my account site,

17   you're accepting and agreeing to both of those agreements.

18   And significantly, they cannot get past this screen if they

19   do not click I have read and accept the terms and conditions

20   outlined above.  And the records of the company show that he

21   did click that because he, in fact, signed up for my

22   account, so that's a third way that Mr. Garten agreed to

23   arbitrate his claims.

24        Now, the next tab, tab 4, shows the payment

25   agreement arbitration and class action provisions.  These

1    are slightly different than the other provisions he agreed

2    to.  And you see the language on the left side for

3    arbitration and on the right side for class action waiver.

4    And so because Mr. Garten went forward with his my account

5    process, he agreed to arbitrate his claims and he agreed to

6    waive any class action treatment.

7              And finally, tab 5, in addition to my account,

8    Mr. Garten also signed up for auto pay.  As I mentioned, his

9    claim relates to auto pay.  And this is a screenshot which

10   -- by the way, all of this information is in the

11   declarations that we provided on Saturday with our motion.

12   This is a screenshot of the on-line process to register for

13   auto pay.  And you're able to click on the link to pull up

14   the terms and conditions, and that pulls up the payment

15   agreement according to the declaration reference at the

16   bottom.  And the company records show Mr. Garten doing this

17   to register for auto pay.  So Mr. Garten then signed up

18   twice for payment agreements in addition to his registration

19   and installing his modem.

20             So, Your Honor, those are the records -- sorry.

21   Those are the records that we have that we presented to the

22   Court and the plaintiffs with regard to one consumer.  We've

23   got similar records for 38 consumers in different and

24   varying ways.  And I've got two more examples.  I'd leave it

25   up to the Court whether you want me to walk through those or

1     not.  They are similar.

2              THE COURT:  Please don't.

3              MR. LOBEL:  Okay.  I understand, Your Honor.  But

4     I thought it was important for you to just see what these

5     documents looked like.  And thank you for allowing me to do

6     that.

7              So Your Honor, in light of this significant amount

8     of information, and getting back to the motion that's before

9     the court today because I promised you I wouldn't argue the

10    motion to compel, we think it's prudent to hold off on class

11    wide discovery on the basis of the showing that we made.  We

12    think that the Court should first determine which claims

13    remain in court after we resolve the motion that will be

14    resolved in a few months and then determine the proper scope

15    of discovery.  Use the motions as a way to sift through

16    these claims and let -- and let's, maybe they'll all remain.

17    Maybe none will remain.  Maybe the only, Mr. Maguire's claim

18    will remain, the one gentleman who didn't agree to

19    arbitrate.  But we think that once that happens, then the

20    Court can fashion discovery that's proportionate to the

21    remaining claim and appropriate.

22             And, Your Honor, the reason I say that is that the

23    plaintiffs make much of Mr. Maguire.  He's a small business

24    owner, did not have an arbitration agreement because he's

25    got a business, a separate business contract.  He did have a

1    class waiver agreement.  And they make much of, well, the

2    case will go forward and Mr. Maguire will be before the

3    Court so we might as well get going.  Well, Your Honor, we

4    disagree.  If all of these claims are moved to arbitration

5    and only Mr. Maguire is left and it's a one-off plaintiff

6    case, nonclass, with damages of a thousand or $2,000, I

7    think the MDL will likely be dissolved.  I think the case

8    will go back to Florida.  I think the Court will find that

9    there's no federal jurisdiction over the claim.  It will go

10   to Florida state court where it belongs.  And so I'm

11   not -- we don't concede, we don't agree at all, contrary to

12   what plaintiffs say, that any case would necessarily go

13   forward.  We won't know until Your Honor resolves the

14   motions, and that's what we're suggesting that prudence

15   dictates.

16            I will say, Your Honor, I know you want to move

17   the case forward, as do we.  We think we will be making much

18   progress over the summer.  We're going to be very busy on

19   this case.  Plaintiffs have asked for three months of

20   discovery related to our motion.  We've got this

21   intervention discovery that's ongoing.  We are going to

22   resolve the issue of, at the end of that process, what cases

23   belong in this court, whether the MDL will continue, and

24   it's very significant progress, in our view.  And so we

25   think we can make lots of progress without exposing the

1      company to classified discovery that frankly we believe that

2      the parties agreed we would not ever engage in.  And so we

3      don't want the Court to feel that the case will be stalled

4      while this process unfolds.

