## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

MDL No. 17-2795 (MJD/KMM)

This Document Relates to
Civil File No. 18-296 (MJD/KMM)

**MEMORANDUM OF LAW & ORDER**

---

Patrick E. Gibbs, Douglas P. Lobel, David A. Vogel, Sarah M. Lightdale, and Lauren Gerber Lee, Cooley LLP; and William A. McNab and David M. Aafedt, Winthrop & Weinstine, P.A.; Counsel for Defendants CenturyLink, Inc., Glen F. Post, III, R. Stewart Ewing, Jr., David D. Cole, Karen Puckett, Dean J. Douglas, and G. Clay Bailey.

Michael D. Blatchley, John C. Browne, and Michael Mathai, Bernstein Litowitz Berger & Grossmann LLP; Keith S. Dubanevich, Timothy S. DeJong, and Keil M. Mueller, Stoll Berne Lokting & Shlachter P.C.; Special Assistant Attorneys General and Counsel for Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund, Plaintiff Fernando Vildosola and Lead Counsel for the Class; and Richard A. Lockridge, Gregg M. Fishbein, and Kate M. Baxter-Kauf, Lockridge Grindal Nauen P.L.L.P., Liaison Counsel for Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund and Plaintiff Fernando Vildosola.

---

## I.      INTRODUCTION

This matter is before the Court on Defendants' Motion to Dismiss under Rule 12(b)(6). [Docket No. 154] The Court heard oral argument on June 7, 2019. For the reasons that follow, the Court denies the motion in its entirety.

## II. BACKGROUND

### A. Factual Background

The Class Period runs from March 1, 2013 to July 12, 2017. ([Docket No. 143] Consolidated Securities Class Action Complaint ("Compl.") at 2.)

#### 1. Defendants

##### a) CenturyLink, Inc.

Defendant CenturyLink, Inc. ("CenturyLink") is the country's third-largest telecommunications company with 50,000 employees and millions of customers. (Gibbs Ex. 4, 2016 CenturyLink Form 10-K at 3; Gibbs Ex. 5, 2017 CenturyLink Form 10-K at 4, 19.) From 2013 through 2017, CenturyLink's annual revenues were approximately $18 billion. (Gibbs Ex. 1, 2013 CenturyLink Form 10-K at 4; Gibbs Ex. 2, 2014 CenturyLink Form 10-K at 3; Gibbs Ex. 3, 2015 CenturyLink Form 10-K at 3; Gibbs Ex. 4, 2016 CenturyLink Form 10-K at 4; Gibbs Ex. 5, 2017 CenturyLink Form 10-K at 5.) During this time, the consumer segment accounted for approximately one-third of CenturyLink's annual revenues. (Gibbs Ex. 1, 2013 CenturyLink Form 10-K at 6; Gibbs Ex. 2, 2014 CenturyLink

Form 10-K at 5; Gibbs Ex. 3, 2015 CenturyLink Form 10-K at 5; Gibbs Ex. 4, 2016 CenturyLink Form 10-K at 6; Gibbs Ex. 5, 2017 CenturyLink Form 10-K at 7.)

### b) Executive Defendants

At all relevant times, Defendant Glen F. Post, III was the CEO, President, and a director of CenturyLink. (Compl. ¶ 29.)

At all relevant times, Defendant R. Stewart Ewing, Jr. was CenturyLink's CFO and Executive Vice President. (Id. ¶ 30.)

At all relevant times, Defendant David D. Cole was Executive Vice President and Controller of CenturyLink. (Id. ¶ 31.) During the Class Period, he served as CenturyLink's principal accounting officer. (Id.)

From 2009 through October 2014, Defendant Karen Puckett was CenturyLink's Executive Vice President and COO. (Id. ¶ 32.) From November 2014 until she left CenturyLink in August 2015, Puckett served as CenturyLink's President of Global Markets. (Id.) During the Class Period, Puckett was the highest-ranking executive with direct oversight of the consumer segment sales division. (Id.)

Defendant Dean J. Douglas took over Puckett's role.  (Id. ¶ 33.)  He began his employment at CenturyLink as President of Sales and Marketing in February 2016, and later became President of Enterprise Markets.  (Id.)

During the Class Period, Defendant G. Clay Bailey was CenturyLink's Senior Vice President and Treasurer.  (Id. ¶ 34.)  During that time, he also served as a spokesperson for CenturyLink, including in investor conference calls and presentations.  (Id.)  In 2015, Bailey became Senior Vice President of Operations Transformation.  (Id.)  In that role, Bailey oversaw a team devoted to "bringing [] a better customer experience" to CenturyLink's customers.  (Id.)

Bailey, Cole, Douglas, Ewing, Post, and Puckett are collectively known as the "Executive Defendants."

### c)     Other CenturyLink Management

During the Class Period, CenturyLink operated 18 call centers.  (Compl. ¶ 60.)  Each call center was managed by a Call Center Director, and each Call Center Director reported to Linda Olsen, CenturyLink's Vice President of Consumer Contact Centers.  (Id.)  Olsen reported to Defendant CEO Post.  (Id.)

Kathy Victory was CenturyLink's Senior Vice President of Consumer Sales & Care. (Id. ¶ 100.) Kathy Flynn was Vice President of Human Resources. (Id. ¶ 102.)

### 2. Plaintiffs

Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund, ("Oregon") operates and oversees public funds for the benefit of retired public employees. (Compl. ¶ 26.) The Oregon Public Employee Retirement Fund is a state pension fund for retired public employees. (Id.) It had $77 billion in assets under management as of April 30, 2018. (Id.) Oregon purchased CenturyLink securities during the Class Period. (Id.)

Plaintiff Fernando Alberto Vildosola is trustee for the AUFV Trust U/A/D 02/19/2009. (Id. ¶ 27.) AUFV Trust U/A/D 02/19/2009 purchased CenturyLink's 7.60% Senior Notes due September 15, 2039 during the Class Period. (Id.)

### 3. Class Period Allegations

According to Plaintiffs, for a number of years, CenturyLink engaged in systemic "cramming" of customer accounts, by adding services to customers'

accounts without authorization, deceiving customers about the prices they would be charged, and misquoting prices by failing to disclose that "bundles" included fees for optional services that the customers did not need or authorize. (Compl. ¶¶ 44, 64.)  CenturyLink potentially overbilled 3.5 million customers, representing over half of its broadband subscribers and one-third of its 12 million wireline subscribers.  (Id. ¶¶ 65, 178.)

CenturyLink imposed unachievable quotas on sales employees (from sales representatives to call center supervisors, managers, and directors) and terminated sales employees who did not meet them.  (Compl. ¶¶ 63, 77.)  The pressure from these quotas caused customer service employees to engage in widespread cramming.  (Id.)  The customer service department employed "retention specialists," who were incentivized to minimize refunds, required to meet sales quotas, and strictly limited in how much they could reimburse customers.  (Id. ¶¶ 84-86.)  CenturyLink made it difficult for customers to challenge overcharges by deleting call recordings before the customer received the first "real" bill, while requiring customers to prove misquotes.  (Id. ¶ 87.)

