UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |

This Document Relates to

| | |
|---|---|
| 0:17-cv-02832 | 0:17-cv-04943 |
| 0:17-cv-04613 | 0:17-cv-04944 |
| 0:17-cv-04614 | 0:17-cv-04945 |
| 0:17-cv-04615 | 0:17-cv-04947 |
| 0:17-cv-04616 | 0:17-cv-05046 |
| 0:17-cv-04617 | 0:18-cv-01562 |
| 0:17-cv-04618 | 0:18-cv-01572 |
| 0:17-cv-04619 | 0:18-cv-01573 |
| 0:17-cv-04622 | 0:18-cv-01565 |

**DEFENDANT AND INTERVENORS'
SUPPLEMENTAL BRIEF IN
SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION
SETTLEMENT AND PROVISIONAL
CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ........................................................................................... 4

    A.    More Than Two Years of Litigation Lead to the Class Settlement ............. 5

    B.    Keller Solicits Putative Class Members to File Arbitrations ....................... 5

    C.    Keller's Retainer Agreement Restricts Putative Class Members.................. 6

    D.    Keller Threatens CenturyLink with Mass Arbitration ................................. 7

    E.    CenturyLink Asked Keller to Provide Information to Allow
        CenturyLink to Evaluate and Resolve the Claims, but Keller Refused
        to Spend Even "15 Minutes" Per Client to Do So........................................ 8

    F.    CenturyLink's Preliminary Analyses Raise Substantial Concerns
        About Keller's Clients and Makes Clear More Information Is
        Needed......................................................................................................... 9

    G.    Keller Continues to Solicit Putative Class Members After Learning
        That the Parties Had Reached a Proposed Class Settlement....................... 10

    H.    Keller Simultaneously Filed 1,000 Arbitration Demands, Seeking
        Recovery of 10 to 300 Times Claimants' Alleged Actual Damages .......... 11

    I.    Keller's Claimants Face Substantial Risks and Costs................................. 11

    J.    Keller's Conduct Puts Putative Class Members in Untenable
        Positions ................................................................................................... 12

        1.    Keller "actively misled" putative class members............................ 13

        2.    Keller's misleading communications are likely to cause, and
            already have caused, consumer confusion and harassment ............. 14

        3.    Keller's conduct "actively discourages" and "burdens"
            putative class members' right to accept the settlement.................... 15

    K.    Many of Keller's Claimants Would Be Better Served by the
        Proposed Class Settlement, Not Pursuing Individual Arbitration............... 16

i

ARGUMENT............................................................................................................ 18

I.      THE COURT HAS AUTHORITY TO ISSUE AN INJUNCTION TO
        PROTECT ITS JURISDICTION AND THE PUTATIVE CLASS....................... 19

II.     KELLER'S CONDUCT CREATES AN ACUTE NEED FOR A
        TEMPORARY INJUNCTION STAYING PARALLEL ACTIONS ................... 21

CONCLUSION ........................................................................................................ 24

## TABLE OF AUTHORITIES

Page

### Federal Cases

*Aleem v. Pearce & Durick*,
  No. 1:15-cv-00085,
  2016 WL 11475231 (D.N.D. Mar. 28, 2016) ........................................................... 20

*Bank of Am., N.A. v. UMB Fin. Servs., Inc.*,
  618 F.3d 906 (8th Cir. 2010) ..................................................................................... 19

*In re Asbestos Sch. Litig.*,
  No. 83–0268,
  1991 WL 61156 (E.D. Pa. 1991) ............................................................................... 22

*In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*,
  770 F.2d 328 (2d Cir. 1985) ................................................................................. 19, 20

*In re BankAmerica Corp. Sec. Litig.*,
  95 F. Supp. 2d 1044 (E.D. Mo. 2000) ....................................................................... 24

*In re Corrugated Container Antitrust Litig.*,
  659 F.2d 1332 (5th Cir. 1981) ................................................................................... 24

*In re Diet Drugs*,
  282 F.3d 220 (3d Cir. 2002) ......................................................................... 19, 20, 22

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
  No. 11–MD–2247 ADM/JJK,
  2012 WL 13065005 (D. Minn. Jan. 19, 2012)....................................................... 4, 20

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  229 F. Supp. 3d 1052 (N.D. Cal. 2017) ..................................................................... 22

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  No. 08-MDL-1958 ADM/AJB,
  2012 WL 5055810 (D. Minn. Oct. 18, 2012) ............................................................ 20

*Johnson v. NPAS Sols., LLC*,
  No. 9:17-cv-80393,
  2017 WL 6060778 (S.D. Fla. Dec. 4, 2017)............................................................... 20

*Smith v. Volkswagen Grp. of Am., Inc.*,
   No. 13-CV-0370-MJR-PMF,
   2014 WL 12160767 (S.D. Ill. May 27, 2014) ........................................................... 20

*Stott v. Capital Fin. Servs., Inc.*,
   277 F.R.D. 316 (N.D. Tex. 2011) ............................................................................. 20

*United States v. N.Y. Tel. Co.*,
   434 U.S. 159 (1977) ................................................................................................. 19

## **Statutes**

28 U.S.C. § 1651 ............................................................................................................. 19

# **INTRODUCTION**

The law firm Keller Lenkner LLC's ("Keller") recent conduct shows the critical need for judicial intervention to temporarily enjoin and stay parallel arbitrations, as Plaintiffs already requested by their Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification ("Plaintiffs' Motion"). (*See* Pls.' Mot., ECF No. 466; Proposed Prelim. Approval Order ¶ 10, ECF No. 474.) In their proposed preliminary approval order, and separate and apart from the filings related to any state Attorney General action,[1] Plaintiffs requested that the Court temporarily enjoin all parallel proceedings, including arbitrations, by putative class members:

> Pending the Final Approval Hearing and issuance of the Final Approval Order and Final Judgment, Releasing Parties are hereby enjoined from filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits from any class action or other lawsuit, arbitration, or administrative, regulatory, or other proceeding in any jurisdiction based on or relating to the Released Claims. . . .

