UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION<br><br>This Document Relates to:<br>  0:17-cv-02832   0:17-cv-04943<br>  0:17-cv-04613   0:17-cv-04944<br>  0:17-cv-04614   0:17-cv-04945<br>  0:17-cv-04615   0:17-cv-04947<br>  0:17-cv-04616   0:17-cv-05046<br>  0:17-cv-04617   0:18-cv-01562<br>  0:17-cv-04618   0:18-cv-01572<br>  0:17-cv-04619   0:18-cv-01573<br>  0:17-cv-04622   0:18-cv-01565 | MDL No. 17-2795 (MJD/KMM)<br><br>**DECLARATION OF ANDREW UNTHANK IN SUPPORT OF DEFENDANT AND INTERVENORS' SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL AND REQUEST FOR TEMPORARY INJUNCTION TO STAY PARALLEL ARBITRATIONS** |

I, Andrew M. Unthank, hereby declare as follows:

1.    I am a Partner in the Denver, Colorado, office of Wheeler Trigg O'Donnell LLP, and am counsel of record for Defendant CenturyLink, Inc. ("CTL") and the Proposed Intervenors.

2.    When this declaration uses the term "CenturyLink," I am referring to the family of corporate entities that commonly use the trade name "CenturyLink," including CTL and the "Proposed Intervenors" as described in their motion to intervene (ECF No. 80).

3.    This declaration is submitted in support of CenturyLink's Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval and Request for Temporary Injunction to Stay Parallel Arbitrations.

4.      I am over 21 years of age. I make this statement based on my personal

knowledge, unless otherwise stated. I am personally familiar with the documents

described in this declaration. If called as a witness in support of Plaintiffs' Motion, I

could and would competently testify to the following:

I.      **THE MDL PROCEEDINGS AND PROPOSED CLASS SETTLEMENT**

5.      *McLeod et al. v. CenturyLink, Inc. et al.*, C.A. No. 2:17-04504 (C.D. Cal.),

was filed on June 18, 2017. This was the first of several consumer class actions

eventually consolidated into this multidistrict litigation ("MDL").

6.      On October 5, 2017, the Judicial Panel on Multidistrict Litigation created

this MDL. On October 10, 2017, eight actions were transferred from transferor courts for

consolidation with the existing *Romero et al. v. CenturyLink, Inc. et al.*, C.A. No. 0:17-

02832, matter that already was pending before this Court. (ECF No. 1.)

7.      On February 15, 2018, Plaintiffs filed their Consolidated Class Action

Complaint in this MDL, setting forth multiple claims premised on alleged improper sales

and billing practices by CenturyLink. (ECF No. 38.)

8.      The parties engaged in extensive discovery concerning the Proposed

Intervenors' motion to intervene (ECF No. 80) as well as CenturyLink's motion to

compel arbitration and its alternative motion to dismiss, both of which CenturyLink filed

on April 28, 2018. (ECF Nos. 122, 132). The parties marshaled that discovery in their

briefing in support of their respective positions on CenturyLink's motions. (*See* ECF Nos.

216, 229, 253, 295, 305, 306, 360, 396.) The parties concluded that briefing on March 22, 2019. (ECF No. 396.)

9.      The parties began exploring possible resolution opportunities in late 2018. In early 2019, the parties worked to schedule mediation.

10.      On May 20, 2019, the parties mediated with the Honorable Layn R. Phillips, who is one of the nation's leading mediators. (Decl. of Layn R. Phillips ("Phillips Decl.") ¶ 7, ECF No. 470.)

11.      On May 24, 2019, the parties agreed to the terms of a potential class settlement and signed an initial Term Sheet. (*Id.*) The tentative class settlement was subject to confirmatory discovery to be taken by Plaintiffs.

12.      The parties reported to the Court that they had reached a tentative class settlement, subject to confirmatory discovery, on June 7, 2019. (ECF No. 407.) That fact was publicly reported in the Court's minutes. (*Id.*)

13.      On July 22, September 5, and October 4, 2019, the parties filed letters with Court providing updates on the progress of their confirmatory discovery efforts and to finalize the terms of the proposed settlement. (ECF Nos. 418, 454, 461.)

