# Exhibit Q

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION<br><br>This Document Relates to:<br>0:17-cv-02832  0:17-cv-04944<br>0:17-cv-04613  0:17-cv-04945<br>0:17-cv-04614  0:17-cv-04947<br>0:17-cv-04615  0:17-cv-05001<br>0:17-cv-04616  0:17-cv-05046<br>0:17-cv-04617  0:18-cv-01562<br>0:17-cv-04618  0:18-cv-01572<br>0:17-cv-04619  0:18-cv-01573<br>0:17-cv-04622  0:18-cv-01565<br>0:17-cv-04943 | MDL NO. 17-2795 (MJD/KMM)<br><br>DEPOSITION OF<br>JON LODESTEIN |

      Deposition of JON LODESTEIN, taken at the offices of Simmons Perrine Moyer Bergman PLC, 115 Third Street SE, Suite 1200, Cedar Rapids, Iowa, commencing at 1:00 p.m., September 12, 2018, before Tracy A. Hamm, Certified Shorthand Reporter and Notary Public in and for the State of Iowa.

APPEARANCES

On behalf of Plaintiffs:        Hellmuth & Johnson
                                     Attorneys at Law
                                     8050 West 78th Street
                                   Minneapolis, MN  55439
                             By: Michael R. Cashman

On behalf of Defendant:        Winthrop & Weinstine, P.A.
                                     Attorneys at Law
                                     Capella Tower
                                     Suite 3500
                                     225 South Sixth Street
                                   Minneapolis, MN  55402
                             By: William A. McNab

Magna Legal Services
866-624-6221 www.MagnaLS.com
Job #428541



Page 5

```
1   accommodate that, okay?
2        A.    Okay.
3        Q.    The one caveat I ask is if I've asked a question,
4   that you answer the question before we take a break, okay?
5        A.    Okay.
6        Q.    Terrific.  I want to explain to you or share with
7   you that the Court in this particular lawsuit has granted what
8   we call limited discovery which does include this deposition,
9   but it's important for me to say that we're not here to get
10  all of the details of your claims or to try to find out if
11  your claim is true or not, okay?  This is for a more limited
12  purpose.  The Court has forbidden us from going into what we
13  call the merits discovery, so I have no intention of doing
14  that, okay?
15       A.    Okay.
16       Q.    However, I will say that your lawyers have put into
17  question whether the nature of your claim or claims fits
18  within an arbitration clause, so I might need to ask a few
19  very general questions about the nature of your claim, but I
20  want to be clear to you if I do, I don't want to dig into the
21  details of who's right and wrong and all what we call the
22  merits, okay?
23       A.    Okay.
24       Q.    Where do you live right now, Mr. Lodestein?
25       A.    Davenport, Iowa.
```



```
                                                               Page 6

 1     Q.    And can I have your street address, please.
 2     A.    ████████████████████████████████████████████
 3     Q.    And how long have you resided at that location?
 4     A.    Since July of 2016.
 5     Q.    And what type of residence; house, apartment, condo?
 6     A.    It's a condo.
 7     Q.    Do you receive mail at that address?
 8     A.    I do.
 9     Q.    And prior to July of 2016 where did you live?
10     A.    ████████████████████████████████████████████
11     Q.    And what sort of residence was that?
12     A.    House.
13     Q.    And how long did you reside at West 58th Street?
14     A.    Since May of '95.
15     Q.    And we're back far enough.
16           It's my understanding you're currently retired; is
17     that correct?
18     A.    Correct.
19     Q.    And how long have you been retired?
20     A.    Four years.
21     Q.    And what did you do for a living most recently
22     before you retired?
23     A.    I was a salesman.
24     Q.    Who did you work for?
25     A.    Well, I worked for several different companies over
```


