1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3   -----------------------------------------------------------
                     )
   IN RE:  CENTURYLINK SALES    )  File No. 17-md-2795
4   PRACTICES AND SECURITIES     )        (MJD/KMM)
   LITIGATION                   )
5                    )
                    )  Courtroom 13E
6                    )  Minneapolis, Minnesota
                    )  Wednesday, January 22, 2020
7                    )  10:05 a.m.
                    )
8   -----------------------------------------------------------

9

10        BEFORE THE HONORABLE MICHAEL J. DAVIS
       UNITED STATES DISTRICT COURT SENIOR JUDGE

11

12        **MOTIONS HEARING ON DOCKET NO. 466**

13

14

15

16

17

18           RENEE A. ROGGE, RMR-CRR
   Official Court Reporter - United States District Court
19         1005 United States Courthouse
          300 South Fourth Street
20        Minneapolis, Minnesota 55415
           (612)664-5107
21

22

23

24     Proceedings recorded by mechanical stenography;
        transcript produced by computer.
25

```
1    APPEARANCES:

2    For the Consumer          ZIMMERMAN REED LLP
     Plaintiffs:               BRIAN C. GUDMUNDSON, ESQ.
3                              MICHAEL J. LAIRD, ESQ.
                               80 South Eighth Street, #1100
4                              Minneapolis, Minnesota 55402

5                              GUSTAFSON GLUEK PLLC
                               LING S. WANG, ESQ.
6                              120 South Sixth Street, #2600
                               Minneapolis, Minnesota 55402
7
                               HELLMUTH & JOHNSON
8                              ANNE T. REGAN, ESQ.
                               8050 West 78th Street
9                              Edina, Minnesota 55439

10   For the Defendant         WINTHROP & WEINSTINE PA
     CenturyLink and           WILLIAM A. McNAB, ESQ.
11   Proposed Intervenors:     225 South Sixth Street, #3500
                               Minneapolis, Minnesota 55402
12
                               COOLEY LLP
13                             JEFFREY M. GUTKIN, ESQ.
                               101 California Street, 5th Flr
14                             San Francisco, California 94111

15                             COOLEY LLP
                               DOUGLAS P. LOBEL, ESQ.
16                             11951 Freedom Drive, #1500
                               Reston, Virginia 20190
17
                               BLACKWELL BURKE PA
18                             JERRY W. BLACKWELL, ESQ.
                               431 South Seventh Street, #2500
19                             Minneapolis, Minnesota 55415

20                             WHEELER TRIGG O'DONNELL LLP
                               MICHAEL T. WILLIAMS, ESQ.
21                             ANDREW M. UNTHANK, ESQ.
                               370 17th Street, #4500
22                             Denver, Colorado 80202

23   For Movant State of       BERNSTEIN LITOWITZ BERGER &
     Oregon (BY PHONE):          GROSSMANN LLP
24                             MICHAEL D. BLATCHLEY, ESQ.
                               1251 Avenue of the Americas
25                             New York, New York 10020
```

APPEARANCES (contd):

2      For Movant State of        STOLL STOLL BERNE LOKTING &
       Oregon (BY PHONE):            SHLACHTER, P.C.
3                                 KEIL MUELLER, ESQ.
                                  209 SW Oak Street, #500
4                                 Portland, Oregon 97204

5

6                                     *   *   *

7                          **P R O C E E D I N G S**

8                            **IN OPEN COURT**

9                                     *   *   *

10              THE COURT:  Good morning.  Please be seated.

11              Let's call this matter, please.

12              THE CLERK:  In Re CenturyLink Sales Practices and

13      Securities Litigation, Civil Case No. 17-md-2795.

14              Counsel, please state your appearances for the

15      record.

16              MR. GUDMUNDSON:  Good morning, Your Honor.  Brian

17      Gudmundson on behalf of consumer plaintiffs.

18              THE COURT:  Good morning.

19              MR. LAIRD:  Michael Laird on behalf of consumer

20      plaintiffs.

21              THE COURT:  Good morning.

22              MS. WANG:  Good morning, Your Honor.  Ling Wang on

23      behalf of consumer plaintiffs.

