1        UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                    )
      In Re:  CenturyLink Sales     )   File No. 17MD2795
4     Practices and Securities      )       (MJD/KMM)
      Litigation                    )
5                                   )
                                    )   Minneapolis, Minnesota
6                                   )   February 20, 2020
                                    )   2:05 P.M.
7                                   )
                                    )
8                                   )
      ------------------------------------------------------------
9

10

11        BEFORE THE HONORABLE JUDGE MICHAEL J. DAVIS
              UNITED STATES DISTRICT COURT
12                   **(MOTION HEARING)**

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        APPEARANCES

 2        For the Plaintiffs:      Zimmerman Reed, PLLP
                                   BRIAN C. GUDMUNDSON, ESQ.
 3                                 CAROLYN G. ANDERSON, ESQ.
                                   HART L. ROBINOVITCH, ESQ.
 4                                 (Via telephone)
                                   80 South Eighth Street
 5                                 Suite 1100
                                   Minneapolis, MN 55402
 6
                                   Hellmuth & Johnson
 7                                 ANNE T. REGAN, ESQ.
                                   8050 West 78th Street
 8                                 Edina, MN 55439

 9        For the Defendants:      Winthrop & Weinstine, P.A.
                                   WILLIAM A. McNAB, ESQ.
10                                 225 South Sixth Street
                                   Suite 3500
11                                 Minneapolis, MN 55402

12                                 Blackwell Burke PA
                                   JERRY W. BLACKWELL, ESQ.
13                                 431 South Seventh Street
                                   Suite 2500
14                                 Minneapolis, MN 55415

15                                 Cooley LLP
                                   ELIZABETH WRIGHT, ESQ.
16                                 JEFFREY M. GUTKIN, ESQ.
                                   (Via telephone)
17                                 101 California Street
                                   Suite Fifth Floor
18                                 San Francisco, CA 94111

19                                 Cooley LLP
                                   DOUGLAS P. LOBEL, ESQ.
20                                 (Via telephone)
                                   11951 Freedom Drive
21                                 Suite 1500
                                   Reston, VA 20190
22
                                   Wheeler Trigg O'Donnell LLP
23                                 MICHAEL T. WILLIAMS, ESQ.
                                   370 17th Street
24                                 Suite 4500
                                   Denver, CO 80202
25
```

```
 1        For the Movants:           Keller Lenkner
                                     WARREN D. POSTMAN, ESQ.
 2                                   1300 I Street, N.W.
                                     Suite 400E
 3                                   Washington, D.C. 20005

 4                                   Hoff Barry
                                     JARED D. SHEPHERD, ESQ.
 5                                   100 Prairie Center Drive
                                     Suite 200
 6                                   Eden Prairie, MN 55344

 7
          Court Reporter:           KRISTINE MOUSSEAU, CRR-RPR
 8                                   300 South Fourth Street
                                     Suite 1005
 9                                   Minneapolis, MN 55415

10

11

12        Proceedings recorded by mechanical stenography;
          transcript produced by computer.
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                          2:05 P.M.

2

3                     (In open court.)

4         THE COURT:  Good afternoon.  Please be seated.

5    Let's call this matter, please.

6         THE CLERK:  In Re:  CenturyLink Sales Practices

7    and Securities Litigation, 17MD2795.  Counsel, please state

8    your appearances for the record.

9         MR. POSTMAN:  Good afternoon, Your Honor.  Warren

10   Postman and Jared Shepherd for movants.

11        THE COURT:  Good afternoon.

12        MR. GUDMUNDSON:  Good afternoon, Your Honor.

13   Brian Gudmundson, Zimmerman Reed, on behalf of plaintiffs.

14        MS. ANDERSON:  Good afternoon.  Carolyn Anderson

15   on behalf of plaintiffs.

16        THE COURT:  Good afternoon.

17        MS. REGAN:  Anne Regan on behalf of plaintiffs.

18        THE COURT:  Good afternoon.

19        MR. McNAB:  Good afternoon, Judge.  Bill McNab on

20   behalf of CenturyLink and the proposed intervenors.

