UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to | **CENTURYLINK AND ITS OPERATING COMPANIES' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO INTERVENE, COMPEL ARBITRATION, AND STAY PROCEEDINGS** |

This Document Relates to

| | |
|---|---|
| 0:17-cv-02832 | 0:17-cv-04943 |
| 0:17-cv-04613 | 0:17-cv-04944 |
| 0:17-cv-04614 | 0:17-cv-04945 |
| 0:17-cv-04615 | 0:17-cv-04947 |
| 0:17-cv-04616 | 0:17-cv-05046 |
| 0:17-cv-04617 | 0:18-cv-01562 |
| 0:17-cv-04618 | 0:18-cv-01572 |
| 0:17-cv-04619 | 0:18-cv-01573 |
| 0:17-cv-04622 | 0:18-cv-01565 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

   I.    MOVANTS SEEK TO COMPEL ARBITRATION UNDER
        CENTURYLINK'S HIGH-SPEED INTERNET SERVICE
        AGREEMENT ........................................................................................ 2

   II.   MOVANTS DEPRIVED CENTURYLINK OF THE
        OPPORTUNITY TO RESOLVE EACH DISPUTE
        INDIVIDUALLY AND TO AVOID UNNECESSARY
        ARBITRATION COSTS ........................................................................ 4

   III.  MOVANTS REFUSED TO COMPLY WITH THE
        ARBITRATION CONTRACTS AND PURSUED CLAIMS
        ON A CONSOLIDATED BASIS ............................................................ 6

   IV.  CENTURYLINK REVOKED AND TERMINATED MOVANTS'
        ARBITRATION CONTRACTS ............................................................. 8

   V.   CENTURYLINK ALSO INVOKED ITS CONTRACTUAL
        RIGHT TO SMALL CLAIMS COURT ................................................. 9

STANDARD OF REVIEW ............................................................................... 10

ARGUMENT .................................................................................................... 10

   I.    MOVANTS DO NOT MEET THE REQUIREMENTS TO
        RECONSIDER OR MODIFY THIS COURT'S EARLIER
        ORDERS ............................................................................................. 11

        A.   The Court Already Ruled Twice that Class Members'
            Parallel Arbitrations Should Be Temporarily Enjoined ................. 11

        B.   The Court Should Deny the Motions Without Prejudice to
            Refile Them After Final Approval ................................................. 13

        C.   The FAA Does Not Restrict the Court from Rescheduling a
            Motion to Compel Arbitration ...................................................... 15

   II.   THIS COURT, NOT AN ARBITRATOR, HAS THE POWER TO
        DECIDE WHETHER MOVANTS CAN ENFORCE THE
        ARBITRATION CONTRACTS ........................................................... 16

        A.   Enforceability of the Arbitration Provision Is Not an
            Arbitrable Issue ........................................................................... 17

        B.   The AAA Rules Do Not Supersede the Express Agreement .......... 19

# TABLE OF CONTENTS
(continued)

Page

III.  MOVANTS CANNOT ENFORCE THE ARBITRATION
CONTRACTS BECAUSE THEY MATERIALLY BREACHED
THE CONTRACTS ........................................................................... 22

    A.  Like Other Contracts, Arbitration Agreements Are Subject to
Generally Applicable Contract Defenses ........................................ 22

    B.  A Material Breach of an Arbitration Agreement Renders the
Agreement Unenforceable by the Breaching Party ......................... 23

    C.  Movants Materially Breached the Arbitration Clauses ................. 25

        1.  Movants breached both the letter and spirit of the
arbitration contracts by refusing to engage in
pre-arbitration dispute resolution ......................................... 26

        2.  Movants breached both the letter and spirit of the
arbitration contracts by pursuing their claims on a
consolidated basis .................................................................. 27

        3.  Movants exercised their discretion under the contracts
in bad faith to manufacture costly, unnecessary
arbitration and sought to destroy the purpose and value
of the arbitration contracts .................................................... 28

        4.  Movants Finafrock and Johnson anticipatorily
repudiated their arbitration contracts ................................... 31

        5.  Movants' bad-faith material breaches preclude them
from enforcing the arbitration contracts ............................... 32

    D.  CenturyLink Revoked and Terminated Movants' Arbitration
Clauses for Material Breach ........................................................... 34

IV.  THE COURT CAN PERMIT LIMITED INTERVENTION ................... 35

V.  THE COURT SHOULD NOT STAY THE PROCEEDINGS IF
THE COURT COMPELS ARBITRATION ............................................. 36

CONCLUSION ...................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Oil Co. v. Ervin*,
908 P.2d 493 (Colo. 1995) .................................................................................. 25, 33

*Arnold v. ADT Sec. Servs., Inc.*,
627 F.3d 716 (8th Cir. 2010) ...................................................................................... 13

*AT&T Mobility LLC v. Bernardi*,
2011 WL 5079549 (N.D. Cal. Oct. 26, 2011) .......................................................... 27

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ................................................................................................... 22

*In re Baycol Prods. Litig.*,
214 F.R.D. 542 (D. Minn. 2003) ................................................................................ 35

*BG Grp., PLC v. Republic of Arg.*,
572 U.S. 25 (2014) ..................................................................................................... 16

*Bradford v. DANA Corp.*,
249 F.3d 807 (8th Cir. 2001) ...................................................................................... 13

*Brown v. Dillard's, Inc.*,
430 F.3d 1004 (9th Cir. 2005) .................................................................................... 23

*CE Design Ltd. v. King Supply Co.*,
791 F.3d 722 (7th Cir. 2015) ...................................................................................... 35

*City of Benkelman, Neb. v. Baseline Eng'g Corp.*,
867 F.3d 875 (8th Cir. 2017) ...................................................................................... 10

*Cont'l Cas. Co. v. Staffing Concepts, Inc.*,
538 F.3d 577 (7th Cir. 2008) ...................................................................................... 16

*Coors v. Sec. Life of Denver Ins. Co.*,
112 P.3d 59 (Colo. 2005) ...................................................................................... 23, 24

*Copper Mountain, Inc. v. Indus. Sys., Inc.*,
208 P.3d 692 (Colo. 2009) .......................................................................................... 20

*DBA Enters., Inc. v. Findlay,*
    923 P.2d 298 (Colo. App. 1996) ........................................................................24-25, 25

*Dryer v. Nat'l Football League,*
    2013 WL 4781030 (D. Minn. Sept. 6, 2013) ............................................................. 15

*Enderlin v. XM Satellite Radio Holdings, Inc.,*
    483 F.3d 559 (8th Cir. 2007) ............................................................................... 18, 20

*Epic Sys. Corp. v. Lewis,*
    138 S. Ct. 1612 (2018) .............................................................................................. 28

*Fallo v. High-Tech Institute,*
    559 F.3d 874 (8th Cir. 2009) ......................................................................... 18, 19, 21

*First Options of Chi., Inc. v. Kaplan,*
    514 U.S. 938 (1995) ............................................................................................ 21, 23

*Flynt v. Lombardi,*
    782 F.3d 963 (8th Cir. 2015) .................................................................................... 35

*Gingras v. Think Fin., Inc.,*
    922 F.3d 112 (2d Cir. 2019) .................................................................................21-22

*Heating & Plumbing Eng'rs, Inc. v. H.J. Wilson Co.,*
    698 P.2d 1364 (Colo. App. 1984) ....................................................................... 25, 34

*Henry Schein, Inc. v. Archer & White Sales, Inc.,*
    139 S. Ct. 524 (2019) ................................................................................................ 16

*Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.,*
    129 P.3d 1020 (Colo. App. 2005) ....................................................................... 31, 32

*Hooters of Am., Inc. v. Phillips,*
    173 F.3d 933 (4th Cir. 1999) .............................................................................. 24, 33

*Interbank Invs., LLC v. Vail Valley Consol. Water Dist.,*
    12 P.3d 1224 (Colo. App. 2000) ............................................................................... 32

*Jones v. Clinton,*
    72 F.3d 1354 (8th Cir. 1996) .................................................................................... 11

*Keymer v. Mgmt. Recruiters Int'l, Inc.,*
    169 F.3d 501 (8th Cir. 1999) .................................................................................... 23

*Lake Durango Water Co. v. Pub. Utils. Comm'n of State of Colo.*,
    67 P.3d 12 (Colo. 2003) .................................................................. 32

*Land v. I.R.S.*,
    2003 WL 23784461 (D. Minn. Jan. 7, 2003) .................................. 13

*Level 3 Commc'ns, LLC v. Liebert Corp.*,
    535 F.3d 1146 (10th Cir. 2008) ..................................................... 20

*MacDonald v. CashCall, Inc.*,
    883 F.3d 220 (3d Cir. 2018) ........................................................... 22

*McLaughlin Gormley King Co. v. Terminix Int'l Co.*,
    105 F.3d 1192 (8th Cir. 1997) ....................................................... 15

*MedCam, Inc. v. MCNC*,
    414 F.3d 972 (8th Cir. 2005) ......................................................... 10

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985) ....................................................................... 10

*Mountain Mktg. Grp., LLC v. Heimerl & Lammers, LLC*,
    2015 WL 1954393 (D. Minn. Apr. 29, 2015) ...........................13-14