5           And, Your Honor, I would say that the most

6      important consideration ultimately, and I mentioned this in

7      the last status, is the huge imbalance in prejudice to the

8      two sides here.  If you temporarily stay discovery, class

9      wide discovery in this case, because individual discovery

10     has already occurred, if you temporarily stay it, nothing

11     changes for the plaintiffs other than that they are delayed

12     a few months in getting this material that they want so

13     badly.  We believe they have contractually agreed that they

14     should never get that material.  But obviously Your Honor

15     will decide that.

16          THE COURT:  Well, the question is, if I do stay

17     it, as you are trying to convince me to do.

18          MR. LOBEL:  Yes.

19          THE COURT:  Will they have -- will the plaintiffs

20     have received the discovery to mount their challenge against

21     your motion to dismiss?

22          MR. LOBEL:  Well, Your Honor -- well, are

23     you -- do you mean their motion to compel arbitration?

24          THE COURT:  Yes.

25          MR. LOBEL:  Yes.  Yes, Your Honor.  We believe

1     that they're entitled to that discovery under the law, that

2     they're entitled to discovery on assent to these contracts,

3     so yes, absolutely.

4              THE COURT:  But won't there be -- there will be a

5     dispute about what evidence will be needed?

6              MR. LOBEL:  Well, there may be disputes, Your

7     Honor, and I'm confident the parties can resolve those.  But

8     what we know for sure they shouldn't get is class wide

9     discovery.  These are -- the issues would be did the

10    individual consumer, did Mr. Garten consent to, did he form

11    an agreement to a contract.  That they are entitled to.

12    What they're not entitled to are 9.7 million documents that

13    they want so badly that relate to an investigation.  What

14    they're not entitled to are companywide sweeping sales

15    practice records.  None of those have to do with whether a

16    contract was entered into for these individual consumers.

17    And we believe that they've waived the right to that

18    information, so all we're asking is, Your Honor, just let's

19    just wait and see how it shakes out I guess is the way it to

20    put it.  But what -- what I was saying is that --

21              THE COURT:  Let me ask you one more left field

22    question.

23              MR. LOBEL:  Sure.

24              THE COURT:  Dealing with the securities discovery,

25    this case's discovery.

1           MR. LOBEL:  Yes, Your Honor.

2           THE COURT:  That would be quite broad.

3           MR. LOBEL:  Your Honor, it will be broad, and I

4    don't -- I don't presume to speak for Mr. Gibbs, but I

5    believe with the automatic stay in place and the briefing on

6    the motion to dismiss and the amended complaint, I believe

7    Your Honor will resolve the motion to compel arbitration

8    long before that discovery ever arises.  So I don't see that

9    presenting a problem because we've got, we're targeting

10   roughly the end of the summer or maybe a little bit past

11   that for I think resolution -- or at least the hearing on

12   the motion to compel arbitration.  So my understanding is

13   that, and maybe Mr. Gibbs wants to speak to this, he's on

14   the phone, the amended complaint has not even been filed yet

15   and then there will be the motion to dismiss process which

16   is lengthy, as I understand it.

17           THE COURT:  Mr. Gibbs, are you there?

18           MR. GIBBS:  I am, Your Honor.  And that's correct.

19   There is, under the Private Securities Litigation Reform

20   Act, a discovery stay in place in the securities class

21   action.  Under your recent order, we need to meet and confer

22   with plaintiffs' counsel in the securities case and submit a

23   proposed schedule which I would expect to have a date for

24   filing an amended consolidated complaint and then a briefing

25   schedule for a motion to dismiss.  Discovery would be stayed

1    throughout at least that part of the process leading up to a

2    ruling on the motion to dismiss, and given how these

3    schedules are I believe line up, I would expect that process

4    to take us through the summer and into the fall.  So I would

5    be surprised if we were at a -- if we were in discovery in

6    the securities case before you have the motions on

7    arbitration resolved.

8              THE COURT:  All right.  Anyone else want to be

9    heard on that issue?

10             MR. BLATCHLEY:  Your Honor, this is Mike Blatchley

11   from Bernstein Litowitz on behalf of the lead plaintiff

12   Oregon.  We are submitting and we will be working with

13   defendants to set up a schedule, but I don't think we should

14   presume that the timing will be as far as Mr. Gibbs

15   suggests.  But, again, we haven't worked out those details

16   yet.