CenturyLink's cramming practices were documented and monitored by the Executive Defendants through monthly reports detailing thousands of

complaints by the FCC, state agencies, and others.  (Compl. ¶¶ 96-99, 103.)  The

reports showed that cramming complaints were "very common and

widespread," and Post, Puckett, and Victory complained that the number of

complaints was "too high" and thought that the team compiling the data had

overstated the numbers.  (Id. ¶ 105.)  When the team verified the numbers and

provided recommendations on how to reduce cramming, the Executive

Defendants ignored them because they were not willing to sacrifice revenues.

(Id. ¶¶ 105, 107-08.)

During the Class Period, Defendants told investors that CenturyLink's

sales practices were aboveboard and represented that it would never "plac[e] or

record[] an order for our products and services for a customer without that

customer's authorization."  (Compl. ¶ 151.)  Defendants claimed that

CenturyLink's revenue growth in its consumer and small business segments was

due to its focus on customer needs through its call centers, bundling service

packages, and other strategies.  (Id. ¶¶ 58-61.)  These representations were

important to investors because investors were concerned with CenturyLink's

ability to generate dependable cash flows in the face of customers abandoning

traditional wireline telephone services that were the historical core of

CenturyLink's business.  (Id. ¶¶ 55-56.)  The representations were false because,

in fact, CenturyLink's revenues were materially increased by cramming.  (Id. ¶¶

93, 192.)  CenturyLink routinely added services to customer accounts without

authorization, lied to customers about the prices they would be charged, and

systematically misquoted the prices of contracts, particularly by failing to

disclose that "bundled" packages included fees for optional services that the

customer did not need or authorize.  (Id. ¶¶ 63-64, 88-94.)  CenturyLink's

strategy was to "keep the price point low but add fees."  (Id. ¶ 70.)  One-third to

one-half of CenturyLink customers were overcharged (id. ¶¶ 65, 178), and

cramming was happening "all day, every day" "in every state" (id. ¶¶ 89, 96,

105, 107).  (See also id. ¶¶ 103, 108 (providing that CenturyLink internally

substantiated between 50 and 80% of customer overbilling complaints).)

In 2014, Defendants internally acknowledged that cramming was a

problem and attempted to secretly reduce it.  (Compl. ¶¶ 109-10.)  At that point,

over half of all sales employees were being written up each month for failing to

meet the monthly sales quota.  (Id. ¶ 78.)  CenturyLink's human resources team

developed a new "behavioral coaching" system that focused less on "metrics"

and, instead, judged sales employees on how many customers they helped,

whether they resolved all of the customers' issues, and whether they provided good customer service; under this system, supervisors, not sales employees, were held responsible for meeting quotas. (Id. ¶¶ 111, 114.) After implementing the new system, the number of customer complaints declined; however, reducing cramming led to an abrupt decline in sales. (Id. ¶¶ 111, 114.) After the decline in sales, Defendants quickly returned to the old quota system that encouraged cramming. (Id. ¶ 112-14.) At the end of the third quarter of 2015, the policies encouraging cramming had been reinstated, and CenturyLink's revenues increased. (Id. ¶ 117.)

CenturyLink created a false explanation for its fluctuating revenues. (Compl. ¶ 115.) Defendants publicly stated that its revenues were weaker in the fourth quarter of 2014 and the first quarter of 2015 due to credit tightening, organizational realignment, and a new focus on "higher value customers." (Id. ¶¶ 115, 213-18.) They then stated that revenues had rebounded by the third quarter of 2015 due to its strategy of pursuing "higher value bundled sales and select pricing increases" and of "attracting more high-value customers," rather than admitting that the return to extensive cramming drove growth. (Id. ¶ 117.)

In or before March 2016, the Arizona Attorney General began an

investigation into allegations that CenturyLink had engaged in deceptive billing

practices.  (Compl. ¶ 132.)  It found that CenturyLink had engaged in numerous

deceptive billing practices.  (Id.)  In April 2016, CenturyLink agreed to settle the

lawsuit for $150,000 and a promise to take certain measures to prevent

consumers from being improperly charged.  (Id. ¶ 133-35.)  CenturyLink did not

disclose the Arizona Attorney General investigation or settlement in any SEC

filing or other public release.  (Id. ¶ 137.)  Weeks later, CenturyLink reported

favorable results in its consumer segment, which had been bolstered by the

improper sales practices identified by the Arizona Attorney General.  (Id. ¶ 139.)

Douglas claimed that CenturyLink's strategies had been successful in signing up

customers who were "less precluded to churn" and generated "higher ARPU

[average revenue per user]."  (Id. ¶ 140.)  He asserted that CenturyLink, unlike

its competitors, did not charge unwanted fees.  (Id. ¶¶ 140, 220.)

In May 2016, the Minnesota Attorney General issued a civil investigative

demand to CenturyLink after receiving many consumer complaints of deceptive

practices.  (Compl. ¶ 141.)  In October 2016, CenturyLink employee Heidi Heiser,

who had repeatedly raised concerns about CenturyLink's fraudulent business

practices to her supervisors, asked Post, through an online message board, "why customers were being given multiple accounts and being billed for things they did not ask for." (Id. ¶ 146.) Two days later, Heiser was suspended and then fired for blowing the whistle. (Id. ¶ 147.)

On Friday, June 16, 2017, Bloomberg reported on Heiser's whistleblower lawsuit against CenturyLink, that she was fired after raising concerns about cramming with Post, and that she alleged that CenturyLink had charged many millions of dollars in unauthorized fees. (Compl. ¶¶ 152-53.) That day, CenturyLink stock dropped 5% on heavy volume, and analysts attributed the decline to the cramming revelations in Heiser's lawsuit. (Id. ¶¶ 154-56.) On Monday, June 19, 2017, Bloomberg reported on a consumer class action lawsuit on behalf of "potentially millions" of CenturyLink customers alleging billing misconduct that had been filed the day before, which caused CenturyLink's stock to fall by 1.4% that day. (Id. ¶¶ 158, 160.) On July 12, 2017, news reports disclosed that the Minnesota Attorney General had filed a fraudulent billing lawsuit against CenturyLink based on a year-long investigation that provided detail concerning CenturyLink's sales and billing practices and their financial

impact.  (Id. ¶¶ 163-68.)  In response to this news, CenturyLink's stock fell 3.23%

on extremely high volume.  (Id. ¶¶ 169-71.)

Many of the allegations in the Complaint are based on statements from

twenty anonymous former employees ("FEs"), including former call center

representatives, a financial analyst, managers, a human resources director, and a

regional president.  (See, e.g., Compl. ¶¶ 38, 69, 70, 71, 102.)

### 4. Post-Class Period Allegations

In October 2017, CenturyLink entered into a stipulated consent order with

the Minnesota Attorney General in which it agreed to reform its sales practices in

Minnesota.  (Compl. ¶ 173.)

In December 2017, CenturyLink announced the results of an internal

investigation, which found, among other things, that its promotions misled

customers who did not receive discounts that they were offered.  (Id. ¶ 174.)

On March 6, 2018, Post, who had previously announced his intention to

remain CEO until January 1, 2019, announced that he would retire in May 2018.

(Id. ¶ 177.)

### B. Procedural History

On June 25, 2018, Lead Plaintiff Oregon and Plaintiff Vildosola filed a

Consolidated Securities Class Action Complaint against Defendants CenturyLink

and the Executive Defendants.  [Docket No. 143]  The Complaint alleges: Count

1: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated

Thereunder (against Defendants CenturyLink, Post, Ewing, Cole, Puckett and

Douglas); and Count 2: Violations of Section 20(a) of the Exchange Act (against

Defendants Post, Ewing, Cole, Puckett, Douglas and Bailey).