(Proposed Prelim. Approval Order ¶ 10, ECF No. 474.) Defendant CenturyLink, Inc. and Intervenors (together, "CenturyLink") submit this Supplemental Brief, with prior permission of the Court,[2] to provide additional support for Plaintiffs' request.

---

[1] Separately, CenturyLink had filed a Renewed Motion for Temporary Injunction to Enjoin and Stay Minnesota Attorney General's Duplicative Consumer Restitution Claims (ECF No. 475), which CenturyLink intends to withdraw soon. This Supplemental Brief does *not* relate to that motion and, instead, supports Plaintiffs' Motion and its routine request for an injunction against parallel proceedings by settlement class members.

[2] CenturyLink's counsel obtained permission from the Court to file this Supplemental Brief on January 10, 2020.

While the parties were negotiating and proposing to the Court a class settlement, Keller has been running an advertising campaign on Facebook and other websites to mislead consumers into retaining Keller to pursue a mass arbitrations scheme based on the same overbilling allegations that would be resolved by the proposed class settlement. Even though Keller's clients are prospective settlement class members, and even though Keller had actual knowledge that the parties had agreed to a proposed class settlement, Keller did not disclose the consolidated consumer class action or the proposed nationwide settlement to consumers *before* diverting them away from it. Instead, Keller solicited and entered into unethical retainer agreements with putative class members—retainer agreements that require a $750 per-claimant attorney fee if the claims settle before arbitration commences and also require clients to pay Keller a fee if the clients terminate the attorney-client relationship. Through these terms, Keller is effectively restricting putative class members' ability to freely and fairly consider and participate in the proposed class settlement. To date, Keller claims that it has signed up *more than 22,000* putative class members through its misleading solicitations and retainer agreements.

Keller's scheme is so misleading that the wife of Plaintiff and proposed Settlement Class Representative Jon Lodestein signed up with Keller as a client to pursue a claim for Plaintiff and Mrs. Lodestein's shared CenturyLink account. The Lodesteins apparently did not understand that they were signing up with Keller to pursue arbitration, because Plaintiff Lodestein has made clear that he never agreed to arbitration and that he intends to participate in the proposed class settlement as a settlement class representative.

At the same time that Keller is diverting putative class members away from the class settlement without even disclosing the existence of this class action, Keller is repudiating and refusing to honor the terms of the arbitration agreements on its clients' behalf. When CenturyLink requested basic information to allow it the opportunity to resolve the claims pre-arbitration as required by the arbitration contracts, Keller stated that it would not spend even "15 minutes per client" to investigate and discuss the merits of its clients' individual claims. Rather than spend "15 minutes" to allow CenturyLink the opportunity to resolve the claims in accordance with the arbitration agreements, Keller is pursuing a scheme that seeks to weaponize the agreements and prevent CenturyLink from fairly resolving the claims. In fact, Keller threatened to force CenturyLink to pay more than $30,000,000 in arbitration filing fees and costs alone if CenturyLink does not agree to pay a mass settlement outside the class action (and beyond the reach of the Court's fairness review) to resolve *all* of Keller's clients' claims.

Then, in late November 2019, Keller simultaneously submitted 1,000 arbitrations with the American Arbitration Association on behalf of 4.5% of its purported clients. Keller also has threatened to file simultaneous arbitrations for tens of thousands additional claimants. Further, Keller has argued to the AAA that the arbitrations should move forward, even though Plaintiffs' Motion asks this Court to enjoin and stay all parallel arbitrations. On January 9, 2020, the AAA stated its view that it cannot stay the arbitrations until all filing fees have been paid, including CenturyLink's filing fees.[3]

_____

[3] CenturyLink will serve Keller and the AAA with this Brief and the related papers today.

Keller's scheme poses an immediate and growing threat to putative settlement class members and the integrity of these class-action proceedings. Keller is racing to siphon off putative class members at a rate of up to 1,500 per week and pushing forward with 1,000 arbitration demands without allowing its clients to consider either pre-arbitration resolutions on the merits or the proposed class settlement. The actual and potential harm to putative class members caused by Keller's ethics violations is confirmed by the declaration of a nationally-preeminent ethics professor, Nancy Moore (*see* Decl. of Nancy Moore ("Moore Decl."), ECF 510), by publicly-posted consumer complaints regarding Keller's solicitations (Decl. of Andrew Unthank ("Unthank Decl."), ECF 512, ¶¶ 28-29), and by the confusion Keller's solicitations apparently caused for Plaintiff Lodestein and his wife (*id.* ¶ 55).

To ensure that Keller's clients have an informed opportunity to freely consider the class settlement, the Court should grant Plaintiffs' request to enjoin settlement class members from filing, commencing, or prosecuting any parallel suit or arbitration, including Keller's mass arbitrations. *See, e.g.*, *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11–MD–2247 ADM/JJK, 2012 WL 13065005, at *8-109 (D. Minn. Jan. 19, 2012) (Montgomery, J.) (granting temporary injunction of arbitrations in aid of class settlement proceedings). Such injunctions are routinely granted in aid of class-settlement proceedings, but here the need is particularly acute.

## STATEMENT OF FACTS

To help the Court understand the need for judicial intervention against Keller's parallel arbitrations, below CenturyLink details the important context of Keller's scheme

and the evidence supporting the Court's exercise of discretion.