14.      On October 15, 2019, the parties executed a final Settlement Agreement and Release. On October 16, 2019, Plaintiffs moved the Court for preliminary approval of a proposed nationwide class settlement. (ECF Nos. 466, 469.) The Settlement Agreement includes the following pertinent provisions:

**1.7  Class Period**.  Between January 1, 2014 and the date of entry of the Preliminary Approval Order.

* * *

**1.33  Released Claims**.  Liabilities, claims, cross-claims, causes of action, rights, actions, suits . . . of any kind whatsoever . . . based on facts that occurred during the Class Period . . . including . . . (1) promising customers one rate during the sales process but then charging a higher rate during actual billing; (2) billing unauthorized, undisclosed, or otherwise improper charges . . .; and (3) caused customers to incur costs resulting from their accounts being improperly sent to collections without valid reason.

* * *

**1.35  Releasing Party**.  The Settlement Class Representatives, all Settlement Class Members, and their respective heirs, executors, administrators, representatives, agents, lawyers, partners, successors, and assigns.

* * *

**1.39  Settlement Class**.  All persons or entities in the United States who are identified by CenturyLink as a residential or small business customer and who, during the Class Period, had an account for local or long distance telephone, internet, or television services with one or more of the Operating Companies.

* * *

**2.1.5**  If a Settlement Class Member contacts CenturyLink for assistance regarding negative credit issues related to debts that are based upon improper overcharges and the subject of a valid and timely Claim in the Settlement, and which have been sent to a collections agency or otherwise incorporated negatively into the credit profile of a Settlement Class Member, CenturyLink shall take reasonable steps to reverse the adverse credit reporting incident.

* * *

**3.2.1**  A Settlement Class Member may make a Flat Payment Claim for thirty dollars ($30.00) (subject to the Pro Rata Multiplier) by submitting a timely and valid Claim Form indicating a desire to receive a Flat Payment Claim.

**3.2.2**  A Settlement Class Member is eligible to make a Supported Document Claim if he or she seeks reimbursement of more than thirty dollars ($30.00) or asserts an overpayment no described in the attestation on the Claim Form for a Flat Payment Claim.

(ECF No. 469 at Ex. A (Settlement Agreement & Release).)

## II.    KELLER LENKNER LLC'S SOLICITATIONS AND TERMS OF ENGAGEMENT

15.    While the parties to the MDL were engaging in discovery, negotiating the proposed class settlement, and working to present that settlement for Court approval, we learned through multiple channels and reports that the law firm Keller Lenkner LLC ("Keller") was soliciting CenturyLink customers to bring arbitrations alleging the same billing disputes at issue in the MDL and that the parties propose to resolve through the class settlement.

16.    Keller is a plaintiffs' law firm founded in 2017 by three principals who previously co-founded "the world's largest private litigation finance firm." (Compilation of web pages, attached as Exhibit A, available at https://www.kellerlenkner.com/, last visited Dec. 30, 2019, and https://alm-media-yahoopartner.tumblr.com/post/171321962743/gkc-founders-burford-execs-launch-plaintiff-side, last visited January 6, 2020.)

17.     Keller's business model targets companies with mass arbitrations, particularly in connection with class settlement proceedings. (Compilation of Keller demand letters, attached as Exhibit B.) Keller used nearly identical demand letters in its threats to CenturyLink, FanDuel, DraftKings, Postmates, and DoorDash. (*Compare* Ex. B *with* Ex. H, described below.)

18.     In fact, based only on these publicly-available sources, this firm of only 16 attorneys claims to presently represent *more than 50,000* individuals pursuing arbitrations against CenturyLink, FanDuel, DraftKings, Postmates, DoorDash, and other companies. (*Id.*)

19.     In March 2019, a member of CenturyLink's Customer Advocacy Group ("CAG"), Lori Ann Johnson, learned about a website, https://attorneys.centurylinkclaims.com, which was soliciting CenturyLink customers to bring over-billing claims against CenturyLink. (Decl. of Lori A. Johnson ("Johnson Decl.") ¶ 5, attached as Exhibit C.)

20.     Ms. Johnson contacted the telephone number listed on that website and was advised that she had reached attorney Jeremy Troxel's firm ("Troxel"), which apparently was working with the Keller law firm to recruit CenturyLink customers to bring over-billing claims against CenturyLink. (*Id.* ¶ 6.) Ms. Johnson was advised that CenturyLink was aware of the solicitations and had agreed to pay a flat rate for legal fees. (*Id.* ¶ 6.)