MAGNA LEGAL SERVICES

```
 1              All right.  What did you do for a living before you
 2   sold security systems for ADT?
 3       A.     I worked for the W.C. Wood company.
 4       Q.     And what did you do for W.C. Wood?
 5       A.     I was a regional sales manager.
 6       Q.     And what sort of business is W.C. Wood in?
 7       A.     Manufacturer of appliances.
 8       Q.     And as a regional sales manager, what were your
 9   general duties?
10       A.     Contacting dealer accounts in nine states.
11       Q.     Did other salespeople report to you?
12       A.     No.
13       Q.     Okay.  And these are home appliances?
14       A.     Correct.
15       Q.     Washer, dryer, that kind of --
16       A.     Freezers, all refrigerators.
17       Q.     And how long did you work for W.C. Wood?  I think
18   you might have said; I just didn't --
19       A.     Eight years.
20       Q.     I'm not going to go back and back and back.  I'll
21   ask just a more general question.  Prior to working for
22   W.C. Wood, were you in sales the bulk of your adult career?
23       A.     Yes.
24       Q.     I understand you're a married man?
25       A.     Yes.
```



```
 1    Q.    Is your wife's name Kathy?
 2    A.    Kathleen; K-a-t-h-l-e-e-n.
 3    Q.    And how long have you been married to Kathleen?
 4    A.    Since April 24th, 1999.
 5    Q.    And Kathleen lives with you at your current address?
 6    A.    I hope so.  I mean I'm not home right now.
 7    Q.    All right.  And Kathleen has lived with you in the
 8  same residence since 1999?
 9    A.    No; she's -- lived there prior to that.
10    Q.    Okay.  But since you've been married, the two of you
11  have cohabitated.
12    A.    Absolutely.
13    Q.    Okay.  All right.  And do you have children?
14    A.    Grown.
15    Q.    How many?
16    A.    We started out with four.
17    Q.    You say "started out."
18    A.    We had two girls and two boys.  We have one dead
19  daughter, the oldest one; and our second daughter has got
20  terminal cancer; and we have two boys.
21    Q.    So you currently have three.  I'm sorry for your
22  loss.
23          And you said "grown"; approximate ages?
24    A.    Well, the oldest was 45 when she died.  They're all
25  in their 40s.
```