24              THE COURT:  Good morning.

25              MS. REGAN:  Good morning, Your Honor.  Ann Regan

```
1    on behalf of the consumer plaintiffs.

2             THE COURT:  Good morning.

3             MR. MCNAB:  Good morning, Judge Davis.  Bill

4    McNab, Winthrop & Weinstine, on behalf of CenturyLink, Inc.,

5    and the proposed intervenors.

6             THE COURT:  Good morning.

7             MR. GUTKIN:  Good morning, Your Honor.  Jeff

8    Gutkin from the Cooley firm on behalf of CenturyLink, Inc.,

9    and the proposed intervenors.

10            THE COURT:  Good morning.

11            MR. LOBEL:  Good morning, Your Honor.  Douglas

12   Lobel on behalf of CenturyLink and affiliates.

13            THE COURT:  Good morning.

14            MR. BLACKWELL:  Good morning, Your Honor, Jerry

15   Blackwell speaking for CenturyLink.

16            THE COURT:  Good morning.

17            MR. WILLIAMS:  Good morning, Your Honor.  Mike

18   Williams also for CenturyLink.

19            THE COURT:  Good morning.  And a Happy New Year to

20   everyone.

21            All right.  Let's proceed.

22            MR. GUDMUNDSON:  Good morning, Judge Davis.  This

23   is Brian Gudmundson again.

24            We're very pleased to present a settlement for the

25   court's consideration this morning.  It's a product of a lot
```

1    of litigation and a lot of negotiation and a lot of give and

2    take.  We strongly believe it's within the range of possible

3    approval and that the court should grant the motion for

4    preliminary approval.

5           So without further adieu, I will sort of jump into

6    what the settlement is all about and then maybe give a

7    little bit of background about how we got there and then

8    entertain any thoughts the court may have.

9           To start with the settlement, the settlement is

10   somewhat basic.  We start with the settlement class.  The

11   settlement class are CenturyLink customers from January 1,

12   January 1, 2014, to the present.  That is comprised of

13   approximately 6.6 million current customers and

14   approximately 10.6 former customers, approximately

15   17.2 million people in all.

16          The settlement benefits are rather

17   straightforward.  It's an approximately $18.5 million

18   settlement, and that is comprised of a 15.5 million primary

19   fund that will be used to pay the claims that are submitted

20   by class members, any class representative awards that are

21   issued by the court and any attorneys fees that are issued

22   by the court or ordered by the court, rather.

23          There's an additional $3 million fund created for

24   notice of the administration.  From experience in a variety

25   of data breach cases and other cases involving a large

1   amount of class members, we know that this is no small

2   undertaking.  And we believe, a strong belief, that that

3   fund is sufficient to accomplish the goals of constitutional

4   notice in the administration of the settlement.

5          Class members will be able to make two different

6   types of claims.

7          THE COURT:  I'd like to stop you there.  Do you

8   have a guesstimate of how many claims there will be?

9          MR. GUDMUNDSON:  We certainly have a lot of data

10  about claims rates and things like that, but I think Your

11  Honor is asking about a different question, which is if

12  you've got 17.2 million class members and you've got 15 or

13  $18.5 million primary fund, how are you going to pay these

14  claims.  And the answer is rather simple.

15         We don't assume that 100 percent of CenturyLink's

16  customers, past and present, for the past several years

17  suffered damages that were not reimbursed.  I think that if

18  that were the case, these would be bankruptcy proceedings

19  perhaps and not a class action settlement.

20         We did a large amount of confirmatory discovery to

21  determine how many people may be out there to make claims.

22  We spent a long time on it, as Your Honor knows, and we

23  learned some things.  One thing we learned is that there are

24  multiple layers of customer service at CenturyLink that

25  handle complaints about billing and a variety of other

1    things and that issue a lot of reimbursements.  There were

2    tens of millions of dollars of reimbursements during the

3    class period that satisfy a lot of the complaints.

4         At the very top of that web or network of customer

5    service efforts is an organization called the Customer

6    Advocacy Group.  And that's called C-A-G or the CAG.  We did

7    a lot of discovery about the CAG, and we got a lot of

8    information about it.