21        THE COURT:  Good afternoon.

22        MR. WILLIAMS:  Good afternoon, Judge.  Mike

23   Williams on behalf of the defendants and intervenors.

24        THE COURT:  Good afternoon.

25        MS. WRIGHT:  Elizabeth Wright on behalf of
```

1    CenturyLink and the intervenors.

2              MR. BLACKWELL:  Good afternoon, Your Honor.

3    Jerry Blackwell on behalf of CenturyLink and intervenors.

4              THE COURT:  Good afternoon, Mr. Blackwell.  You

5    were way in the back last time.

6              MR. BLACKWELL:  Not that far back.

7              THE COURT:  Why am I having this hearing?  I need

8    to know what is going on here.  I don't like in and around

9    my orders.  Oh, let's find out who is on the phone.

10             MR. LOBEL:  Good afternoon, Your Honor.  This is

11   Douglas Lobel on behalf of CenturyLink and the intervenors.

12             THE COURT:  Good afternoon.

13             MR. ROBINOVITCH:  Good afternoon.  Hart

14   Robinovitch from Zimmerman Reed on behalf of plaintiffs.

15             MR. GUTKIN:  Good afternoon, Your Honor.  Jeff

16   Gutkin from the Cooley firm for CenturyLink and the

17   intervenors.

18             THE COURT:  All right.  Good afternoon.  Who

19   wants to take the lead and tell me why they're trying to

20   fool me on this case?

21             MR. POSTMAN:  It's our motion, Your Honor, so I'm

22   happy to explain the rationale for the motion.  So you've

23   asked for a broader explanation.  I will start broad and go

24   narrow.  Please point me more narrowly if you have specific

25   questions.  Our law firm represents thousands of individual

1   clients.

2           THE COURT:  I expected you to be here when we had

3   the initial hearing giving us the preliminary approval.

4           MR. POSTMAN:  Yes, Your Honor.  Our view --

5           THE COURT:  We looked out in the hallway,

6   downstairs, upstairs, in the building, calling out your

7   name.

8           MR. POSTMAN:  Yes, Your Honor.

9           THE COURT:  Go ahead.

10          MR. POSTMAN:  I am sorry.  Our view is that our

11  clients have a contractual right that is protected by the

12  Federal Arbitration Act not to have to participate in court

13  proceedings.  We --

14          THE COURT:  Have you had opted out?  Are you

15  planning to opt out?

16          MR. POSTMAN:  We will opt out all the clients who

17  want to be opted out.  We I think agree, everybody agrees

18  that our clients should be fully informed of the terms of

19  the settlement and have an uninhibited choice to

20  participate in the settlement.

21          For those who want to continue to pursue

22  arbitrations, we think that is their right.

23          THE COURT:  What about the three people that

24  you've, you have named here?

25          MR. POSTMAN:  They have reviewed the settlement

1    already and the motions in support of it, and they have

2    said they want to proceed with arbitration.  To make very

3    clear, separately from the opt-out right that Rule 23

4    provides, the Federal Arbitration Act and arbitration

5    agreement provide something very different that I think

6    places this case and this motion in an entirely different

7    context from the ordinary Rule 23 context.

8            If I can use a hypothetical, imagine that

9    CenturyLink had a contract with all its consumers that said

10   we promise we will never try to release your claims in any

11   class action unless you affirmatively agree.  I think that

12   the FAA would clearly, if this was part of an arbitration

13   agreement, prohibit what is going on here.

14           THE COURT:  Has your -- have your clients paid

15   the arbitration fees so we can get past that step?

16           MR. POSTMAN:  A thousand clients have.  The

17   others have been waiting to see how -- CenturyLink has been

18   fighting hard to not proceed with them.  To drive home the

19   hypothetical, though, what I want to make clear is, the

20   actual agreement that applies here is not materially

21   different.  That is what arbitration with a class waiver

22   means.  It means they promise not to resolve our clients'

23   claims in a class action.

24           Now, our clients can waive that.  We don't

25   dispute it, but that takes an affirmative step.  You don't

1    lose your contract right because someone sends you a notice

2    and says, hey, you want to give this up, and you don't

3    respond and you've lost the very right to not be involved

4    in that.  So that's broader context to your question of why

5    we did not show up.

6            And I don't want to assume, but I could

7    understand if Your Honor has frustration arising from the

8    fact that this has been a long, large case and that this is

9    an additional hurdle to resolving it.  I understand that.

10   Respectfully, I think the responsibility for that lies with

11   parties who ask for an injunction that under clear Eighth

12   Circuit precedent in my view is not lawful.

13           THE COURT:  Well, I run marathons.  I don't run

14   sprints.  I have an MDL that has been going on since, what,

15   1983.

16           MR. POSTMAN:  As I said, I don't want to presume.

17   I just want to --

18           THE COURT:  From 9,000 cases down to 2.  So, so

19   I'm here for the long haul.

20           MR. POSTMAN:  Thank you, Your Honor.  I think

21   with that context it's important to return to the fact that

22   this injunction in my view clearly conflicts with Section

23   3(b) of *Piper Funds*.  There is two separate sections in

24   that opinion.  There is two separate holdings reversing two

25   separate orders, and Section 3(b) says that the FAA

1    requires arbitration agreements to be enforced and that an

2    injunction prohibiting them from being enforced violates

3    the FAA.

4          The facts that the parties point to to try to get

5    around *Piper*, it's actually remarkable.  They're all from

6    separate section of *Piper*.  Every time you see a pin cite

7    to 304, that's the discussion of the opt-out order section.

8    There is no real analysis respectfully from the parties

9    about how it can be consistent with the Federal Arbitration

10   Act to render unenforceable an arbitration agreement when

11   the FAA expressly says that is what cannot happen.  It must

12   be enforceable.

13         *Piper* says even for a time, if the agreement is

14   rendered unenforceable even for a time, that is contrary to

15   the FAA.  So we think we are extremely likely, virtually

16   certain, to prevail on appeal on that question, and with

17   that in mind, I think it makes the rest of the stay factors

18   tip heavily in favor of a stay or actually just revising,

19   eliminating the injunction which would avoid the need for

20   the appeal.

21         You know, on injury to movants, Piper itself said

22   in the opt-out section of the opinion, even being delayed

23   in your right to arbitrate for a time frustrates the

24   purpose of the arbitration agreement.  That's an injury by

25   itself.  Belated enforcement of the arbitration clause, I

1   am quoting, significantly disappoints the expectations of

2   the parties.

3          Now CenturyLink in their briefing on this motion

4   raises arguments about why they don't think they should

5   have to proceed with movants' arbitrations, but I think

6   that gets ahead of the game.  There is no real dispute that

7   movants are barred by the injunction from seeking