*Nadeau v. Equity Residential Props. Mgmt. Corp.*,
    251 F. Supp. 3d 637 (S.D.N.Y. 2017)......................................23-24

*NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*,
    770 F.3d 1010 (2d Cir. 2014)...............................................18, 20

*Norgren, Inc. v. Ningbo Prance Long, Inc.*,
    2015 WL 5562183 (D. Colo. Sept. 22, 2015) ............................... 33

*Omaha Indian Tribe v. Tract I-Blackbird Bend Area*,
    933 F.2d 1462 (8th Cir. 1991) ....................................................... 28

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
    724 F.3d 1069 (9th Cir. 2013) ................................................20-21

*Perry v. Thomas*,
    482 U.S. 483 (1987).................................................................22-23

*In re Piper Funds, Inc., Institutional Government Income Portfolio Litig.*,
    71 F.3d 298 (8th Cir. 1995) ............................................... 14, 15, 36

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967) .............................................................................. 22, 23

*Ranta Constr., Inc. v. Anderson*,
    190 P.3d 835 (Colo. App. 2008) ................................................................ 25

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010) ..................................................................... 17, 22, 34

*Roach v. BM Motoring, LLC*,
    155 A.3d 985 (N.J. 2017) .............................................................. 24, 27, 34

*Rodriguez v. Wet Ink, LLC*,
    2011 WL 1059541 (D. Colo. Mar. 22, 2011) ....................................... 23, 24

*Shockley v. PrimeLending*,
    929 F.3d 1012 (8th Cir. 2019) .................................................................. 21

*Slaven v. Engstrom*,
    848 F. Supp. 2d 994 (D. Minn. 2012) ........................................................ 11

*Smith v. Prosser*,
    2014 WL 3573668 (D. Minn. July 18, 2014) ............................................. 14

*Snell v. Allianz Life Ins. Co. of N. Am.*,
    2000 WL 1336640 (D. Minn. 2000) .......................................................... 35

*Spano v. V & J Nat'l Enters., LLC*,
    264 F. Supp. 3d 440 (W.D.N.Y. 2017) ...................................................... 24

*Streambend Props. III, LLC v. Sexton Lofts, LLC*,
    2012 WL 4481300 (D. Minn. Sept. 28, 2012) ........................................... 14

*Tri-Star Petroleum Co. v. Tipperary Corp.*,
    107 S.W.3d 607 (Tex. App. 2003) ................................................ 24, 26-27, 34

*In re Tyler*,
    839 F.2d 1290 (8th Cir. 1988) .................................................................. 11

*U.S. Nutraceuticals, LLC v. Cyanotech Corp.*,
    769 F.3d 1308 (11th Cir. 2014) ................................................................ 21

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*,
    2012 WL 2325798 (D. Minn. June 19, 2012) ............................................ 35

*Van Dusen v. Swift Transp. Co.*,
  830 F.3d 893 (9th Cir. 2016) ............................................................. 15

*Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*,
  872 P.2d 1359, (Colo. App. 1994) ................................................... 33

*Willey v. Mayer*,
  876 P.2d 1260 (Colo. 1994) .............................................................. 28

**Statutes**

Federal Arbitration Act ("FAA"), 9 USC § 2 ............................. 19, 22

FAA, 9 USC § 3 ............................................................................ 36

FAA, 9 USC § 4 ....................................................................... *passim*

FAA, 9 USC § 16 ....................................................................... 36-37

**Other Authorities**

Colo. Jury Instr., Civil 30:13 ......................................................... 31

Fed. R. Civ. P. 16(b) ...................................................................... 11

Restatement (Second) of Contracts § 241 (1981) ........................... 25

## INTRODUCTION

Having lost the ability to arbitrate for three clients, the Keller Lenkner LLC ("Keller") law firm now seeks a second bite at the apple for six other clients ("Movants"). Their Motion to Compel Arbitration revisits an issue the Court already resolved:  whether the Court's Preliminary Approval Order precludes Keller's clients from arbitrating their claims at this time.  The Court should affirm its orders that protect the Settlement Class and ensure an orderly and efficient settlement process.  The Court should also deny Movants' Motion to Compel Arbitration on the merits because they no longer have a right to arbitrate.

*The Court should deny the Motions without prejudice.*  Movants provide no bases for this Court to reconsider or modify its earlier orders.  They rely on facts that existed before the Court entered its earlier orders, and which—for strategic purposes— their lawyers chose not to raise.  Movants may refile their Motions, if they wish, after the Court rules on final approval of the class settlement.

*It is the Court that resolves whether CenturyLink terminated the arbitration contracts.*  Movants wrongly ask the Court to delegate the issue of enforceability to the arbitrator.  If the Court chooses to address the merits of the Motion to Compel, the Court (not the arbitrator) would decide if CenturyLink terminated the arbitration contract. Under controlling precedent, this Court presumptively determines if the parties have an enforceable arbitration agreement.  The arbitration provision confirms this point, expressly declining to delegate to the arbitrator a dispute about enforceability.

***Movants have no right to arbitrate.***  The Court should deny the Motion to Compel because the agreement to arbitrate has been properly terminated based on Movants' breaches.  Movants destroyed the essential purpose and value of the arbitration contract in multiple ways:

- Movants failed to comply with the arbitration clause requirement that they "first present any claim or dispute to CenturyLink in writing ***to allow CenturyLink the opportunity to resolve the dispute***."

- By acting in unison with thousands of Keller's other clients, Movants violated the prohibition against filing arbitration claims simultaneously on a coordinated, "consolidated" basis.

- Movants have attempted to deprive CenturyLink of its contractual right to have Movants' claims heard in small claims courts, by inflating their damage claims without a factual basis.

Movants deprived CenturyLink of the efficient, low-cost methods for resolving disputes under the arbitration contracts.  CenturyLink therefore terminated the arbitration clauses for breach, leaving Movants with no basis to compel arbitration.

For these and other reasons discussed below, the Court should deny the arbitration motion and dismiss Movants' Petition for Order Compelling Arbitration (ECF No. 607).

## **BACKGROUND**

## I.    **MOVANTS SEEK TO COMPEL ARBITRATION UNDER CENTURYLINK'S HIGH-SPEED INTERNET SERVICE AGREEMENT**

Movants seek to compel arbitration based on the arbitration provision in Section 17 of the CenturyLink® High-Speed Internet Subscriber Agreement ("Internet Agreement"), entitled the "Dispute Resolution and Arbitration" provision (the "arbitration contract").  Declaration of Ashley Keller ("Keller Decl.") Ex. 1 § 17, ECF

No. 599-1.  The arbitration contract provides for individualized dispute resolution, where both parties can resolve their disputes efficiently and inexpensively.  Arbitration is a last resort if pre-suit resolution fails and neither party invokes small claims court.  The contract includes several requirements to achieve its intended purpose.

*__Pre-filing Requirement.__*  First, to avoid unnecessary arbitration costs, paragraph 17(a)(i) requires the individual customer ("you") to engage with CenturyLink in informal dispute resolution efforts:

> Before commencing arbitration you must first present any claim or dispute to CenturyLink in writing to allow CenturyLink the opportunity to resolve the dispute.  If the claim or dispute is not resolved within 60 days, you may request arbitration.

*Id.*  This requirement is extremely important for both consumers and CenturyLink because it allows the parties to resolve claims informally without incurring the costs of arbitration.  CenturyLink invests substantial resources to resolve customer complaints without the need for arbitration, and does so successfully.  Background, Part II, *infra*.

*__No Consolidated Action.__*  Second, the contract contemplates that only two parties will be involved in any dispute—"CenturyLink" and "you."  Keller Decl. Ex. 1 ¶¶ 17(a), (a)(i), (a)(ii) & (b).  It also prohibits pursuing claims on a "consolidated" basis in *any* form.  *Id.* ¶ 17(b) ("you . . . waive any right to pursue any claims on a class or consolidated basis or in a representative capacity"); *see also id.* ¶ 17(a) (providing small claims court exception to arbitration for "only individual (non-class, non-representative, non-consolidated) claims").  This provision ensures that CenturyLink and its customers

can address each customer's individualized claim on its merits, rather than based on multiple claims.  Background, Part III, *infra*.

   **_Small Claims Court Option._**  Third, if the parties cannot resolve their dispute directly, either the customer or CenturyLink may choose to resolve the dispute in small claims court, rather than arbitration:

>   The sole exceptions to arbitration are that either party may pursue claims: (1) in small claims court that are within the scope of its jurisdiction, provided the matter remains in such court and advances only individual (non-class, non-representative, non-consolidated) claims[.]

Keller Decl. Ex. 1 ¶ 17(a).

   **_No Delegation to Arbitrator of Enforceability of Arbitration Contract._**  Finally, the customer and CenturyLink agreed that a court, not an arbitrator, will resolve all disputes about the enforceability of the arbitration contract:

>   [T]he arbitrator, and not any court, shall have exclusive authority to resolve . . . any dispute or claim that all of this Agreement, or any part of this Agreement **_other than this arbitration[ ] provision_**, is void, voidable, lacking in consideration, illusory, invalid, unconscionable, or for any reason unenforceable.

*Id.*

   CenturyLink now addresses the facts relevant to each of these particular provisions in the arbitration contract.