17             THE COURT:  Okay.  I appreciate that.  Okay.

18   Anything else on that issue?

19             All right.  Go ahead.

20             MR. LOBEL:  Your Honor, I was just talking about

21   prejudice because that's one of the factors that courts look

22   at in this decision in front of Your Honor, and I just do

23   think there's a huge imbalance.  We can't unring the bell if

24   this class material comes out.  And there are

25   significant -- would be significant costs, not just monetary

1    costs, Your Honor, but the loss of these rights, if we are

2    right, and this all presumes we're correct, are significant,

3    the loss of the rights under the Federal Arbitration Act,

4    the loss of our contractual rights, our significant

5    prejudice, and on the other side, the only prejudice I see

6    to the plaintiffs is delay.  And if we're wrong, they will

7    get what they want at the appropriate time.  But, again, I

8    think that the class discovery would effectively void the

9    arbitration agreements and class action agreements.  It

10   would usurp the role of the arbitrator in determining the

11   scope of discovery if we're correct.  Obviously there would

12   be enormous resources expended which may be wasted, in a

13   sense, if there's never class treatment of these cases.  And

14   so logically the arbitrability issue should come first and

15   be resolved before discovery, especially when we've made

16   such a strong showing here in our motion.

17          And I think that one of the cases talks about the

18   wisdom of staying discovery in this situation because, if

19   not, the advantages of arbitration would be lost forever.

20   And that's really what we think is a significant factor for

21   the Court to consider.  So with that, I've taken an awful

22   lot of the Court's time, and I appreciate the time you've

23   given me, and I'm happy to answer any questions, Your Honor.

24          THE COURT:  Thank you for right now.

25          MR. LOBEL:  Thank you.

1         MR. GUDMUNDSON:  Good morning, Your Honor.

2         THE COURT:  Good morning.

3         MR. GUDMUNDSON:  We've heard a lot of unsworn

4    testimony this morning and a lot of testimony that's been

5    evidence that's not been tested in discovery, and things are

6    going to change quite a bit.  It's all designed for one

7    thing.  It's all designed to create a Pavlovian response for

8    us all, for the Court, for the plaintiffs' lawyers and for

9    everybody else that when we ring that bell and say the word

10   arbitration, everybody grinds to a halt and freezes until

11   the defendant has what it wants.

12        Well, I can assure Your Honor that the plaintiffs'

13   counsel in this room and the many law firms that have come

14   together to prosecute this case are no dummies.  We know

15   that the *Concepcion* case has been around for a long time.

16   We know what a arbitration agreement looks like and we know

17   when it has the potential to destroy the rights of millions

18   of people in one fell swoop.  But here we smell a rat and

19   for good reason.

20        One look no further than this fine postcard that

21   was handed up to Your Honor that looks less like a rifle

22   shot and more like a blood spatter analysis that we might

23   need to get the CSI team in to look at.  The saving grace,

24   perhaps, may be their attempt last fall in 2017, in the far

25   right column here, to fix all of their problems with the

1    arbitration agreement, and there are many, many problems

2    with their arbitration agreements.

3            But let me take a step back and talk about the

4    standard here, Your Honor.  The standard is your complete

5    discretion.  This is no different than any other case in

6    which the defendant stands up at the beginning when the

7    complaint has been filed and says this thing is meritless,

8    stay discovery.  Judge Magnuson entertained a similar motion

9    in the Target data breach case and denied it.  It's the

10   exact same standard.

11           Let's talk about these agreements.  We're not here

12   to argue the motion to compel arbitration today, although we

13   did hear what I'm assuming is about 80 to 90 percent of

14   their motion to compel arbitration argument.  In a typical

15   case what we'll get is something that looks like I suppose

16   the process that they try to follow with the 2017 contract

17   on the far right there, which we'll be attacking as a

18   complete deception upon the class because it said nothing

19   about pending litigation that they knew was pending.

20           But beyond that, we've got at least five, I think

21   it's more like six or seven, different agreements and siloed

22   within those are multiple versions over the years, various

23   products, some of which weren't even at issue in this case

24   and some of which aren't even being challenged by the

25   plaintiffs, we've got various points in time, almost none,

1    at the point of sale.  The point of sale when the contract

2    is made and the bargain is struck is when the bargain is

3    struck.  We see virtually every checkmark here on this blood

4    splatter analysis at some indiscriminate point in time when

5    your grandmother or your neighbor or whoever is trying to

6    deal with the situations that we allege in our complaint is

7    trying to get their service up and running, trying to get

8    the benefit of their bargain.