Defendants have now filed a motion to dismiss the Complaint.  [Docket

No. 154]

## III.  DISCUSSION

### A.    Legal Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may

move the Court to dismiss a claim if, on the pleadings, a party has failed to state

a claim upon which relief may be granted.  In reviewing a motion to dismiss, the

Court takes all facts alleged in the complaint to be true.  Zutz v. Nelson, 601 F.3d

842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is
> plausible on its face.  Thus, although a complaint need not include
> detailed factual allegations, a plaintiff's obligation to provide the
> grounds of his entitlement to relief requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of
action will not do.

Id. (citations omitted).

> A claim has facial plausibility when the plaintiff pleads factual
> content that allows the court to draw the reasonable inference that
> the defendant is liable for the misconduct alleged.  The plausibility
> standard is not akin to a probability requirement, but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.
> Where a complaint pleads facts that are merely consistent with a
> defendant's liability, it stops short of the line between possibility
> and plausibility of entitlement to relief.

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted).

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

connection between the misrepresentation or omission and the purchase or sale

of a security; (4) reliance upon the misrepresentation or omission; (5) economic

loss; and (6) loss causation."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27,

37–38 (2011) (citation omitted).  The "materiality requirement is satisfied when

there is a substantial likelihood that the disclosure of the omitted fact would

have been viewed by the reasonable investor as having significantly altered the

total mix of information made available."  Id. at 38 (citation omitted).

The Private Securities Litigation Reform Act ("PSLRA") provides

heightened pleading standards for securities complaints and requires that

> any private securities complaint alleging that the defendant made a
> false or misleading statement must: (1) specify each statement
> alleged to have been misleading [and] the reason or reasons why the
> statement is misleading; and (2) state with particularity facts giving
> rise to a strong inference that the defendant acted with the required
> state of mind.

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007) (citations

omitted).

### B. Whether Plaintiffs Have Pled Falsity

#### 1. Pleading with Particularity

Under the PSLRA, "the complaint must indicate why the alleged

misstatements would have been false or misleading at the several points in time

in which it is alleged they were made.  In other words, the complaint's facts must

necessarily show that the defendants' statements were misleading."  In re Cerner

Corp. Sec. Litig., 425 F.3d 1079, 1083 (8th Cir. 2005) (citations omitted).

The Court concludes that Plaintiffs have sufficiently pled falsity with

particularity.  Defendants object that Plaintiffs fail to plead numerical estimates

of the financial impact of cramming on CenturyLink's revenues.  The law does

not require securities plaintiffs to plead a particular number or percentage.

Rather, a complaint inadequately describes the impact of alleged wrongdoing when allegations are completely vague, "[w]ithout any indication" that the alleged conduct would affect the company's earnings.  In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1084 (8th Cir. 2005).  Here, Plaintiffs provide detailed allegations about how cramming was a widespread practice at CenturyLink, that more than 3.5 million customers were overbilled, that the cramming was material to CenturyLink's revenues as demonstrated by the drop in sales when cramming was curtailed by implementation of the behavioral coaching and the subsequent increase in revenue when the quota system was reinstated and cramming returned to its previous frequency.  (See, e.g., Compl. ¶¶ 65, 89, 93, 103, 105, 107, 109-20.)  These allegations are sufficient.  See, e.g., Friedman v. Rayovac Corp., 295 F. Supp. 2d 957, 987 (W.D. Wis. 2003) (holding that the law does not require plaintiffs "plead the dates of transactions or the exact dollar amounts involved" when the complaint "identif[ied] numerous statements from various employees of the defendant attesting to widespread practices of the company").  "[A]t the motion to dismiss stage, the plaintiffs may not [need] to allege precise dollar values and dates, [but] they [are] required to plead something more than a broad statement that was consistent with the Company's

actual disclosures." <u>Galestan v. OneMain Holdings, Inc.</u>, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (citation omitted). Quantification may be required when a plaintiff alleges "overstatement or overvaluation," but not when a plaintiff alleges "the failure to disclose known, material [] problems . . . existing from the beginning of the Class Period." <u>Id.</u> at 299 (citation omitted).

Moreover, like the complaint in <u>In re Gentiva Securities Litigation</u>, this Complaint "does not allege accounting fraud or the failure to disclose the specifics of a securities markup, or any other type of numerical manipulation," but rather, alleges that a portion of CenturyLink's reported revenue was derived from a widespread, serious fraud. 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013). This is information that could be important to a reasonable investor even if the fraud only accounted for a small percentage of CenturyLink profits; also, the information would be material because the alleged fraud opened CenturyLink to potential civil and criminal liability. <u>See</u> <u>id.</u> (<u>See also</u> Compl. ¶ 204.)

The Court further rejects Defendants' objection that the Complaint is inadequate because it fails to allege that CenturyLink has restated its financial statements or that its auditors or the SEC have asked it to do so. A restatement or auditor finding is not a prerequisite to alleging fraud; such a requirement

"would shift to accountants the responsibility that belongs to the courts."

Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002). Nor is it fatal that, at this stage, Plaintiffs cannot provide details on the results of CenturyLink's internal audit. "The specifics of [CenturyLink's] audit are . . . precisely the type of facts which are particularly within defendants' knowledge and therefore, need not be included in the complaint." See In re First Merchants Acceptance Corp. Sec. Litig., No. 97 C 2715, 1998 WL 781118, at *11 n.5 (N.D. Ill. Nov. 4, 1998) (citation omitted).

### 2.      Allegation of Facts Showing Falsity

Defendants assert that, with regard to three categories of statements, the Complaint fails to allege facts showing that the statements are false.

### a)      Falsity of Statements Regarding Strategies and Policies

The Complaint asserts that Defendants repeatedly attributed revenue growth to CenturyLink's various business strategies, such as "bundling." Defendants represented that bundling presented significant value to customers, helped "maintain . . . customer relationships" and "enhance customer loyalty," "attract and retain customers and increase usage of [CenturyLink's] services," and resulted in more dependable and growing revenues. (Id. ¶¶ 205, 207.) The

Complaint adequately alleges that CenturyLink's statements regarding its strategies and policies were false because, in fact, cramming was widespread, systemic and knowingly encouraged by CenturyLink's impossible-to-meet quota system, that management instructed sales representatives to use deceptive sales tactics, and that Defendants knew CenturyLink's sales were materially dependent on cramming.  (See, e.g., id. ¶¶ 4, 6, 63, 64, 81, 89, 105, 108.)  See, e.g., In re Syncor Int'l Corp. Sec. Litig., 239 F. App'x 318, 320 (9th Cir. 2007) ("Defendants made numerous statements attributing [the company's] overseas earnings to a variety of legitimate business practices, while omitting any mention of illegal payments.  However, plaintiffs have alleged specific facts suggesting that illegal payments were in fact a significant reason for [the company's] overseas growth. . . .  By attributing [the company's] success solely to legitimate practices, defendants implicitly (and falsely) warranted that there were no illegal practices contributing to that success."); Hefler v. Wells Fargo & Co., No. 16-CV-05479-JST, 2018 WL 1070116, at *7 (N.D. Cal. Feb. 27, 2018) ("Given this context [allegations that Wells Fargo's success was based on "fraudulent sales practices"], Plaintiffs adequately allege that [the defendant's] statements about the success of Wells Fargo's cross selling and its commitment to providing value

for customers were both material and false or misleading."); <u>Shaev v. Baker</u>, No.