### A.      More Than Two Years of Litigation Lead to the Class Settlement

The parties have litigated these consumer class actions since 2017. (Unthank Decl. ¶¶ 5-8.) After Plaintiffs filed their Consolidated Class Action Complaint, CenturyLink moved to compel arbitration and to dismiss. After discovery and briefing on CenturyLink's motions, the parties agreed to mediate with the Honorable Layn R. Phillips. (*Id.* ¶¶ 8-10.) On May 24, 2019, the parties agreed to the terms of a proposed class settlement and signed a Term Sheet. (*Id.* ¶ 11) On June 7, 2019, they publicly reported to the Court that they had reached a tentative class settlement, subject to confirmatory discovery. (*Id.* ¶ 12; Minutes, ECF No. 407.)

Plaintiffs moved for preliminary approval of the class settlement on October 16, 2019. (*Id.* ¶ 14.) The parties propose that the Court certify a Settlement Class that includes "[a]ll persons or entities in the United States who are identified by CenturyLink as a residential or small business customer and who, during the Class Period, had an account for local or long distances telephone, internet, or television services with" CenturyLink. (*Id.*) The Class Period is between January 1, 2014, and the date of entry of the Preliminary Approval Order. (*Id.*)

### B.      Keller Solicits Putative Class Members to File Arbitrations

Keller is a plaintiffs' law firm that was founded in 2017 by three principals who previously co-founded "the world's largest private litigation finance firm." (Unthank Decl. ¶ 16; *id.* Ex. A.) Keller's business model targets companies with mass arbitrations, particularly where a class settlement may be imminent. (*Id.* ¶ 17; *id.* Ex. B.) In fact, this

firm of only 16 attorneys claims to presently represent *more than 50,000* individuals pursuing arbitrations against CenturyLink, FanDuel, DraftKings, Postmates, DoorDash, and other companies. (*Id.*)

Earlier this year, Keller began advertising to CenturyLink customers to recruit arbitration claimants from among the putative class members. (Id. ¶¶ 19-21; id. Ex. C & Ex. D.) To solicit putative class members, Keller uses Facebook advertisements, an interactive website, an online questionnaire, and a form retainer agreement—none of which disclose the putative class action or proposed class settlement. (*Id.*) The initial sign-up process asks for basic contact information and only whether CenturyLink has billed "more than they first quoted you" or "for services you never requested." (*Id.* ¶ 23.) Even if the consumer answers both questions "No," the website sends the consumer a link to sign Keller's Retainer Agreement. (*Id.* ¶¶ 24-25.) Keller apparently signs up anyone who will agree to its Retainer Agreement, without first evaluating the facts supporting the purported claim. (*Id.*)

## C. Keller's Retainer Agreement Restricts Putative Class Members

To date, Keller claims to have solicited more than 22,000 CenturyLink customers to engage Keller's services. (*Id.* ¶ 51.) Under its Retainer Agreement, Keller is to pursue "individual arbitration" on behalf of putative class members and receive a fee of $750 per claimant if an early settlement is reached before arbitration commences. (*Id.* ¶ 26; *id.* Ex. E.4.) This is true even though the tentative class settlement was announced in the public record on June 7, 2019, Keller discussed the proposed settlement terms with CenturyLink's counsel in August 2019, and Plaintiffs' motion for preliminary approval

and the parties' settlement agreement were publicly filed in October 2019. (*Id*. ¶ 12; *id*. Ex. M at 3.) This flat-fee provision is unethical and unreasonable. (Moore Decl. ¶ 14.) The Retainer Agreement secures this unreasonable attorney fee through contradictory and misleading language suggesting that CenturyLink will pay any attorney fees, even though there is no requirement in the law that CenturyLink pay attorneys' fees as part of any voluntary settlement. And Keller specifically told CenturyLink ███████████████ ████████████████████████████████.[4] (Unthank Decl. ¶ 47.)

The Retainer Agreement also purports to authorize Keller to accept certain settlements on behalf of putative class members "without further direction or authorization" (Unthank Decl. ¶ 26 § 3), and "to execute all documents connected with" the claims (*id*. § 13). Although the Retainer Agreement states that Keller intends to represent other clients, the Agreement falsely claims that there are no known conflicts of interest. (*Id*. § 8.) Keller's clients cannot terminate the Agreement (e.g., to accept a class settlement offer) unless Keller's fee is paid. (*Id*. § 7.) But the Agreement grants Keller the asymmetrical right to terminate its clients "at any time" if Keller "believe[s] that your potential claims are unlikely to result in a recovery for any reason." (*Id*. § 6.)

### D.      Keller Threatens CenturyLink with Mass Arbitration

On May 14, 2019, Keller sent a letter to CenturyLink on behalf of "[m]ore than 9,000" clients who retained Keller to pursue arbitration claims against CenturyLink. (*Id*.

---

[4] Regardless of how Keller ultimately handles payment of its attorney fees (if any), the Retainer Agreement deters putative class members from agreeing to any settlement that is less than $750 per claimant by stating that Keller's clients are only "entitled to retain the full recovery net of this fee." (Moore Decl. ¶¶ 14(b), 26; *id*. Ex. 4 ¶ 2.)

¶ 30.) Keller emphasized that arbitration "is expensive," noting that CenturyLink would have to pay fees of "$1,900 for each individual arbitration," plus up to an additional "$2,500 in arbitrator compensation," for total arbitration costs up to $4,400 per claim, regardless of the merits or amount of alleged damages for each individual claim. (*Id.* ¶ 32.) Keller threatened "to proceed with every arbitration simultaneously," which, for 9,000 claimants, "would obligate CenturyLink to pay the AAA more than $30 million in initial fees and costs—to say nothing of CenturyLink's own attorneys' fees and its underlying liability." (*Id.* ¶ 33.) Keller invited CenturyLink to "explore whether we can agree on an alternative process for resolving our clients' claims," ███████████ ████████████████████████████████████████████████████████████ ████████████████████. (*Id.* ¶ 34.) Keller enclosed with its May 14 letter a generic arbitration demand that did not describe any individual's claim or damages, much less include any documentary support. (*Id.* ¶ 31; *id.* Ex. H at 3-8.)