21.     Also in March 2019, a Facebook advertisement titled "CenturyLink

Claims" was created and linked to https://attorneys.centurylinkclaims.com/sign-up. A

true and accurate copy of the content found on this Facebook page as of January 5, 2020,

and of the content found at the referenced link as of December 30, 2019, is attached as

Exhibit D.

22.     A current CenturyLink customer and CAG analyst, Robert Matthews,

proceeded through the "sign-up" process on January 6, 2020. (Decl. of R. Matthews

("Matthews Decl.") ¶¶ 1-5, attached as Exhibit E.)

23.     The "sign-up" process included the following forms:



Thank you for signing up, we have sent your claim agreement to  your email.

If you have any questions, please contact us at: attorneys@centurylinkclaims.com or feel free to call (800) 597-9765

(*Id.* ¶¶ 6, 10 & Ex. 1, 3.)

24.     After answering "no" to both questions, submitting the form, and receiving

the "thank you" message, Mr. Matthews received the following text message:

> Hi Robert,
> This is Jeremy Troxel one of the attorneys helping CenturyLink
> customers get compensation. Please feel free to text or call this number
> with any questions and we will get back to you as soon as possible. I also
> included a link to sign your claim document as well:
> troxellaw.com/2ZTwDnJ

(*Id.* ¶ 11.)

25.     The link included in the above text message led to a Questionnaire &

Retainer Agreement. (*Id.* ¶ 12 & Ex. 4.)

26.     The Retainer Agreement, with Keller Lenkner LLC and Troxel Law LLP,

features the following pertinent provisions:

**1. Scope of Representation** …

We agree to represent you in investigating and, if appropriate in the attorneys' opinion, filing an individual arbitration asserting consumer fraud and/or related claims against CenturyLink, Inc. and, if appropriate, its subsidiaries or affiliates (collectively, the "Company")

The attorneys shall have no obligation to represent you in any other matter, and no obligation to handle any appeal of any decision in this matter. If we think it will help reach a successful resolution of your claims, we may also pursue resolution of your claims outside of or before initiating arbitration, including in court.

**2. Attorneys' Fees**

If your case resolves before the commencement of an arbitration or court case in which you are a named party, then the attorneys will collect a flat-fee of $750 in exchange for preparing your claim for filing, making a demand of the Company, and negotiating the resolution. … If you win your claim, the law requires the Company to pay you these fees and costs in addition to the damages and penalties the Company owes you. The attorneys will collect these fees from the Company as part of any award or settlement and deduct them from the total recovery as their fee. You will be entitled to retain the full recovery net of this fee. You agree that $750 is a reasonable fee reflective of the time, effort, expense, and skill the attorneys will put into your case to get it to the point of pre-commencement resolution.

If your case resolves after commencement, then the attorneys will collect a lodestar-based reasonable attorney's fee and recover their litigation costs from the Company under any applicable fee-shifting law. Again, the attorneys will collect this fee from the Company, not from you. … You authorize the attorneys to pursue this fee by asking any court or arbitrator for it and you agree that it will belong to the attorneys.

**3. Direction to Settle at Full Value**

The attorneys will work to get you the maximum amount allowed under the law. By signing this Agreement, you instruct the attorneys to, without further direction or authorization from you, accept a "full-value"

settlement offer. A full-value settlement offer is any settlement offer made to you by the Company that:

- pays to you an amount equal to or more than the amount of any overpayments you made to paid to [*sic*] the Company in the past 36 months. Based on the information you provided, this amount is $100.00
- requires you to release only those claims against the Company related to its billing practices; and
- requires you to keep the terms of the settlement confidential, meaning that you will not disclose them except to your immediate family, lawyers, and tax or financial professionals.

\* \* \*

### 6. Attorneys' Right to Withdraw

You acknowledge that the attorneys have the right to stop representing you at any time if, in their professional judgment and consistent with their ethical responsibilities, they come to believe that your potential claims are unlikely to result in a recovery for any reason, including, but not limited to, the Company's inability to pay.

### 7. Client's Right to Terminate Attorneys

You may terminate attorneys at any time by written notice by email to centurylinkclaims@klclientservices.com. If you do, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination.