MAGNA
LEGAL SERVICES

Page 87

```
 1   tax-free.
 2        Q.   At the end of 2017, you didn't throw four of these
 3   away, did you?
 4        A.   Actually I provided them to -- in July -- I think it
 5   was July or August I provided them to Roxanne Conlin's office,
 6   so -- after that which I wasn't getting any bills from
 7   CenturyLink so there are no more to get.
 8        Q.   There was a closing bill eventually, correct?
 9        A.   I think we've covered that one.  I think it was like
10   ten dollars and -- you owe me $10.92 or something.
11        Q.   I think the last one we looked at was April 1 of two
12   thousand --
13        A.   No; you had one from June, I'm sure.
14        Q.   We haven't looked at it.
15        A.   Yep.
16             MR. CASHMAN:  That's okay.  You don't need to look
17   for it.
18             THE WITNESS:  Well, I don't like to be --
19             MR. CASHMAN:  You guys have a disagreement, so
20   that's --
21             THE WITNESS:  Okay.  We'll agree to disagree.
22   BY MR. McNAB:
23        Q.   So in paragraph 7 you say:  "To the best of my
24   knowledge, I did not," quote, "click to accept," closed quote,
25   "any arbitration or class action waiver clauses through a
```



```
 1   Quick Connect process"; do you see that?
 2       A.    Yes.
 3       Q.    What do you mean by "click to accept" in quotations?
 4       A.    I didn't do it.
 5       Q.    Why is that in quotations?
 6       A.    I don't know; you'd have to ask my attorney.
 7       Q.    But it's your Declaration, sir?
 8       A.    I didn't put any quotes -- I spoke on the phone.  I
 9   didn't put quote-unquote.
10       Q.    Okay.  So you don't know why that's got --
11       A.    I cannot tell you why.
12       Q.    All right.  And it says to the --
13       A.    I --
14       Q.    Sorry, I don't mean to interrupt.  Please continue.
15       A.    I can tell you exactly the process that I use, but
16   so far you haven't asked me, but that's okay.
17       Q.    Again, this sentence starts with "to the best of my
18   knowledge," and what do you mean by that?
19       A.    Again, those were the words that my attorney used.
20   I would flatly say I did not click on "accept and click."
21       Q.    All right.
22       A.    So I assume that was a legal situation versus a --
23       Q.    I asked you a few minutes ago if you reviewed it and
24   whether you made any changes to it, and your answer was no,
25   correct?
```



```
                                                          Page 101
 1      Q.    What was your understanding of agreement you reached
 2   with CenturyLink based on that telephone call?
 3      A.    He was going to set it all up, and my phone number
 4   was going to be continued as 3208; however, I found out within
 5   a matter of days that he had actually created a completely new
 6   account, and my 3208 number was in limbo with a company called
 7   DISH Net landline.
 8      Q.    Okay.
 9      A.    Which is basically CenturyLink.
10      Q.    I want to bring you back to the January 26th, 2017,
11   conversation you had with CenturyLink.  Did they -- that
12   CenturyLink representative say anything other than to you "I
13   will take care of everything for the agreed-upon price for the
14   agreed-upon term"?
15      A.    The agreed price was 64.95 for three years and that
16   I didn't -- he could take care of everything and that I didn't
17   have to worry about it, he got it all under control.
18      Q.    Were you asked to assent to any Terms and
19   Conditions?
20      A.    No.
21      Q.    Were you asked to agree to mandatory arbitration?
22      A.    No.
23      Q.    Were you asked to waive any legal rights you might
24   have including the ability to bring a class action or
25   participate in a class action?
```



Page 102

```
 1      A.    No.
 2      Q.    Okay.  You mention that a -- well, strike that.
 3            Did the CenturyLink representative that you spoke to
 4   on January 26th arrange for a technician to come to your home?
 5      A.    Yes.
 6      Q.    What were you told by why a technician had to come
 7   to your home?
 8      A.    Technician would come out and set everything up.
 9      Q.    Did you ever engage in any so-called QuickConnect
10   process?
11      A.    No.
12      Q.    Did you ever set up your CenturyLink account?
13      A.    No.
14      Q.    And you told us that a technician came to your home;
15   about how long after January 26 would that have been?
16      A.    About a week, ten days approximately.
17      Q.    And what happened when that technician came out?
18      A.    He came out, went to the basement, set every -- or
19   hooked up -- did -- I believe he had to do some rewiring and
20   hooked up the modem, connected it to his computer, evidently
21   linked the modem to the system and then disconnected his
22   computer, connected my desktop to the modem 'cause it --
23   they're -- the installation that I paid for included one
24   computer.  He went to my office computer and proceeded to set
25   everything up, and when he was done, he said, "Okay.  You're
```



Page 103

```
 1    ready to go."
 2         Q.     Is it your testimony that the technician alone did
 3    all the --
 4         A.     That --
 5                MR. McNAB:   Objection; form.
 6                Go ahead.
 7                MR. CASHMAN:   Go ahead.
 8                THE WITNESS:   The technician did everything.  I just
 9    watched.
10    BY MR. CASHMAN:
11         Q.     Did the technician say anything to you about
12    agreeing to Terms and Conditions?
13         A.     No.
14                MR. McNAB:   Objection, form; leading.
15    BY MR. CASHMAN:
16         Q.     Did the technician say anything to you about
17    agreeing to mandatory arbitration?
18         A.     No.
19                MR. McNAB:   Objection, form; leading.
20    BY MR. CASHMAN:
21         Q.     Did the technician say anything to you about waiving
22    your class action rights or any legal rights that you might
23    have?
24                MR. McNAB:   Object to form.
25                THE WITNESS:   No.
```