9         One of the things we learned is that less than

10   1 percent of the class during the class period made a

11   complaint to the CAG.  And the CAG is handling most

12   escalated issues that cannot be handled or where customers

13   cannot be satisfied or the claims are too large or they're

14   of a certain strength or people are pursuing them beyond the

15   means of normal customer service to satisfy them.  So less

16   than 1 percent of the class made complaints to CAG.

17        The total amount of financial reimbursements by

18   CAG during the class period was $2.5 million.  The average

19   financial reimbursement made by CAG was $68.  And that

20   became very instructive to us, especially that $68 number,

21   because it showed that while there are claims out there,

22   they may not be the astronomical types of claims, thousands

23   of dollars, that will be worth individual cases or things

24   like that, and it helped us sort of form what might be a

25   reasonable settlement.  And so we believe it's going to be a

1     small percentage of the class that makes claims.

2            And in order to make a claim -- let me talk just a

3     little bit about how the claims are made and how these class

4     members verify their losses.  The first is a flat payment

5     claim.  The class member can --

6            THE COURT:  You still didn't answer my question.

7     What's your guesstimate?

8            MR. GUDMUNDSON:  Well, our guesstimate is

9     somewhere in the low percentages, low under 10 percent.

10           THE COURT:  Under 10 percent?

11           MR. GUDMUNDSON:  Yes.

12           THE COURT:  All right.

13           MR. GUDMUNDSON:  And certainly we have data that

14    can be further extrapolated, further analyzed and further

15    combined, if the court desires further information.

16           THE COURT:  You know, I need to -- I'm just asking

17    questions --

18           MR. GUDMUNDSON:  Sure.

19           THE COURT:  -- and like my questions answered.

20           Dealing with -- you can talk about this later at

21    some point, but what about that Equifax disaster?  And so

22    just trying to figure out if it's 18.5, minus 3 for

23    administrative costs, and then if the court grants a third

24    for attorneys fees and a guesstimate of a million dollars

25    for fees and costs -- I don't know.  I just threw that

1    figure out.

2            MR. GUDMUNDSON:  Sure.

3            THE COURT:  So that ends up with $8.5 million in

4    the pot for reimbursement.  So I was trying to figure out,

5    you know, what percentage of the people -- you are saying

6    10 percent of 17.2.  So that's how many people?

7            MR. GUDMUNDSON:  That would be 1.7.  We certainly

8    think the number of claims will be below that.

9            If 1.7 million people made claims, it would be one

10   of the largest claims ever made in the history of class

11   action settlements, and we just don't think that the data

12   was there to support that.  We think that the money is

13   certainly sufficient to support hundreds of thousands of

14   claims, and we believe the data show that that was a more

15   accurate number.

16           But I can tell you this, Your Honor.  If we move

17   to preliminary approval and we receive 5 million claims,

18   we're going to have a lot of answering to do on final

19   approval and there's going to be another round to look at

20   this.

21           We believe that at this stage of the game the data

22   has showed us, and certainly we're willing to satisfy the

23   court with further data, if the court so desires, that it's

24   certainly worth going forward in making that effort, issuing

25   notice to the class, seeing what the response is.  And if we

1      get objections, requests to opt out, a number of claims

2      we'll have -- we'll have most of the claims data, if not all

3      of it, by the time we come back for final approval.  Your

4      Honor may well say, well, I warned you of that, I didn't

5      think it was enough, you told me that the data was there,

6      now we have to take another look at it, and I don't think

7      that it's what it should be.  That's sort of the position we

8      see ourselves in right now.  We don't think that that's the

9      route we are going to be on.  We think that we're on a

10     successful path, but that's -- that's the structure of how

11     this thing can roll out.

12             THE COURT:  All right.  And you've got two paths

13     for collection.  And with that you must have some

14     guesstimate of what the monetary payout will be with just

15     signing up -- just a person signed up and received services

16     or didn't receive services or were overcharged, but don't

17     have any documentation, and then, second, the group that has

18     documentation.  So what is it -- and you've got a

19     multiplier.  So what's the guesstimate on the payout on the

20     flat fee claims and the supported claims?  What's the

21     guesstimate?