8   arbitration, and that's the right that they have that's

9   protected under the Federal Arbitration Act.

10          So injury to movants I think is established under

11  *Piper*.  If we look at injury to the other class members,

12  plaintiffs basically say that they don't want to let

13  movants opt out because it would reduce CenturyLink's

14  motivation to settle.  I think that's a pretty stark

15  admission that plaintiffs are trying to subjugate the

16  interest of movants for the benefit of the rest of the

17  class.

18          I don't think that's permissible or an interest

19  that should weigh against the stay, and that's at page five

20  of their decision where they say that defendant would have

21  a reduced incentive to settle.  I am sorry.  Page five of

22  their opposition.  I also note there is no benefit to the

23  class to putting this issue off if there is reversal in the

24  Eighth Circuit and it comes back and having this be

25  disrupted months from now when it can be resolved now.

1          Then that brings us to the injury to CenturyLink.

2     I understand why they don't want to face additional claims

3     and additional risk of liability, but they don't have any

4     cognizable interest in avoiding that.  I think we all know

5     that this very settlement and this action is substantially

6     lower because plaintiffs needed to calculate and take

7     account of the real risk that the entire case would be

8     compelled to arbitration.

9          CenturyLink has obtained a major benefit from

10    saying that these claims should be taken to arbitration.

11    The very relief they were seeking compelling arbitration is

12    now what they are saying is irreparable harm to them.  I

13    don't think they can have it both ways.  If they say we're

14    going to force people to go arbitrate and then a

15    substantial number take them up on it, there may be

16    questions about the process, and I'm happy to talk about

17    that.

18         But the idea that they can't even start, it's

19    contrary to the FAA, and their obligation to honor their

20    contract is not an injury for purposes of this analysis.  I

21    think the public interest factor follows from the FAA

22    holding in *Piper* that even a temporary injunction or

23    frustration of the ability to arbitrate is a violation of

24    the statute, and a violation of the statute is against the

25    public interest.

1          So I think that at a minimum, the Court should

2     stay, or as I noted, I think this could all go away if it

3     lifted the injunction.  I will also note, there are

4     basically no decisions supporting this that address the

5     FAA.  All the cases they cite, the parties cite, *Uponor*,

6     *Medtronic*, *Zurn* where there is an injunction enjoining

7     arbitration, this is part of a boilerplate order.

8          Mostly if you look at the facts, I don't think

9     there was even an arbitration agreement in existence.  None

10    of them mention the FAA, but *Medtronic*, for example, was a

11    stock drop securities class action, and as far as I'm

12    aware, there is no publicly-traded entity yet that has an

13    arbitration agreement covering those claims.  Arbitration

14    wasn't even on the horizon.  It was just in the

15    boilerplate, and it was dropped into the order.

16          There is no case, and likely because of *Piper,*

17    holding where it was actually litigated that it's

18    consistent with the FAA to enjoin the parties' ability to

19    pursue arbitration.  So that's why I think the injunction

20    should be stayed or lifted.  There is also the question

21    that the parties have touched on about whether the rest of

22    the order should be stayed and the opt-out process.

23          So for purposes of the stay motion, I'm not sure

24    the Court needs to stay the rest of the orders or address

25    opt-out issues.  If the injunction is gone, that was the

1   basis for us rushing into court, but if the Court is either

2   considering leaving the injunction in place or just wants

3   to be pragmatic about this and think about the broader

4   question of how to deal with this, I think it's important.

5           *Piper* also says, we're now moving to the second

6   holding and second order addressed in *Piper*, that parties

7   to an arbitration agreement if they want to pursue

8   arbitration have to be allowed to opt out, and they have to

9   be allowed to opt out outside the formal process of Rule 23

10  if they wish.

11          And that was, that was the holding I think that

12  we agree *Piper* said, at least in that case.  We will argue

13  about distinguishing facts, and so I would say one way to

14  make this very simple is to lift the injunction, which

15  violates the FAA, and say that if a claimant seeking

16  injunction submits the same sort of opt-out as in *Piper*,

17  then they're opted out.

18          If that's, if that happens, we have no argument

19  with the rest of the class proceeding, and that follows

20  straight from *Piper*.  So if you have other questions, I'm

21  happy to address them.

22          THE COURT:  Thank you.

23          MR. McNAB:  Good afternoon again, Your Honor.

24  Bill McNab on behalf of CenturyLink and the proposed

25  intervenors.  I hardly know where to begin.  Counsel

1     mentioned rushing into court, a month late and a dollar

2     short as Your Honor pointed out.  Now, they had no notice

3     and opportunity and could have prevented what has now

4     happened, which is an interruption in a court ordered

5     process.  The Court is well aware of that.

6              I guess I would begin by saying that we believe

7     the Court should be entirely comfortable with the

8     preliminary approval order as entered, including the

9     temporary injunction, because every bit of it is proper and

10    fully comports with Rule 23, the FAA, the due process

11    clause and the All Writs Act.  There is neither a need nor

12    a justification for a stay of any part of the Court's

13    order.

14             Now, I'll cut to the chase in a moment, but I'm

15    going to back up and just say that it appears there is one

16    thing we agree with the movants on, and that is the

17    applicable standard, and that is that there are four things

18    that they have to show in order to be eligible for a stay

19    of this Court's order:  A strong likelihood of success on

20    the merits, irreparable harm, no substantial harm to the

21    other parties in the matter and that the motion serves the

22    public interest.

23             In this instance, Your Honor, they failed not

24    only to show all of them or any of them, they missed the

25    boat on all of them.  Now, Mr. Postman's argument today,

1    and this has been the case both in their initial brief and

2    in their reply brief that they filed, I believe, or

3    sometime yesterday, that Your Honor's order violates the

4    FAA.  I think they're wrong.

5            What they say, at least for purposes of

6    likelihood of success on the merits, what they say is that,

7    well, Section 2 provides that agreements to arbitrate shall

8    be valid, irrevocable and enforceable, save upon such

9    grounds as exist at law or in equity for the revocation of

10   any contract.  Well enough.  That is what it says.

11           What is glaringly missing here, though, Your

12   Honor, in the record before this Court is any agreement to