## II.   MOVANTS DEPRIVED CENTURYLINK OF THE OPPORTUNITY TO RESOLVE EACH DISPUTE INDIVIDUALLY AND TO AVOID UNNECESSARY ARBITRATION COSTS

   Contrary to contract requirements, Movants failed to submit their individual

claims in writing to CenturyLink and did not give CenturyLink "the opportunity to resolve the dispute" before initiating arbitration.  Movants offer no facts showing that they tried to do so.  *See* Declarations of Movants ("Movants' Decls."), ECF Nos. 600-605.

For business purposes, CenturyLink considers this pre-filing requirement to be an important provision of the arbitration contract.  *See* Declaration of Scott Belka ("Belka Decl.") ¶ 6, filed concurrently herewith.  This provision is intended to provide CenturyLink with an opportunity to evaluate and resolve claims *before* incurring the cost of legal proceedings.  *Id.*  For example, the AAA charges per arbitration fees of $125 for consumers and between $3,400 and $4,900 for CenturyLink.  Keller Decl. Ex. 2, ECF No. 599-2.  By requiring that the customer give CenturyLink an opportunity to resolve a claim before arbitration, CenturyLink has the opportunity to weigh the benefit of resolving the claim informally versus accepting the risks and costs of proceeding to arbitration.  Belka Decl. ¶ 6.

CenturyLink's pre-filing dispute resolution procedures successfully resolve most customers' issues.  *Id.* ¶¶ 10-12.  From January 2018 through February 2020, CenturyLink responded to threatened legal action by approximately 300 consumers, including pre-filing resolution efforts for threatened arbitrations and small claims court matters.  *Id.* ¶ 10.  During that time, CenturyLink received only 13 arbitration demands and nine small claims court actions; the other approximately 287 consumer matters were resolved without arbitration or litigation.  *Id.* ¶ 11.

Movants do not (because they cannot) dispute that they failed to give CenturyLink the opportunity to resolve their claims individually without arbitration.  *See* Movants' Decls.

### III.   MOVANTS REFUSED TO COMPLY WITH THE ARBITRATION CONTRACTS AND PURSUED CLAIMS ON A CONSOLIDATED BASIS

Movants have pursued their claims simultaneously, and on a consolidated basis, with thousands of other customers who purportedly are represented by Keller.  This makes it impossible for CenturyLink to address the individual merits of Movants' claims.  Their conduct violates the arbitration contract's express bar against consolidated actions.

Since Keller first contacted CenturyLink in May 2019, it has threatened to "simultaneously" file thousands of arbitration demands.  Keller Decl. Ex. 2 at 1.  From the outset, Keller made clear that it was not seeking to resolve its clients' claims on their individual merits, but instead was seeking a mass settlement.  Declaration of Andrew M. Unthank ("Unthank Decl."), ECF No. 513, ¶ 34.  Keller unabashedly touted as settlement-leverage the enormous, cumulative AAA arbitration fees CenturyLink would owe if Keller were to simultaneously file thousands of cookie-cutter arbitration demands.  Keller Decl. Ex. 2 at 1.  For instance, Keller brandished the threat of CenturyLink having to "pay AAA more than $30 million in initial fees and costs."  *Id.*

In response, CenturyLink repeatedly requested that Keller comply with Movants' (and its other clients') arbitration contracts.  Unthank Decl. ¶¶ 38-53 & Exs. J, L, M, O.  Keller, acting for Movants and others, refused to comply with the contract.  *Id.* ¶¶ 39-40, 46-54 & Exs. K & M.  Keller responded: "**at 15 minutes per client, such a pre-demand**

**'dialogue' would consume more than 3,500 hours [for the then-14,000 clients], or the equivalent of 145 round-the-clock days**." *Id*. ¶ 40 & Ex. K at 2 (emphasis added). Instead, Keller provided only lists containing the names and contact information for more than 22,000 individuals whom Keller claimed to represent. *Id*. ¶ 52 & Ex. O. Keller refused to provide even basic descriptions of each client's claim, the approximate date when the dispute arose, the service(s) involved, or the claimed actual damages. *Id*. That is, Keller and Movants intentionally withheld the information that CenturyLink needed to evaluate and resolve Movants' and others' claims. *Id*.

Keller threatened mass arbitrations "[i]f CenturyLink is unwilling to engage in a practical, pre-arbitration discussion that addresses *all of our clients' claims*." *Id*. ¶ 40 & Ex. K at 2 (emphasis added). Keller made it clear that it would discuss only a mass resolution of the purported 22,000 claims. *Id*. ¶¶ 40, 52-54 & Exs. K & O.

The arbitration contract bars consolidated pursuit of customers' claims for good reason. As the Court is well aware, CenturyLink provides consumers with different services (such as internet, phone, TV, long-distance, and security) marketed in a variety of different ways. Belka Decl. ¶ 16. Customers have raised a wide array of claims— everything from installation and equipment issues to disputes about service termination. *Id*. It is impossible to address the merits of each customer's claim without receiving details from the customer. *Id*. ¶¶ 8, 9, 16, 17, 21, 22, 44. That difficulty is compounded if thousands of other customers' claims are joined with it. *Id*. ¶ 22.

IV.    **CENTURYLINK REVOKED AND TERMINATED MOVANTS' ARBITRATION CONTRACTS**

Since receiving Keller's first demand letter, CenturyLink consistently and repeatedly emphasized that CenturyLink would evaluate and resolve each Movant's individual claim, as the arbitration contracts require:

- June 12, 2019:  "We would like to have a meaningful dialogue about each of your clients on an individual basis, as we all agreed to do in our contracts."  Unthank Decl. Ex. J at 2.

- July 10, 2019:  "CenturyLink is interested in exploring with you whether there is any process by which your clients could comply with their contractual obligations to engage in individualized resolution discussions."  *Id.* Ex. L at 3.

- September 6, 2019:  "[W]e ask again that you provide the information regarding each Plaintiff and claim that we requested so that CenturyLink has an opportunity to evaluate and resolve each claim pre-suit."  *Id.* Ex. M at 1.

- October 8, 2019:  "CenturyLink remains willing to resolve any good faith dispute any of your clients might have, as we have offered repeatedly in our earlier correspondence, consistent with the resolution procedures your clients agreed to."  *Id.* Ex. O at 1.

For more than six months, Movants ignored or rejected each such request to cure their breaches and repudiations of the arbitration contract.

On January 9, 2020, CenturyLink exercised its contractual right to terminate and revoke the arbitration contracts.  *Id.* ¶ 72 & Ex. Y.  Even following termination, however, CenturyLink informed Keller that CenturyLink remained "willing to resolve your clients' claims, without litigation and without any added cost to your clients, based on the merits of each claim as contemplated by their agreements with CenturyLink," or, alternatively, through the class settlement or small claims court.  *Id.* ¶ 73 & Ex. Y at 1.

## V.     CENTURYLINK ALSO INVOKED ITS CONTRACTUAL
##        RIGHT TO SMALL CLAIMS COURT

CenturyLink made it clear from the outset that it was electing its right to resolve

Movants' claims in small claims court, not at the AAA.  In a July 10, 2019, letter to

Movants' counsel, CenturyLink stated:

> Although CenturyLink believes you have no right to file
> arbitration claims without first providing individualized
> notices, CenturyLink will invoke its right to have as many of
> your clients' disputes decided in small claims court under the
> provisions of its agreements preserving a small claims court
> option for both parties.

Unthank Decl. Ex. L at 5.

Movants ignored CenturyLink's election and filed demands at the AAA anyway.

*Id.* ¶ 56.  Movants Covington, Sokey, Van Riper, and Watkins were among the first 1,000

Keller clients who simultaneously filed arbitration demands on November 21, 2019.

Belka Decl. ¶ 24.  Their arbitration demands repeat, in cookie-cutter fashion, the same

pattern of allegations for each of the 1,000 demands:  (i) the amount CenturyLink

allegedly quoted for services; (ii) an alleged billed amount that is higher than the alleged

quoted amount; (iii) the alleged number of months that the Movant was overbilled; and

(iv) the Movant's CenturyLink account number.  *Id.*  Movants even crafted their damage

claims so they could avoid small claims court jurisdictional limits. In each case, they

uniformly sought damages that were ***exactly ten times*** their alleged actual damages:[1]

---

[1]    The 10x inflated damages are the alleged compensatory damages, *before* taking
into account punitive damages, attorneys' fees, and costs.  *E.g.*, Keller Decl. Ex. 3, ECF
No. 599-3; Belka Decl. ¶ 24.

| Movant | Alleged Actual Damages | Demanded Compensatory Damages |
|---|---|---|
| Van Riper | $1,620 | $16,200 |
| Covington | $1,584 | $15,840 |
| Sokey | $2,880.72 | $28,807.20 |
| Watkins | $2,520 | $25,200 |

Belka Decl. ¶¶ 24, 28, 32, 36, 40.

## STANDARD OF REVIEW

For a motion to compel arbitration under the Federal Arbitration Act ("FAA"), 9 USC § 4, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985); *accord MedCam, Inc. v. MCNC*, 414 F.3d 972, 974 (8th Cir. 2005). A summary judgment standard applies where, as here, the "parties submit[ ] matters outside the pleadings." *City of Benkelman, Neb. v. Baseline Eng'g Corp.*, 867 F.3d 875, 882 (8th Cir. 2017). If there are genuine issues of material fact concerning enforceability, the Court must conduct a trial on those facts. *See* 9 U.S.C. § 4.