9            In some instances, they've said they send you a

10   letter that says to -- they send you a letter that says to

11   click on the internet to go look at the arbitration terms

12   and conditions.  This is prior to when the technician

13   arrives to set up your internet.  I guess they expect you to

14   go to the library or somewhere else to get those terms, I'm

15   not sure.

16           In other instances -- well, let me take a step

17   back and talk about this unsworn testimony that concerns us

18   so greatly, and that is the very term plaintiffs agreed, and

19   that's what's caught our eye a lot here.  They've given some

20   internal documents that may not even be hearsay, they're

21   probably double hearsay.  They don't look like computer

22   generated documents.  They look like something that was

23   created by a lawyer for presentation in this court.  We'll

24   be testing that.  We don't know if they're authentic or not.

25   But one thing is clear.  They do not indicate who clicked

1    that button.  In many instances, the CenturyLink technician

2    may have done it.  We believe about half of all of these

3    contracts were part of a technician installation whereupon

4    the technician could easily clicked through, as happened to

5    one member of our legal team and other people who have been

6    deposed in other aspects of the investigations that are

7    impacting CenturyLink over these issues.  We don't know who

8    clicked that.

9         And it's just wrong for Mr. Lobel to say that we

10   don't use signatures anymore.  We see this all the time in

11   cases where somebody has to sign and then we get a clean

12   pamphlet of papers that come through and it's that person's

13   signature on the dotted line as to the arbitration agreement

14   at the point in time the contract is signed.  That's not

15   here.

16        But perhaps most concerning, perhaps most

17   concerning, and we have not done our full analysis, but we

18   just received -- I'm sorry, of what we just received on

19   Saturday which was not part of this motion but which has

20   been argued at length at today, perhaps most concerning,

21   and, again, with no prejudice to the arguments we may make

22   down the line after we have a full chance to analyze all of

23   this, is the fact that they won't even say who the contract

24   is with.

25        I'm looking at the CenturyLink high-speed internet

1    subscriber agreement, which was Exhibit 3 to their document,

2    it would be ECF 90-3.  This is a document they claim binds

3    all sorts of people.  It defines CenturyLink as the

4    affiliate of CenturyLink, Inc. that provides you the

5    service, software, and/or equipment.  Well, who is that?

6    We've got ten or so interveners coming in, our clients have

7    never heard of these people.  I'm a CenturyLink customer

8    because I have been for years and you just keep it going, of

9    course, I -- I have never heard of any of these people.

10   Where's the contract?  Where does it say who the agreement

11   is with?  We are going to be attacking these contracts.  And

12   when you attack the formation of the contract and the

13   existence of the contract, different things happen in

14   arbitration that requires us a stop and grind an MDL to a

15   halt.

16        When they stand before Your Honor this fall or

17   whenever the Court sets the hearing, the standard of proof

18   to compel arbitration is going to be that all of the

19   plaintiffs assented to arbitrate these claims.  They've made

20   no showing of any valid contract, no proof of ascension, and

21   no -- have not argued that those arbitration agreements

22   apply to these claims.

23        And going back to who the party, the defendant

24   here is CenturyLink, Inc.  CenturyLink, Inc., has said in

25   its papers repeatedly and in court to Your Honor it has done

1   nothing to anyone, has no agreements with anyone, it has not

2   said a word to anyone, it doesn't even have any employees,

3   it has never done anything wrong.  And when they said that

4   you've got the wrong defendant there, we said, okay, well,

5   who said all of this stuff?  Our clients called CenturyLink

6   and talked to somebody, who said this stuff?  They didn't

7   provide that information.  Instead, we've got interveners.

8   They are not saying these are proper defendants.  They're

9   merely saying they're parties to some contracts that our

10  clients may or may not be aware of.  But who said all of

11  this stuff?  Who made these promises to our clients about a

12  price that was never honored and never intended to be

13  honored?  All we've heard is that we've got arbitration

14  clauses so broad that they encover -- they encompass all

15  entities, all people, all claims for all-time.  Well, we

16  think that's a shell game and that it falls well short of

17  the ascent that's required to destroy the legal rights of

18  all of these people and all of these millions of class

19  members.

20          Let's talk about prejudice for a second.  The

21  prejudice here, they say, is having to undergo class wide

22  discovery.  That's really the sum and substance of the

23  prejudice they describe.  But even the individual claimants

24  in this case have fraud claims, and those fraud claims go

25  all the way to the very top of the business model and

1    everything to prove that what happened actually happened.