16-CV-05541-JST, 2017 WL 1735573, at *15 (N.D. Cal. May 4, 2017) ("Plaintiffs

also explain in detail why the proxy statements were misleading—for example,

the disclosures 'suggested that [the company's] strong financial performance was

attributable to a purportedly effective governance structure, while improperly

omitting that such financial performance stemmed, in material part, from the

illicit account-creation scheme.'") (addressing 14(a) claims) (citation omitted);

<u>Steiner v. MedQuist Inc.</u>, No. CIV. 04-5487 (JBS), 2006 WL 2827740, at *16 (D.N.J.

Sept. 29, 2006) ("Here, the Court holds that Plaintiffs have adequately pleaded

that Defendants' statements putting the source of the Company's revenue at

issue were misleading, thereby stating a Section 10(b) cause of action.

Specifically, in a number of public filings reporting revenue, [the Company]

failed to disclose its billing scheme [to unlawfully overcharge customers and

underpay employees], instead attributing its revenues to legitimate business

factors such as 'increased sales to existing customers, sales to new customers and

additional revenue from acquisitions.'").

        **b)**     **Falsity of Statements Regarding Effect of Attempt to Reduce Cramming**

The Complaint adequately alleges that CenturyLink's attempt to reduce cramming, in 2014, negatively impacted sales, which caused CenturyLink to reinstate its previous quota policy and encourage cramming to flourish. (See, e.g., Compl. ¶¶ 112, 114, 116-17.) The Complaint adequately alleges that Defendants lied about the reasons for the negatively impacted revenue (id. ¶¶ 115, 124, 215, 216, 263) and the rebounding revenue caused by these changes (id. ¶¶ 117-18, 211, 220, 222-23, 226-28, 230-33). Giving false explanations for growth is actionable. See, e.g., Novak v. Kasaks, 216 F.3d 300, 311-12 (2d Cir. 2000); City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc., No. 6:12-1609, 2013 WL 1100819, at *3-4 (W.D. La. Mar. 15, 2013).

Defendants' complaints about the reliability of FE statements is unavailing at this stage, when the Complaint provides ample detail to show that the FEs had personal experience with cramming, the quota system, and the effect of changing the quota system, either as sales representatives or human resources employees. The Complaint also provides accounts of FEs whose duties including investigating customer and regulatory complaints and reporting on those findings to management, so there is a sufficient basis for their accounts of the numerosity and substantiation of cramming complaints.

Defendants' specific complaint that Bailey's statement to FE-5 was not related to cramming is inappropriate at this stage. FE-5 alleges FE-5 "explained the complaints and issues with cramming s/he was experiencing," and, "[i]n response," Bailey "acknowledged these cramming issues were occurring," and stated: "We've got to do something about our call centers." (Compl. ¶ 109.) Defendants admit that FE-5 and Bailey had the conversation in question, as corroborated by the email submitted by Defendants. ([Docket No. 158] Gibbs Decl., Sealed Ex. 26.) At the motion to dismiss stage, the Court accepts FE-5's account of Bailey's comment.

### c) Falsity of Statements Regarding Regulatory Risks

The Complaint alleges falsity when it asserts that Defendants issued misleading statements about regulatory risks when they represented as merely possible risks that had already materialized (such as inquiries and enforcement actions instituted by regulatory bodies) and concealed the fact that CenturyLink's illegal practices were unsustainable when they should have disclosed "known trends and uncertainties" that they knew had "a material . . . impact on" revenues. (Compl. ¶¶ 258-61.) See, e.g., In re Mylan N.V. Sec. Litig., No. 16-CV-7926 (JPO), 2018 WL 1595985, at *10 (S.D.N.Y. Mar. 28, 2018) ("[T]o

warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.") (citations omitted).

"A disclosure duty exists under Item 303 when a trend or event is both (1) presently known to management, and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation." Beaver County Employees Retirement Fund v. Tile Shop Holdings, Inc., 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (citations omitted). The Complaint adequately alleges that Item 303(a) of Regulation S-K required CenturyLink to disclose that its illegal sales practices were a material driver of its reported revenue, that its attempt to curtail those practices caused a decline in revenues, and that abandoning this effort caused revenues to rebound. See 17 C.F.R. § 229.303(a)(3)(ii) ("Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."); (Compl. ¶¶ 109-14, 122, 262).

### 3.      Whether the Statements Were False When Made

Defendants' assertion that their statements were not false when made because they tried to meet customer needs and abide by the Code of Conduct but simply failed in their execution does not justify dismissing the Complaint. Plaintiffs have provided detailed allegations, supported by FE statements, that Defendants made statements directly contrary to facts they knew were occurring. For example, Defendants stated that they followed the Code of Conduct that provided they would never place an order for services without that customer's authorization while FE allegations show that CenturyLink instructed sales representatives to quote prices without disclosing that individual optional services were included and knew that employees frequently placed orders without customers' authorization.  (Compl. ¶¶ 81-82, 183, 239-40.)  Cramming occurred so frequently that placing an "unauthorized service on account" was an option in the drop-down menus for violations of company policy in CenturyLink's internal computer system.  (Id. ¶ 96).  Also, Defendants represented that CenturyLink's financial performance in the consumer sector grew due to strategies such as bundling and pricing strategies when, in fact, Defendants knew the performance was materially influenced by overbilling. (See Compl. ¶¶ 201-02, 209-10, App'x A.)  When CenturyLink received media

24

inquiries about billing, Defendants stated that CenturyLink "work[ed] diligently to provide each customer with a fair and quick resolution," when, in fact, it sought to retain as much of the rampant overcharges as possible. (Id. ¶¶ 64, 83–93, 149, 246.)

### 4. Puffery

> [S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them. The role of the materiality requirement is not to attribute to investors a childlike simplicity but rather to determine whether a reasonable investor would have considered the omitted information significant at the time . . . soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements, and they are certainly not specific enough to perpetrate a fraud on the market.

In re Hutchinson Tech., Inc. Sec. Litig., 536 F.3d 952, 960–61 (8th Cir. 2008) (citation omitted).

Defendants assert that certain categories of the alleged false or misleading statements are inactionable puffery. The Court concludes that, at this stage, Defendants' objections fail.

### a) Customer Needs

The Complaint adequately alleges that CenturyLink's statements that its strategies were based on meeting customer needs and bundling in order to

provide value to customers and create customer loyalty were false because, in fact, it knowingly encouraged widespread cramming of charges and services that customers did not need or want in order to materially boost its revenue and had created a "customer service" apparatus designed to keep as much of its improper overcharges as possible. (Compl. ¶¶ 83-87, 194-200, 207, 244.) While in many instances, statements about meeting customer needs could be puffery, in the context of this case, in which it is alleged that CenturyLink's financial performance stemmed, in material part, from fraud on customers, the statements can reasonably be interpreted as material and false or misleading. See, e.g., Hefler v. Wells Fargo & Co., No. 16-CV-05479-JST, 2018 WL 1070116, at *7 (N.D. Cal. Feb. 27, 2018) ("Given this context [allegations that Wells Fargo's success was based on "fraudulent sales practices"], Plaintiffs adequately allege that [the defendant's] statements about the success of Wells Fargo's cross selling and its commitment to providing value for customers were both material and false or misleading."). This is particularly true when Defendants purposefully encouraged investors to rely on CenturyLink's statements about its focus of "customer needs" by, for example, highlighting those representations as "very important," using its focus on customer needs to differentiate CenturyLink from

competitors that were being targeting by regulators, and referencing that focus to convince investors it would succeed in areas the competitors it acquired had failed.  (See, e.g., Compl. ¶¶ 41-42, 44-48, 51, 193.)