Two weeks later, Keller sent CenturyLink a second letter identifying "nearly 3,000 additional" claimants. (*Id.* ¶ 35.) That is, Keller claimed to have signed up more than 176 claimants per day since May 14. (*Id.* ¶ 37.)

### E. CenturyLink Asked Keller to Provide Information to Allow CenturyLink to Evaluate and Resolve the Claims, but Keller Refused to Spend Even "15 Minutes" Per Client to Do So

CenturyLink responded and requested that Keller provide sufficient information about Keller's claims to allow the parties to evaluate and resolve each claim before proceeding to arbitration, as required by CenturyLink's arbitration contracts. (*Id.* ¶ 38.) Keller refused to provide even the most basic information, such as account numbers,

descriptions of the individual claims, or the amount of the actual damages alleged by each claimant. (*Id.* ¶ 39.) Even though Keller voluntarily sought out and accepted the responsibility of representing thousands of individual clients, Keller refused to spend even *"15 minutes"* to discuss the claims "on an individual basis," stating "such a pre-demand 'dialogue' would consume more than 3,500 hours, or the equivalent of 145 round-the-clock days." (*Id.* ¶ 40; *id.* Ex. K at 2 (emphasis added).) Keller threatened mass arbitrations "[i]f CenturyLink is unwilling to engage in a practical, pre-arbitration discussion that addresses *all of our clients' claims.*" (*Id.* (emphasis added).) In other words, Keller made clear that it sought a mass resolution of the purported claims.

## F. CenturyLink's Preliminary Analyses Raise Substantial Concerns About Keller's Clients and Makes Clear More Information Is Needed

Although Keller refused to provide information to allow CenturyLink to fully and fairly evaluate its individual clients' claims, CenturyLink attempted to research its customer databases with the limited contact information disclosed by Keller. (*Id.* ¶ 44.) CenturyLink's preliminary and limited analyses raised concerns regarding many of Keller's clients and confirmed that more information was needed from Keller. (*Id.* ¶¶ 42-44.) For example, CenturyLink could not identify any potential customer account that could be connected with some of Keller's clients. (*Id.* ¶ 44.) Some clients claimed to receive services at addresses where CenturyLink does not provide services. (*Id.*) And some claimants appeared to owe money to CenturyLink and could be subject to potential counterclaims. (*Id.*)

In light of these concerns, on July 10, 2019, CenturyLink again requested that Keller provide basic information regarding the claims so that the parties would have an opportunity to evaluate and resolve the claims pre-arbitration as required by the contracts. (*Id.* ¶¶ 42-45; *id*. Ex. L.) CenturyLink advised Keller that Keller's insistence on a mass resolution and refusal to provide individualized claim information "finds no support in the parties' contracts." (*Id*. at 2.) Yet Keller continued to withhold the information and denied the parties an opportunity to evaluate and resolve the claims on their merits before arbitration. (Unthank Decl. ¶ 46.)

### G.  Keller Continues to Solicit Putative Class Members After Learning That the Parties Had Reached a Proposed Class Settlement

Keller likely learned that the parties had negotiated a proposed class settlement on or before June 7, 2019, but certainly knew shortly thereafter. (*Id*. ¶ 12; *id*. Ex. M at 3.) Even months after Plaintiffs filed for preliminary approval, Keller did not materially alter its solicitations. (*Id.* ¶ 21; *id*. Ex. D.) Keller continued to omit any information about the putative class action or the tentative settlement from its advertisements. (*Id.*)

In September 2019, Keller informed CenturyLink that Keller had recruited "8,293 additional . . . clients," bringing the total number to over 22,000. (Unthank Decl. ¶ 51.) In other words, Keller had signed up dozens of clients per day, every day, between June 19 and September 24. (*Id*.) Again, in October 2019, CenturyLink requested basic information regarding the new claims so that CenturyLink would have the opportunity to evaluate and resolve the claims as contemplated by the arbitration contracts. (*Id*. ¶¶ 52-53; Ex. O.) Again, Keller declined.

### H.     Keller Simultaneously Filed 1,000 Arbitration Demands, Seeking Recovery of 10 to 300 Times Claimants' Alleged Actual Damages

More than a month after Plaintiffs filed their Motion for Preliminary Approval, Keller submitted 1,000 arbitration demands to the AAA on behalf of a subset of its 22,000 clients. (Unthank Decl. ¶ 56.) In this first set of simultaneously submitted demands, Keller has provided *some* of the information for the 1,000 claimants that CenturyLink repeatedly requested for five months, including each claimant's alleged account number and a description of the alleged billing error and actual damages. (*Id*. ¶ 57; *id*. Ex. S.) But Keller continues to omit or withhold key information, such as the date(s) of the alleged billing errors. (*Id*.) Further, Keller's demands seek inflated damages amounts that are 10 to 300 times the amount of claimed actual damages. (*Id*. ¶ 58.)

Currently, Keller is attempting to push forward with the arbitrations and has objected to CenturyLink's request that the AAA stay the arbitrations pending this Court's preliminary fairness review of the proposed settlement. (*Id*. ¶¶ 64-68.) Keller has argued that the AAA should move forward with the arbitrations, even though Plaintiffs' Motion asks this Court to stay and enjoin all parallel arbitrations. (*Id.* ¶ 67.) On January 9, 2020, the AAA ruled that it will not stay the arbitrations until all arbitration filing fees are paid by Keller and CenturyLink. (*Id.* ¶ 68; *id.* Ex X.)