### 8. Potential Conflicts

The attorneys intend to represent many clients with claims like yours. At this time, your interests and the interests of other clients align. We know of no conflicts of interest that would have an adverse impact on our representation of you.

\* \* \*

**13. Power of Attorney**

Consistent with the attorney ethics rules and other requirements for powers of attorneys, you grant us the power of attorney to execute all documents connected with your claims.

(*Id*. Ex. 4.)

27.     The joint solicitation effort of Keller and Troxel has been the subject of online complaints featured at https://www.reportedcalls/3127287934. A true and accurate copy of the content appearing at this URL as of December 30, 2019, minus certain of the irrelevant advertising content, is attached as Exhibit F.

28.     One of the complaints found at this website reads as follows:

**User Comments**

This is the email sent to me. An attorney will always use your first and last name and this person is a scammer trying to get your Social Security Number and other information. Dear Client, We are making progress in your overbilling claim against CenturyLink. In order for us to continue with your claim we need the attached document to be completed and signed as well as a picture or copy of one of your CenturyLink Bills. The entire process should not take more than a few minutes to complete. Please fill out all the blank information. If you have any questions, feel free to reply to this email or text/call us at: 312-728-7934 Best regards, Jeremy Troxel, Attorney and the Keller Lenkner Legal Team Keller Lenkner LLC – Keller Lenkner is a national law firm based in Chicago, Illinois. Keller Lenkner represents employees, consumers, students, and other injured parties as plaintiffs in complex litigation across the country. Troxel Law LLP – Jeremy Troxel is the founder of Troxel Law LLP and of Troxel, Krauss and Chapman LLP. Troxel Law represents thousands of consumers and employees in cases alleging wage theft and fraud. If you would like to know more about us or have questions about anything at all, feel free to give us a call or reply to this email.

September 26, 2019   ⌐   Reply

(*Id*.)

29.     The joint solicitation effort also has been the subject of complaints posted on Facebook by users, including the following, a true and accurate copy of which is attached as Exhibit G:



(*Id.*)

## III.   KELLER'S COMMUNICATIONS WITH CENTURYLINK

### A.   Keller's Initial Letters to CenturyLink

30.     On May 14, 2019, Keller sent a letter to the CenturyLink "Legal Department" for the first time alerting CenturyLink that "[m]ore than 9,000 individuals have retained Keller Lenkner LLC to pursue claims against CenturyLink . . . ." A true and accurate copy of this May 14, 2019, letter with attachments is attached as Exhibit H.

31.     Attached to this letter was a single, generic arbitration demand made on behalf of all of Keller's clients together with a list of those clients. (*Id.*)

32.     Keller stated that "although CenturyLink's service contracts require individual arbitration, we understand that individual arbitration is expensive" and that CenturyLink would have to pay filing and case management fees totaling "$1,900 for each individual arbitration" and up to "$2,500 in arbitrator compensation," i.e., up to $4,400 in arbitration fees per demand. (*Id.*)

33.     Keller then threatened "to proceed with every arbitration simultaneously," which, with 9,000 claimants, "would obligate CenturyLink to pay AAA [i.e., American Arbitration Association] more than $30 million in initial fees and costs—to say nothing of CenturyLink's own attorneys' fees and its underlying liability, which we believe is substantial." (*Id.*)

34.     Keller invited CenturyLink to "explore whether we can agree on an alternative process for resolving our clients' claims" (*id.*), which CenturyLink quickly learned meant ███████████████████████████████████████████████
████████████████████

35.     Two weeks later, Keller sent CenturyLink a second letter claiming that "nearly 3,000 additional individuals [] have retained Keller Lenkner LLC to pursue claims against CenturyLink." A true and accurate copy of this May 31, 2019, letter with attachments is attached as <u>Exhibit I</u>.

36.     Attached to this letter was the same single, generic arbitration demand made on behalf of all of Keller's clients together with a list of the new clients engaged in the two weeks since Keller's first letter. (*Id*.)

37.     In this two-week period, Keller claimed to have signed up an average of more than 150 claimants per calendar day.