22             MR. GUDMUNDSON:  Well, we have not done an

23     actuarial analysis of it, but we have talked to class action

24     administrators, who are rather sophisticated in this type of

25     data.  By all accounts, the number of documented and support

1  claims are an infintesimally small portion of the claims.

2  We believe that the overwhelmingly large number of claims

3  will be the $30 flat payment variety, where you're simply

4  stating that I was overcharged in one of the eight following

5  ways and I didn't already receive reimbursement.

6        You know, one of the things that we're concerned

7  about and we're working really hard to do it or preventing

8  is fraudulent claims.  We're very concerned that the people

9  who have valid claims get paid the amount they should be

10  paid.  And to that end, we are working with the class action

11  administrator to put systems in place so that we are not

12  drowned out with a bunch of bad claims from people who

13  falsify a document or something like that.  We have not done

14  an actuarial analysis of how many are going to be received.

15        THE COURT:  So if the vast majority are going to

16  be the flat fee claims and it's $30 max, times the

17  multiplier, that could diminish the $30 down to 10 cents on

18  a dollar?

19        MR. GUDMUNDSON:  Well, certainly, Your Honor, if

20  that happened, we would have some harsh questions to answer

21  at final approval, and we think that that's not going to

22  happen.

23        THE COURT:  Well, you know, I want you to know

24  that I've been looking at the calculations here and trying

25  to figure out how you came up with your multiplier and your

1   numbers, so.

2           MR. GUDMUNDSON:  Of course.  And, Your Honor, that

3   was a concern that was shared by plaintiffs' counsel

4   certainly, and we did do a lot of confirmatory discovery,

5   some of which -- only some of which was provided at the

6   preliminary approval stage.  The question is, How many

7   claims are out there?  That's the question.  What percentage

8   is out there?  I mean, who do we have to --

9           THE COURT:  That's why I was asking.

10          MR. GUDMUNDSON:  Exactly.

11          THE COURT:  What's your guesstimate?  And at this

12  point, it's just a guesstimate.  I understand that.  And so

13  I can have, you know, I can do -- I can say 17.2, but I know

14  that's not going to be the case.  So you've done the

15  research, and so you are saying it would be up to 10

16  percent.

17          MR. GUDMUNDSON:  I think the 10 percent would be

18  on the astronomically high end of the equation and there's a

19  couple of reasons for that, one of which is important and

20  one of which is not at this stage of the game.

21          The data just didn't show a huge percentage of

22  people making claims and a huge percentage of people making

23  such complaints in the confirmatory discovery.  That may

24  mean a couple things.  It may mean people are just fed up

25  and don't want to waste the time in making a complaint, but

1      that's the data we have, but we also have data showing a

2      very large amount of money was reimbursed to claimants

3      during the class period, a very large amount, tens of

4      millions of dollars, that theoretically, if we had a lot of

5      unreimbursed claims out there, they've already been

6      satisfied.

7              So we looked at data related to something called

8      the ORKO issue that was raised in the Minnesota CDAG case.

9      We identified a lot of different documents that identified

10     specific, systematic computer glitches or even if they are

11     not glitches, but they affected a lot of people, and we know

12     that those were automatically reimbursed to those folks

13     whether they made a complaint or not.  We've got deposition

14     testimony to that fact.  We've got documentary support of

15     that fact.  And so we're left with the same questions that

16     you are, Your Honor, and we've done a lot of the research

17     into it, and we feel satisfied with it, but it's important

18     that you feel satisfied with it, that there's just not a

19     large percentage.  It's in the low percentages.

20             And then, of course, the factor that's perhaps not

21     as important at this stage and shouldn't be considered is

22     how many people are actually going to take the time to make

23     a claim.  It's -- it's -- those rates are out there.  We did

24     not factor that into the equation when we negotiated this.

25     It would be inappropriate to do so.  But we do, even putting

1    that aside, think that there's enough money here to pay the

2    claims that are out there.

3              THE COURT:  Okay.  Continue.

4              MR. GUDMUNDSON:  And again, Your Honor, just

5    touching very briefly on the types of claims that can be

6    made, it's the flat payment for $30 a claim, which can be

7    sort of ratcheted up or ratcheted down depending on how many

8    claims are made, and that doesn't require any proof of

9    causation.

10             There may be some checks done if somebody doesn't

11   have -- use that account number or something like that.