13   arbitrate they have not established.  We have tried for

14   months.  We have asked these folks through their counsel to

15   tell us, What services did you procure from CenturyLink?

16   When did you procure those services?  What claims?  What

17   problems?  What complaints do you have with those services,

18   and most of all, what arbitration agreement or agreements

19   are you claiming apply?

20           They have provided none.  Now, Your Honor, it's

21   axiomatic that one cannot invoke the FAA without an actual

22   agreement to arbitrate.  So until it's demonstrated, we

23   spent months trying to demonstrate that the 35 roughly

24   named plaintiffs had enforceable arbitration agreements,

25   and Mr. Gudmundson and his colleagues spent an equal amount

1    of time trying to demonstrate to the Court that they did

2    not exist or they were not enforceable.  That has never

3    been decided even with respect to those for whom evidence

4    was gathered and put before the Court.

5            So here, we've got three people saying we have

6    rights under the FAA, but they have not pointed to a

7    contract that provides them a right to arbitrate.  Now,

8    with respect to *Piper*, it does not say in any way that the

9    FAA prohibits injunctions of arbitration.  It merely says

10   that Section 16 allows appeal of interlocutory injunctions.

11           It's really important to note that the *Piper*

12   court left in place the District Court's injunction with

13   respect to every non-named or unnamed class member with the

14   exception of Park Nicollet, a sophisticated institutional

15   investor with a very unique arbitration agreement.  Number

16   one, it was unique at least with respect to this case

17   because it was before the court.

18           Number two, it was unique because it was

19   undisputed that it was the contract, that it was valid; and

20   three, it was unique because it said that Park Nicollet had

21   the immediate right to arbitrate.  Here, we certainly don't

22   have a contract.  We don't have a contract that is

23   undisputed, and we don't have a contract that says that any

24   of these claimants or these movants have an immediate right

25   to the arbitral forum, and that's the only party for whom

1      the Eighth Circuit carved out the injunction.

2            If the Eighth Circuit thought that injunctions

3      that could bar an arbitration were in violation of the FAA,

4      it would have said so.  It would have vacated the

5      injunction in its entirety.  Your Honor, Counsel also noted

6      that that's the only case and there is no case that

7      supports defendants' and plaintiffs' position with respect

8      to the injunction, but that's not right.

9            The Eighth Circuit has visited this issue three

10     times, and admittedly, the circumstances have been

11     different in each of those cases.  They differ from each

12     other, and to some extent they differ from this case, but

13     the upshot is that in 1994 in *YA Group Securities*, the

14     Court of Appeals considered, the Eighth Circuit considered,

15     whether a District Court's injunction of an arbitration was

16     enforceable, and it affirmed.

17            In *Piper Funds* that we've just talked about in

18     1995, the Court of Appeals left the injunction in place

19     with respect to all of the unnamed class members with one

20     exception, a very unique institutional investor with a very

21     unique contract.

22            And number three, *Bank of America* in 2010, again,

23     the court affirmed an injunction notwithstanding discussion

24     of both the FAA and the due process clause, the Court of

25     Appeals upheld the District Court's injunction prohibiting

1    arbitration.  So it is clear that the Eighth Circuit does

2    not have a per se prohibition.  It does not consider that

3    the FAA itself per se prohibits injunctions, and the

4    circuit has itself affirmed them, let's call it, two and a

5    half times out of three.

6              For those reasons, we think it's very unlikely

7    that plaintiffs will prevail on the appeal.  They also fail

8    on the other necessary showings, as I mentioned.  For

9    example, irreparable harm.  Well, let me back up.

10             With respect to the due process clause, *Bank of

11   America* expressly held that the injunction did not violate

12   the due process clause notwithstanding the parties' claim

13   that it did.  Now, movants have argued, well, that's

14   different because that was a party and we're nonparties,

15   but of course it's well settled U. S. Supreme Court

16   jurisdiction that the All Writs Act grants this court

17   authority to enjoin nonparties, as well as parties, in

18   furtherance of the court's jurisdiction.

19             Second, and perhaps more important and as the

20   Court sort of began these proceedings with, clearly movants

21   had notice, actual notice and opportunity to be heard.

22   They chose intentionally or negligently -- I don't know.

23   Maybe they forgot to show -- well, actually I believe I saw

24   one of their attorneys in the back of the room the day of

25   the preliminary approval hearing.  Now, I can't swear to

1    that, but I kind of think they actually were here.  They

2    just chose not to be heard.

3            So I don't think they can come to this Court or

4    run to the Eighth Circuit and say they have been deprived

5    constitutional due process, notice and opportunity to be

6    heard, when they were actually here and chose not to speak.

7            I'll be quick on irreparable harm.  They have not

8    showed that any brief temporary delay in arbitration

9    proceeding necessitates an irreparable harm, and with

10   respect to harm to the other parties, the Court is well

11   aware we are well underway with the claims administrator.

12   We have printed some four million inserts that were to go

13   out with bills that now may not be usable.

14           We had incurred tens of thousands of dollars of

15   costs in that process, and this motion knocked that off the

16   rails.  In the meantime, the stay that plaintiffs are

17   asking this Court to enter and the shenanigans that they

18   are planning to bring before the Eighth Circuit potentially

19   jeopardized the recovery by some 17 million people.

20           And with respect to the public interest, this

21   Court knows well the public has a significant interest in

22   the orderly resolution of large, complex multi district

23   litigation.  Here the Court is overseeing the proposed

24   resolution of some 19 multi state or nationwide class

25   actions involving some 17 million consumers and in

1    something like 38 states.  And getting those cases resolved

2    fully, fairly, finally and in accordance with Rule 23 is in

3    this Court's interest, the interest of the originating

4    courts and therefore in the interests of the public.

5              So finally, I would just say with respect to this

6    question about opting out, it's curious the position that

7    the movants' counsel has taken today is somewhat different

8    than in the reply brief that was filed yesterday, which on

9    page 7 says that the second issue, they refer to the second

10   *Piper* issue, as whether or not *Piper* should have been

11   allowed to opt out outside of the terms of the preliminary

12   approval order, they refer to that as the second issue.