## ARGUMENT

As an initial matter, the Court should affirm its earlier orders and exercise its discretion to consider the motions to intervene, compel arbitration, and stay proceedings ("Motions") only after the Court decides whether to grant final approval to the class settlement. The Court enjoined all actions by class members while it implements the

settlement. Movants do not meet the requirements for reconsidering or modifying the Preliminary Approval Order.

If the Court chooses to consider the merits, it should deny Movants' arbitration motion because they have no right to arbitrate. Movants materially breached their arbitration contracts, and in response, CenturyLink exercised its contractual right to terminate the arbitration contracts. The contracts' delegation clause reserves to this Court, not an arbitrator, the power to decide whether Movants can enforce the arbitration contract.

## I. MOVANTS DO NOT MEET THE REQUIREMENTS TO RECONSIDER OR MODIFY THIS COURT'S EARLIER ORDERS

The Court has authority to control its schedule, including the times for filing, briefing, and consideration of motions. Fed. R. Civ. P. 16(b); *In re Tyler*, 839 F.2d 1290, 1292 (8th Cir. 1988) ("The Court has authority to control and manage matters pending before it."); *Slaven v. Engstrom*, 848 F. Supp. 2d 994, 1004 (D. Minn. 2012), *aff'd* 710 F.3d 772 (8th Cir. 2013) ("Inherent in judicial authority is the authority of the court to set its own schedule."). The Court has "broad discretion" to exercise that authority. *Jones v. Clinton*, 72 F.3d 1354, 1361 (8th Cir. 1996), *aff'd sub nom. Clinton v. Jones*, 520 U.S. 681 (1997).

### A. The Court Already Ruled Twice that Class Members' Parallel Arbitrations Should Be Temporarily Enjoined

On January 24, 2020, the Court entered its Preliminary Approval Order ("Order"), ECF No. 528. The Order contained procedures for class members to opt out of the Settlement Class (*id.* ¶ 6) and stated that the Court would consider opt-out submissions

when it considers final approval of the settlement (*id.* at 4 ¶ 4).   The Order also contained

the following temporary injunction:

> Pending the Final Approval Hearing and issuance of the Final
> Approval Order and Final Judgment, Releasing Parties are
> hereby enjoined from filing, commencing, prosecuting,
> maintaining, intervening in, participating in (as class
> members or otherwise), or receiving any benefits from any
> class action or other lawsuit, arbitration, or administrative,
> regulatory, or other proceeding in any jurisdiction based on or
> relating to the Released Claims. . . .

*Id.* ¶ 10.   The record fully supported this injunction.   *E.g.*, Suppl. Br., ECF No. 509, at 4-

18.

Three of Keller's clients moved to stay the Order pending their appeal of it.   Mot.

for Stay Pending Appeal, ECF No. 554.   They argued that the temporary injunction was

unenforceable under the FAA and under the Due Process clause.   Mem. in Support of

Mot. for Stay Pending Appeal, ECF No. 550, at 3-9.   Those movants argued they should

be permitted to arbitrate "immediately."   *E.g.*, *id.* at 11.

The Court denied that motion in its February 21, 2020, Memorandum of Law &

Order ("Stay Denial"), ECF No. 569.   The Court found that the Movants had both notice

and opportunity to be heard on the parties' request for a temporary injunction, but the

Movants "made the strategic decision to not file any opposition, seek to intervene, or

appear at the hearing."   *Id.* at 21.   The Court noted that the temporary injunction and opt-

out process were "carefully crafted" and "necessary to properly manage the disposition of

this case and enforce the Court's Preliminary Approval Order, including avoiding

confusion among class members, ensuring proper notice, and preserving resources."   *Id.*

at 14.  The Court thus enforced its Preliminary Approval Order and denied a stay.[2]  *Id.* at

19-23.

**B.      The Court Should Deny the Motions Without
            Prejudice to Refile Them After Final Approval**

By moving to compel arbitration now, Movants effectively ask the Court to either

reconsider or modify the temporary injunction and the opt-out procedures in the

Preliminary Approval Order, as well as the Stay Denial.  Movants do not meet the

requirements for reconsideration or modification.

The Court should not reconsider its previous orders unless Movants can show (1) a

manifest error of law or (2) a change of facts or circumstances that did not exist at the

time the Court entered the orders.  *Arnold v. ADT Sec. Servs., Inc.*, 627 F.3d 716, 721-22

(8th Cir. 2010); *Land v. I.R.S.*, No. 01-2280 (DWF/SRN), 2003 WL 23784461, at *1 (D.

Minn. Jan. 7, 2003), *aff'd* 71 F. App'x 609 (8th Cir. 2003) ("The proper role of a motion

to reconsider is extremely limited to correct manifest errors of law or to present newly

discovered evidence.").

Similarly, the Court will not modify a prior scheduling order without a showing of

good cause.  *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001) (moving party

must show good cause to modify case management order).  Good cause is not present

where a party is not diligent in meeting court deadlines, or where there are no newly-

developed circumstances that justify modification.  *See Mountain Mktg. Grp., LLC v.*

---

[2]      After the Court denied the stay, the Movants filed a similar motion in the Eighth
Circuit.  That motion remains pending.

*Heimerl & Lammers, LLC*, No. 14-CV-846 SRN/BRT, 2015 WL 1954393, at *4 (D.

Minn. Apr. 29, 2015) (denying motion for modification where party was not diligent in

meeting the court's deadline and provided no explanation for its delay).

Movants offer no new facts or circumstances that arose only after entry of the

Preliminary Approval Order.  All of the facts on which they base their Motions existed at

the time of that Order.  They simply chose not to present those facts to this Court.  Stay

Denial at 21.  Through Movants' counsel, they had notice and opportunity to bring any

facts or arguments to the Court's attention before it entered the Order.  *Id.*  Failure to

raise facts known to a party are not grounds for reconsideration of an earlier order.  *Smith*

*v. Prosser*, Civ. No. 12-2695 (DWF/JSM), 2014 WL 3573668, at *3 (D. Minn. July 18,

2014) (denying motion to reconsider because the "[p]laintiffs have presented no new

facts or circumstances that would necessitate any changes by [the] Court"); *Streambend*

*Props. III, LLC v. Sexton Lofts, LLC*, Civ. No. 10-4745 (MJD/SER), 2012 WL 4481300,

at *1 (D. Minn. Sept. 28, 2012), *aff'd* 587 F. App'x 350 (8th Cir. 2014) ("A motion to

reconsider is not an appropriate vehicle for Plaintiffs to raise new legal theories and new

factual allegations that were within Plaintiffs' knowledge and possession long before it

initiated this lawsuit.").

Movants present no reason to revisit their previous arguments about *In re Piper*

*Funds, Inc., Institutional Government Income Portfolio Litigation*, 71 F.3d 298 (8th Cir.

1995).  *See* Mem. at 7.  Except for superficial differences, these six Movants remain in

the same shoes as the first three.  They did not ask to opt out before the Court entered the

temporary injunction, or before they filed the Motions.  Any opt-out request they may

submit in the future will be considered in due course with all other opt-out requests, and will not immediately release Movants from the temporary injunction.[3]  Further, as shown below, Movants do not have an "immediate" right to arbitration, unlike the appellant in *Piper Funds*.  Neither the arbitration contract nor AAA Rules contain an "immediate" right.  Even if they did, CenturyLink terminated the arbitration contract for breach.

The Court should enforce its Order as to Movants and continue to temporarily enjoin parallel arbitrations.  The Court should deny the Motions, with permission to refile them after Movants follow the Court's procedures.

### C.    The FAA Does Not Restrict the Court from Rescheduling a Motion to Compel Arbitration

Movants cannot complain that a temporarily delayed resolution of their arbitration motion would violate the FAA.  *Cf.* Stay Denial at 17-20.  Where, as here, the Court has to resolve their claimed right to arbitration, the schedule for hearing that issue does not constitute denial of a right to arbitrate.  *See, e.g.*, *McLaughlin Gormley King Co. v. Terminix Int'l Co.*, 105 F.3d 1192, 1194 (8th Cir. 1997) ("briefly freezing the parties' dispute resolution activities until it determines arbitrability, is surely appropriate"); *Van Dusen v. Swift Transp. Co.*, 830 F.3d 893, 897 (9th Cir. 2016) (case management order to

---

[3]    *See Dryer v. Nat'l Football League*, Civ. No. 09-2182 (PAM/AJB), 2013 WL 4781030, at *1-2 (D. Minn. Sept. 6, 2013) (submitting opt-out form does not immediately release putative class member from injunction against parallel actions, because opt outs from conditional class are not effective unless and until the Court *finally* certifies settlement class and approves the settlement); Gudmundson Decl. Ex. A, ECF No. 469-1, Settlement Agreement § 6.2.3 (making opt-outs non-final before the Court's final approval, by allowing class member to submit both a request for exclusion and claim form, with the latest form controlling).

resolve motion to compel arbitration did not violate FAA); *Cont'l Cas. Co. v. Staffing Concepts, Inc.*, 538 F.3d 577, 580-81 (7th Cir. 2008) (party moving to compel arbitration does not have cognizable harm where court struck motion and invited it to be refiled).