2    They're going to be producing that stuff and likely already

3    have.  These documents have been collected for attorney

4    general investigations, for all sorts of things already,

5    this stuff, for an internal investigation apparently that is

6    going to be subject to some motion practice before Your

7    Honor.

8           But even talking about prejudice, this is going to

9    take some time.  This is MDL discovery in very, very

10   important large claims that are going to take a long time to

11   negotiate.  I've got lead counsel in other case in the

12   Northern District of Georgia right now in front of Judge

13   Totenberg and I've done other cases in front of Judge

14   Thrash.  In the Northern District of Georgia, there's an

15   automatic stay of discovery by operation of the local rule.

16   And in those cases that we've had in front of Judge Thrash,

17   the Equifax case and the Home Depot data breach case and

18   they're in front of Judge Totenberg in the Arby's data

19   breach case, we say, we understand that there's a stay of

20   discovery here, but we need to get things in place so that

21   when that stay is lifted we can move things down the line

22   and that we don't start the process at that point.

23          Frankly speaking, if we started the process of

24   serving requests for production, negotiating ESI parameters,

25   negotiating objections and responses and things like that

1    for this fall, whatever case is left, and I'm highly

2    confident that there will be some case, that's not going to

3    get started, the documents won't start flowing until early

4    next year.  But if we were able to get the process moving,

5    it takes months, frankly, to get these things negotiated, to

6    get the discovery disputes resolved and things like that.

7          We're already teeing up.  We served intervention

8    discovery.  We've heard about the massive overreach and the

9    massive objections that we're going to be receiving.  That's

10   going to be litigated and that's going to be before Your

11   Honor on a motion that's set to be heard I think May 24th.

12   So I think Your Honor hit the nail in the head when you said

13   there's going to be some disputes over this kind of stuff

14   and it's going to have to be resolved.

15         THE COURT:  Hold on, I'm reading Judge Magnuson's

16   order right now.

17         MR. GUDMUNDSON:  Sure.  We've heard some concerns

18   in the papers, both in sort of some concerns about excessive

19   costs, excessive discovery, prejudice and things like that,

20   but I want to assure the Court of a couple of things.

21   Number one, plaintiffs have no desire to take more discovery

22   than is needed.  We are -- we take these cases on contingent

23   bases.  We manage them the most efficient way as possible.

24   We've got a lot of stuff to do here, a lot of paper to

25   manage.  We want to be as efficient as possible, and we're

1    very experienced at doing that.  We have highly skilled ESI

2    experts and technicians and lawyers who will help craft the

3    most efficient document collection production review

4    possible.  We want to work with them to address the burden.

5    We do that in every case.

6         We've also got a very, very robust clawback

7    agreement that we agreed to at the defendant's request.  And

8    this is what is known as a 502(d) agreement.  In a 502(d)

9    agreement, it sort of addresses the topic of inadvertent

10   production, when the court -- when the parties might want to

11   make some efficiencies to get documents rolling that might

12   result in some inadvertence.

13        And as part of that 502(d) agreement, there's what

14   is called a 502(b) inquiry which is if somebody wants to

15   say, well, that wasn't inadvertently produced, I get to keep

16   it, you look at the factors in 502(b) to see whether it was

17   inadvertent.  We agreed to get rid of those.  We've said all

18   you have to do is say the word and we'll give it back.

19   That's a very robust clawback agreement that should

20   eliminate a lot of burden.

21        But one of the big inquiries here and whether you

22   -- and when you consider whether to grant a motion to stay

23   is whether it's a going to give a tactical advantage to

24   someone, and that's exactly what this is all about.  It's

25   all about giving CenturyLink a tactical advantage, and it

1    could not have been clearer, despite the fact the business

2    model is going to come into play in some form or fashion

3    because the individual claims have fraud components and

4    other things that embrace it, the securities cases involve

5    all of these issues, these things -- but the motive is

6    clear, slice and dice.

7         I talked about an extensional crisis we had last

8    time I was in here because that's exactly what they're

9    trying to create.  This is an MDL and, for better or worse,

10   we need to resolve the big issue, the reason we're all here.

11   But following this -- this wrongful pathway that's been laid

12   out in this motion to stay, the motion to intervene, the

13   motion to compel arbitration, just about every other

14   utterance we've heard, is to make this all about 38

15   individual complaining consumers, not about the Minnesota AG

16   case, not about the securities case, not about the other

17   many AG investigations that they're undergoing right now,

18   but all about 38 complaining consumers, what they call the

19   billing disputes litigation.