### b)    Code of Conduct

The Complaint adequately alleges that Defendants made actionable false statements regarding CenturyLink's Code of Conduct.  While a code of conduct may generally be aspirational, in this case, CenturyLink presented the Code of Conduct as fact.  The Code of Conduct did not state that CenturyLink "aspired" to certain values.

CenturyLink explicitly stated that its directors, officers and employees were "required" to abide by the Code of Conduct and that it would disclose any changes to or waivers from the Code of Conduct applicable to directors or executive officers.  (Compl. ¶¶ 238-39.)  In turn, the Code of Conduct concretely promised that CenturyLink would never "misstate facts or confuse or mislead consumers through Company advertisements or promotions," "engage in unethical or deceptive sales practices," or "place or record an order for our products and services for a customer without that customer's authorization."  (Compl. ¶ 240.)  Post stated that the Code of Conduct was not aspirational but

was the "standards by which we conduct our operations" and any "violations of the Code will not be tolerated." ([Docket No. 163] Blatchley Decl., Ex. C, CenturyLink Code of Conduct at 3.) The Complaint further alleges that, in fact, CenturyLink systemically crammed customers by placing orders for products and services without customers' authorization, engaged in deceptive sales practices, and misled consumers through promotions, and that these systemic practices materially inflated CenturyLink's revenue. (See, e.g., Compl. ¶ 64.) Plaintiffs point out that CenturyLink's top sales performers and honored employees were the worst crammers, so violations were, in fact, tolerated by CenturyLink. (Compl. ¶ 103.) Finally, Defendants held out CenturyLink's treatment of its customers as critical to its business, enabling it to succeed where its competitors had not. (Compl. ¶¶ 41-42, 48.)

In this context, Plaintiffs' allegations are not inactionable puffery. See, e.g., In re St. Jude Med., Inc. Sec. Litig., 836 F. Supp. 2d 878, 888 (D. Minn. 2011) ("[E]ven if some portions of individual statements might be too vague and general to be actionable, particular statements by Defendants must be evaluated not only in their entirety, but also in context."). "While generalized, open-ended or aspirational statements do not give rise to securities fraud (as mere puffery),

statements contained in a code of conduct are actionable where they are directly at odds with the conduct alleged in a complaint." In re Signet Jewelers Ltd. Sec. Litig., No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018).

### 5. Opinions

Defendants have failed to show that the statements in the Complaint are inactionable as Defendants' subjective beliefs. In Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, the Supreme Court held that a defendant's statement that "we believe we are obeying the law," cannot be false simply because it turned out that the defendant's belief was wrong when the plaintiffs admit that the "opinion was honestly held." 135 S. Ct. 1318, 1327-32 (2015). Here, Plaintiffs do not admit that Defendants' beliefs were honestly held. They repeatedly allege facts that show that Defendants knew that their statements were, in fact, false.

### 6. Forward-Looking Statements

The PSLRA contains a safe-harbor provision, which protects defendants from liability when: (1) they have made forward-looking statements accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the statement is made without actual knowledge that it was false or misleading.

Julianello v. K-V Pharm. Co., 791 F.3d 915, 920–21 (8th Cir. 2015) (citing 5 U.S.C. §

78u–5(c)(1)). "In determining whether a statement is truly forward-looking, the

determinative factor is not the tense of the statement; instead, the key is whether

its truth or falsity is discernible only after it is made." Id. at 921 (citation

omitted).

The statements Defendants point to contain statements of present fact or

past fact, to which the safe harbor does not apply. For example, Defendants

point to Douglas's statement that CenturyLink was generating revenue growth

through price increases and noting that "we're continuing to drive some of those

price increases into the second half, and we'll see those manifest themselves in

the second half, as well." (Compl. ¶ 228.) This statement is not purely forward-

looking because it states that CenturyLink was already generating revenue

growth through price increases and that this already-established trend is

continuing. Defendants also highlight Post's statement to investors that

CenturyLink had "increased the level of focus in [its] call centers in first call

resolution for our customers" and that the "focus on first call resolution is

another change we believe may have affected our broadband additions for the

quarter as we focus more on the customer issues rather than selling, but we

believe the improved customer experience will improve customer retention and improve our revenue over time." (Id. ¶ 229.) This statement includes a representation of CenturyLink's current and past actions focusing on first call resolution, how those actions had already affected CenturyLink's revenues, and his current belief that continuing those actions will improve CenturyLink's revenue. Combining false or misleading statements about past or present facts with forward-looking statements does not invoke the safe harbor. See, e.g., In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1142 (9th Cir. 2017) ("[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement."). Other paragraphs cited by Defendants include statements about CenturyLink's present marketing strategy (see, e.g., Compl. ¶¶ 196-97, 205), present commitment to resolving customer billing complaints (id. ¶¶ 242-45), or other present or past facts.

**C.    Scienter**

## 1.    Scienter Pleading Standard

"The PSLRA requires that the complaint state 'with particularity' facts giving rise to a 'strong inference' that the defendants acted with the scienter required for the cause of action."  <u>In re Navarre Corp. Sec. Litig.</u>, 299 F.3d 735, 745 (8th Cir. 2002) (quoting 5 U.S.C. § 78u–4(b)(2)).  The Complaint must "set forth facts that give a <u>strong</u> reason to believe that there was reckless or intentional wrongdoing."  <u>Id.</u>  "[A] plaintiff may satisfy the scienter element with proof of severe recklessness, that is, highly unreasonable omissions or misrepresentations that . . . present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it."  <u>In re Ceridian Corp. Sec. Litig.</u>, 542 F.3d 240, 244 (8th Cir. 2008) (citation omitted).

"Scienter can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity."  <u>Cornelia I. Crowell GST Tr. v. Possis Med., Inc.</u>, 519 F.3d 778, 782 (8th Cir. 2008).  "The relevant inquiry is whether <u>all</u> the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether

any allegation, scrutinized in isolation meets that standard." <u>Id.</u> (citation

omitted).

> To determine whether the plaintiff has alleged facts that give rise to
> the requisite "strong inference" of scienter, a court must consider
> plausible, nonculpable explanations for the defendant's conduct, as
> well as inferences favoring the plaintiff. The inference that the
> defendant acted with scienter need not be irrefutable, <u>i.e.</u>, of the
> "smoking-gun" genre, or even the most plausible of competing
> inferences.

<u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 323–24 (2007) (citation

omitted).

> Yet the inference of scienter must be more than merely "reasonable"
> or "permissible"—it must be cogent and compelling, thus strong in
> light of other explanations. A complaint will survive . . . only if a
> reasonable person would deem the inference of scienter cogent and
> at least as compelling as any opposing inference one could draw
> from the facts alleged.

<u>Id.</u> at 324 (footnote omitted).