### I.     Keller's Claimants Face Substantial Risks and Costs

Based on CenturyLink's preliminary analyses of Keller's first 1,000 arbitration demands, Keller's claimants face substantial risks, including exposure to potential counterclaims, as well as sanctions and fee-shifting if their claims are found frivolous.

After substantial research, CenturyLink has located apparent customer accounts for all but one of the first 1,000 claimants. (*Id*. ¶ 62; *id*. Ex. U.) Although Keller still has not provided complete information for the 999 claimants identified, based on the facts alleged to date CenturyLink has determined:

- CenturyLink already provided more than 50% of claimants with voluntary benefits that are equal to or greater in value than the $30 settlement payment that would be available to settlement class members if the Court approves the class settlement. (Unthank Decl. ¶ 62(a).)

- 11% of claimants already received voluntary benefits of $250 or more, and 40% received benefits of between $30 and $250. (*Id*. ¶ 62(b).)

- Approximately 34% of claimants have an outstanding balance due for 90 days or more, are in debt collections, or had their account written off, with 8% owing CenturyLink $250 or more and another 18% owing CenturyLink between $50 and $250. (*Id*. ¶ 62(c).)

- Approximately 69% of claimants allege that overbilling continued for more than one year, 28% claim for more than three years, and 18% claim for more than five years. (*Id*. ¶ 59.) Many of these claims are time-barred, because claimants reasonably should have known that the price on the first bill did not match the price they allegedly were quoted.

- More than 7% of claimants have claims that are certainly time-barred because they closed their accounts more than three years before the earliest-filed class action in this MDL. (*Id*. ¶ 62(d).)

Keller does not appear to have disclosed these risks to putative class members in any of its solicitation and lawyer-retention materials. (*Id*. ¶¶ 19-26; id. Ex. C-E.)

**J.      Keller's Conduct Puts Putative Class Members in Untenable Positions**

Faced with Keller's scheme and siphoning of more than 22,000 putative class members away from the class settlement, CenturyLink retained Professor Nancy Moore of Boston University School of Law to evaluate Keller's solicitations, Retainer Agreements, and other conduct. Professor Moore is one of the nation's leading experts in

legal ethics and specializes in the ethics of class actions and mass litigation. (Moore Decl. ¶¶ 1-2; *id.* Ex. 1 (Moore CV).) CenturyLink asked Professor Moore to analyze the ethical issues arising from Keller's joint representation of 22,000 customers. (*Id.* ¶ 3.)

Professor Moore concluded that Keller's conduct is misleading and deceptive to putative class members and violates multiple rules of professional responsibility that "involve fiduciary duties imposed on lawyers for the benefit of their clients." (*Id.* ¶¶ 8-28.) According to Professor Moore, Keller's clients "may be harmed" by its conduct and "are in an untenable position" with respect to the proposed class settlement, unless the Court takes action to protect the putative class members.[5] (*Id.* ¶¶ 8, 24.)

### 1. Keller "actively misled" putative class members

Professor Moore found that Keller's solicitations "actively misled" putative class members into signing up with the firm to pursue arbitration by falsely stating or implying the following, in violation of multiple ethics rules:

(a) Arbitration is the sole or primary method by which the claims must be resolved, even though Keller knows (and fails to disclose) that claims could be resolved through the proposed class settlement or in small claims court.

(b) Keller would pursue each client's claim through "individual arbitration," even though Keller actually pursues a mass arbitration strategy and refuses to engage in individualized dispute resolution discussions.

(c) There are no known conflicts among Keller's 22,000 clients, despite Keller simultaneously representing clients with conflicts of interest.

(e) Keller's legal fees would be paid by CenturyLink, even though there is no requirement that CenturyLink pay fees separately in conjunction with a

---

[5] Professor Moore also recognizes that CenturyLink has an interest in a fair, efficient, and binding resolution of the putative class members' claims. (Moore Decl. ¶ 8.)

voluntary settlement, and even though Keller told CenturyLink ████████
████████████████████████████████████████.

(*Id.* ¶¶ 9-14.)

Professor Moore also found that Keller acted unethically and unfairly in failing to disclose the risks and disadvantages of its mass arbitration strategy, particularly when compared to the putative class action and proposed settlement. (*Id.* ¶ 15-18.) Keller's material omissions include the difficulty of proving each individual client's right to recover in an individual action, which is unnecessary with a class action; the risk that a court or arbiter will find that Keller's clients materially breached their arbitration agreements and they will be unable to arbitrate their claims after opting-out of the class settlement; the risk that the claims or counterclaims could be moved to small claims court and they will have no legal representative after opting-out of the class settlement; and the fact that any aggregate settlement achieved outside the class action would not be subject to Rule 23(e)'s protections. (*Id.* ¶¶ 17-18.)

### 2. Keller's misleading communications are likely to cause, and already have caused, consumer confusion and harassment

Keller's misleading communications are not merely likely to confuse and harass, but actually have confused and harassed, putative class members. For example, Keller identified Kathleen Lodestein as one of its clients. (Unthank Decl. ¶ 55.) Mrs. Lodestein is married to, and shares a CenturyLink account with, Plaintiff Lodestein, *a Settlement Class Representative in this MDL.* (*Id.*) Even though Mrs. Lodestein allegedly signed Keller's Retainer Agreement, Mr. and Mrs. Lodestein apparently did not understand what they were signing up for. Mr. Lodestein has testified that they never agreed to arbitrate

any claim with CenturyLink. (*Id*.) And Mr. Lodestein intends to participate in the class settlement as a Class Representative.