**B.     CenturyLink's Attempts to Engage with Keller to Evaluate and Resolve Its Clients' Individual Claims on the Merits**

38.     On June 12, 2019, CenturyLink responded by letter and requested that Keller provide sufficient information to allow CenturyLink to evaluate and resolve each claim before proceeding to arbitration, as required by CenturyLink's contracts. In particular, CenturyLink requested the purported customer's account numbers, a description of their claims (including the service(s) and date(s) at issue), the damages alleged and the contract at issue. A true and accurate copy of this June 12, 2019, letter is attached as Exhibit J.

39.     On June 19, 2019, Keller responded by letter and refused to provide the requested information. Instead, Keller provided only lists of its clients' "current physical addresses, email addresses, and phone numbers." A true and accurate copy of this June 19, 2019, letter with attachments is attached as Exhibit K.

40.     Keller refused "to engage in pre-demand discussions on an individual basis," stating:

> And at 15 minutes per client, such a pre-demand "dialogue" would consume more than 3,500 hours, or the equivalent of 145 round-the-

> clock days. Suffice it to say that we do not agree that such an exercise is necessary or would be in our clients' best interests. If CenturyLink is unwilling to engage in a practical, pre-arbitration discussion that addresses all of our clients' claims, we will proceed to individual arbitrations.

(*Id.*)

41.     Keller also provided "an updated list of approximately 14,000 clients," suggesting that in less than three weeks Keller had engaged more than 2,000 new clients (i.e., more than 100 new clients per day). (*Id.*)

42.     On July 10, 2019, CenturyLink responded and again asked for basic information regarding each claim so that the parties could engage and have the opportunity to resolve the claims on an individualized basis prior to arbitration. (Letter from Williams to Keller, July 10, 2019, at 1-3, attached as <u>Exhibit L</u>.)

43.     CenturyLink explained the importance of individualized information and engagement for both parties under its arbitration contracts, noting that

> A pragmatic approach is precisely what the pre-filing requirements contemplate. In the ordinary case, a customer who desires to pursue arbitration provides the necessary notice, readily provides the information we have requested from you, and gives the parties an efficient means to resolve the dispute short of filing an arbitration demand. In many instances, CenturyLink communicates directly with the customers to more efficiently investigate and resolve their issue. This process benefits both parties to the contract by allowing each side to give the individualized attention necessary to understand and resolve inherently-individualized claims and to avoid the costs of arbitration proceedings. . . . [Y]ou . . . have omitted any information specific to any particular customer that could be acted on during this pre-filing resolution process.

(Ex. L at 2.)

44.     CenturyLink also explained that it spent substantial time and resources to attempt to locate records for a representative sample of Keller's clients, using the incomplete information Keller provided in its client lists. (*Id*. at 3.) Although it was impossible to fully and fairly evaluate the claims based on that incomplete information, CenturyLink reported that its preliminary findings raised concerns, including the following:

    a.  CenturyLink attempted to locate accounts that potentially matched 100 randomly-drawn entries and could not locate any potentially matching account information for nearly 25% of those entries;

    b.  CenturyLink sorted Keller's client lists by the "CenturyLink – Account State" field and identified three states where Keller's clients claimed their accounts were active but where CenturyLink appeared to provide no internet or local phone services;

    c.  CenturyLink identified that certain claimants on Keller's lists appeared to have previously complained to state authorities, such as state public utilities commissions, and their earlier complaints were resolved promptly or were unfounded;

    d.  CenturyLink also identified certain claimants on Keller's lists who appeared to owe outstanding past-due balances to CenturyLink, with one appearing to owe nearly $900.

(*Id*. at 3-4.)

45.     CenturyLink reiterated to Keller that it was "interested in exploring with you whether there is any process by which your clients could comply with their contractual obligations to engage in individualized resolution discussions[,]" but that Keller's "proposed approach interferes with CenturyLink's right to attempt to fairly resolve these disputes before they are filed, as well as [Keller's] clients' rights to do the same." (*Id*. at 3, 5.)