12   People have to supply data that they were a customer, when

13   they were a customer, what they ordered and stuff like that

14   and then that they were overcharged.

15             There's a supported document claim if people have

16   a claim that they think is worth pursuing.  It's a greater

17   value.  They can do that and receive up to 40 percent of

18   that.

19             By the way, if you do the math on the $68 average

20   financial reimbursement and apply 40 percent to that, that

21   also gets you to around $30.  So the two class members are

22   being treated roughly equal.

23             THE COURT:  One thing we forgot to do, we didn't

24   acknowledge to people that are on the phone.

25             Who is on the phone?  Are there any attorneys --

1          MR. BLATCHLEY:  Good morning.

2          THE COURT:  Are there any -- please acknowledge

3     yourself.

4          MR. BLATCHLEY:  Good morning, Your Honor.  This is

5     Michael Blatchley from Bernstein Litowitz.  We represent

6     lead plaintiff Oregon in the securities case.

7          THE COURT:  All right.  Anyone else?

8          MR. MUELLER:  Good morning, Your Honor.  This is

9     Keil Mueller with Stoll Berne, also representing lead

10    plaintiff State of Oregon in the securities class action.

11         THE COURT:  Thank you.  I apologize for not

12    acknowledging you earlier.

13         You may proceed.

14         MR. GUDMUNDSON:  Sure.  I think that the court has

15    got a pretty firm grasp on what the two types of claims are,

16    so I want to round back a little bit and just talk a little

17    bit more about the fairness of the case and what the

18    analysis sort of is.  And I know Your Honor has presided

19    over a number of class action settlements and is quite

20    familiar with the standards to be applied.

21         You know, the big one is, What are the litigation

22    risks and what are the range of possible outcomes.  And that

23    doesn't minimize the court's concern that somebody is going

24    to get a 10 cent check at the end of the day, and the court

25    will have a chance to analyze that.  But we think that given

1     the confirmatory discovery and given the litigation risks

2     that this case faced, you know -- you know, there was so

3     much work done in this case.  I know that Your Honor is well

4     aware of the documents.  I know certainly your staff is.

5     Hundreds of pages of briefing and hundreds and hundreds of

6     exhibits just on three motions, and we have not gotten to

7     the merit -- not even gotten to the merits yet.  The risks

8     are legion.  We think we got a good deal in light of the

9     risks.  There's certainly case law out there that -- that

10    says that even a hundredth or a thousandth percent of a

11    recovery could be fair given the risks.  We don't think we

12    are in that zone.  We hope we are not in that zone.  But we

13    do think the litigation risks were substantial, not the

14    least of which was arbitration, a contested class

15    certification, and then you got to prove your case in chief.

16         We think that we've put a lot of work into it.  We

17    worked rather cooperatively.  We had a lot of disagreements,

18    but we had candid communication with defense counsel, and I

19    think we were able to achieve a result that both sides feel

20    is going to make people feel good.

21         I don't speak for defense counsel, and they will

22    have a chance to speak for themselves, but I got to know

23    them a little bit throughout the course of the litigation in

24    trying to litigate and settle this case, and I know that

25    they will tell you that they are not interested in doing a

1    deal that's going to fall flat on its face and that they

2    participated in confirmatory discovery fully and that they

3    believe in the value of the case as well.

4            A word about notice.  We've got terrific notice

5    here.  It's direct notice.  The current customers are

6    getting their notice how they get their bill, by email if

7    they get their bill by email, by direct mail, U.S. mail, if

8    they get their bill in the mail.  Former customers are

9    getting direct notice too to the extent possible through

10   email notice.  We're doing a very sophisticated

11   technological thing that the class action administrators are

12   quite good at, which is finding emails with addresses, so

13   you don't have to worry about people moving around.  That

14   being said, there's going to be a check against, for U.S.

15   mail, against the national change of address registry.  And

16   it's all going to be supported by indirect notice on Google

17   through targeted ad words and targeted keywords.  We've got

18   a declaration in the record to the constitutionality of that

19   notice, and we feel very good about it.

20           There's -- there's a large portion of the

21   settlement that has to do with agreed business practices

22   that are going to prevent this type of thing from happening

23   in the future.