13             They say it's irrelevant here because movants are

14   not attempting to opt out of the proposed class.  So I

15   don't know if they have changed their position since

16   yesterday, but it is our position, Your Honor, as we put

17   before the Court, these plaintiffs have now said -- these

18   movants have now said to you that they represent thousands

19   or tens of thousands of individuals.

20             We have put before Your Honor a record that

21   demonstrates they have taken a position that they cannot

22   give these tens of thousands of clients even 15 minutes of

23   their time.  So with that in mind, it seems to me and to us

24   that the best thing for all class members, whether they've

25   already signed up with these folks, whether they see Google

1    ads and pop-up ads out there or Facebook ads or not, the

2    fair and right and conservative thing to do is make sure

3    that all of the putative class members receive the same

4    court approved notice from the court approved administrator

5    in the same way in the same time.

6          And then with that proper Rule 23 process ensured

7    for everyone, if a party chooses to opt out, that's what

8    Rule 23 says they can do, but they opt out in accordance

9    with the mechanisms that Rule 23 requires and that Your

10   Honor placed in your order.

11         That way all of the putative class members are

12   treated the same, and that to me just seems fair and

13   responsible.  So unless you have any questions.

14         THE COURT:  Thank you.

15         MR. McNAB:  Thank you, Your Honor.

16         THE COURT:  Good afternoon.

17         MR. GUDMUNDSON:  Good afternoon, Your Honor.  The

18   movants have a really big problem here, and that's the

19   *Piper* case.  The *Piper* case forecloses them from doing

20   anything, either here or at the Eighth Circuit, if they

21   don't opt out, and the language could not be possibly

22   clearer.

23         I'm going to read it into the record.  I think

24   it's important.  I think it's important because Mr. Postman

25   in his briefing in front of you today looked you in the eye

1    and said that there were two separate holdings:  One about

2    a March 3rd order related to the entry of an injunction,

3    and the Eighth Circuit addressed the second order on April

4    3rd related to the denial of an opt-out.

5            Let me read the conclusion.  It's listed under a

6    title called Conclusion in the order of *Piper*.  This is a

7    quote.  "The District Court's March 3rd order," that's a

8    preliminary approval order within the injunction, "and the

9    April 3rd order," denying the opt-out, "are reversed

10   insofar as and only insofar as they affect Park Nicollet

11   Medical Foundation."

12           Everything was held in place except for Park

13   Nicollet Medical Foundation.  Why is that?  On page 304,

14   which Mr. Postman doesn't like and I agree, he shouldn't

15   like it, is the conclusion of the analysis on the court's

16   denial of an opt-out request at the District Court level,

17   and the Eighth Circuit said, quote, "In these

18   circumstances, the court abused its discretion in refusing

19   to enter an order excluding Park Nicollet from the class."

20           Your Honor, it's the plaintiffs' position, it's

21   stated as clearly as can be in our papers, and I will state

22   it as clearly as I can to you today.  We have received no

23   opt-out requests from these movants.  If they do, we're

24   obliged to follow *Piper*.  If they satisfy *Piper* and if they

25   satisfy the settlement agreement, they ought to be gone,

 1     but that's not what they want.

 2           The reply just came in yesterday.  I'm not sure

 3     who all has had a chance to read it yet, but it goes on at

 4     some length about Section 2 of the FAA, and what

 5     Mr. Postman really wants, I believe, is to stay in the MDL

 6     and do what he wants with his clients.

 7           The issue with that is that the judicial panel in

 8     a multi district litigation saw fit to create an MDL and

 9     consolidate all of the cases here before Your Honor, and

10     Your Honor saw fit to appoint lead counsel in this case,

11     and lead counsel made a different strategic decision.

12           We didn't decide to pursue 17.2 million

13     individual arbitrations for obvious reasons.  We don't

14     skive anybody's desire to go pursue a litigation strategy

15     they want.  Perhaps, Mr. Postman thinks he can represent

16     22,000 people capably in arbitration, but for the past

17     several years and to the tune of multi millions of dollars

18     of Lodestar time, attorney time, expenses, we have fought

19     the notion that arbitration should apply in this case.

20           Central to Mr. Postman's reply arguments and what

21     he is telling you today is that once you invoke Section 2

22     of the FAA and say that I have a right to arbitrate, I get

23     to go arbitrate no matter what.  Well, I would respectfully

24     submit, because I have been involved in a lot of it, there

25     are literally mountains of decisions on when a party is not

1   obligated to arbitrate.

2          Circumstances such as waiver, unconscionability,

3   conspicuousness, a lot of things that were talked about in

4   the hundreds and hundreds of pages of briefing before Your

5   Honor.  They can't stay in and do what they want.  They

6   must opt out if they are to get what they want.  So what

7   about this motion?

8          We've got a motion to stay the entire settlement

9   for 17.2 million people pending appeal before the Eighth

10  Circuit that has been brought before Your Honor.  Certainly

11  CenturyLink counsel invited them to appear at the

12  preliminary approval hearing by virtue of their

13  supplemental brief in support of preliminary approval,

14  which one would have thought would have invoked most

15  anybody to come and appear to defend their actions, but

16  they didn't.

17         The first stay issue is whether Keller Lenkner

18  and their clients can win on the merits of their appeal.

19  They cannot.  They simply cannot.  It will not take Your

20  Honor or anybody else very long to read that *Piper* case and

21  realize you have to opt out if you're going to do what you

22  want, and if you do, they're gone.

23         If they satisfy the requirements of *Piper* and

24  they satisfy or arguably satisfy, we have not seen any

25  requests for an opt-out, the terms of the settlement

1     agreement, we are obliged to follow *Piper*, and they can go

2     do whatever they want as far as we're concerned.

3              But the bigger point is, I wouldn't say it's the

4     bigger point, but a primary point is that the injunction

5     itself is valid.  *Piper* said it was valid.  *Piper* said it

6     was valid for every single person other than the one who

7     requested to opt out.  The All Writs Act allows that we

8     brief that.

9              The District Court decisions, Judge Montgomery in

10    *Zurn Pex* and *Uponor* contain almost identical language to

11    the injunction at issue here in a variety of other cases

12    from *Target* to the *Dryer* case to other cases that I've been

13    involved with in this district.  It takes on different

14    forums.

15             It's an okay argument, I guess, to say, well,

16    they didn't raise the issue there, so we don't know if it's

17    legal or not, but I guess I would say, I don't think that