Movants' counsel admitted this point in a brief filed in the Eighth Circuit on behalf of the other movants. *Miller v. CenturyLink, Inc.*, No. 20-1294 (8th Cir.), Reply Br. in Supp. of Mot. to Stay D. Ct.'s Injunction Pending Appeal, Mar. 16, 2020, at 7 ("Of course, a court may temporarily refuse to order arbitration if it needs time to decide whether a party has a contractual right to arbitrate in the first place.").

## II.   THIS COURT, NOT AN ARBITRATOR, HAS THE POWER TO DECIDE WHETHER MOVANTS CAN ENFORCE THE ARBITRATION CONTRACTS

If the Court addresses the merits of the Motions now, it should first conclude that the Court, not an arbitrator, has the power to decide whether Movants can enforce the arbitration contract.

Movants incorrectly state that the arbitration contract delegates to the arbitrator the question of whether they breached the arbitration contract or must proceed to small claims court. Mem. at 12-14. Here, where CenturyLink levels a ***substantive*** challenge to arbitration—namely, whether there is an enforceable contractual duty to arbitrate at all— the issue is presumptively for the Court to decide. *See BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25, 34-35 (2014). This presumption can be overcome only by "'clear and unmistakable' evidence" that the parties agreed to arbitrate the threshold question of enforceability of the arbitration contract. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019) (citation omitted).

Movants cannot make this showing.  Nothing in the contract satisfies this exacting standard.  To the contrary, the contract expressly reserves enforceability of the arbitration provision to the Court.[4]  Keller Decl. Ex. 1 ¶ 17(a) (delegating to the arbitrator disputes regarding enforceability of all aspects of the Internet Agreement "other than this arbitration[] provision").

## A.      Enforceability of the Arbitration Provision Is Not an Arbitrable Issue

The parties agreed that the Court, and not the arbitrator, determines the enforceability of the arbitration contract.

Movants' selective quotation of the arbitration provision omits its express reservation to the Court of whether the arbitration provision itself is "for any reason unenforceable."  Mem. at 13.  Specifically, the delegation clause states:

> [T]he arbitrator . . . shall have exclusive authority to resolve any dispute or claim arising under or relating to (among other subjects) the interpretation, applicability, enforceability or formation of this [Internet] Agreement, including but not limited to any dispute or claim that all of this [Internet] Agreement, or any part of this [Internet] Agreement ***other than this arbitration[] provision***, *is void, voidable, lacking in consideration, illusory, invalid, unconscionable, or for any reason unenforceable.*"

---

[4]      Even if Movants had presented "clear and unmistakable evidence" that the parties agreed to delegate this threshold question of enforceability to the arbitrator (they did not), Movants' material breach would render an *agreement to delegate* unenforceable, too.  *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69-70 (2010) (The court must decide enforceability of delegation because it is "simply an additional, antecedent agreement [to arbitrate] . . .  and the FAA operates on this additional arbitration agreement just as it does on any other.").

Keller Decl. Ex. 1 ¶ 17(a) (emphasis added).  The emphasized language—the "Delegation Carve Out"—shows that the parties specifically agreed ***not*** to arbitrate the threshold question of enforceability of the arbitration contract.  *Cf. Enderlin v. XM Satellite Radio Holdings, Inc.*, 483 F.3d 559, 560 (8th Cir. 2007) (provision "except[ing] from arbitration, *inter alia*, 'any Claim based on Section 11(b) above [(the arbitration clause)]' . . . necessarily includes a challenge to the enforceability of § 11(b) itself").  The fact that the Delegation Carve Out withholds challenges to the enforceability of the arbitration contract from the scope of issues delegated to the arbitrator means that Movants cannot meet the "clear and unmistakable evidence" standard.  *See NASDAQ OMX Grp., Inc. v. UBS Secs., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014) ("where a broad arbitration clause is subject to a qualifying provision that at least arguably covers the present dispute" there is "ambiguity as to the parties' intent to have questions of arbitrability—which would include whether a dispute falls within or outside the scope of the qualifier—decided by an arbitrator").

Contrary to Movants' argument (Mem. at 13-14), the Court is not required to delegate to the arbitrator the question of ***enforceability*** of the arbitration contract.  Movants claim that CenturyLink previously cited *Fallo v. High-Tech Institute*, 559 F.3d 874 (8th Cir. 2009), for the proposition that the arbitrator decides "enforceability" whenever the parties incorporate the AAA Rules.  Mem. at 14.  But CenturyLink cited *Fallo* for a different proposition—namely, that the arbitrator decides whether a particular claim falls within the ***scope*** of an arbitrable agreement.  *See* Def.'s Mot. to Compel Arb. & Enforce Class-Action Waivers, ECF No. 124, at 26.  Moreover, *Fallo* did not hold that

an arbitration agreement's incorporation of the AAA Rules constitutes clear and unmistakable evidence that the parties intended that the arbitrator resolve challenges to the *enforceability* of the arbitration provision itself under FAA § 2.  To the contrary, the Eighth Circuit decided whether the arbitration contract was enforceable—specifically, whether an unconscionability defense precluded enforcement of the arbitration contract— even though that contract incorporated the AAA Rules.  Thus, by reaching the merits of the enforceability challenge in *Fallo*, the Eighth Circuit necessarily did ***not*** hold that incorporation of the AAA Rules in an arbitration agreement means that the parties delegated enforceability challenges to the arbitrator.  559 F.3d at 877-79.

Likewise, this Court should decide enforceability, especially given the plain language of the parties' Delegation Carve Out.  Keller Decl. Ex. 1 ¶ 17(a)(1).

### B.     The AAA Rules Do Not Supersede the Express Agreement

Movants ask the Court to ignore their unambiguous agreement and, instead, imply an agreement to delegate enforceability of the arbitration contract to the arbitrator.  Mem. at 13-14.  Movants argue that "CenturyLink's agreement provides that the arbitration will be administered by AAA according to AAA Rules," and that, under AAA Rules, the arbitrator decides whether the arbitration contract is enforceable.  *Id.* at 13.

This contention is wrong for several reasons.

*First*, the parties expressly agreed in the Delegation Carve Out that the arbitrator does not decide whether the arbitration provision is enforceable, as just described.

*Second*, Movants do not cite any binding authority for enforcing AAA Rules over an express provision of the contract.  CenturyLink has found none.  The Court should

enforce the parties' express statement ***not*** to delegate enforceability issues over the AAA

Rules' delegation language:

- The AAA Rules allow the parties to "change" any AAA Rule "in writing." AAA Consumer Rule R-1(c). That is what CenturyLink and Movants expressly agreed to in the Delegation Carve Out.

- Following the rule of contact interpretation that specific contract language controls over general language, the Court should enforce the parties' specific and unambiguous agreement *not* to arbitrate the question of enforceability over any alleged presumption based on the Agreement's general reference to having the AAA conduct the arbitration. *See Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (Colorado law enforces specific contract clauses over general language where the specific clause appears to be inconsistent with the general one).

- Following the rule not to interpret a contract so as to leave words superfluous, the Court should not render the phrase "other than the arbitration[ ] provision" meaningless, as Movants ask the Court to do. *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 699 (Colo. 2009) (the court cannot interpret a contract to render language meaningless).

Movants' attempt to elevate the AAA Rules over the parties' express agreement not to

delegate enforceability issues is "meritless." *Enderlin*, 483 F.3d at 560-61 (finding

"meritless" an argument that the AAA Rules required arbitration of enforceability

question where the agreement excepted from arbitration "challenges to the

enforceability" of the arbitration clause); *NASDAQ OMX*, 770 F.3d at 1032 (provision

that "carves out certain issues from arbitration . . . delays application of AAA rules until a

decision is made as to whether a question does or does not fall within the intended scope

of arbitration, in short, until arbitrability is decided").[5]

---

[5]    On reply, Movants may point to out-of-circuit cases holding that carve outs do not limit an arbitrator's authority to decide arbitrability where the arbitration contract expressly incorporates the AAA Rules. *See, e.g.*, *Oracle Am., Inc. v. Myriad Grp. A.G.*,

Finally, even if the Court were to find that the parties originally agreed to arbitrate

enforceability (they did not), any such agreement is now unenforceable due to Movants'

material breaches.  *See* Argument, Part III, *infra*.  Forcing arbitration to determine

enforceability of the now-revoked arbitration contract would undermine that contract in

the same way, and to the same extent, as forcing arbitration of the underlying claims.  In

both scenarios, Movants are depriving CenturyLink of the purpose and value of the

arbitration contract's requirements for individualized dispute resolution and a small

claims court option.  *See, e.g.*, *Shockley v. PrimeLending*, 929 F.3d 1012, 1020 (8th Cir.