20        Before I sit down, I want to make a note on Rule

21   23 because I think it's important.  Because when I -- when I

22   refer to this card as a blood spatter analysis, of course

23   I'm being a bit, you know, glib with the Court, I suppose,

24   but it does raise some issues.  It does raise some issues to

25   say, well, if so many plaintiffs agree to so many different

1    agreements and so many things are at issue and so many

2    products, well, doesn't that really give pause for concern

3    in Rule 23?  And my response to that is this.  That's why

4    we're asking for this discovery and that's why we're making

5    this inquiry and that's why we're making these statements to

6    you.

7           The biggest element on class certification in most

8    cases is predominance, and we will never stand up and say

9    that that there's not individual issues in this case.  But

10   we want to be able to get the information and to prove to

11   the Court that the overarching story, the binding story

12   predominates over that, and we think that we will, if we're

13   given a chance.  Thank you, Your Honor.

14           THE COURT:  All right.  Thank you.  Counsel.

15           MR. LOBEL:  Your Honor, thank you.  Let me get

16   back to where I started which is the standard.  I heard

17   vigorous defense of the formation of these contracts, and

18   I'm sure they're going to fight us hard on this, but he's

19   wrong that this is unsworn testimony, Your Honor.  We put in

20   four declaration of 96 pages that are sworn by company

21   personnel that sponsored all these documents.  This is not

22   unsworn.  This is our showing.  And the standard, as I said,

23   is not if we win, not likelihood of success, did we make a

24   substantial showing and is it not unfounded.  And on that

25   basis, nothing Mr. Gudmundson can -- I think can rebut that

1   we've made a significant showing for Your Honor to exercise

2   your discretion to just delay, not -- not deprive, just

3   delay for a short time until you really see what the state

4   of play is.  If they can do everything that he claimed that

5   they can do, then eventually I suppose they will be entitled

6   to this broad class wide discovery.  But right now we've

7   made I think cast significant doubt on whether these

8   plaintiffs would ever be entitled to get class wide

9   discovery or even this Court has jurisdiction.  So I, again,

10  prudence would caution to just wait and see.

11          Now, Your Honor, again, it was a scatter shot, I

12  heard, well, the technicians probably come to the house and

13  install the HSI and the modem instead of the consumer.

14  Well, we put in a declaration from Ms. Irini who says that,

15  first of all, 50 percent or more of consumers self-install

16  their modems.  There's no technician to click for them.  So

17  that's a problem with their theory and that's in the record.

18          And secondly, that -- I'm sorry, Your Honor.  I

19  lost my train of thought on that.  But it's pure

20  speculation, I mean, that a technician came in your house

21  and took your modem over and installed and you were

22  invisible to the arbitration agreement.  I don't think the

23  Court can base a decision on that kind of argument.

24          With respect to who did the consumers do business

25  with, Mr. Shesagiri in his declaration, pages 5 to 7, he

1    went through the records of the company.  He has a list of

2    plaintiff and company that the plaintiff got service from.

3    The reason that the HSI agreement doesn't have the name of

4    the company is it's used nationwide, Your Honor.  There are

5    80 subsidiaries because of regulatory reasons that provide

6    service by this company.  They -- they cannot have 80

7    different contracts that have the company name so they have

8    one high-speed internet contract that is used by multiple

9    state companies that provide high-speed internet.  So but in

10   any event, we know that the plaintiffs signed up for a

11   CenturyLink service, obtained CenturyLink services, and

12   consented to the agreement.  So, you know, this notion that

13   they don't know who their company is, they got bills every

14   month, they paid them, I mean, surely they knew they were

15   getting CenturyLink service.

16        Your Honor, this notion of push of a button, we

17   can just sort of push of a button.  It's not true at all.

18   Whatever has been done in other proceedings, obviously we

19   don't know whether those other proceedings or investigations

20   are broader than this case, address different issues.

21   There's privileged information.  We would need to do a

22   relevance review, a privilege review, privilege logs.  We

23   would have fights over these issues with the Court.  It

24   would take the Court's time, it would take CenturyLink's

25   time, it would take the plaintiffs' time.  All of this will

1    unfold if the class wide discovery goes forward.  And while

2    that may be appropriate if they're entitled to it, and,

3    inevitable, if they're not entitled to it because they

4    agreed to arbitrate, we should never be there.  So that,

5    again, that's why prudence counsels against it.

6            And I have to say, Your Honor, that Mr. Gudmonson

7    said, you know, we'll be judicial, we'll be streamlined.