Overall, at the motion to dismiss stage, Plaintiffs have provided ample

evidence to support a strong inference of scienter by Defendants. "One 'classic'

fact pattern giving rise to a strong inference of scienter is that defendants made

statements when they knew or had access to information suggesting these public

statements to be materially inaccurate." <u>Navarre</u>, 299 F.3d at 746 (citation

omitted).  Viewing the allegations as a whole, the Complaint establishes this classic fact pattern.

### 2.    Sales Quotas

Plaintiffs adequately allege that Defendants set and enforced sales quotas that they knew could only be met through cramming, which supports a strong inference of scienter.  The Complaint shows that Defendants knew that, by setting and enforcing these quotas, they were causing extensive cramming because employees openly discussed that the quotas could not be met without cramming (Compl. ¶¶ 67-73); because Defendants had access to real time data and reviewed regular reports on quotas, cramming incidents, and disciplinary actions (id. ¶¶ 75, 103-05); and because cramming and missing quotas were both widespread (id. ¶¶ 72, 74-76, 78-79, 68-69, 101-02, 113).  See, e.g., In re Wells Fargo & Co. Shareholder Derivative Litig., 282 F. Supp. 3d 1074, 1082, 1099-1100 (N.D. Cal. 2017) (holding that imposition of strict sales quotas and close tracking by company established scienter when fraud was pervasive); In re St. Paul Travelers Sec. Litig. II, No. CIV.04-4697 (JRT/FLN), 2006 WL 2735221, at *4 (D. Minn. Sept. 25, 2006) (holding that pervasiveness of misconduct and senior executives access to reports of misconduct showed scienter); In re Countrywide

Fin. Corp. Derivative Litig., 554 F. Supp. 2d 1044, 1059 (C.D. Cal. 2008) (holding

that scienter was established when witness accounts tell "the same story . . . from

markedly different angles" of a companywide culture of encouraging

misconduct).  FE-5 and FE-11 report that they were instructed to cram during

training sessions, which further supports a strong inference that management

knew that quotas led to cramming and that cramming was pervasive.  (Compl. ¶

82.)  This is not like the cases cited by Defendants, such as In re SolarCity Corp.

Sec. Litig., in which the confidential witness merely alleged that he or she was

encouraged to meet sales quotas but never alleged "he or she was told to engage

in deceptive sales practices or that he or she ever engaged in such practices."  274

F. Supp. 3d 972, 1001 (N.D. Cal. 2017).

> ### 3. Knowledge of Cramming Based on Importance of Consumer Unit and Contemporaneous Data and Reports

The conclusion that the Complaint adequately alleges that Defendants

knew about systemic cramming is further bolstered because, at the motion to

dismiss stage, it is reasonable to assume that top management were "aware of

matters central to that business's operation."  In re McLeodUSA Inc., No. C02-

001-MWB, 2004 WL 1070570, at *6 (N.D. Iowa Mar. 31, 2004).  CenturyLink's

consumer and small and medium business units accounted for more than one-

third of its revenue.  (Compl. ¶¶ 37-38.)  Thus, their performance was logically a

central focus for investors and for Defendants and that performance was heavily

impacted by cramming and attempts to stop it.  (Id. ¶¶ 37-38, 55-61, 184.)

Additionally, FE-5 alleges that Bailey acknowledged that cramming was

problem and four FEs (FE-1, FE-8, FE-17, and FE-20) allege that senior

management tried to address cramming through a program Post praised and

then ended those efforts when eliminating sales quotas caused both a drop in

cramming and a decline in sales.  (Compl. ¶¶ 109-14.)

A strong inference of scienter is further supported by allegations that Post

and Puckett received reports about extensive cramming allegations by

customers, a substantial portion of which were verified, and Post, Puckett, and

Ewing had access to comprehensive data on sales and revenues that included

notes on cramming discipline.  (Compl. ¶¶ 75, 103-06.)  See Cornwell v. Credit

Suisse Group, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (holding recklessness was

adequately pled when plaintiffs "allege through an array of 'Confidential

Witnesses' that [] executives reviewed specific reports that should have alerted

them to the problems they later allegedly misrepresented").

### 4.     Government and Internal Investigations

Scienter is further supported by the fact that CenturyLink entered into a settlement agreement with the Arizona Attorney General in April 2016 that required its officers and directors to closely monitor its sales practices to prevent improper charges to consumers, including by investigating consumer complaints of inaccurate charges.  (Compl. ¶¶132-35, 138.)  See, e.g., Minneapolis Firefighters' Relief Ass'n v. Medtronic, Inc., No. CV 08-6324 (PAM/AJB), 2010 WL 11469576, at *8 (D. Minn. Feb. 3, 2010) (finding scienter when defendant company had entered into an agreement that required senior management to monitor the very type of activities about which they later made misleading statements). Moreover, Cole certified that he was "familiar with the Company's day-to-day operations" and that CenturyLink was "complying with applicable service quality standards and consumer protection rules," including those prohibiting "unauthorized switching to another telecommunications provider and unauthorized inclusion, or addition of services, commonly known as slamming and cramming."  (Compl. ¶ 50.)

### 5.     Statements by Former Employees

Allegations from former employees strongly support a finding of scienter.

### a) FE-15

FE-15 was a Regional President.  (Compl. ¶ 70.)  FE-15's allegations show that, based on FE-15's personal interactions with them, Puckett, Bailey and Victory not only knew that CenturyLink charged low prices and then tacked on fees and terms to recover revenue, but that this was CenturyLink's purposeful marketing strategy, and they heard and rejected criticism that this strategy was misleading consumers.  (Id.)  This shows that Defendants' statements that CenturyLink was different from its competitors that were doing this (see, e.g., Compl. ¶¶ 140, 220-25) were knowingly false.

### b) FE-19

FE-19, a Manager of Executive Complaints, provides a firsthand account of regularly reporting extensive cramming to Puckett and Post, of providing recommendations to address cramming that were rejected by Post, Puckett, and Victory, and statements by senior leadership that they refused to change practices in the face of substantiated state Attorney General investigations of cramming and would rather simply pay the fines.  (Compl. ¶¶ 103-08.)  FE-19's allegations show that, based on FE-19's personal interactions with them, Post and Puckett knew that cramming was pervasive.

### c)    FE-5

FE-5 was a Consumer and Business Sales Manager in Boise, Idaho. (Compl. ¶ 73).  At this stage, the Court accepts FE-5's version of his or her conversation with Bailey, particularly when Defendants admit that a conversation did occur, and the email submitted by Defendants references that conversation and does not state that cramming was not discussed.  Thus, in April 2014, FE-5 told Bailey about the "constant and rampant cramming and misquoting" s/he had seen, Bailey agreed that these fraudulent practices were occurring, and Bailey stated that CenturyLink had "to do something about" it. (Compl. ¶ 109.)  FE-5's interaction with Bailey shows that Bailey knew cramming was a problem and that this information was likely shared with Post, who soon after put Bailey in charge of an attempt to reform CenturyLink's sales practices. (Id. ¶ 110.)