Other putative class members have publicly posted complaints about Keller's and the associated Troxel firm's misleading solicitations. (*Id*. ¶¶ 28-29.) One CenturyLink customer posted that he was "feeling annoyed" because claimants were getting "sucked in" to sign a retention agreement that would allow the attorneys to "keep[] all that I would win" because their attorney fee exceeded the value of the claim. (*Id*. ¶ 29; *id*. Ex. G.) Likewise, after another apparent customer expressed confusion regarding Keller and Troxel's joint solicitations, the following warning was posted in response: "[T]his person is a scammer"; he is "scamming people and claims to be fighting CenturyLink. Contact your local Attorney . . . ." (*Id*. ¶ 28; *id*. Ex. F.)

### 3. Keller's conduct "actively discourages" and "burdens" putative class members' right to accept the settlement

Professor Moore found that both the attorney fee and termination clauses of Keller's Retainer Agreement are likely to create confusion and effectively deter Keller's clients from participating in the proposed class settlement after they learn of its existence. (Moore Decl. ¶¶ 24-26.) Regarding attorney's fees, Keller's Retainer Agreement states that a $750 flat fee is reasonable and will be paid if the client's case resolves *before* arbitration commences, regardless of how much or how little work was done by Keller on the client's behalf, and regardless of how favorable or unfavorable the resolution is for the client. (*Id.* ¶ 14(d); *id.* Ex. 4 § 2.) The Agreement also states that if the *client* terminates Keller's services, "the attorneys are entitled to a reasonable fee and

reimbursement of costs."[6] (*Id.* ¶ 25; *id.* Ex. 4 § 7.) This means that Keller's clients are told that they cannot terminate Keller's services and accept the proposed class settlement without being obligated to pay Keller's fee. Professor Moore concluded that, together, Keller's fee and termination provisions are "false and misleading" and "dishonest" to putative class members and "actively discourage[] and thereby burden[] the clients' right to accept a settlement in the Class Action Lawsuit." (*Id.* ¶ 26.) This is despite the fact that, as discussed below, the majority of Keller's clients likely would benefit from the proposed class settlement if they were free to accept it.

### K.     Many of Keller's Claimants Would Be Better Served by the Proposed Class Settlement, Not Pursuing Individual Arbitration

Under the proposed class settlement, CenturyLink would set up a non-reversionary fund of $15.5 million to pay any CenturyLink customer who believes he or she was overbilled. (Pls.' Mem. in Support of Mot. for Prelim. Approval 11-14, 16, ECF No. 468.) If the Court approves, such customers would receive (1) a flat payment starting at $30 and adjusted by a pro rata multiplier, even if they have no proof of overbilling, or (2) if they have proof of overbilling, the actual amount of their alleged overpayment for up to six months, adjusted by a litigation risk factor and pro rata multiplier. (*Id.*)

Even if the Court were to assume that *all* of Keller's clients have valid claims (they do not), most of Keller's clients would be better off participating in the class

---

[6] In contrast, *Keller* can terminate its client's representation "at any time" if Keller believes the client's "potential claims are unlikely to result in a recovery for any reason." (Moore Decl. ¶ 27; *id.* Ex. 4 ¶ 7.) This could prejudice Keller's clients, including if it terminated the relationship after clients had opted out of the settlement class. (*Id.* ¶ 27.)

settlement, not pursuing arbitration. (Unthank Decl. ¶ 61.) First, if the Court approves the class settlement, the settlement offer will be made available to all class members without significant risk, delay, or effort. All CenturyLink customers since January 1, 2014, would be entitled to recover, even if their individual claims otherwise would be time-barred,[7] and even if they owe CenturyLink money. In arbitration, by contrast, there is a significant risk claimants will recover nothing or, worse, they may be found to owe CenturyLink an unpaid balance and, possibly, attorney fees.

Second, the Retainer Agreement's terms make it unlikely that Keller's clients would fare better under a Keller settlement than the class settlement. The Retainer Agreement states that Keller's clients agree that a $750 attorney fee is reasonable for a settlement reached before arbitration commences and that attorney fees will be deducted from the clients' total recovery.[8] (*See* Moore Decl. Ex. 4 ¶ 2.) The Retainer Agreement also states that Keller's clients "instruct[ed]" Keller to settle "without further direction or authorization" at an amount equal to the alleged overcharges for the past 36 months. (*Id.* Ex. 4 ¶ 3.) Based on Keller's overcharge allegations, the net recovery for such a settlement would be no better than the class settlement for approximately 58% of Keller's first 1,000 claimants after Keller's $750 fee is deducted. (Unthank Decl. ¶ 61.)

---

[7] The settlement allows recovery for alleged overpayments made since January 1, 2014.

[8] Although the Retainer Agreement makes inconsistent statements regarding Keller's fee, Professor Moore explains that these statements are "misleading" and "dishonest" in light of the law and Keller's conduct.  (*See* Moore Decl. ¶ 14.)

Finally, Keller's clients face a substantial risk that they will be found to have materially breached their arbitration agreements and will be unable to arbitrate their claims if they opt out of the class settlement. Keller, on behalf of its clients, has engaged in a scheme to deprive CenturyLink of the value of its arbitration contracts by, among other things, refusing to provide basic information regarding the claims or to otherwise engage in individualized, pre-arbitration dispute resolution, demanding a mass or collective resolution on behalf of all clients, and then simultaneously filing mass arbitrations with artificially inflated damages claims. (*Id*. ¶¶ 71-72; *id* Ex. Y.) After several pleas to Keller to cure and retract its repudiations and breaches of the contracts on its clients' behalf, CenturyLink terminated the arbitration contracts for all 22,000 clients on January 9, 2020. (*Id*. ¶ 72.) Although CenturyLink has made clear that it remains willing to resolve all 22,000 claims on their individual merits, without litigation and without any added costs (*id.* ¶ 73), Keller's conduct on claimants' behalf could destroy their right to arbitrate and leave them without legal representation, if claimants forego their opportunity to file a claim in the class settlement.