46.     CenturyLink proposed that the parties explore alternative options that could allow CenturyLink the opportunity to evaluate and eventually resolve the claims on their merits. To move forward cooperatively, CenturyLink proposed ██████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

47.     CenturyLink also proposed ██████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

48.     During these discussions, ██████████████████ ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

49.     CenturyLink continued to attempt to negotiate acceptable, extra-contractual

process that would have allowed CenturyLink the opportunity to evaluate the merits of

Keller's clients' claims. Eventually, the negotiations broke down on September 6, 2019,

after Keller continued to insist that ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

CenturyLink rejected Keller's demand, stating: "We have compromised on every issue

that CenturyLink could have compromised on, without abandoning the spirit of the

consumer agreements' presuit resolution procedures." (*Id.*)

50.     CenturyLink nevertheless reiterated to Keller that, even though the parties

were unable to agree to an extra-contractual arrangement, CenturyLink remained

committed to "engage with you regarding each of your clients' claims through the normal

contractual processes." (*Id.*) Keller did not respond to that offer to engage.

51.  On September 24, 2019, Keller sent another notice, by email, claiming to

have recruited "8,293 additional … clients" to pursue arbitrations against CenturyLink,

bringing Keller's client total to more than 22,000 individuals. (Email from W. Postman to M. Williams, Sept. 24, 2019, without attachments, attached as <u>Exhibit N.</u>) Based on its earlier claimed client totals, Keller apparently signed up an average of more than 85 clients per day, every day, between June 19 and September 24.

52.     On October 8, 2019, CenturyLink responded, in pertinent part:

> Even after CenturyLink repeatedly requested the basic information necessary to evaluate and resolve the claims, you have made no effort to provide the requested information. Your latest list of purported claimants contains none of the additional information we requested after you provided your deficient earlier lists. So here we are with another 8,293 purported claimants whom you say you represent, but we have made no progress toward resolution for any one of the 22,068 claims you threaten.

> You continue to reject the pre-suit resolution processes your clients agreed to follow, through which they may have resolved their claims by now. You continue to pursue a consolidated approach for individual claims to maintain your threat of mass filings that potentially would require CenturyLink to pay tens of millions in arbitration fees. These tactics violate CenturyLink's agreements at the expense of the claimants who actually may have legitimate claims (if any).

> In your September 24 email, you raise questions that are apparently intended to give the impression that you are trying to engage on behalf of your clients and simply need more information from CenturyLink to do so. That is categorically untrue. Your questions do nothing to advance and resolve your clients' claims through the contractual processes.

> You have provided CenturyLink with a list of names that you apparently solicited online without confirming their identities or claims, and you ask CenturyLink to identify which of your listed names the Company is unable to identify in CenturyLink's customer information systems. This is equivalent to handing CenturyLink a list of 22,068 unconfirmed claimants without CenturyLink account numbers who may have claims for something at some unknown point in time, and then asking CenturyLink what it thinks. CenturyLink has no obligation to perform

19

your due diligence for you, and it is not in the position to do so. In addition to the privacy concerns that this raises for our customers, it does nothing to resolve your clients' claims through the contractual processes. Until you provide the requested information for each of your clients, CenturyLink cannot confirm and address their claims through the contractual processes.

Your approach is especially problematic where CenturyLink is already in the process of negotiating, and soon will propose, a class action settlement of the pending multidistrict litigation. That settlement is the product of thoughtful consideration of the risks and benefits of continuing litigation over allegations similar to those in your generic demand. Your eligible clients who truly believe they have legitimate claims should consider seeking benefits through the class settlement. Given your apparent unwillingness to investigate your clients' claims or to comply with the contractual processes to pursue their claims in arbitration, we do not see how you can properly assess that their interests would be better served by opting out of any class settlement. We hope that they will soon have that opportunity to consider for themselves.

(Letter from Williams to Keller, Oct. 8, 2019, at 1-3, attached as <u>Exhibit O</u>.)

53.     CenturyLink again reiterated that it was "willing to work with [Keller] to resolve each legitimate claim if each claimant supplies the information we have requested to allow CenturyLink to evaluate each claim." (*Id*. at 3.)

54.     Keller never directly responded to CenturyLink's October 8, 2019, letter.

55.     CenturyLink subsequently discovered that, among the more recently identified 8,293 CenturyLink customers added to Keller's client list was Kathleen Lodestein. The address and telephone information for Mrs. Lodestein supplied by Keller matches the same CenturyLink account information for Plaintiff and Settlement Class Representative Jon Lodestein, which CenturyLink produced in discovery in this MDL. (*Compare* Keller Client List, attached as <u>Exhibit P</u>, *with* Dep. of J. Lodestein at 5:24-

6:10, attached as Exhibit Q.) Plaintiff Lodestein testified that his wife's name is Kathleen

Lodestein and that they share a residence. (*Id*. at 9:24-10:12.) Contrary to Keller's

arbitration plans for the Lodesteins' claim against CenturyLink, Plaintiff Lodestein

disputes that he ever consented to arbitrate with CenturyLink. (*Id*. at 87:23-88:20;

101:10-102:1; 103:8-25.)