24           As Your Honor may be aware, there's been a number

25   of state attorney general settlements.  Those settlements

1    include on a state basis a number of reforms, business

2    practices.  This is somewhat similar, but it expands to

3    nationwide to all 36 states where CenturyLink does business.

4    There will be full objection, full opt-out rights and a

5    standard release, which is before the court.

6           THE COURT:  Let's go back to the most recent AG

7    settlement in the State of Minnesota dealing with the

8    opt-out process there.  It may, just my early calculations,

9    it may seem like the people of Minnesota could, that had

10   CenturyLink, could end up with more money from the AG fund

11   than from this fund or am my calculations wrong on that?

12   And even if I'm wrong, how are we going to give notice to

13   those individuals that the AG has a pot of money and they

14   may want to opt-out for that?

15          MR. GUDMUNDSON:  Certainly.  Well, I am not the

16   most knowledgeable about that settlement, perhaps defense

17   counsel is.  I do know a little bit about it, and I will

18   answer the question to the extent I think I can.

19          That settlement is comprised of a couple different

20   pots of money.  One is -- is something around 6 or $800,000

21   and that's going to specific people who were affected by the

22   ORKO issue, which was a number of discounts that were

23   promised at point of sale, but were not delivered.  They

24   were found through computer algorithms.  Those people were

25   identified and all of those people nationwide are getting

1    that money back.  I believe that process was -- that process

2    was in process before all of this came to a head.

3              There's a separate pot, 8 or $9 million.  I

4    believe it's the settlement agreement the Minnesota State

5    Attorney General has, calls for that to be spent by any

6    lawful means under the 8.31 Minnesota statute.  I don't know

7    if their intention is to give it back to individual

8    consumers to make them whole for any damages they are not

9    made whole with in the MDL or if it's for a different

10   purpose, but perhaps the defense counsel can talk a little

11   bit about that, but I can tell you that it does not state in

12   that settlement that this is going to be apportioned and

13   ascribed to individually approved damages.  I don't know

14   what process they are willing to apply, but none of the

15   attorney general -- current attorney general settlements, to

16   my knowledge, call for a full restitutionary model where

17   people will be made whole, although one may -- I believe one

18   talks about backing up this settlement and says if anybody

19   feels they haven't gotten enough there, they can perhaps

20   make a claim against the fund here.

21             Our feeling about the attorney general settlements

22   is that, you know, we think it's fantastic.  We gave some

23   extra time, as you know, at the end of the year last year to

24   try to make those settlements, give that time to happen, and

25   we feel that we're part of that.  We feel that all of this

1     is a part of the same problem being resolved.  Perhaps more

2     attorney general -- attorney generals will step forward.

3              But, you know, if somebody is making a claim here,

4     we're not asking -- all we're saying is, Did you have a loss

5     and have you been reimbursed yet, and they can make a claim.

6     If there's a separate process set up by an attorney general

7     that may make the citizens of certain states whole, great.

8     We certainly are not purporting to make anybody whole.

9     That's not the nature of litigation, but I think that states

10    with terrific attorney generals, like Minnesota, perhaps the

11    people deserve a little bit more.

12             But if Your Honor has more questions about the

13    attorney general settlements, I would be happy, but, again,

14    I'm not the most --

15             THE COURT:  Okay.  Continue.

16             MR. GUDMUNDSON:  Okay.  A note about class

17    certification.  We think it's all in the papers.  I don't

18    intend to go through the elements of class certification,

19    unless Your Honor is concerned.

20             THE COURT:  No.

21             MR. GUDMUNDSON:  Timing.  The timing that we're

22    considering is set forth both in the motion papers and in

23    the proposed order.  We're generally looking at notice going

24    out in about 45 days.  People will have a minimum of 45 days

25    to consider whether to file a claim, opt-out or object.

1        We have it scheduled to file a petition for

2   attorneys fees within 130 days, about five months, and the

3   final fairness hearing scheduled sometime after that, with

4   the final approval motion coming in at least two weeks

5   prior.  That ultimate timing for the final fairness hearing,

6   by my math, looks somewhere about July or August, depending

7   on the court's schedule and inclination to grant the

8   preliminary approval motion and timing of that, but that's

9   the general time frame of that.