18    Judge Montgomery and I don't think the litigants before

19    federal District Court are in the habit of submitting

20    illegal provisions to sneak one by unwary consumers and

21    other litigants.

22             But the bigger point of course is that *Piper*

23    requires these folks to opt out if they want to get where

24    their going.  I'm going to quote, Mr. McNab quoted itself

25    and said the movants are not willing to opt out.  They put

1     it in the reply brief.  It is inexplicable.  I don't

2     understand it, but there it is.

3           The other big issue as far as we're concerned is

4     the issue of irreparable harm.  There can be no irreparable

5     harm if they opt out and pursue their arbitration.  I fully

6     respect the fact that the plaintiffs in the MDL are in a

7     different position than CenturyLink, who have to deal with

8     opt-outs once they happen, and that CenturyLink counsel may

9     take a different position as to whether they can

10    immediately arbitrate.

11          As far as we're concerned, we have not seen an

12    opt-out request.  If and when we see it, we will measure it

13    against the requirements of *Piper*.  We'll measure it

14    against the requirements of the settlement agreement, and

15    we believe we're obliged to follow *Piper*.

16          We've talked about the concept of strategic delay

17    here.  Did they or did they not appear in court?  Did they

18    or did they not decide to go to the Eighth Circuit instead

19    of Your Honor?  If they did, certainly that's not

20    irreparable harm.  That's a choice to game the system, but

21    it also could have been accidental.

22          It might warrant it if perhaps they didn't know

23    what was going on or something like that and they missed

24    the deadline to submit a motion for reconsideration, but we

25    think that the Court can still provide guidance on the

1    issue of this injunction.

2              The Court is going to be asked to render a ruling

3    with respect to the likelihood of success on the merits,

4    and plaintiffs believe it's important that the Court does

5    so, and one of the reasons is notice.  You received a

6    letter from Mr. Lobel yesterday with which both parties

7    joined, and the nature of that letter talked about the

8    impact that this issue has had on notice.

9              Notice in this case is important because there is

10   a lot of class members.  There is 17.2 million class

11   members, and the parties with the prospect of language

12   being changed within the notice have taken a very cautious

13   approach.  I will say my opinion, of course, is that *Piper*

14   is very clear.

15             We think that the language in the notice as

16   written is okay, but some guidance from Your Honor would be

17   quite helpful, and I'm sure that, that it's eminently

18   possible when ruling on the likelihood of success on the

19   merits.

20             THE COURT:  All right.

21             MR. GUDMUNDSON:  That's really all I had, Your

22   Honor.  If there is anything you want to discuss --

23             THE COURT:  Thank you.  Please.

24             MR. POSTMAN:  Thank you.  Thank you, Your Honor.

25   You know, you'll read *Piper* for yourself.  Obviously I've

1    got to say, this idea that it doesn't say that an

2    injunction against arbitration violates the FAA, I'm

3    reading from page 302 just before 3(b).  The principal

4    issue on this appeal is whether the District Court violated

5    the --

6              THE COURT:  Let me get there.

7              MR. POSTMAN:  I'm sorry.  Pin cite 302, halfway

8    down before where Section 3(b) starts.

9              THE COURT:  Okay.  Go ahead.

10             MR. POSTMAN:  The principal issue on this appeal

11   is whether the District Court violated the FAA as construed

12   in McMahon when it enjoined Park Nicollet from proceeding

13   with an arbitration to which it was contractually

14   entitled."

15             It then has a part B that says the order

16   enjoining arbitration, and it explains why the order was

17   unlawful.  It has a part C that refers to the separate

18   order refusing Park Nicollet's request to opt out and says

19   that refusing to let Park Nicollet opt out was unlawful.

20   Mr. Gudmundson read the conclusion, but he inserted a

21   "because" and "therefore."

22             What it says is that, point 1, the two orders are

23   reversed in so far and only insofar as they affect Park

24   Nicollet, but that doesn't mean everyone else was lawful.

25   That means the court decided the rights of the parties

1   before it.  That is routine for courts to do.  You can't

2   read in, "and therefore everything is okay."

3           The Court held that the order enjoining the

4   arbitration was unlawful as to the parties before it and

5   vacated it, and then it said, "and," not "or," and the

6   District Court's refusal to let the party opt out outside

7   the Rule 23 process based on the letter submitted by its

8   counsel was unlawful.

9           Courts decide the rights of parties before them.

10  As I said, Your Honor, Your Honor of course will draw your

11  own conclusions, but I think the language -- I mean the

12  Court teed up, the question was whether the injunction

13  violated the FAA, and then it said this injunction was

14  unlawful.

15          To be clear, too, we can parse language and words

16  in the order and the conclusion, but what was the reasoning

17  of the decision?  The decision didn't just say here's a

18  bunch of facts and then here's the outcome.  The reason was

19  because the FAA requires that arbitration agreements be

20  enforced, and the injunction rendered it unenforceable.

21          I know we have starkly opposing views of the

22  case, and that's fair.  I think it is inescapable that the

23  injunction is unlawful.  *Bank of America* was a case in

24  which the court held there was no arbitration agreement.

25  So to say the FAA doesn't prohibit the injunction doesn't

1     follow.

2              *Piper* is the most recent case addressing this

3     topic and says expressly that it is unlawful.  I do have to

4     say, and I don't want to get too far into it because I

5     think it's a side show, but the suggestion that we said we

6     cannot represent 10,000 people is based on a misleading

7     characterization of what happened.  What happened was, we

8     filed, we approached CenturyLink and said we would like to

9     file arbitrations.

10             We're happy to work through a reasonable

11    practical way to address this.  If you want to tell us

12    people who you think have a threshold issue who can't go,

13    we're happy to do that.  If you want to talk about some

14    alternative structure, we're happy to do that.  Our view is

15    that these people are barred by the arbitration clause from

16    court, and we're actually going to try to vindicate their

17    rights this way.

18             And CenturyLink said, well, what we demand is

19    that before you bring arbitration, we go through row by row

20    and line by line and spend 15 minutes on each person.  We

21    said that's not required by the agreement.  It just says we

22    present the claim to you, and then you have a chance to

23    resolve it.  If you don't do it, we can go to arbitration.

24    We're happy to discuss a pragmatic practical way to do it,

25    but that's a needless hurdle that we are not going to agree