2019) (contract formation defense applied both to the entire agreement and the delegation

clause); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019) ("specific attack on

the delegation provision is sufficient to make the issue of arbitrability one for a federal

---

724 F.3d 1069, 1077 (9th Cir. 2013); *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769
F.3d 1308, 1310-12 (11th Cir. 2014).  But those cases do not apply here because they
involved carve-out language limiting only the ***types*** of substantive, merits-related
disputes that must be arbitrated, like a claim for breach of a confidentiality provision.
*U.S. Nutraceuticals*, 769 F.3d at 1310.  Those cases are consistent with CenturyLink's
citation to *Fallo* previously to this Court, as discussed above.  Here, CenturyLink and
Movants' Delegation Carve Out limits the delegation clause itself, thus withholding from
the arbitrator the threshold arbitrability issue of whether the arbitration clause is
enforceable.  The Supreme Court has recognized that this distinction is important.  *See,
e.g.*, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995) ("the law treats
silence or ambiguity about the question who (primarily) should decide arbitrability
differently from the way it treats silence or ambiguity about the question [of] whether a
particular merits-related dispute is arbitrable because it is within the scope of a valid
arbitration agreement") (original alterations and quotation marks omitted).  "Courts
should not assume that the parties agreed to arbitrate arbitrability unless there is clear and
unmistakable evidence that they did so," whereas for purposes of identifying the
substantive claims that are arbitrable, "any doubts concerning the scope of arbitrable
issues should be resolved in favor of arbitration."  *Id.* (original alterations and quotation
marks omitted).

court"), *cert. denied sub nom. Sequoia Capital Operations, LLC v. Gingras*, 140 S. Ct. 856 (2020); *MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226-27 (3d Cir. 2018) ("In specifically challenging a delegation clause, a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions.").

Accordingly, the Court should decide enforceability of the arbitration contract.

## III.   MOVANTS CANNOT ENFORCE THE ARBITRATION CONTRACTS BECAUSE THEY MATERIALLY BREACHED THE CONTRACTS

Movants' material breaches of the arbitration contracts leave no enforceable agreement to arbitrate.  In response to Movants' material breaches, CenturyLink exercised its rights to revoke and terminate the arbitration contracts.

### A.   Like Other Contracts, Arbitration Agreements Are Subject to Generally Applicable Contract Defenses

The FAA's "savings clause" makes arbitration agreements unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Thus, "courts must place arbitration agreements on an equal footing with other contracts."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Like other contracts, arbitration agreements can be invalidated by generally applicable contract defenses.  *Rent-A-Ctr.*, 561 U.S. at 68; *see also Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 & n.12 (1967) ("the purpose of [the FAA] . . . was to make arbitration agreements as enforceable as other contracts, but not more so").  A contract defense is "generally applicable" if it does not "apply only to arbitration or [] derive [its] meaning from the fact that an agreement to arbitrate is at issue."  *Concepcion*, 563 U.S. at 339; *accord Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) (generally applicable

contract defenses include any state law "govern[ing] issues concerning the validity, revocability, and enforceability of contracts generally"); *Prima Paint*, 388 U.S. at 404 (applicable defenses include those relating to "performance of the agreement").

Movants invoke contracts governed by Colorado state law.  Mem. at 15-16; Keller Decl. Ex. 1 ¶ 17(a)(i).  Thus, the arbitration contracts are susceptible to any "generally applicable" contract defense that exists under Colorado law.  *First Options*, 514 U.S. at 944 (state-law principles apply to arbitration agreements); *Keymer v. Mgmt. Recruiters Int'l, Inc.*, 169 F.3d 501, 504 (8th Cir. 1999) (applying Ohio law according to the parties' agreement).

### B.     A Material Breach of an Arbitration Agreement Renders the Agreement Unenforceable by the Breaching Party

Colorado follows the well-established rule that material breach renders a contract unenforceable by the breaching party.  *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005) ("[A] party to a contract cannot claim its benefit where he is the first to violate [materially] its terms.").  This principle applies equally to the material breach of an arbitration agreement.  *See, e.g.*, *Rodriguez v. Wet Ink, LLC*, No. 08-CV-00857-MSK-CBS, 2011 WL 1059541, at *4 (D. Colo. Mar. 22, 2011) (under Colorado law, material breach of arbitration agreement prevents breaching party from compelling arbitration).  Courts outside of Colorado also apply this general contract defense to arbitration contracts.  *E.g.*, *Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1009-10 (9th Cir. 2005) (having breached the arbitration agreement, Dillard's could not enforce it); *Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) ("The Court

agrees defendant materially breached the Arbitration Agreement and therefore cannot use the Agreement to compel arbitration."); *Rodriguez*, 2011 WL 1059541, at *4 ("Wet Ink's refusal to pay its share of the arbitration costs was a material and unexcused breach of the arbitration agreement that excuses Ms. Rodriguez from her obligation to arbitrate.").

A material breach goes to the root or essence of the agreement. *Coors*, 112 P.3d at 64. Like any other contract, arbitration agreements are materially breached where their fundamental purpose is thwarted, such as by conduct that defeats the efficiency and fairness of arbitration or that appears designed to prevent fair resolution of disputes on their merits. *See Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 939-40 (4th Cir. 1999) (holding arbitration agreement unenforceable because one party to agreement employed unfair rules that "creat[ed] a sham," depriving the other party of "a system whereby disputes are fairly resolved by an impartial third party"); *Roach v. BM Motoring, LLC*, 155 A.3d 985, 995 (N.J. 2017) (finding breach where party opportunistically invoked right to arbitrate to prevent resolution of disputes); *Tri-Star Petroleum Co. v. Tipperary Corp.*, 107 S.W.3d 607, 612-14 (Tex. App. 2003) (affirming revocation of arbitration contract where the breaching party "deprived [the other party] of the benefits it reasonably expected would flow from the arbitration process"); *Spano v. V & J Nat'l Enters., LLC*, 264 F. Supp. 3d 440, 459 (W.D.N.Y. 2017) (finding material breach where delay tactics negated the time and cost efficiencies of arbitration).[6]

---

[6]    These results are consistent with Colorado law, which recognizes that a breach is material when it results in the non-breaching party receiving no benefit from the contract. *See DBA Enters., Inc. v. Findlay*, 923 P.2d 298, 301 (Colo. App. 1996) ("[T]o determine whether a breach of contract is material . . . [t]he extent to which an injured party will

In addition, "every contract contains an implied duty of good faith and fair dealing . . . [which] is generally used to effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995). Not only is compliance with the duty of good faith and fair dealing a stand-alone obligation, *id.* at 498-99, but evidence of bad faith may be used "to determine whether [a] breach was material." *Ranta Constr., Inc. v. Anderson*, 190 P.3d 835, 842 (Colo. App. 2008) (citing Restatement (Second) of Contracts § 241 (1981)). "In determining whether a failure to render or to offer performance is material, the following circumstances are significant: . . . (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." Restatement (Second) of Contracts § 241; *see also DBA Enters.*, 923 P.2d at 301 ("Our [Colorado] supreme court has adopted the approach of Restatement (Second) of Contracts § 241 . . . .").

**C.    Movants Materially Breached the Arbitration Clauses**

Keller and Movants' bad-faith conduct and mass-arbitration scheme with 22,000 other Keller clients easily satisfies the standard for material breach by destroying the fundamental purpose and value of the arbitration contracts.

---

obtain substantial benefit from the contract . . . should be considered in determining the materiality of failure of performance." (citations and internal quotation marks omitted)); *Heating & Plumbing Eng'rs, Inc. v. H.J. Wilson Co.*, 698 P.2d 1364, 1366-67 (Colo. App. 1984) (material breach justified termination where contractor reneged on critical promise not to mark-up costs on change orders for overhead and profit).

### 1.   *Movants breached both the letter and spirit of the arbitration contracts by refusing to engage in pre-arbitration dispute resolution*

The fundamental benefit of the bargain of the arbitration contracts is the opportunity for efficient, low-cost resolution of disputes based on the individual facts of each customer's claim—which nearly always enables the parties to avoid costly arbitration.  Background, Part II, *supra*.  Specifically, the arbitration contracts required that each Movant present his or her claim "in writing" in a manner sufficient to "*allow CenturyLink the opportunity to resolve the dispute*."  Keller Decl. Ex 1 ¶ 17(a)(i) (emphasis added).  Under each arbitration contract, CenturyLink and each Movant would proceed to individual arbitration only if informal resolution failed and if neither party chose to resolve the dispute in small claims court.  Keller Decl. Ex. 1 ¶¶ 17(a), 17(a)(i) & 17(b).  Movants gave CenturyLink *no* opportunity to understand—much less evaluate or resolve—their disputes on the facts and merits.

Movants materially breached the arbitration contracts by forcing their claims straight to arbitration by refusing "to provide basic information" about their claims.  Stay Denial at 19.  The result of this breach is that they effectively "depriv[ed] CenturyLink of the opportunity to evaluate and resolve their claims before arbitration."  *Id.*  Thus, Movants' breaches defeated the very purpose of the arbitration contract by destroying any opportunity for pre-arbitration, individualized resolution, and by seeking to impose on CenturyLink the arbitration fees and costs that the contractually-agreed requirements are intended to avoid.  *See Tri-Star*, 107 S.W.3d at 612-14 (arbitration contract was revocable because non-breaching party was "deprived . . . of the benefits it reasonably

expected"); *Roach*, 155 A.3d at 995 (arbitration agreement was materially breached by opportunistic invocation of right to arbitrate to *prevent* resolution of disputes).