8    Well, Your Honor has authorized discovery in one area in

9    this case so far, limited discovery in the intervention

10   motion.  Last week we got 340 document requests to be

11   finalized in 11 days.  That's an issue that Mr. McNab wants

12   to talk to you about.  That's a problem that's arisen.  But

13   I say that only to say that the first shot out of the box

14   was not limited as we had hoped and was not cabined in an

15   appropriate way, in our view.  So we ultimately see concerns

16   about that issue and the rabbit hole that we would go down.

17           And, Your Honor, the other point that needs to be

18   made is Mr. Gudmonson is ignoring the concept of

19   proportionality.  Proportionally is built into the law now.

20   If it turns out that three of those cases or two or one

21   remain, why should they get the same amount of discovery as

22   if 38 remain or class wide?  You know, that's why we have to

23   put it through the sifter and see how it comes out and what

24   remains and then the Court can fashion an appropriate,

25   reasonable, proportionate discovery plan.  Right now we

1    don't know.  I think the Court may have a sense now that

2    there's some evidence to support it.  They'll attack it,

3    you'll resolve it, and then we'll know.  And so that's I

4    think the bottom line is, you know, better safe than sorry,

5    I suppose, is the way to look at it.

6                THE COURT:  Okay.  Thank you.

7                MR. LOBEL:  Thank you, Your Honor.

8                THE COURT:  Anything further?

9                MR. GUDMUNDSON:  Maybe if Mr. McNab has something

10   to say in motion to intervene discovery, I can address both

11   points and that way we can make it move a little quicker.

12               THE COURT:  Good morning.

13               MR. MCNAB:  Good morning, Your Honor.  Bill McNab,

14   Winthrop & Weinstine, on behalf of defendants.  I'll be very

15   brief.  I know the Court doesn't like surprises, and this is

16   really just an update.  It's not a ripe issue, but it's an

17   issue that is quickly ripening.

18               As Your Honor will recall at the April 5th status

19   conference, plaintiffs requested discovery regarding the

20   intervention motion and Your Honor agreed.  And you said,

21   quote, let's do some very limited discovery, and then you

22   rescheduled that motion to next month to June 7th for that

23   purpose.  And you said to plaintiffs' counsel, Is that

24   enough time for you to get the discovery done, the limited

25   discovery that you need?  And Your Honor went on and said,

1    All right.  You meet and confer.  I want limited discovery.

2    Let's get to the point.  That was April 5th.

3          Last Friday, April 27th, more than three weeks

4    later, at 4:30 in the afternoon, we received 340 document

5    requests as well as notices for 11 depositions, all to be

6    returnable within 11 to 13 days of those subpoenas.  Your

7    Honor, we are very concerned.  We started the conversation

8    with plaintiffs' counsel about those concerns yesterday.  We

9    have scheduled a meet and confer, a formal meet and confer,

10   for tomorrow.  We do feel that they waited over three weeks

11   and then dumped massive requests on us and allowed us a week

12   and a half to process those requests that information.

13          On top of that, Your Honor, not only are there so

14   many requests, many of them do not address intervention at

15   all.  I'll give you just a few examples: documents

16   sufficient to show adherence to corporate formalities;

17   documents reflecting intercompany accounts, transfers,

18   loans, and etc.; documents showing employee incentives and

19   benefits; documents showing all employee training materials;

20   documents showing ownership of all intellectual property,

21   trademarks, and trade names; photographs of every building

22   belonging to the proposed interveners.

23          Your Honor, we submit that none of that has

24   anything to do with the simple question on intervention is

25   does the moving intervener have an interest in the property

1    or the transaction at issue in the case.

2           But the real issue is how is any of that limited?

3    We understood Your Honor's order.  We were prepared and

4    expected to engage in very limited intervention related to

5    discovery and now, a month down the road, we are going to be

6    forced to meet and confer to try to narrow this down.  And

7    as I said, we started that conversation yesterday.  We will

8    meet and confer in good faith.  If we can get it resolved,

9    you won't hear about it again.  But given the scope of what

10   we received and our perception that it's a long way from

11   what Your Honor ordered as very limited intervention

12   discovery, I have to say you may be hearing from the parties

13   again on this, and I'm sorry to say so.

14           THE COURT:  Okay.  Thank you.

15           MR. GUDMUNDSON:  Well, I'm here to argue another

16   motion I guess I wasn't prepared to argue.  They've got

17   about ten companies who say that they are the right parties.