### d)    General FE Allegations

Overall, the FE allegations are sufficient, at this stage, to establish a strong inference of scienter.  As set forth above, few FEs had personal interactions with Executive Defendants that show knowledge of extensive cramming.  However, there is no requirement that each FE have interactions with the Executive

Defendants. The majority of FEs do not allege personal interactions with Executive Defendants, but do provide information based on their personal experience in relevant positions (such as human resources or sales) about the pervasiveness of cramming and the effort to curtail cramming that was aborted when it led to lower sales. For instance, FEs were directly involved in CenturyLink's sales practices (Compl. ¶¶ 70-82, 84-87, 89-92); personally responded to customer complaints and monitored responses to customer complaints (id. ¶¶ 96-108); formulated revenue projections (id. ¶ 69); investigated, disciplined and terminated employees for sales misconduct (id. ¶¶ 102); developed and implemented a program to address cramming (id. ¶¶ 111); and communicated with senior management about these activities (id. ¶¶ 103-10).

Finally, Linda Olsen's statement that CenturyLink's "culture" was that if a sales representative does not reach 90% of his or her quota, CenturyLink would "churn to the next person," must be viewed in context with her knowledge of revenue targets and sales quotas, the pervasiveness of cramming, the aborted anti-cramming effort, and her position supervising call centers. (Compl. ¶¶ 60, 68, 75, 79.) In this context, Olsen's statement gives rise to the strong inference

that she knew that material portion of CenturyLink's consumer sales were based

on cramming. This fact, in conjunction with her directly reporting to Post,

further supports the overall conclusion that there was widespread knowledge

among senior management, including the Executive Defendants, about the

pervasiveness of cramming, which materially affected CenturyLink's revenues.

### 6. Termination of Whistleblowers

Plaintiffs allege that Heiser was terminated for confronting Post regarding

cramming and FE-11 was terminated for refusing to cram. (Compl. ¶¶ 146-47.)

FE-7 and FE-9's repeated reports of cramming were never addressed. (Id. ¶¶ 86,

96-98.) These terminations and CenturyLink management's indifference to

reports of cramming further support a finding of scienter.

### 7. Behavioral Coaching Allegations

Plaintiffs assert that, in 2014, CenturyLink senior management

implemented "a new behavioral coaching model for its sales employees," which

evaluated their performance on the basis of how many customers the employee

helped, whether the employee resolved all of the issues the customer presented,

and whether the employee provided good customer service. (Compl. ¶ 111.)

Supervisors, rather than sales representatives were held accountable for sales

numbers.  (Id. ¶ 114.)  This model replaced the previous model based on multiple

metrics that were nearly impossible to meet and encouraged cramming.  (Id. ¶

111.)  Based on multiple FE statements, Plaintiffs assert that this change reduced

cramming and thereby caused a significant decline in sales.  (Id. ¶¶ 111-15.)

Plaintiffs assert that, "almost immediately," CenturyLink senior management

"went back to the old model of enforcing quotas at the sales representative level"

(id. ¶¶¶ 112, 114), and cramming again drove sales growth by the third quarter

of 2015 (id. ¶ 117).  Post was aware of the project and recognized Flynn for her

work on it.  (Id. ¶ 111.)  The facts regarding the behavioral coaching change are

drawn from statements of multiple employees with personal knowledge: FE-8 (a

Lead HR Business Partner), FE-17 (Director of Human Resources for consumer

and small business sales), and FE-20 (an HR Business Partner) and one regional

manager, FE-1 (Manager of Customer Care and Sales in the Southeastern United

States).  (Compl. ¶¶ 38, 74, 102, 111-14.)

    At this stage and within the broader context of the other allegations in the

Complaint, Plaintiffs' allegations regarding the behavioral coaching strategy

support finding scienter.  While no FE directly states that a particular Executive

Defendant directed the coaching model changes, some FEs provide evidence that

the Executive Defendants and upper management frequently reviewed reports regarding sales numbers for sales representatives and frequency of cramming. Other FEs, with personal knowledge based on their positions in human resources or sales, provide evidence that the model was changed to no longer enforce sales representative quotas and that this led to less cramming and fewer sales. They further provide evidence that the quota model was quickly restored, leading to both increased sales and cramming.

The parties dispute whether CenturyLink's sales fell in connection with implementation of the behavioral coaching model. Plaintiffs rely on FE testimony that sales did fall and on analyst statements that CenturyLink's consumer revenues were below expectations after the behavioral model was implemented and, after it was eliminated, the revenues beat estimates. (Compl. ¶¶ 112, 114, 115, 119.) Defendants submit portions of CenturyLink's public filings from the same time period to dispute that revenues fell. Plaintiffs retort that CenturyLink changed its reporting methodology during this time period and that the filings submitted are incomplete. Plaintiffs have pointed to evidence, in the form of FE and analyst statements, to support their theory that the coaching changes caused changes in the incidence of cramming, which, in

turn, materially affected consumer sales.  At this stage, Plaintiffs' allegations are sufficient.

### 8.      Executive Resignations

Defendants are correct that, alone, evidence of premature executive resignations is inadequate to show scienter as there may be many plausible reasons for earlier than expected resignations.  However, in the context of the other evidence and coupled with evidence of timing, such as Post announcing his early retirement several weeks after CenturyLink announced the results of its investigation into the sales and billing allegations (Compl. ¶ 29), evidence of these resignation at least marginally assists Plaintiffs in alleging scienter.  See In re Nash Finch Co., 502 F. Supp. 2d 861, 882 (D. Minn. 2007) (holding that "unexpected resignations," along with other evidence, supported a strong inference of scienter).

### 9.      Denials of Wrongdoing

Plaintiffs note that, when the SEC asked CenturyLink about the drivers of consumer segment performance, CenturyLink did not disclose cramming. Plaintiffs argue that it is implausible that Defendants were not aware of practices that impacted between a third and a half of all CenturyLink customers.  This is

particularly true because Defendants had recently made and then abandoned efforts to stop cramming. Plaintiffs argue that there is a strong inference that Defendants would have uncovered the true reason for CenturyLink's fluctuating revenues before they responded to an August 2015 request from the SEC. (Compl. ¶¶ 121-24.) Given the previously discussed allegations, the Court agrees that Plaintiffs have pled a strong inference of scienter in this situation. And the SEC's alleged satisfaction with CenturyLink's responses is "irrelevant" to scienter, Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc., 633 F. Supp. 2d 763, 796 (D. Ariz. 2009), judgment vacated in part on other grounds on reconsideration, 690 F. Supp. 2d 959 (D. Ariz. 2010); particularly since Plaintiffs allege that Defendants lied in those responses.

In the face of news investigations and consumer complaints, CenturyLink "expressly denie[d]" wrongdoing, stated that it had "fully disclosed" all contract terms, minimized reports of misconduct as isolated incidents in which employees had failed to "follow routine billing processes," and stated that it promptly investigated and fairly resolved complaints. (Compl. ¶ 133-34, 136, 148-51.)

Emphatic statements by Defendants denying wrongdoing with regard to billing and claiming to have fully disclosed contract terms coupled with Defendants' investigated responses to SEC inquiries in August 2015 regarding CenturyLink's revenues in its consumer segment and its marketing and sales efforts contribute to a strong inference that Defendants violated the law by at least acting severely recklessly in making denials.  See Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 270 (3d Cir. 2009) ("Because of the context (specific analyst queries) and content (consistent denials of unusual discounting) of [the corporate officer's] statements, the possibility that [the corporate officer was ignorant is not necessarily exculpatory.  Even if [he] were not aware of the full extent of the unusual discounting, or the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors.") (footnote omitted).