## ARGUMENT

Plaintiffs already have made a routine request for the Court to temporarily enjoin all proceedings by settlement class members upon the Court's preliminary approval of the class settlement. (*See* Proposed Prelim. Approval Order ¶ 10, ECF No. 474.) Keller's conduct provides substantial, additional support for Plaintiffs' request and shows the need for the Court to temporarily enjoin all parallel arbitrations by settlement class members to protect the interests of absent class members and to ensure the orderly administration of

these proceedings. Because Keller's arbitration demands involve the same claims that are the subject of the proposed settlement in this MDL class-action proceeding, the Court has the jurisdiction and power to enjoin the pending and threatened arbitrations during the pendency of the settlement approval process. Plaintiffs' requested injunction is well-supported both legally and factually here.

## I.   THE COURT HAS AUTHORITY TO ISSUE AN INJUNCTION TO PROTECT ITS JURISDICTION AND THE PUTATIVE CLASS

The All-Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. Through that Act, the Court "has the inherent ability to protect its own jurisdiction over the dispute pending before it." *Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 914 (8th Cir. 2010). The All-Writs Act is applied "flexibly" by the courts and "extends, under appropriate circumstances, to persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 173-74 (1977). And it can be exercised "[e]ven before a federal judgment is reached." *In re Baldwin-United Corp. (Single Premium Deferred Annuities Ins. Litig.)*, 770 F.2d 328, 335 (2d Cir. 1985).

The threat to a court's jurisdiction posed by parallel actions is "particularly significant where there are conditional class certifications and impending settlements in federal actions." *In re Diet Drugs*, 282 F.3d 220, 236 (3d Cir. 2002). That is because where the parties "have reached a settlement agreement after lengthy, protracted, and

difficult negotiations[,] parallel proceedings can 'seriously impair the federal court's flexibility and authority to approve settlements in multi-district litigation' and . . .'destroy the utility of the multidistrict form otherwise ideally suited for resolving such broad claims.'" *Uponor*, 2012 WL 13065005, at *9 (quoting *Baldwin-United*, 770 F.2d at 337); *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, No. 08-MDL-1958 ADM/AJB, 2012 WL 5055810, at *13 (D. Minn. Oct. 18, 2012). "In complex cases where certification or settlement has received conditional approval, or perhaps even where settlement is pending, the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court." *Diet Drugs*, 282 F.3d at 236.

For this reason, federal courts routinely enjoin pending and threatened actions during the class-settlement approval process. *E.g.*, *Uponor*, 2012 WL 13065005, at *8-10 (enjoining pending cases and class members from commencing or participating in "any other lawsuit, arbitration, or administrative, regulatory or other proceeding" during the notice and opt-out period); *Zurn Pex*, 2012 WL 5055810, at *13 (same).[9] The Court's authority specifically includes enjoining related arbitrations. *Uponor*, 2012 WL 13065005, at *9 ("Federal courts' broad authority under the All Writs Act encompasses the power to enjoin both subsequent and parallel arbitration proceedings.").

---

[9] *See also Johnson v. NPAS Sols., LLC*, No. 9:17-cv-80393, 2017 WL 6060778, at *3 (S.D. Fla. Dec. 4, 2017); *Aleem v. Pearce & Durick*, No. 1:15-cv-00085, 2016 WL 11475231, at *2 (D.N.D. Mar. 28, 2016); *Smith v. Volkswagen Grp. of Am., Inc.*, No. 13-CV-0370-MJR-PMF, 2014 WL 12160767, at *7 (S.D. Ill. May 27, 2014); *Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 341 (N.D. Tex. 2011).

The Court should do the same here. The proposed class settlement is the result of more than two years of hard-fought litigation, including discovery, significant motions, mediation with one of the nation's preeminent mediators, multiple additional days of settlement negotiations, and confirmatory discovery to evaluate the fairness of the tentative settlement terms. (Pls.' Mem. at 5-10, ECF No. 466.) The proposed classwide compensation resulted from the parties' thoughtful balancing of the strengths and weaknesses of the claims and defenses, the small fraction of customers whose billing concerns have not yet been voluntarily resolved through CenturyLink's dispute resolution process, and the relatively small amount of actual damages (i.e., an average of $68 estimated for those customers impacted by any billing error. (*Id.* at 20-26.)

## II. KELLER'S CONDUCT CREATES AN ACUTE NEED FOR A TEMPORARY INJUNCTION STAYING PARALLEL ACTIONS

Keller seeks to upend the delicate balance struck by CenturyLink's arbitration agreements without Keller having done any of the discovery and other work that Class Counsel did here. Keller demands its own private, mass settlement—immune from the Court's fairness review—by misleading consumers and then threatening CenturyLink with more than $30,000,000 in arbitration costs and fictitious 10x to 300x damage multipliers that, together, dwarf any alleged actual damages. Keller's solicitations and enrollment materials have misled some consumers, who otherwise would be eligible to recover through the class settlement, into forgoing the class settlement *before putative class members even know the class settlement exists.* In addition, Keller's conduct could

mislead consumers who later learn about the class settlement into believing that they need to sign up with Keller to participate in the class settlement.

The Court should grant the requested injunction to allow Keller's clients to freely consider the proposed class settlement and other available options for resolution of their claims. *Cf. In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1061 (N.D. Cal. 2017) (recognizing court's fiduciary obligations to absent class members). Under these circumstances, it is appropriate for the Court to enjoin parallel actions even while the Court is considering whether to grant preliminary approval to the proposed class settlement. *See Diet Drugs*, 282 F.3d at 236; *In re Asbestos Sch. Litig.*, No. 83–0268, 1991 WL 61156, at *1-3 (E.D. Pa. 1991) (enjoining class member from litigating "in any other forum" as trial approached because that is the period during which "the prospect for settlement [would] be at its maximum").