## IV.    KELLER SIMULTANEOUSLY SUBMITS 1,000 ARBITRATION DEMANDS TO THE AMERICAN ARBITRATION ASSOCIATION

56.    On November 21, 2019, Keller notified CenturyLink that it was

simultaneously "filing demands for individual arbitration on behalf of 1,000 clients who

were overcharged by CenturyLink" and provided a link to a Dropbox folder containing

those demands. (Email from Larry to Williams, Nov. 21, 2019, attached as Exhibit R.)

57.    Each of those 1,000 arbitration demands submitted to the AAA alleges a

CenturyLink account number, which information Keller repeatedly had refused to

provide pre-arbitration, and otherwise alleges the same generic formula (e.g., "Despite

being quoted [X] per month, Claimant was in fact charged [Y] per month for [Z]

months." (Demand No. 1, attached as Exhibit S.) But Keller continues to omit and

withhold from the 1,000 demands key information about the claimants and their claims,

like the dates of the alleged billing errors.

58.    More than 98% of Keller's 1,000 demands seek more than three times the

amount of the claimants' alleged actual damages. More than 75% of Keller's claimants

seek recovery of an amount that is exactly 10 times their alleged actual damages, and

another 17% seek recovery between 10 and 300 times their alleged actual damages. (Decl. of Kristina Sun ("Sun Decl.") ¶ 14, attached as Exhibit T.)

59. Approximately 69% of claimants allege that overbilling continued for more than one year, 28% claim for more than three years, and 18% claim for five years or more. (*Id.* ¶ 11.)

60. About 82% of claimants who allege they previously contacted CenturyLink fail to allege *when* they supposedly contacted CenturyLink or when the alleged billing errors occurred, which obscures the statute-of-limitations analysis. (*Id.* ¶ 21.)

61. More than 58% of Keller's claimants would receive more money from a documented claim under the proposed class-action settlement than from a purported "full-value," pre-arbitration settlement under Keller's Retainer Agreement, if the damages are calculated by using 36 months of alleged overpayments and then subtracting Keller's $750 attorney fee from any pre-arbitration recovery. (*Id.* ¶¶ 15-18.)

62. Further, CenturyLink has located customer accounts that appear to match some of the information provided for all but one of the first 1,000 claimants. (Decl. of Chris Parker ("Parker Decl."), ¶ 14, attached as Exhibit U.) Although Keller still has not provided complete information for the 999 claimants identified to date, and some of these account matches may be false positives, CenturyLink preliminarily has determined:

     a. CenturyLink already provided more than 50% of claimants with voluntary customer-satisfaction benefits that are equal or greater in value than the $30

flat settlement payment that would be available to settlement class members if the Court approves the class settlement. (*Id.* ¶¶ 15(h)-(i).)

b.  Approximately 11% of claimants already received voluntary customer-satisfaction benefits of $250 or more, and 40% of claimants already received voluntary benefits totaling between $30 and $250. (*Id.*)

c.  Approximately 34% of claimants have an outstanding balance due for 90 days or more, are in debt collections, or had their account written off, with 8% owing CenturyLink $250 or more and another 18% owing CenturyLink between $50 and $250. (*Id.* ¶ 15(f).)

d.  More than approximately 7% of claimants have claims that are time-barred because they closed their accounts more than three years before the earliest-filed class action in this MDL. (*Id.* ¶ 15(b).) And, the evidence suggests more claims are likely time barred. Ex. U ¶¶ 11, 21.)

63.  On December 3, 2019, the AAA notified CenturyLink that it "opened a case file for Demand #1, [REDACTED], for the purpose of facilitating communication at this stage." (Email from A. Shoneck of AAA, Dec. 3, 2019, attached as Exhibit V.) The AAA scheduled an initial telephone conference with counsel for CenturyLink and Keller for December 12.