10       Just some concluding remarks.  I'll reiterate that

11  we are pleased with the settlement.  We'd like to see

12  preliminary approval granted.  We certainly stand ready to

13  provide whether -- whatever further information the court

14  would like to see.

15       We had -- I would be very remiss if I didn't

16  mention the simply outstanding PSE we had in this case.  We

17  had heavy lifting across the board that resulted in a lot of

18  work, but a lot of work was required, and the efforts of the

19  firms that were involved in this case was simply

20  outstanding, perhaps one of the best team efforts I've ever

21  been a part of.

22       The class representatives are owed an incredible

23  amount of credit.  Each of them stood willing to do whatever

24  it took.  25 of them were deposed.  All of them collected

25  documents and provided the information that was required.

1    They believe very, very strongly in the settlement and in

2    this effort, and they cooperated and participated to an

3    amazing degree.

4         I know that Judge Menendez is not here, but during

5    2018 she called it the summer of discovery, and we spent

6    four or five months doing so much discovery.  It almost is

7    unsparing, frankly.  And those class reps getting 25, 30

8    people in the right place at the right time, prepared and

9    their documents in order and, frankly, working with defense

10   counsel to make sure the thing worked on their end that we

11   could take their depositions and get their documents in

12   place and get them reviewed all simultaneously, was quite an

13   effort and I was very proud to be a part of it.

14        One final word.  I think that I would be remiss if

15   I didn't mention the good relationship that I personally had

16   with defense counsel, especially Mr. Lobel and Mr. McNab.

17   We established very early that we wouldn't agree on very

18   much, but we would have a high degree of candor and with

19   that I think helped us through the summer of discovery and

20   it also helped -- helped us talk turkey in the end to try to

21   get something done that would be a good result for

22   everybody.

23        So with that, I will sit down and leave it for the

24   court to let me know of any further thoughts.

25             THE COURT:  Thank you.

1          MR. LOBEL:  Good morning again, Your Honor.

2     Douglas Lobel for CenturyLink.

3          THE COURT:  Good morning.

4          MR. LOBEL:  Your Honor, we do fully support the

5     settlement on behalf of CenturyLink, and we do think it is

6     fair, reasonable and adequate, and I'm very much in

7     agreement with what Mr. Gudmundson said throughout his

8     remarks.

9          As you know, there was an enormous amount of work

10    done on this case, and it was very contentious at the

11    beginning and everyone -- we didn't agree on much.  And

12    eventually when we all had the idea to explore the

13    possibility of resolution, it was by no means a foregone

14    conclusion.  And you even may note in Judge Phillips'

15    declaration, he indicates that.  And we had a very difficult

16    day with him, and we didn't walk away with a resolution, but

17    we kept at it.  And as much of the hard work that we did in

18    disputing each other and litigating, we then put into the

19    possibility of resolution and we reached what we think is a

20    very good result, which is clearly discounted for the risk

21    that both parties had in this litigation, but we think we've

22    come to a place that makes a lot of sense for the class and

23    is a good result for the class and also for the company.

24         And this company, Your Honor -- you mentioned the

25    state settlements.  This company has now reached settlements

1    with four states, in the process of resolving the Arizona

2    issues and will shortly be entering into a settlement with

3    Arizona.  This company has stepped up and is trying to do

4    the right thing, is trying to get past this period of its

5    history where it's spending so much of its effort, time and

6    money litigating these issues with its customers and wants

7    to move past that to serving its customers and improving its

8    services to its customers.

9         And one other thing that is notable in the state

10   settlements and also in this federal proposed settlement is

11   these process improvements that the company has agreed to

12   enter into because the company wants to.  The company is a

13   good company made of -- made up of very good people, and

14   they want to get past these problems, the perceptions in the

15   press, the issues with complaints, and they want to do the

16   right thing for these customers, and this is -- and that's

17   why we readily agreed to these improvements, and we think

18   that it's brought us to a better place.  So we want to

19   continue that and continue this process with the federal

20   settlement.

21        And with that said, I'm happy to answer any

22   questions the court may have.