```
 1    to as an extra contractual requirement.

 2            We nowhere said, oh, we can't represent these

 3    people or we are not going to spend 15 minutes on their

 4    claims, and frankly, the time it took for us to move

 5    forward with these claims is because we put a ton of work

 6    into them.  So I have to correct the record on that.  The

 7    idea that we didn't show up, again, nothing required --

 8    okay.  I'll cut to the chase.

 9            THE COURT:  I had to pull your chain on that one.

10            MR. POSTMAN:  All right.  Thank you.  Understood.

11    I'll cut to the chase.  If, you know, movants had to file

12    very quickly to attack the injunction.  I think, I expect,

13    that when we talk to them and say if the injunction is

14    lifted you can go forward with arbitration, they will opt

15    out.  I think that is the simplest thing.

16            If the injunction is lifted and if our clients

17    can opt out the way the opt-out was done in *Park Nicollet*,

18    which was what *Piper Fund* said had to happen, if those two

19    things happen, we want nothing to do with the MDL.  No

20    offense.  We don't want to be counsel here.  Our clients we

21    will send the Court's notice to.  They will get all the

22    same notice as everyone else anyway, and those who want to

23    opt out, we would opt them out.

24            Those who want to participate, we will help them.

25    We will take zero fees.  We want no fees from any part of
```

1     the settlement.  We would rather, as illustrated, we would

2     rather not be here.  We would just like that our clients

3     who want to arbitrate get their right under the FAA to

4     arbitrate, and we think that's a reasonable request.

5            If you eliminate the injunction and let us opt

6     out the way that it happened in *Piper*, then we're fine.

7            THE COURT:  All right.  Thank you.

8            Mr. McNab, anything further?

9            MR. McNAB:  Very briefly.  Thank you, Your Honor.

10    I just want to say, Mr. Postman kept referring to the

11    agreement.  If they have the agreement, we would love to

12    see it.  He claims that, well, this is what it says, but he

13    won't produce it to the Court or to us.  We don't believe

14    that he can, and yet, he demands that this Court withdraw

15    its injunction because his clients are somehow protected by

16    the FAA.

17           The FAA only applies where there is a valid

18    agreement to arbitrate.  Part of their burden is to

19    demonstrate that that is the situation here, and even then,

20    the cases they cite do not stand for the proposition that a

21    temporary injunction violates the FAA.  Now, with respect

22    to this --

23           THE COURT:  Hold on.  Mr. Postman, you have been

24    challenged.

25           MR. McNAB:  I'm sorry?

1              THE COURT:  Mr. Postman, you have been

2     challenged.  Where is this agreement?

3              MR. POSTMAN:  May I approach?

4              THE COURT:  You may.  Let's have fun.

5              MR. POSTMAN:  I think we've got to be real here.

6     You are someone who subscribes to the Internet.  It shows

7     up on your screen.  This is all in the Beard declaration

8     when CenturyLink moved to compel.  You can't expect the

9     consumer to either print out or save the arbitration

10    agreement.  They took the position in moving to compel that

11    effectively every class member, if you're a customer of

12    ours, you're subject to an arbitration agreement.

13             We asked them, please provide the specific

14    arbitration agreement.  We don't have it, and they ignored

15    it.  I think we all know that if we had filed a class

16    action -- forget about the MDL.  If a party files a class

17    action, they will show up with that agreement in a second.

18    We asked them for it.  They didn't give it, and they're

19    playing this coy game of saying, oh, you don't have it.

20             What we haven't heard them say is, we don't

21    believe there is one.  They're not actually disputing it.

22    They're just saying, oh, can't find that piece of paper

23    that no consumer has.  I think that's a game, and it is

24    unreasonable when they have taken the position in this

25    court that every class member is bound by arbitration.

1          THE COURT:  All right.  Mr. McNab?

2          MR. McNAB:  I think that is a mischaracterization

3     of the position that we've taken.  There are certain

4     categories of customers who have consumer contracts with us

5     that don't have arbitration agreements, which is why we

6     have asked them for account information.  We've asked them

7     for what kinds of services did these individuals have?

8     When did they have them?  We're trying to determine that

9     ourselves.

10          Second and more important, we did put a number of

11     these arbitration agreements that do exist for certain

12     consumers of certain products in front of this Court in

13     connection with our motion.  I don't know that every

14     consumer that has been a customer of CenturyLink has an

15     arbitration agreement.  I suspect there are some, quite a

16     number, who do not.

17          What I do know is that of all of the arbitration

18     agreements that I have seen and that we have put in front

19     of this Court, there isn't a one that looks anything like

20     the *Piper Funds* arbitration agreement that promises an

21     immediate right to arbitration.  That's the categorical

22     distinction here.  That is what -- and the Court of Appeals

23     talked extensively about why that was the basis of its

24     decision and its carveout with respect to one of thousands

25     of class members.  So this notion, Mr. Postman says, well,

 1    okay, we said we didn't want to opt out, but maybe we do.

 2    I'm not sure.  We probably will, if you let us do it the

 3    way it was done by *Park Nicollet*.

 4              *Park Nicollet* was very different.  It was a

 5    massive institutional investment fund with lots and lots of

 6    lawyers who were able to give it more than 15 minutes of

 7    their time.  All we are suggesting, and the order that was

 8    proposed to you and that you ultimately signed and is

 9    consistent with Rule 23 says that, yes, at the right time

10    with the right notice, folks will be able to opt out if

11    that is what they choose to do.

12              And if these three or other clients of

13    Mr. Postman's make that informed decision at the right time

14    in the right manner consistent with Your Honor's order,

15    which itself is consistent with the requirements of

16    Rule 23, they can do that, but in these circumstances where

17    22,000 people are ostensibly represented by someone who

18    doesn't have 15 minutes of time for any of them, we just

19    think that it makes sense that they receive the same

20    treatment as everyone else.

21              And we've explained in our papers why that delay,