> **2.      *Movants breached both the letter and spirit of the arbitration contracts by pursuing their claims on a consolidated basis***

The efficiency and cost-effectiveness of the contractually-agreed dispute resolution arrangement depends on the opportunity for CenturyLink and Movants to engage in individualized, bilateral, dispute resolution.  This is why the arbitration contract prohibits pursuit of claims on a "consolidated" basis in ***any*** form.  Keller Decl. Ex. 1 ¶ 17(b) ("you . . . waive any right to pursue any claims on a class or consolidated basis or in a representative capacity").  Movants consistently have avoided bilateral dispute resolution.  In derogation of their agreement to pursue claims only on an individual basis, Movants have pursued, and continue to pursue, their claims on a consolidated basis.  Background, Part III, *supra*.

By acting through Keller only on a coordinated, consolidated basis, Movants materially breached the arbitration contract by avoiding bilateral resolution and preventing their individual claim from being evaluated, and potentially resolved, efficiently and cost-effectively on the merits.  *See Roach*, 155 A.3d at 995 (material breach by conduct designed to prevent resolution of disputes).[7]

---

[7]      It is irrelevant that Movants do not "purport to represent anyone but themselves individually" in their AAA demands, because they are "represented by the same firm, filed essentially identical arbitration demands," and "all seek[ ] the same, non-individualized relief." *AT&T Mobility LLC v. Bernardi*, No. C 11-03992 CRB, 2011 WL 5079549, at *6 (N.D. Cal. Oct. 26, 2011) (addressing claims for collective injunctive relief that violated the parties' individualized agreements).  The Supreme Court has held that lower courts must police efforts to frustrate agreements calling for bilateral dispute

### 3. *Movants exercised their discretion under the contracts in bad faith to manufacture costly, unnecessary arbitration and sought to destroy the purpose and value of the arbitration contracts*

Because Movants have allowed their counsel to make all decisions and communications regarding their claims, their counsel's conduct is imputed to Movants under the law. *See Willey v. Mayer*, 876 P.2d 1260, 1264 (Colo. 1994) (holding principal liable for actions of agent with actual or apparent authority); *Omaha Indian Tribe v. Tract I-Blackbird Bend Area*, 933 F.2d 1462, 1471 (8th Cir. 1991) (imposing sanction for frivolous appeal and noting that "the client must live or die by the conduct of its counsel"). Movants are therefore responsible for their counsel's bad-faith actions.

Keller, on Movants' and others' behalf, has sought to destroy the value and purpose of the arbitration contract by exercising their discretion in bad-faith.

**Stockpiling claims for months or years.** At the outset, Keller chose not to present Movants' and others' claims to CenturyLink as they supposedly arose or became known to each customer. *See* Unthank Decl. ¶¶ 30-37; Belka Decl. ¶¶ 13-25. Instead, Keller chose to remain silent and stockpile claims *en masse* until it had signed up more than 9,000 claimants. Keller Decl. Ex. 2. Keller's actions interfered with the timely and efficient resolution of Movants' claims on the merits.

**Flooding CenturyLink with threatened arbitrations.** Next, Keller broke the dam they had created, flooding CenturyLink first with 9,000 threatened arbitrations, and then

---

resolution. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622-23 (2018) ("attacking (only) the individualized nature of the arbitration proceedings . . . seeks to interfere with one of arbitration's fundamental attributes").

with 13,000 more threatened arbitrations.  Unthank Decl. ¶¶ 30, 35, 51.  This

overwhelmed CenturyLink's dispute resolution system, which is designed to focus on

individual claims as they arise and works extremely well on a rolling, case-by-case basis.

Belka Decl. ¶¶ 5-10, 16-17.  It is not designed to resolve thousands of individual claims

simultaneously.  *Id.* ¶ 22.

> ***Withholding all claim information from CenturyLink.***  After it flooded

CenturyLink with more than 22,000 claims, Keller chose not to provide to CenturyLink

*any* information about each of its client's claims or alleged damages.  Stay Denial at 19;

Unthank Decl. ¶¶ 36, 38-39.  Instead, Keller presented CenturyLink only with (1) a

generic, consolidated arbitration demand that contained no facts about any client, and (2)

voluminous lists of Keller's clients that disclosed only the names and contact information

for thousands of clients.  Unthank Decl. ¶¶ 36, 38-39.  In other words, Keller stripped

their consolidated "claim" of all information necessary for CenturyLink to understand

any particular client's claim, depriving CenturyLink of any "opportunity to resolve" the

claims individually and on the merits.  *See, e.g.*, Belka Decl. ¶¶ 18-24; Stay Denial at 5-6,

19-22.

> ***Pursuing a consolidated settlement on behalf of 22,000 claimants.***  When

CenturyLink tried to engage with Keller in pre-arbitration dispute resolution of individual

claims as contractually agreed, Keller refused and strategically maintained that it would

discuss only a consolidated settlement on behalf of "all" of Keller's 22,000 clients.

Background, Part III, *supra*; Unthank Decl. ¶ 40 & Ex. K.

***Bad-faith conduct to manufacture costly, unnecessary arbitration.***   When CenturyLink refused to capitulate and insisted that each of Keller's clients perform the contract, Keller and Movants manufactured costly, unnecessary arbitrations that specifically defeated the contracts' intent of efficient, low-cost resolution of claims on their individual merits.   Their purpose was to obtain mass settlement leverage based not on the merits of any individual claim, but based instead on the *in terrorem* threat of massive potential "transaction costs."   *See, e.g.*, Keller Decl. Ex. 2.   For instance, Movants simultaneously filed arbitration demands with 996 of Keller's other clients. When CenturyLink asked Keller to voluntarily stay their arbitrations in deference to the Court's class settlement proceedings, Keller refused.   Unthank Decl. ¶¶ 64-67.   Keller made no effort to object to Consumer Plaintiffs and CenturyLink's request for a temporary injunction enjoining parallel arbitrations, but instead decided to disrupt and interfere with the class settlement proceedings with their belated motion.   *Cf.* Stay Denial at 4, 9, 21.   Movants have refused to follow the Court's procedures for opting out of the Settlement Class and have sought to hold the entire class settlement hostage while violating the temporary injunction and seeking to arbitrate their claims.   Tellingly, many, if not most, of Keller's clients would be better off participating in the class settlement, assuming that their claims are resolved on their merits.   *See* Unthank Decl. ¶¶ 61-62.

***Artificially inflating Movants' claimed damages.***   The Movants who filed their arbitration demands with the AAA also inflated their claimed actual damages by 10 times in a transparent attempt to deprive CenturyLink of its contractual right to choose small claims court.   Background, Part V, *supra*.

***Refusing to cure.***  All along the way, Keller and Movants ignored or rejected CenturyLink's repeated requests to cure their breaches and repudiations of the arbitration contracts.  Background, Part IV, *supra*; Unthank Decl. ¶¶ 38-54, 56-62, 70-73.  After more than six months, the extensive and ongoing bad-faith conduct detailed above made it clear that Keller and Movants would not cure and that they intended to move forward in a way that deprives CenturyLink of the value of the arbitration contracts.

**4.     *Movants Finafrock and Johnson anticipatorily repudiated their arbitration contracts***

Movants are wrong that the material breach argument is "facially inapplicable to Ms. Finafrock and Ms. Johnson" because they have not yet filed arbitration demands with AAA.  *See* Mem. at 11.  Under Colorado law, "[a]n anticipatory repudiation of contract may occur upon a party's definite and unequivocal manifestation of its intention that it will not perform as required by the contract."  *Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.*, 129 P.3d 1020, 1023 (Colo. App. 2005) (affirming holding that tenant repudiated lease contract by communicating intent not to perform); *see also* Colo. Jury Instr., Civil 30:13 ("A party to a contract who shows a clear and definite intention not to perform the contract before the time when (his) (her) (its) own performance (is due) (is to be completed) commits a breach of contract.  The intention not to perform may be shown by words or conduct or both.").

Movants Finafrock and Johnson, like all of Keller's 22,000 other clients, have repudiated their contracts by refusing to engage in good faith pre-arbitration dispute resolution, engaging in the same coordinated efforts as Keller's other clients, withholding

all information about their claims, and refusing (even to this day) to comply with their arbitration provisions or cure their breaches. *See Highlands Ranch*, 129 P.3d at 1023; *Lake Durango Water Co. v. Pub. Utils. Comm'n of State of Colo.*, 67 P.3d 12, 21 (Colo. 2003), *as modified on denial of reh'g* (Apr. 28, 2003) (affirming finding that Lake Durango had repudiated the contract by refusing to perform). "A repudiating party cannot enforce the provisions of the contract," including any contractual right to cure. *Highlands Ranch*, 129 P.3d at 1024. "Repudiation . . . allows an innocent non-repudiating party, if it so chooses, to terminate the contract without performing its part of the bargain." *Interbank Invs.*, *LLC v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1231 (Colo. App. 2000). Thus, having "clearly communicated [their] intent not to perform" their obligations under the arbitration provisions, Mses. Finafrock and Johnson are not entitled to an opportunity to cure because that would be a "futile act[]." *Highlands Ranch*, 129 P.3d at 1024.