18   340 divided by 10 is 34.  I left a few messages and talked

19   with Mr. McNab yesterday that said all the dates were

20   negotiable, all the locations are negotiable, but the bottom

21   line is this.  CenturyLink Inc. says it ain't us, it ain't

22   us, it's these people, it's these people over here, these

23   are the people who did everything and we deserve to

24   understand why that is.  They've fashioned it in the form of

25   a motion to intervene, stuck it right between a motion to

1    stay and two other massive motions, obviously to put us

2    through our paces.  We're fine with that.  We are big people

3    and we can deal with it.  But there's a lot of discovery

4    that goes into figuring out who the proper paries are when

5    it's a shell game.

6            And all of the discovery, you will see when it's

7    before you, as it was previewed by Mr. McNab, seeks to

8    understand are these real companies?  We've never heard of

9    them.  Nobody picked up the phone and said this is Larson

10   Redfield, LLC when our clients called from Wisconsin.

11   Apparently the Wisconsin clients contracted and dealt with a

12   Larson Redfield, LLC.  Never heard of them.  But that's what

13   all of these are going to.

14           And it's all going to be -- I will renew a request

15   I made to the Court last time that was rejected, and I'm

16   mindful of that, and we requested that the motion to

17   intervene run concurrently with the motion to compel

18   arbitration opposition and that was because we thought that

19   a lot of the discovery would overlap and some of it does.

20   There's some common declarants that cover both.  But this

21   issue of who the people -- who our people contracted with

22   and who these arbitration agreements and contracts

23   supposedly are between is an important issue and we need to

24   figure that out.

25           And if it's going to take more time on the motion

1    to intervene, the result of the conversations between

2    Mr. McNab and our team are probably not going to be that we

3    just give up and say, okay, fine, we don't really care if

4    it's a real company or not or we don't really care that the

5    fact that the bills all say CenturyLink even though you say

6    it's Larson Redfield, LLC.  It's going to be that we come

7    and ask for more time or we continue to pursue our rights

8    and get whatever we can and subject to Your Honor's

9    discretion.  That's really all I have to say on that, Your

10   Honor.  Thank you.

11           THE COURT:  Mr. McNab.

12           MR. MCNAB:  Just very briefly, Your Honor.  All

13   the things that Mr. Gudmundson is talking about they want to

14   know about who these companies are, are they real,

15   that -- those have nothing to do with the standard on the

16   motion to intervene.  The -- it's a very low threshold and

17   the intervener simply needs to make the showing that it has

18   an interest in the property or the transaction at issue in

19   the lawsuit.

20           Now, we have -- that motion isn't fully briefed so

21   I'm not going to try and win that motion.  What I'm

22   suggesting is that we have already made the showing, we have

23   submitted evidence, admissible evidence, as to who they are,

24   what their relationships were with each of the individual

25   plaintiffs, what their rights and interests are, so beyond

1   that, the other issues that Mr. Gudmundson and his

2   colleagues are worried about are the subject of other

3   discovery down the road if and when there comes a time for

4   that discovery.  If those parties are in, they're in.  Thank

5   you, Your Honor.

6        THE COURT:  Thank you.  Since there wasn't a

7   motion before me, it was nice to be involved in all your

8   disputes right now.

9        I will take the original motion under advisement

10  and get my order out as quickly as possible.

11       Dealing with the motion to intervene and the

12  discovery requests, you're all going to meet and confer and

13  if you -- if there are difficulties on the timetable, I

14  suggest that you both agree that we move the June motion to

15  the date that we set up for the motion for arbitration, so

16  that gives everyone enough time so we're not -- I've heard

17  the complaint that everything is going to be squeezed in, in

18  11 days.  Well, it's summertime and 11 is easy.

19       So let's see if we can do something about that.

20  You have my suggestion.  I hope you take it up and then I'll

21  have a joint motion and I will agree to that and then we'll

22  have one or two days for you to argue.  Okay, all right?

23       It's always good to see you all.  It's -- you get

24  this old senior judge down here to hear you because

25  it's -- you just are outstanding attorneys and I just love

1   being in your presence.  So let's adjourn, and I'll see you

2   next time.

3        (Proceedings concluded at 11:44 a.m.)

4

5                         *     *     *

6

7

8        I, Staci A. Heichert, certify that the foregoing is

9   a correct transcript from the record of proceedings in the

10  above-entitled matter.

11

12               Certified by:  *s/ Staci A. Heichert*

13                              Staci A. Heichert,
                                RDR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25