### D.     Loss Causation

To adequately plead loss causation, the Complaint must allege "a causal connection between the material misrepresentation and the loss."  Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342 (2005).  It is insufficient to allege "a misrepresentation leads to an inflated purchase price but nonetheless does not

46

proximately cause any economic loss." Id. at 346.  Instead, Plaintiffs must allege

that the "share price fell significantly after the truth became known."  Id. at 347.

Federal Rule of Civil Procedure 8(a)'s notice pleading standard applies to loss

causation.  Id. at 346.

Here, the Complaint alleges that CenturyLink's cramming was first

revealed on June 16, 2017, when Bloomberg reported that Heiser had filed a

whistleblower complaint claiming that she was fired after raising concerns about

cramming with Post.  (Compl. ¶¶ 152-54.)  The article noted that the alleged

cramming was widespread with unauthorized fees in the "many millions."  (Id.

¶ 153.)  CenturyLink stock dropped 5% on heavy volume, and analysts

attributed the decline to the cramming revelations.  (Id. ¶¶ 154-56.)  On June 19,

2017, Bloomberg reported on a consumer class action lawsuit on behalf of

"potentially millions" of CenturyLink customers who had been defrauded

through billing misconduct, which caused another statistically significant share

decline of 1.4%.  (Id. ¶¶ 158, 160.)  On July 12, 2017, the Minnesota Attorney

General disclosed that, based on a year-long investigation, it had filed a lawsuit

against CenturyLink that provided detail concerning CenturyLink's practices

and their financial impact.  (Id. ¶¶ 163-68.)  In response, CenturyLink's stock fell

3.23%.  (Id. ¶¶ 169-71.)  Heiser estimated the overcharges were in the millions

(Compl. ¶ 153); the consumer lawsuits estimated damages as hundreds of

millions (id. ¶158);  and the Minnesota Attorney General stated that the damages

were likely to be "very, very significant" (id. ¶ 167).  The Complaint alleges that

the market reacted strongly to the detailed allegations in the whistleblower

complaint, the consumer class actions, and the findings of the Minnesota

Attorney General, indicating that the market perceived the allegations to be true.

These allegations "provide [Defendants] with some indication of the loss and the

causal connection that the plaintiff has in mind."  Dura Pharm., Inc., 544 U.S. at

347.

     Plaintiffs have adequately pled loss causation.  They assert that

Defendants' false statements artificially inflated the price of CenturyLink stock.

Then, they explicitly plead that when the falsity of Defendants' statements was

revealed, through news reports on the lawsuits alleging systemic cramming at

CenturyLink, CenturyLink's share price fell significantly and that analysts

attributed the decline to the cramming revelations.

     Defendants accurately point to caselaw holding that "the announcement of

an investigation, without more, is insufficient to establish loss causation."  Loos

48

v. Immersion Corp., 762 F.3d 880, 890 (9th Cir. 2014) (footnote omitted).

However, here, the Complaint does not simply rely on revelation of a

government investigation without more.  It relies on allegations by a

whistleblower, in a class action lawsuit, in news reports, and in detailed

allegations by the Minnesota Attorney General.  As the Sixth Circuit has noted:

"Sometimes defendants reveal their own fraud via a 'corrective disclosure,' i.e., a

statement that reveals what the defendants themselves previously concealed.

But such admissions can be hard to come by, and courts have otherwise held that

revelations can come from many sources, including whistleblowers, analysts,

and newspaper reports."  Norfolk County Ret. Sys. v. Cmty. Health Sys., Inc., 877

F.3d 687, 695 (6th Cir. 2017) (citations omitted).

     **E.**     **Liability of Douglass and Puckett**

     Defendants argue that lower level executives such as Douglas and Puckett

cannot be held liable for the statements of more senior executives under the

holding in Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135

(2011).  Janus provides:

> For purposes of Rule 10b–5, the maker of a statement is the person
> or entity with ultimate authority over the statement, including its
> content and whether and how to communicate it. . . .  One who
> prepares or publishes a statement on behalf of another is not its
> maker.  And in the ordinary case, attribution within a statement or

> implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

Id. at 142-43.

Assuming that Janus applies to the liability of corporate officers working together for the same entity, cf. SEC v. Goldstone, 233 F. Supp. 3d 1169, 1227 (D.N.M. 2017), Plaintiffs have adequately pled that Puckett was "personally involved" in preparing revenue projections and sales quotas, oversaw CenturyLink's sales apparatus, was regularly informed of the incidences of cramming, and was responsible for addressing CenturyLink's sales apparatus in CenturyLink's investor presentations. (Compl. ¶¶ 67-70, 75, 104-08, 297.) They further pled that Douglas succeeded Puckett in that same role. (Id. ¶ 298.) Thus, at this stage, the most plausible reading of the Complaint is that Puckett and Douglass drafted, reviewed, or approved the prepared remarks that were given in joint presentations. See In re Valeant Pharm. Int'l, Inc. Sec. Litig., No. CV157658MASLHG, 2017 WL 1658822, at *12 (D.N.J. Apr. 28, 2017).

### F.    Section 20(A) Claim

"The purpose of the federal control-person statute [§ 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)] is to prevent people and entities from

using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws." Lustgraaf v. Behrens, 619 F.3d 867, 873 (8th Cir. 2010) (citation omitted). "[T]he statute provides for liability of those who, subject to certain defenses, directly or indirectly control a primary violator of the federal securities laws." Id. (citation omitted). The statute requires "only some indirect means of discipline or influence short of actual direction to hold a controlling person liable." Id. (citation omitted).

> To meet this standard, a plaintiff must prove: (1) that a primary violator violated the federal securities laws; (2) that the alleged control person actually exercised control over the general operations of the primary violator; and (3) that the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated. Culpable participation by the alleged control person in the primary violation is not part of a plaintiff's prima facie case. If a plaintiff satisfies the prima facie burden, the burden shifts to the defendant to show that it acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Id. at 873–74 (citations omitted). "Unlike the first prong of our control-person test, where fraud is at issue, the second and third prongs involve questions of control and are therefore analyzed under our ordinary notice-pleading standard." Id. at 875.

As set forth above, Plaintiffs have successfully pled Section 10(b) primary violations against all Defendants against whom such a claim is asserted. Thus, Plaintiffs have successfully pled a predicate violation of Section 10(b). <u>See Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic Materials, Inc.</u>, 641 F.3d 1023, 1030 (8th Cir. 2011).

As to Bailey, Plaintiffs have alleged that he exercised control over CenturyLink's general operations and "possessed . . . the power to determine the specific acts" giving rise to the claim. <u>Lustgraaf</u>, 619 F.3d at 873. The Complaint alleges that Bailey was CenturyLink's Senior Vice President of Operations and Treasurer, served as the Company's spokesperson before regulatory and legislative authorities and investors, and was charged with overseeing efforts to address cramming. (Compl. ¶¶ 34, 110.) Thus, Plaintiffs have alleged that he exercised control over CenturyLink's general operations and had power to determine the acts on which the underlying violation is predicated in that he oversaw efforts to address cramming, was CenturyLink's spokesperson before investors and regulatory authorities, and was Treasurer.

IV. CONCLUSION

In sum, at this early stage, Plaintiffs have alleged sufficient facts to support all of the claims in their Complaint.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendants' Motion to Dismiss under Rule 12(b)(6) [Docket No. 154] is **DENIED**.


Dated:   July 30, 2019                          s/ Michael J. Davis
                                                Michael J. Davis
                                                United States District Court