Under Keller's Retainer Agreement, claimants who choose to participate in the class settlement purportedly would owe Keller an attorney fee that exceeds the average expected recovery per claimant. The potential class-settlement recovery by any claimant would rarely, if ever, be enough to cancel out Keller's unreasonable $750 attorney fee. Thus, Keller's fee provision would tend to discourage settlement participation by making it nearly impossible for many, if not most, of Keller's clients to cover Keller's attorney fee with their class-settlement recovery.[10]

---

[10] Of Keller's first 1,000 arbitration demands, more than 50% of claimants plead actual damages of less than $750. (Unthank Decl. ¶ 61.)

Keller's mass arbitration strategy also poses undisclosed risks for its clients as compared to their participation in the proposed class settlement. Most obviously, there is the risk that Keller's clients would recover nothing in arbitration—because, for instance, their claims are time-barred—or that they might have to *pay* CenturyLink because they have unpaid bills that exceed any modest sum that CenturyLink allegedly overbilled. Because notice of the proposed class settlement has not yet been approved by the Court or disseminated to putative class members, and because Keller fails to inform its clients of the class action or settlement, Keller necessarily failed to disclose other risks and costs its clients and prospective clients will face by pursuing arbitration. These undisclosed risks include: (i) the relative difficulty of proving each individual's right to recover compared to the class settlement process; (ii) that a court or arbiter could find that Keller's clients materially breached their contracts by refusing to engage in the pre-suit dispute resolution, by demanding a mass or collective settlement, and by simultaneously filing coordinated, mass arbitrations for inflated claims; (iii) that the claims could be moved to small claims court; (iv) that Keller's clients are much more likely to face counterclaims for any unpaid debts owed to CenturyLink[11]; and (v) that any settlement achieved outside of the class action will not be subject to independent judicial review and the fairness protections of Rule 23(e).

---

[11] CenturyLink has notified Keller that if Keller follows through on his threatened mass arbitration demands, CenturyLink will file counterclaims against claimants who owe significant unpaid debts to CenturyLink. (*See* Unthank Decl. ¶ 52; *id.* Ex. O.)

The proposed class settlement, by contrast, carries no such risks. No settlement class member who is eligible to recover benefits would be denied benefits on the basis of a statute of limitations. And there is no risk that claimants in the class settlement would end up owing CenturyLink money on a counterclaim for unpaid debt.

These circumstances merit the Court's intervention to preserve the status quo until the putative class members can be notified of the class settlement and make their own, individual opt-out decision. *See, e.g.*, *In re BankAmerica Corp. Sec. Litig.*, 95 F. Supp. 2d 1044, 1050 (E.D. Mo. 2000) (enjoining parallel state case and explaining that the plaintiffs "and the law firm behind them, do not have the best interests of the class at heart and have proved themselves wholly inadequate to control the conduct of this suit"); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1335 (5th Cir. 1981) (affirming injunction of parallel state action where the plaintiffs' attorneys had "taken, and manifested an intention to continue to take, actions threatening this court's exercise of its proper jurisdiction and the effectuation of its judgments, by filing and threatening to file duplicative and harassing litigation"). The Court's enjoining existing and future arbitrations would help to ensure that Keller's clients receive an informed opportunity to consider whether the class settlement is in their individual best interests.

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' Motion and enter an order temporarily enjoining all parallel actions by settlement class members, including Keller's arbitrations, pending the Court's final fairness review of the proposed settlement.

CenturyLink's counsel will serve Keller and the AAA with a copy of this Supplemental Brief and the related papers today.

Dated:  January 10, 2020                    Respectfully submitted,


                                            s/ Andrew M. Unthank
                                            Carolyn J. Fairless (CO Bar No. 30214)
                                            Andrew M. Unthank (CO Bar No. 36832)
                                            Wheeler Trigg O'Donnell LLP
                                            370 Seventeenth Street, Suite 4500
                                            Denver, CO  80202-5647
                                            Telephone:  303.244.1800
                                            Facsimile:  303.244.1879
                                            Email:   fairless@wtotrial.com;
                                                     unthank@wtotrial.com

                                            Douglas P. Lobel (VA Bar No. 42329)
                                            David A. Vogel (VA Bar No. 48971)
                                            Cooley LLP
                                            11951 Freedom Drive
                                            Reston, Virginia 20190
                                            Tel.: (703) 456-8000
                                            Fax: (703) 456-8100
                                            Email:   dlobel@cooley.com
                                                     dvogel@cooley.com

                                            Martin S. Schenker (CA Bar No. 109828)
                                            Jeffrey M. Gutkin (CA Bar No. 216083)
                                            Cooley LLP
                                            101 California Street, 5th Floor
                                            San Francisco, CA 94111
                                            Tel.: (415) 693-2000
                                            Fax: (415) 693-2222
                                            Email:   mschenker@cooley.com
                                                     jgutkin@cooley.com

                                            William A. McNab (MN Bar No. 320924)
                                            David M. Aafedt (MN Bar No. 27561X)
                                            Winthrop & Weinstine, P.A.
                                            Capella Tower, Suite 3500

225 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 604-6400
Fax: (612) 604-6800
Email:   wmcnab@winthrop.com
            daafedt@winthrop.com

*Attorneys for Defendant CenturyLink, Inc.*
*and Intervenors Qwest Corporation, Embarq*
*Florida, Inc., Embarq Missouri, Inc.,*
*Carolina Telephone and Telegraph Company*
*LLC, Central Telephone Company,*
*CenturyTel of Idaho, Inc., CenturyTel of*
*Larsen-Readfield, LLC, CenturyTel of*
*Washington, Inc., CenturyTel Broadband*
*Services, LLC, and Qwest Broadband*
*Services, Inc.*

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on January 10, 2020, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system which will send notification

of such filing to electronically by the parties listed on the Court's Service List.


*s/ Claudia L. Jones*