64.  During the initial telephone conference, CenturyLink advised that it was seeking a stay of arbitration proceedings.

65.     During that telephone conference, CenturyLink's counsel explained that the MDL Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification, which was filed October 16, 2019, sought a stay of all parallel litigations and arbitrations, necessarily including the 1,000 arbitration demands that Keller submitted to the AAA.

66.     On December 13, 2019, CenturyLink submitted a letter to the AAA detailing its position that the arbitrations should not proceed and forwarding the pertinent filings in this MDL showing Plaintiffs' pending request to stay and enjoin related litigations and arbitrations. (Letter from Williams to AAA, Dec. 13, 2019, attached as Exhibit W.)

67.     On December 27, 2019, Keller responded and objected to CenturyLink's request that the AAA stay the arbitrations.

68.     On January 9, 2020, the AAA sent Keller and CenturyLink's counsel a letter stating that "administration of these cases has not commenced" because the "filing requirements have not been met." (Letter from Shoneck of AAA to Williams, Jan. 9, 2020, attached as Exhibit X.)] The letter also stated that the "payment of the filing fees from both parties" must occur for all filing requirements to be met and a stay to be requested under the AAA's rules. (*Id.*) The AAA's position is that CenturyLink must pay $340,425 in arbitration filing fees before CenturyLink is entitled to ask for a stay under the AAA's rules. (*Id.*)

69.     CenturyLink is filing its Supplemental Brief in Support of Plaintiffs'

Motion for Preliminary Approval of Class Action Settlement and Provisional Class

Certification to specifically address the critical need to temporarily enjoin Keller's

existing and threatened arbitrations, pending this Court's final fairness review of the

proposed class settlement.

## V.     CENTURYLINK TERMINATED AND REVOKED KELLER'S CLIENTS' ARBITRATION AGREEMENTS BASED ON THEIR MATERIAL BREACHES

70.     My law partner Mike Williams has informed me that during the AAA's

initial telephone conference on December 12, 2019, Keller continued to maintain its

position that its clients had complied with the arbitration agreements before submitting

arbitration demands to the AAA. Mr. Williams participated in that telephone conference

on behalf of CenturyLink and informed the AAA and Keller that Keller's clients had not

complied with the pre-arbitration dispute resolution terms. Since that December 12

telephone conference, Keller still has not done anything to honor the arbitration

agreements or to cure its clients' contract violations and repudiations of the arbitration

agreements.

71.     After CenturyLink had informed Keller of its clients' violations of the

arbitration agreements, in letters dated June 12 (Exhibit J), July 10 (Exhibit L), and

October 8, 2019 (Exhibit R), as well as in email and oral discussions, Keller continued to

refuse to comply with the contracts on its clients' behalf and made no effort to cure or

retract its breaches and repudiations. (*See* Letter from Polk to Keller's Clients, Jan. 9, 2020, attached as Exhibit Y.)

72.   Because Keller and its clients continued to materially breach the arbitration agreements and continued to refuse to cure their breaches and repudiations for more than six months, on January 9, 2020, CenturyLink terminated and revoked the arbitration agreements for Keller's more than 22,000 clients. (*Id.*) As CenturyLink explained:

> Your and your attorneys' conduct—including refusing to engage in individualized, pre-arbitration resolution discussions, demanding a consolidated resolution on behalf of *all* of Keller Lenkner's 22,000 clients, and simultaneously filing mass arbitrations with artificially inflated damages claims—breaches the Arbitration Agreement's dispute-resolution provisions. In addition, your and your attorneys' conduct violates the anti-class-action or anti-collective-action clause of your contract with CenturyLink, as applicable. Your refusal to retract and cure the contract violations and repudiations have destroyed the value of the Arbitration Agreement, deprived CenturyLink of a fair opportunity to evaluate and resolve your claim before arbitration, and wasted enormous amounts of CenturyLink time and resources.

(*Id.*)

73.   Nonetheless, CenturyLink's counsel informed Keller that, despite CenturyLink's termination and revocation of the arbitration agreement, CenturyLink remains willing to attempt to resolve Keller's clients' claims, whether on their individual merits without litigation, through the proposed class settlement, or in small claims court. (Email from Williams to Keller, Jan. 9, 2020, attached as Exhibit Z).

Dated:  January 10, 2020

I hereby declare under the penalty of perjury that the foregoing is true and correct

_____

Andrew M. Unthank