23        THE COURT:  Well, I'm glad to hear that the state

24   matters are coming to a conclusion and successfully coming

25   to a conclusion.  So that would be --

1          One question I have for you, dealing with the

2     notice language for those state cases for either opting in

3     or opting out, do you think there should be specific

4     language to make sure it's clear that there's several

5     opportunities for them to --

6          MR. LOBEL:  Your Honor, we don't believe that

7     people can participate in the state settlements only if they

8     opt-out of the federal settlement.  We don't think that's

9     necessary.

10          The state settlements are structured where pools

11     of money were agreed to as part of an agreement to resolve

12     contested litigation.  And let me, for example, read you the

13     language in the Minnesota settlement.  The money that was

14     dedicated to the settlement is to be used for "any lawful

15     purpose in the attorney general's sole discretion."  And we

16     know from speaking to the attorney general that there are

17     costs of investigation, there are other significant costs

18     that -- and it's their decision solely and in their sole

19     discretion whether any of that money goes to the consumers

20     or whether all of that money goes, but it's not necessary

21     for them to opt-out of this proposed settlement in order to

22     share in those moneys.

23          THE COURT:  Okay.

24          MR. LOBEL:  Now, I think we all recognize they

25     can't double recover, but that's something that the attorney

1    general will have to work out in each of those states, and

2    we don't see that as really part of the settlement.

3             THE COURT:  Okay.  So you don't think there will

4    be a confusion by our notice to the consumers?  That's what

5    my concern is.

6             MR. LOBEL:  I understand your concern, Your Honor,

7    and that's something that we need to look at.  I don't --

8    you know, these have been ongoing.  In fact, these

9    settlements I believe were all struck after we filed our --

10   or the plaintiffs filed the motion.  So, in other words, the

11   notice language was crafted before the state settlements,

12   but -- and, you know, I certainly will not stand up here and

13   say that consumers can't be confused, because they can be.

14   This is a confusing process.

15            THE COURT:  It is.

16            MR. LOBEL:  We all get these notices in the mail,

17   and those of us that know the process are sometimes

18   confused, but, in any event, no, we think that the notice

19   language is adequate to put the consumers on notice.  And,

20   again, the states will do what the states will do.

21            THE COURT:  All right.  Thank you.

22            MR. LOBEL:  Any further questions, Your Honor?

23            THE COURT:  No.

24            MR. LOBEL:  Thank you.

25            THE COURT:  Thank you.

1          Anything else?  Anybody else wish to be heard?

2          Anyone on the phone wishes to be heard?

3          MR. BLATCHLEY:  No, but thank you, Your Honor.

4          THE COURT:  All right.  Well, I will again review

5     the order; and with no objections, I more than likely will

6     sign it and get the dates out.

7          All right.  Anything else that we need to talk

8     about?

9          MR. LOBEL:  No, Your Honor.

10          MR. MCNAB:  No, Your Honor.

11          MR. GUDMUNDSON:  No, Your Honor.

12          THE COURT:  Well, thank you.

13          And this is part of the process of we hear so

14     much -- I have to turn the radio off and the TV off.

15     Everyone is talking about the schism in this country about

16     people not trusting each other.  And it's just not the

17     government, but it's also business.  And if a customer can't

18     get satisfaction, that just makes the irritation about the

19     whole world is against them.

20          And I'm glad to hear that both sides feel that

21     CenturyLink has come to grips with this problem and is

22     trying to solve the problem.  If customers can get good

23     service, then that helps the whole country.  And I know how

24     irritating it is to be on the phone for hours trying to get

25     something settled.  And so it's good that we're -- hopefully

1    we're moving in the right direction here, both for the

2    customers and for the company.

3            And so I'll sign the preliminary order, and we'll

4    see where we are at the final hearing.  All right?

5            Thank you.

6            THE CLERK:  All rise.

7        (Court adjourned at 10:38 a.m., 01-22-2020.)

8                        *   *   *

9            I, Renee A. Rogge, certify that the foregoing is a

10    correct transcript from the record of proceedings in the

11    above-entitled matter.

12                    Certified by:  /s/Renee A. Rogge
                                    Renee A. Rogge, RMR-CRR
13

14

15

16

17

18

19

20

21

22

23

24

25