22    if they are entitled to arbitrate at some point, that brief

23    delay to ensure that they receive the proper treatment

24    under Rule 23 is not a harm that is recognized by the law.

25              Thank you, Your Honor.

 1              THE COURT:  Thank you.

 2              MR. GUDMUNDSON:  Your Honor, if I may, just a few

 3    more remarks, and I think that Mr. Postman's --

 4              THE COURT:  I apologize.  I only have one of my

 5    hearing aids in because I've got an ear infection in one of

 6    my ears, so I need you to speak into the microphone so I

 7    can hear you.

 8              MR. GUDMUNDSON:  The issue that Mr. Postman's

 9    rebuttal remarks raise is an issue of sequencing.  It's an

10    issue that for those who have been part of the meeting and

11    conferring and discussing of these issues is a word I use a

12    lot here.  They say in their papers they do not seek to opt

13    out, and here they say they seek to opt out under certain

14    circumstances that I'm honestly not quite sure what they

15    are, but it seems to me what they may be really after is

16    some sort of a prior blessing that a certain type of

17    opt-out is sufficient.

18              I don't think that that's possible.  I think that

19    what has to happen from a sequencing point of view is, they

20    have to read *Piper* which we know they have, read the

21    requirements of the settlement agreement, and present their

22    request to opt out under the language of *Piper*.  It may be

23    that at that time a dispute arises, maybe even between the

24    plaintiffs and CenturyLink and movants, maybe between all

25    of us, as to the sufficiency of that opt-out.

1          But there is no question that that presentation

2     of a request to exclude must be made under the language of

3     *Piper*, and if they present that request and are denied,

4     Your Honor will then be in a position to decide the

5     sufficiency of the opt-out, and I -- my reading of the

6     *Piper* language is that there are certain criteria, and I

7     don't know what conclusion everyone would come to because

8     it hasn't been presented yet, but I will repeat.  I don't

9     want to repeat myself too much, but we are obliged to

10    follow the language of *Piper* as a binding Eighth Circuit

11    precedent.

12         But, again, just to underscore it, that request

13    to opt out must be made.  That's all I have.

14         THE COURT:  Thank you.

15         Mr. Postman, you have the last few minutes.

16    Anything else that you want to respond to?

17         MR. POSTMAN:  Thank you, Your Honor.  I'll just

18    note that I think to be pragmatic about this, the reason I

19    talked about the opt-out as distinct from the injunction, I

20    won't do another trip around the merry-go-round on the

21    meaning of *Piper*, but --

22         THE COURT:  I've got it here.

23         MR. POSTMAN:  Yes.  Yes.

24         THE COURT:  It's going around and around.

25         MR. POSTMAN:  We'll all go back and read it again

1    carefully.  Whatever happens with the injunction, the

2    simple point is, our clients have a contractual right not

3    to have to jump through additional hoops to pursue

4    arbitration based on a class action.  I'll note that *AT&T*

5    *v. Concepcion*, the seminal case saying that arbitration

6    agreements get enforced, was about the complexity that

7    arises when parties have to go through the class process

8    and at the point of agreement, a notice to absent class

9    members, all of that, and the point of an arbitration

10   agreement is to avoid that.

11           So I will be very simple.  In *Piper* we went and

12   pulled the record.  I'm happy to give people copies.  The

13   opt-out letter was a letter on behalf of Park Nicollet's

14   counsel saying we're proceeding with arbitration.  We don't

15   want to participate in the class.  I will represent to the

16   Court, and I will confirm again when we send the opt-outs,

17   that we will provide full notice.  We've already done it to

18   a large number of our clients of the court approved notice

19   of the settlement.  We will provide our frank advice as

20   their attorneys about their options.

21           We will say if you want to participate in the

22   class, we'll help you, and we won't charge you a dollar.

23   If you want to proceed with your arbitration, we will do

24   that for you, and those who choose to proceed with

25   arbitration we will submit a letter, just like the one in

1    *Piper Funds*, saying these people want to proceed with

2    arbitration.

3            I think the holding of *Piper* is that they don't

4    have to jump through any more hoops once we do that, and we

5    will be out of -- we won't be causing any more complexity

6    in this proceeding.  Thank you.

7            THE COURT:  Anything further?

8            MR. McNAB:  If I may, Your Honor.  This is not so

9    much about advocacy as about a practical situation here.

10   We did submit the letter yesterday, and obviously we were

11   well along in the process of preparing notice in accordance

12   with Your Honor's order.

13           The uncertainty, particularly because of the

14   nature of the proposed order that was submitted by the

15   movants, which asks you on its face to stay the entire

16   preliminary approval order, not just the injunction, left

17   us in a position where we were damned if we do and we were

18   damned if we don't.  So as we indicated in the letter,

19   right now if Your Honor was to deny this motion today or

20   tomorrow or in the very near future, we would be able to

21   pretty much fire up the process and be two weeks behind on

22   the initial date.  The March 10th target date moves to

23   March 24th.

24           There is no telling, of course, what other

25   consequences might be if Your Honor is either unable to

1    rule or grants the order.  Until we see that we don't know.

2    This is advocacy.  I will be pretty candid about that.

3    There is an order already out there.  It's a valid order,

4    and it describes exactly what the process is to opt out.

5          Now, I don't know if Mr. Gudmundson is suggesting

6    that the order that we submitted collectively to the Court

7    is somehow afoul of *Piper*.  I don't think that's what he is

8    saying, but unless an applicant is situated just like Park

9    Nicollet was, I don't think that *Piper* requires that Your

10   Honor has to deviate from the process that's already set

11   forth in your order.  Thank you.

12          THE COURT:  Thank you.  Anything further?  All

13   right.  Thank you.  I will take this under advisement.

14                    **(Court was adjourned.)**

15                    *        *        *

16

17

18          I, Kristine Mousseau, certify that the foregoing

19   is a correct transcript from the record of proceedings in

20   the above-entitled matter.

21

22

23   Certified by:  s/  Kristine Mousseau, CRR-RPR
                         Kristine Mousseau, CRR-RPR
24

25