### 5. *Movants' bad-faith material breaches preclude them from enforcing the arbitration contracts*

The purpose of Keller's conduct is obvious: the arbitration filing fees and costs that CenturyLink would be required to pay if Keller is successful in manufacturing mass arbitration, as well as the costs of defending against their attempts to interfere with these proceedings, ***vastly exceed*** the aggregate value of Movants and other clients' claims, as well as the costs of litigating those claims in small claims court. This strategy allows Keller's clients to hold a proverbial gun to CenturyLink's head and extract a ***consolidated*** settlement driven by the transaction costs of mass arbitration and defending against their

attempted interference with implementation of the class settlement for millions of class members, and on terms divorced from the underlying merits of the claims.

A party who manipulates bilateral resolution procedures to impose unnecessary costs on, and gain undue advantage over, the other party, breaches the duty of good faith and fair dealing and is not permitted to enforce the agreement. *See Hooters*, 173 F.3d at 939 (material breach where one party employed unfair rules and deprived the other party of a fair dispute resolution system); *cf. Norgren, Inc. v. Ningbo Prance Long, Inc.*, No. 14-CV-03070-CBS, 2015 WL 5562183, at *12 (D. Colo. Sept. 22, 2015) ("[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." (internal citations omitted)); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo. App. 1994) (Lender held liable for bad-faith pattern of conduct designed to extract an undue benefit, including "elect[ing] to proceed by judicial foreclosure for the sole purpose of circumventing the statutory safeguards against delay existing in the public trustee foreclosure statute" and "elect[ing] to proceed by judicial foreclosure in order to increase borrowers' debt with default interest, and thereby take more properties than it was entitled to."); *Amoco*, 908 P.2d at 498 ("The duty of good faith and fair dealing applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time.").

Thus, Movants are not permitted to enforce the arbitration contracts under the law.

### D.   CenturyLink Revoked and Terminated Movants' Arbitration Clauses for Material Breach

In response to Movants' repeated material breaches and refusal to cure their breaches and repudiations of the arbitration contracts, CenturyLink exercised its contractual rights to revoke and terminate their arbitration contracts.  Unthank Decl. ¶¶ 71-72 & Ex. Y (CenturyLink's revocation and termination notice to Movants).  Thus, Movants have no existing arbitration agreement to enforce under FAA § 4.  *See Tri-Star*, 107 S.W.3d at 612-14 (arbitration contract was revocable because non-breaching party was "deprived . . . of the benefits it reasonably expected"); *Heating & Plumbing*, 698 P.2d at 1366-67 (material breach "justified . . . terminating the contract"); *Roach*, 155 A.3d at 995.

Movants incorrectly argue that a material breach of the arbitration contract requires CenturyLink to *rescind* the entire Internet Agreement and refund to Movants all "the money" CenturyLink "collected" from them for internet services.  Mem. at 16.  To the contrary, rescission is not at issue.  "[A]n arbitration provision is severable from the remainder of the contract." *Rent-A-Ctr.*, 561 U.S. at 71 (citation omitted).  CenturyLink's revocation of Movants' arbitration contracts effectively severed and terminated the arbitration contract.  Unthank Decl. Ex. Y at 2; Background, Part IV, *supra*.

Even though Movants cannot seek arbitration in these circumstances, they are not left without a remedy.  Quite the contrary.  Movants now have the choice whether to (1) participate in the class settlement, (2) resolve their claims via CenturyLink's direct, informal dispute resolution, or (3) pursue their claims in small claims court.

For all these reasons, the Court should deny Movants' arbitration motion.

## IV. THE COURT CAN PERMIT LIMITED INTERVENTION

CenturyLink does not oppose these six Movants' request to intervene—so long as their intervention is limited to litigation of their Motion to Compel Arbitration.[8] *Flynt v. Lombardi*, 782 F.3d 963, 966 (8th Cir. 2015) (holding limited intervention under Rule 24(b) was appropriate); *In re Baycol Prods. Litig.*, 214 F.R.D. 542, 544 (D. Minn. 2003) (granting motion to intervene for limited purpose).

Now that the Court has preliminarily approved the class settlement and appointed Class Counsel, the Court should not permit Movants to raise arguments on behalf of other class members or for any purpose other than Movants' arbitration motion. *Cf. CE Design Ltd. v. King Supply Co.*, 791 F.3d 722, 726 (7th Cir. 2015) (affirming denial of motion to intervene where settlement had been negotiated and was about to be presented for approval: "At that late stage the only object of the intervention could be to block the settlement . . . ."); *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2325798, at *2 (D. Minn. June 19, 2012) (proposed intervention would prejudice the settlement parties by revisiting settlement negotiation); *Snell v. Allianz Life Ins. Co. of N. Am.*, No. 97-2784 RLE, 2000 WL 1336640, at *9 (D. Minn. 2000) (unlimited intervention would prejudice parties that expended substantial

---

[8]     Movants would need to identify the specific case(s) into which they seek to intervene, in the unlikely event the cases are ever returned to the transferor courts for trial.

effort to settle).  The Court appointed Class Counsel to represent the class members'

interests.

## V.   THE COURT SHOULD NOT STAY THE PROCEEDINGS
        IF THE COURT COMPELS ARBITRATION

If the Court were to compel arbitration of Movants' claims, CenturyLink opposes

Movants' request that the class action be stayed pending resolution of their individual

arbitrations.  Mem. at 1 (seeking a "stay [of] this proceeding until such arbitrations are

complete").  If the Court compels arbitration, it should enter an order that (1) excludes

Movants from the Settlement Class, (2) denies their motion to stay the class proceedings,

and (3) enters final judgment for Movants on their Petition for an Order Compelling

Arbitration (ECF No. 607).  Such an order and final judgment would avoid unnecessarily

staying the implementation of the class settlement for millions of class members while

Movants arbitrate their individual claims.  *Cf., e.g.*, *Piper Funds*, 71 F.3d at 304 (motion

to stay class action was moot after movant opted out of class action).

Entry of a final order and judgment also would allow CenturyLink to appeal and

seek guidance from the Eighth Circuit, without interfering with the class-action

proceedings.  *See* 9 U.S.C. § 16(a)(3) (allowing an appeal from "a final decision with

respect to an arbitration that is subject to this title"); *id.* §§ 16(b)(1) & (b)(2) (prohibiting

appeals "from an interlocutory order . . . granting a stay of any action under section 3" or

"directing arbitration to proceed under section 4").  If the Court were to grant Movants'

motion to stay under FAA § 3, however, CenturyLink would not be able to appeal the

Court's order until after Movants' arbitrations have been completed.  *See* 9 U.S.C. §§ 16

(a)(3) & (b)(1).  CenturyLink's ability to appeal the Court's ruling on Movants'

arbitration motion would serve the interests of judicial economy because the ruling

potentially will affect CenturyLink's contractual defenses to Keller's 22,000 threatened

arbitrations.

### **CONCLUSION**

For all these reasons, CenturyLink requests that the Court deny the Motions with

leave to refile after the Final Approval Hearing or, alternatively, (1) grant Movants leave

to intervene solely for the limited purpose of litigating their arbitration motion, (2) deny

the arbitration motion, and (3) deny their motion to stay as moot.


Dated: March 31, 2020                          Respectfully Submitted,

                                               /s/ Douglas P. Lobel
                                               Douglas P. Lobel (VA Bar No. 42329)
                                               David A. Vogel (VA Bar No. 48971)
                                               COOLEY LLP
                                               11951 Freedom Drive
                                               Reston, Virginia 20190
                                               Tel.: (703) 456-8000
                                               Fax: (703) 456-8100
                                               Email:    dlobel@cooley.com
                                                         dvogel@cooley.com

                                               Jeffrey M. Gutkin (CA Bar No. 216083)
                                               COOLEY LLP
                                               101 California Street, 5th Floor
                                               San Francisco, CA 94111
                                               Tel.: (415) 693-2000
                                               Fax: (415) 693-2222
                                               Email:    jgutkin@cooley.com

                                               William A. McNab (MN Bar No. 320924)
                                               WINTHROP & WEINSTINE, P.A.
                                               Capella Tower, Suite 3500

225 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 604-6400
Fax: (612) 604-6800
Email:    wmcnab@winthrop.com

Carolyn J. Fairless (CO Bar No. 30214)
Michael T. Williams (CO Bar No. 33172)
Andrew M. Unthank (CO Bar No. 36832)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone:  303.244.1800
Facsimile:  303.244.1879
Email:    williams@wtotrial.com
            unthank@wtotrial.com
            benz@wtotrial.com

Jerry W. Blackwell (MN Bar No. 186867)
Blackwell Burke P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Tel.: (612) 343-3200
Fax: (612) 343-3205
Email: blackwell@blackwellburke.com

*Attorneys for Defendant CenturyLink, Inc. and
Operating Companies Qwest Corporation,
Embarq Florida, Inc., Embarq Missouri, Inc.,
Carolina Telephone and Telegraph Company
LLC, Central Telephone Company, CenturyTel
of Idaho, Inc., CenturyTel of Larsen-Readfield,
LLC, CenturyTel of Washington, Inc.,
CenturyTel Broadband Services, LLC, and
Qwest Broadband Services, Inc.*

223104327

- 38 -