UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to | **MEMORANDUM OF LAW IN SUPPORT OF MOTION OF CENTURYLINK AND ITS OPERATING COMPANIES TO DISQUALIFY COUNSEL AND REQUIRE CORRECTIVE NOTICE** |

This Document Relates to

| | |
|---|---|
| 0:17-cv-02832 | 0:17-cv-04943 |
| 0:17-cv-04613 | 0:17-cv-04944 |
| 0:17-cv-04614 | 0:17-cv-04945 |
| 0:17-cv-04615 | 0:17-cv-04947 |
| 0:17-cv-04616 | 0:17-cv-05046 |
| 0:17-cv-04617 | 0:18-cv-01562 |
| 0:17-cv-04618 | 0:18-cv-01572 |
| 0:17-cv-04619 | 0:18-cv-01573 |
| 0:17-cv-04622 | 0:18-cv-01565 |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES...........................................................................iii

INTRODUCTION ......................................................................................... 1

FACTS .......................................................................................................... 3

I. KELLER CLAIMS TO REPRESENT 22,000 CENTURYLINK
CUSTOMERS AS CLIENTS ................................................................. 3

II. KELLER MISREPRESENTS KEY FACTS TO ENCOURAGE CLIENTS
TO OPT OUT OF THE SETTLEMENT ................................................ 5

III. KELLER DOES NOT PROVIDE INDIVIDUALIZED
REPRESENTATION TO EACH CLIENT............................................. 9

    A.    Each Client Presents Unique Claims, Counterclaims, and Defenses,
for Which Arbitration May Not Be the Superior Strategy ........................... 9

    B.    Keller Offers the Same Advice to All Clients, Regardless of Each
Client's Best Interest .................................................................. 11

IV. KELLER'S REPRESENTATION OF 22,000 CLASS MEMBERS IS RIFE
WITH CONFLICTS ............................................................................ 13

V. KELLER'S CONTINUED REPRESENTATION THREATENS
CENTURYLINK AND THE CLASS MEMBERS ............................... 14

LEGAL STANDARD ................................................................................. 14

ARGUMENT............................................................................................... 15

I. THE COURT HAS INHERENT AUTHORITY TO REGULATE
LAWYERS WHO APPEAR BEFORE IT............................................ 15

    A.    The Court Has Authority to Disqualify Keller............................. 15

    B.    CenturyLink Has Standing to Request Keller's Disqualification .............. 16

II. KELLER VIOLATED NUMEROUS ETHICAL OBLIGATIONS..................... 18

    A.    Keller Has Misled Its Clients ................................................... 19

i

# **TABLE OF CONTENTS (cont.)**

Page

B.    Keller Is Not Providing Individualized Advice to 22,000 Clients ............. 20

C.    Keller Has Non-Consentable Conflicts of Interest ...................................... 23

III.    THE COURT SHOULD DISQUALIFY KELLER AND ORDER
CORRECTIVE NOTICE TO ITS CLIENTS ......................................................... 27

A.    Disqualification Is Appropriate to Protect Class Members ......................... 27

B.    The Court Should Require Keller's Clients to Opt Out Individually .......... 30

C.    The Court Should Order the Settlement Administrator to Send
Corrective Notice to Keller's Clients, at Keller's Expense ......................... 31

CONCLUSION ............................................................................................................. 33

## TABLE OF AUTHORITIES

Page

<u>**Cases**</u>

*Abbott v. Kidder Peabody & Co.*,
 42 F. Supp. 2d 1046 (D. Colo. 1999)....................................................... 16, 17, 25

*Allred v. Pacificorp*,
 2015 WL 12866208 (D. Utah Oct. 19, 2015) ............................................. 20, 22

*Arnold v. Cargill Inc.*,
 2004 WL 2203410 (D. Minn. Sep. 24, 2004) ...........................15, 16, 27, 28-29

*AVR, Inc. v. Cemstone Prods. Co.*,
 1993 WL 104933 (D. Minn. Mar. 25, 1993) ................................................ 26, 27

*Black v. Missouri*,
 492 F. Supp. 848 (W.D. Mo. 1980) ................................................................... 16

*Clarke v. First Transit, Inc.*,
 2012 WL 12877865 (C.D. Cal. Nov. 2, 2012) .................................................. 28

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
 2019 WL 144589 (N.D. Cal. Jan. 9, 2019) ................................................ 14, 26

*Doe v. Nielsen*,
 883 F.3d 716 (7th Cir. 2018) ...................................................................... 24, 25

*Doe v. Reg'l Sch. Unit No. 21*,
 2013 WL 492540 (D. Me. Feb. 7, 2013) ............................................................ 5

*DT Boring, Inc. v. Chicago Pub. Bldg. Comm'n*,
 2016 WL 3580756 (N.D. Ill. June 28, 2016)..................................................... 17

*Evans v. Jeff D.*,
 475 U.S. 717 (1986)........................................................................................... 18

*Fed. Deposit Ins. Corp. v. Amundson*,
 682 F. Supp. 981 (D. Minn. 1988)..................................................................... 16

*First NBC Bank v. Murex, LLC*,
 259 F. Supp. 3d 38 (S.D.N.Y. 2017) ................................................................. 25

## TABLE OF AUTHORITIES (cont.)

Page

*Georgine v. Amchem Prods., Inc.*,
  160 F.R.D. 478 (E.D. Pa. 1995) ........................................................ 22, 30, 32

*Gifford v. Target Corp.*,
  723 F. Supp. 2d 1110 (D. Minn. 2010) ............................................. 15, 16, 27

*Great Rivers Co-op. v. Farmland Ind., Inc.*,
  9 F.3d 764 (8th Cir. 1995) ....................................................................... 32

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ..................................................................... 16

*Healy v. Axelrod Constr. Co. Defined Benefit Pension Plan & Tr.*,
  155 F.R.D. 615 (N.D. Ill. 1994) ................................................................. 26

*In re BankAmerica Corp. Sec. Litig.*,
  350 F.3d 747 (8th Cir. 2003) ............................................................... 16, 27

*In re Coleman*,
  295 S.W.3d 857 (Mo. 2009) ...................................................................... 24

*In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*,
  2009 WL 5195841 (D. Minn. Dec. 15, 2009) ....................................... 22, 23

*In re Lutheran Bhd. Variable Ins. Prods. Co.*,
  2002 WL 1205695 (D. Minn. 2002) ................................................... *passim*

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1239 (N.D. Cal. 2000) ..................................... 28, 29, 32, 33

*In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*,
  910 F. Supp. 2d 891 (E.D. La. 2012) ................................................... 21-22

*In re Owens Corning*,
  305 B.R. 175 (D. Del. 2004) ...................................................................... 22

*In re Payment Card Interchange Fee
and Merchant Discount Antitrust Litig.*,
  2014 WL 4966072 (E.D.N.Y. Oct. 3, 2014) ........................................ 29, 32

*In re Potash Antitrust Litig.*,
  1993 WL 543013 (D. Minn. Dec. 8, 1993) ............................. 14-15, 16, 18, 27

## <u>TABLE OF AUTHORITIES (cont.)</u>

<u>Page</u>

*In re Synthroid Mktg. Litig.*,
  197 F.R.D. 607 (N.D. Ill. 2000) ...................................................................... 32

*In re Vioxx Prod. Liab. Litig.*,
  760 F. Supp. 2d 640 (E.D. La. 2010) ............................................................ 23

*In re World Trade Ctr. Disaster Site Litig.*,
  754 F.3d 114 (2d Cir. 2014) ......................................................................... 29

*In re World Trade Ctr. Disaster Site Litig.*,
  769 F. Supp. 2d 650 (S.D.N.Y. 2011) .......................................................... 26

*In re World Trade Ctr. Disaster Site Litig.*,
  834 F. Supp. 2d 184 (S.D.N.Y. 2011) .......................................................... 29

*In re WorldCom, Inc. Sec. Litig.*,
  2003 WL 22701241 (S.D.N.Y. Nov. 17, 2003) ............................................. 32

*In re Zurn Pex Plumbing Prods. Liab. Litig.*,
  2012 WL 5055810 (D. Minn. Oct. 18, 2012) ................................................ 30

*Johnson v. M.B. Fin. Bank, N.A.*,
  2016 Ill. App. (1st) 151817-U (2016) ........................................................... 31

*Macheca Transp. Co. v. Philadelphia Indem. Co.*,
  463 F.3d 827 (8th Cir. 2006) ....................................................................... 28

*Matter of Panel File 96-35*,
  570 N.W.2d 499 (Minn. 1997) ..................................................................... 18

*Mendez v. Radec Corp.*,
  907 F. Supp. 2d 353 (W.D.N.Y. 2012) ......................................................... 24

*Moulton v. U.S. Steel Corp.*,
  581 F.3d 344 (6th Cir. 2009) ....................................................................... 25

*O'Connor v. Jones*,
  946 F.2d 1395 (8th Cir. 1991) ................................................................ 15, 17

*Olson v. Snap Prods., Inc.*,
  183 F.R.D. 539 (D. Minn. 1998) .................................................................. 15

# TABLE OF AUTHORITIES (cont.)

Page

*Pine Island Farmers Coop v. Erstad & Riemer, P.A.*,
    649 N.W.2d 444 (Minn. 2002) .................................................................. 18

*Retiree Support Grp. v. Contra Costa Cty.*,
    2016 WL 4080294 (N.D. Cal. July 29, 2016) ............................................ 33

*Rice v. Perl*,
    320 N.W.2d 407 (Minn. 1982) ............................................................ 20, 22

*Sanchez Ritchie v. Energy*,
    2014 WL 12637956 (S.D. Cal. Aug. 13, 2014) ........................................... 5

*Selover v. Hedwall*,
    184 N.W. 180 (Minn. 1921) ...................................................................... 22

*STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*,
    644 N.W.2d 72 (Minn. 2002) .............................................................. 18, 22

*Zerger & Mauer LLP v. City of Greenwood*,
    751 F.3d 928 (8th Cir. 2014) .................................................................... 15

## Statutes, Rules, and Regulations

755 Ill. Comp. Stat. 45/3-3(b) ....................................................................... 31

Ill. R. Prof'l Conduct 1.1 .................................................................... 2, 20, 22

Ill. R. Prof'l Conduct 1.2 .................................................................... 2, 20, 22

Ill. R. Prof'l Conduct 1.3 .................................................................... 2, 21, 22

Ill. R. Prof'l Conduct 1.4 .................................................................... 2, 21, 22

Ill. R. Prof'l Conduct 1.7 ...................................................................... 24, 26

Ill. R. Prof'l Conduct 1.7(b) ........................................................................ 24

Ill. R. Prof'l Conduct 1.7(b)(1) ................................................................... 24

Ill. R. Prof'l Conduct 8.4(c) ............................................................. 2, 19, 20

Minn. R. Prof'l Conduct 1.1 ............................................................... 2, 20, 22

**TABLE OF AUTHORITIES (cont.)**

Page

Minn. R. Prof'l Conduct 1.2......................................................................2, 20, 22

Minn. R. Prof'l Conduct 1.3......................................................................2, 21, 22

Minn. R. Prof'l Conduct 1.4......................................................................2, 21, 22

Minn. R. Prof'l Conduct 1.7......................................................................2, 24, 26

Minn. R. Prof'l Conduct 1.7(b) ........................................................................24

Minn. R. Prof'l Conduct 1.7(b)(1) .....................................................................24

Minn. R. Prof'l Conduct 7.1......................................................................2, 19, 20

**Other Authorities**

Karl Stark,
   *Merck offers billions for Vioxx claims*,
   Philadelphia Inquirer (Nov. 10, 2007)..........................................................23

Michael Corkery & Jessica Silver-Greenberg,
   *'Scared to Death' by Arbitration: Companies Drowning in Their Own System*,
   N.Y. Times, Apr. 6, 2020 ................................................................................3

Richard E. Flamm,
   LAWYER DISQUALIFICATION § 2.2 (2d. 2014)................................................5

## **INTRODUCTION**

The Court should disqualify Keller Lenkner LLC ("Keller") from representing class members in this proceeding because Keller has committed multiple ethical violations and has obstructed the Court's efforts to fairly inform class members of their opportunity to participate in the class settlement.  If Keller continues to represent these class members, and continues to communicate with them about the settlement, many thousands of class members may be deprived of this opportunity.  The Court should also issue corrective notice to ensure that these class members can consider the class settlement free of misleading, incomplete, and conflicted advice.

The Court has broad discretion to determine the counsel who appear before it, not only to enforce ethics rules, but to maintain public confidence in the legal profession and protect absent class members.  CenturyLink has standing to raise Keller's ethical violations because CenturyLink has been directly harmed by Keller's misconduct and its ethical violations impair the fairness of the proceeding.

The Court should exercise its authority to disqualify Keller from this case.  Keller has repeatedly misled more than 22,000 class members by:

- Inducing class members to retain Keller without informing them about the class action lawsuits, the proposed settlement, or Keller's or other clients' conflicting interests;

- Misrepresenting the settlement's terms, even after the Court entered its Preliminary Approval Order;

- Providing "one size fits all" advice that the settlement is a "bad deal," regardless of each client's unique circumstances; and

- Misrepresenting to clients CenturyLink's reasons for not proceeding with arbitration, and failing to inform clients that Keller had breached their arbitration contracts and that CenturyLink had terminated the contracts.

As a result, the Court cannot determine whether any of those clients have made *fully-informed* decisions to opt out of the Settlement Class, free from misleading and conflicted advice.

Keller's misconduct violates multiple requirements of the Minnesota and Illinois Rules of Professional Conduct, including:

- **Rules 7.1 and 8.4(c)** by misrepresenting and omitting material information;

- **Rule 1.7** by simultaneously representing more than 22,000 class members despite two types of non-consentable conflicts among its clients and between Keller and its clients; and.

- **Rules 1.1, 1.2, 1.3 and 1.4** by failing to provide adequate individualized representation and advice.

Because of these ethical violations, the Court should disqualify Keller from continuing to represent clients with respect to this class action and the proposed settlement. The Court also should order that Keller's clients be sent corrective notice that provides accurate information about the class settlement to cure Keller's misinformation. Without these actions, Keller's unethical conduct will continue to harm tens of thousands of absent class members and CenturyLink and will interfere with the fair administration of this MDL. Numerous courts in similar situations have ordered similar remedies. For example, Judge Magnuson barred a third-party lawyer from representing some class members before the court and ordered corrective notice due to the lawyer's misleading

solicitations and misrepresentations regarding that class action. *In re Lutheran Bhd. Variable Ins. Prods. Co.*, 2002 WL 1205695 (D. Minn. 2002).

Here, the Court should disqualify Keller from representing any class members before the Court, order that Keller not to communicate further with its clients regarding the class settlement, and order that corrective notice be sent to Keller's clients.

## FACTS

### I.    KELLER CLAIMS TO REPRESENT 22,000 CENTURYLINK CUSTOMERS AS CLIENTS

Keller, a boutique law firm founded in 2017, employs fewer than two dozen lawyers. Declaration of Andrew Unthank ("Unthank Decl.") ¶ 18, ECF Nos. 512 & 513. Keller touts its "experience managing litigation-related investments." *Id.* ¶ 16 & Ex. A, p. 10. Its litigation-related investment strategy is to interfere with class actions by soliciting and stockpiling thousands of class members whose claims Keller threatens to present collectively in arbitration. *Id.* ¶ 17. Keller uses the specter of tens of millions of dollars in arbitration fees as leverage to extract global settlements, without consideration of the merits of individual claims. *Id.* ¶¶ 32-34. It has employed this same strategy against Uber, Postmates, DoorDash, FanDuel, DraftKings, and other companies.[1] *Id.* ¶¶ 17-18. Keller claims to represent **over 50,000** individual clients. *Id.* ¶ 18.

---

[1]    In fact, Keller is promoting itself and its new "flood of claims" strategy to the media, apparently seeking to shape the public's view. *See, e.g.*, Michael Corkery & Jessica Silver-Greenberg, *'Scared to Death' by Arbitration: Companies Drowning in Their Own System*, N.Y. Times, Apr. 6, 2020, available at https://www.nytimes.com/2020/04/06/business/arbitration-overload.html (last visited Apr. 7, 2020). The evidence discussed below shows that Keller has overstepped, creating

Keller has targeted CenturyLink with the same mass arbitration scheme.  In May 2019, Keller first threatened to "simultaneously" file arbitrations for about 9,000 clients, which "would obligate CenturyLink to pay . . . more than $30 million in initial filing fees and costs[.]"  *Id.* ¶¶ 30, 33.  Keller has since increased its inventory to more than 22,000 clients, *id.* ¶ 51, inflating its arbitration-fee threat to $100 million.  Keller has withheld basic information about each of its clients' claims, preventing CenturyLink from evaluating or resolving any claim individually on the merits.  Mem. of Law & Order ("Stay Denial") at 19, ECF No. 57 in Case 0:17-cv-02832-MJD-KMM.  Keller has demanded that CenturyLink pay a massive, consolidated settlement to avoid the arbitration fees.  Unthank Decl. ¶ 34.

The strategy generates a substantial payout for Keller only if Keller negotiates a mass "opt out" settlement.  *Id.* ¶¶ 34, 48 & Ex. M at 4.  In all other scenarios, however, Keller receives little or nothing, even if its individual clients would be better off.  Tr. of Feb. 20, 2020 Mot. Hr'g ("Feb. 20 Tr."), ECF No. 571, 31:24–32:1, filed concurrently herewith.  Keller's compensation thus is contingent on persuading as many clients as possible to opt out of the class settlement.  It has no incentive to advise its clients to participate in that settlement, even if doing so is unquestionably in the clients' best interests.  None of its available client communications advises its clients to remain in the class, even if they stand to recover nothing by opting out.

---

substantial problems when it adapted its one-size-fits-all model to CenturyLink's customers and this class action.

## II.   KELLER MISREPRESENTS KEY FACTS TO ENCOURAGE CLIENTS TO OPT OUT OF THE SETTLEMENT

Keller's retention materials and ongoing client communications use false or misleading statements to steer class members away from the class settlement.

***Misleading Solicitation and Enrollment Materials.***  As detailed in CenturyLink's Supplemental Brief (ECF No. 509 at 13-14), Keller designed its online solicitations and client enrollment to funnel clients into arbitration through misleading statements.

- Before the client's retention, Keller failed to disclose the class action or the cost-free, risk-free class settlement.  Unthank Decl. ¶¶ 21-26 & Exs. D-E.

- At the time of retention, Keller stated that there were no known conflicts, even though multiple conflicts exist.  *Id.* ¶ 26; Declaration of Professor Nancy Moore ("Moore Decl.") ¶ 13, ECF No. 510 & 511.[2]

- Keller advised prospective clients it would pursue "individual" arbitration, but did not disclose it will pursue *mass* arbitration without first evaluating and potentially resolving claims on their individual merits.  Unthank Decl. ¶¶ 21-26 & Exs. D-E.

- Keller did not disclose the risks of its mass arbitration strategy, including the risks of breaching the clients' arbitration contracts.  *Id.*

- Keller falsely told clients CenturyLink will pay Keller's fees in arbitration. *Id.* ¶¶ 19-20 & Ex. C.

---

[2]     The Court can consider Professor Nancy Moore's ethics opinions as part of its disqualification analysis.  *See, e.g.*, *Sanchez Ritchie v. Energy*, 2014 WL 12637956, at *3 (S.D. Cal. Aug. 13, 2014) (considering expert ethics opinion on motion for disqualification); *Doe v. Reg'l Sch. Unit No. 21*, 2013 WL 492540, at *11 n.11 (D. Me. Feb. 7, 2013) (same); *see also* Richard E. Flamm, LAWYER DISQUALIFICATION § 2.2 at 21 (2d. 2014) ("There are times when a judge may find the opinion of an expert witness to be relevant and helpful in determining the ethical issues involved.  For this reason, many courts have allowed—even welcomed—expert witness testimony with respect to the issues raised by a disqualification motion.").

Keller continued to make these misleading statements—without mentioning the class settlement—for months after Keller learned about the class settlement.  Unthank Decl. ¶¶ 22-26 & Ex. E.  It continued to do so even after the Court entered its Preliminary Approval Order.  Sun Decl. ¶ 11 & Ex. E.

    ***Misrepresenting Terms of Settlement.***  Since preliminary approval, Keller's client communications have continued to be misleading.  In those communications, some of which its clients posted online, Keller misrepresented the terms of the class settlement:

- In one email sent on or before February 7, 2020, Keller advised the settlement "averages out to $1 per class member," and said "we don't think an average of $1 per class member is nearly enough money":

> As you may know, CenturyLink has been defending itself against a large consumer-fraud class action for a few years now. Throughout that case—which Keller Lenkner LLC was not involved in—CenturyLink has argued that its customers could not bring claims in court, and instead had go through arbitration, as you did. But this summer, CenturyLink decided to settle the class action after all, paying $15 million to release the claims of approximately 15 million people. While the amount each class member receives will vary, that averages out to $1 per class member. If you'd like to know more about the settlement, you will soon be able to review them at the settlement website. In the meantime, you may view a copy of the proposed class notice here, and the settlement documents are available here.

    * * * * *

> We think the settlement violates your contract with CenturyLink, and we don't think an average of $1 per class member is nearly enough money. Although we cannot promise any particular result, we believe we can do better than $1 per person if we bring individual arbitrations for our clients.

Sun Decl. ¶¶ 8-10 & Ex. F.

- In the email above, Keller failed to disclose the $30 undocumented claim option or the option of submitting a documented claim for a larger amount. *Id.*

- In another email sent on or before February 18, 2020, Keller misleadingly stated that class members will receive "an average of $30," regardless of whether they make a documented or undocumented claim:

> We think the settlement violates your contract with CenturyLink, and we don't think an average of $30 per class member is nearly enough money. Although we cannot promise any particular result, we believe we can do better than $30 per person if we bring individual arbitrations for our clients.

*Id.* Ex. E.

- Keller advised clients they "can do better than" $30 per claimant, without mentioning any of the risks of arbitration (*e.g.*, that some claims are time barred, and other clients owe CenturyLink money that CenturyLink will pursue if they choose arbitration or small claims court). *Id.*

***Misrepresenting Facts Regarding CenturyLink's Termination.***  CenturyLink terminated Keller's clients' arbitration contracts after Keller materially breached and repudiated the contracts on behalf of its clients.  Unthank Decl. ¶¶ 71-73 & Ex. Y at 2. CenturyLink asked Keller to forward the notice to Keller's clients and, alternatively, offered to send the notice directly if Keller preferred.  *Id.* Ex. Y at 1.  Keller never responded.

Instead, Keller (i) failed to forward the notice to some or all clients, (ii) misrepresented CenturyLink's termination, and (iii) concealed Keller's role in triggering the termination:

- In several emails, Keller falsely stated:  "CenturyLink refused to go forward with the arbitrations . . . because they were going to settle your claims in a class action settlement."  Sun Decl. Exs. E-G.

- None of Keller's publicly-available, post-termination communications disclosed that CenturyLink terminated the clients' arbitration contracts. *Id.*

- Nine of Keller's clients filed declarations in in this MDL that listed documents Keller provided them, but ***none of them*** said Keller provided them with CenturyLink's termination notice. *See* Declarations of Movants ("Movants' Decls."), ECF Nos. 539, 541-542, 600-605 (listing selected documents provided by Keller that do *not* include the notice).

- Keller apparently has not disclosed CenturyLink's Supplemental Brief, which (a) attached the termination notice, (b) explained Keller's material breaches that triggered termination, and (c) detailed Keller's misconduct. *See id.* (listing documents Keller provided, but omitting the Supplemental Brief).

**<u>*Misrepresenting Clients' Responsibility for Keller's Fees.*</u>**   Keller also misled, or at least confused, its clients about their responsibility to pay its attorneys' fees, to dissuade clients from participating in the class settlement.

- Keller's Retainer Agreement states the client must pay Keller $750 as a "reasonable" fee if the client terminates Keller's representation without commencing arbitration (*e.g.*, participates in the class settlement).  Unthank Decl. ¶ 26; Moore Decl. ¶¶ 14(d), 25-26.

- Keller has falsely stated that CenturyLink will pay Keller's fees if the client opts to pursue arbitration, including in the event of a settlement.  Unthank Decl. ¶¶ 19-20 & Ex. C; Sun Decl. ¶ 12 & Ex. I.

Attempting to undo the damage, Keller recently sent a mass email disclaiming its intention to seek fees from clients who participate in the class settlement and attempting to clarify that its fees for arbitration would reduce its clients' recoveries.  *See* Sun Decl. Ex. E ("And under our agreement with you, you will never owe us any attorneys' fees out-of-pocket.  You will only ever pay us attorneys' fees as part of any award or settlement you receive from CenturyLink."); *see also id.* Feb. 20 Tr. at 31:24–32:1 ("We want no fees from any part of the settlement.").  These after-the-fact disclaimers in mass

emails to clients do not eliminate possible confusion created by Keller's earlier statements in the formal Retainer Agreement.  Supplemental Declaration of Professor Nancy Moore ("Moore Suppl. Decl.") ¶ 8, filed concurrently herewith.

## III.   KELLER DOES NOT PROVIDE INDIVIDUALIZED REPRESENTATION TO EACH CLIENT

Keller pursues a generic "one-size-fits-all" strategy in which it advises class members that the class settlement is a "bad deal" and encourages arbitrations, in line with Keller's financial interests, but without regard to the clients' risk and often against the clients' best interests.

### A.   Each Client Presents Unique Claims, Counterclaims, and Defenses, for Which Arbitration May Not Be the Superior Strategy

As a starting point, it is important to recognize that the potential claims of each of Keller's clients—like each class member—vary widely.

***Widely Varying Claims.***  CenturyLink provides many different consumer services. Individual complaints about "overbilling" vary wildly, arising from a range of sales, installation, repair, billing, or termination-of-service issues.  Declaration of Scott Belka ("Belka Decl.") ¶¶ 15-17, ECF Nos. 628-29.  Yet, Keller originally sent CenturyLink the same generic, draft complaint to describe all of its clients' claims.  Unthank Decl. ¶ 30 & Ex. H at 9.

Some of Keller's clients have very small claims.  For instance, one of its 1,000 clients who filed a AAA arbitration demand claimed: "Despite being quoted $42.00 per month, Claimant was in fact charged $43.00 per month for 3 months," for ***actual damages of $3***.  Sun Decl. Ex. J.  If that claimant were to file a risk-free, cost-free claim

in the class settlement, the client may receive a settlement payment that is up to ten times or more her actual damages. Nevertheless, Keller filed a AAA demand seeking *$900* in compensatory damages, plus attorney fees, interest, arbitration costs, punitive damages, and injunctive relief. *Id.*

***CenturyLink's Counterclaims.***  CenturyLink's preliminary analysis of Keller's first 1,000 arbitration demands shows that about 34% of Keller's clients owe CenturyLink money.  Unthank Decl. ¶ 62.c.  CenturyLink would pursue these unpaid balances, and those claimants could end up owing CenturyLink money.

***Affirmative Defenses***.  For Keller's first 1,000 arbitration demands, CenturyLink has preliminarily determined that:

- Over two-thirds seek to recover payments made, without protest, for at least one year, and one in six continued to voluntarily pay for five years, Unthank Decl. ¶ 59, exposing them to waiver and voluntary payment defenses.

- Over half voluntarily accepted credits and other resolutions from CenturyLink when they called with billing disputes and are subject to accord-and-satisfaction defenses.  *Id.* ¶ 62.a.

- Many of Keller's clients are subject to statute of limitations defenses because they closed their accounts years ago.  *Id.* ¶ 62.d.

***Different Strategies.***  For these and other reasons, each client would have a unique perspective on the wisdom of participating in the class settlement or pursuing arbitration, especially if Keller disclosed their arbitration contracts have been terminated and that CenturyLink had offered to negotiate individually with each client.  For clients with a claim at or below $30, or who face significant counterclaims for unpaid balances, the guaranteed payout of $30 is less risky than attempting to arbitrate.  Other clients could

submit a documented claim for more than $30, rather than face counterclaims or affirmative defenses.  Because each of Keller's 22,000 clients has unique considerations, their individual strategy assessments necessarily differ.

### B.      Keller Offers the Same Advice to All Clients, Regardless of Each Client's Best Interest

Keller has shunned the class settlement and pursued arbitration for its more than 22,000 clients, regardless of each client's individual best interest.  Under this one-size-fits-all approach, Keller is not providing adequate individual representation to its clients with respect to the class settlement.

***Keller Enrolled Clients Without Minimal Due Diligence.***  To build its inventory of clients, Keller operated an online advertising and solicitation campaign.  Unthank Decl. ¶¶ 19-26.  Potential clients were asked for their contact information and answers to only ***two*** Yes/No questions about their claims.  *Id.* ¶ 23.  Even if a potential client answered "no"—indicating they had not been billed more than quoted or for services not requested—Keller ***instantaneously*** sent its Questionnaire and Retainer Agreement.  *Id.* ¶¶ 24-25.  None of these forms required supporting documents.  *Id.* ¶ 25 & Ex. E.  Keller's Retainer Agreement includes a "Power of Attorney," which, if enforceable, purports to allow Keller to "execute all documents connected with your claims" without the clients' knowledge or consent.  *Id.* ¶ 26

***Keller Refused to Discuss Each Client's Claim Pre-Arbitration.***  Keller then presented clients' claims to CenturyLink on a consolidated basis and threatened "simultaneous" arbitration filings.  Unthank Decl. ¶ 40 & Ex. K.  When CenturyLink

asked for information about the individual claims, Keller refused to spend even "15 minutes per client" discussing their claims with CenturyLink. *Id.* Instead, Keller insisted CenturyLink address "all" their claims together. *Id.*

**_Keller Sends Generic Advice to Clients_.** After the Court granted preliminary approval of the class settlement, Keller sent emails to clients providing generic advice regarding the settlement. Sun Decl. Exs. E-G. Rather than analyzing each client's claim or making an individualized recommendation, Keller's emails discourage *all* clients from participating in the settlement. *See id.* Keller calls the settlement "a bad deal . . . that you are completely free to participate in"; tells clients "we believe we can do better than $30 per person if we bring individual arbitrations for our clients"; and asks them to "[p]lease also keep an eye on your inbox and your phone" because Keller will "be sending instructions for opting out of the settlement in the near future." *Id.* Ex. F. Keller never explains in these emails the relative risks and benefits of pursuing individual arbitration versus the class settlement. *See id.* Exs. E-G.

**_Keller Attempts Mass Opt Outs_**. The harm to class members from this lack of individual representation is not speculative or remote. Earlier today, Keller filed a letter with the Court in which Keller purported to opt out *en masse* approximately 2,000 class members. Letter from Postman to Court ("Postman Letter"), ECF Nos. 631-633.

## IV.     KELLER'S REPRESENTATION OF 22,000
##          CLASS MEMBERS IS RIFE WITH CONFLICTS

Keller's Retainer Agreement falsely states that no conflict exists with Keller's representation of the client at the time of retention.  Unthank Decl. ¶ 26.  Keller's inventory of 22,000 class members with divergent interests is filled with conflicts.

***Conflicts of Interest Between Keller and Its Clients.***  Keller's interests conflict with its clients' interests.  Moore Suppl. Decl. ¶ 13.  Keller tacitly admits it will receive substantial fees only if large numbers of its clients opt out and it succeeds in extracting a mass settlement.  *See* Sun Decl. Ex. A at 31:24–32:1; *id.* Exs. E-G.  As the number of opt outs increases, Keller's potential fees also increase.  This math creates a perverse incentive for Keller to encourage all of its clients to opt out, without regard to whether any individual client may do better in the class settlement.  Moore Suppl. Decl. ¶ 13(b).

***Conflicts Between Clients.***  In addition, Keller's clients have divergent interests with respect to the class settlement offer and their individual opt-out decisions.

The majority of its clients are unlikely to succeed in arbitration—because their claims are undocumented, time-barred, or subject to counterclaims (or some combination of these)—and would be best served by participating in the class settlement.  By contrast, a minority of its clients with relatively stronger claims could potentially recover more in individual suits or arbitrations than in the class settlement.  These interests conflict when Keller pursues its consolidated settlement strategy for all clients.  By including weak claims with relatively stronger claims in the same consolidated settlement negotiation,

Keller weakens the bargaining power of the stronger claimants and underserves their interests.

This is not the first time Keller has disregarded conflict-of-interest rules.  A California federal court disqualified the Keller firm and Warren Postman in a matter against Uber based on a conflict.  *Diva Limousine, Ltd. v. Uber Techs., Inc.*, 2019 WL 144589, at *14 (N.D. Cal. Jan. 9, 2019).

## V.    KELLER'S CONTINUED REPRESENTATION THREATENS CENTURYLINK AND THE CLASS MEMBERS

Keller's conduct has injured, and will continue to injure, CenturyLink and class members.  Keller's misrepresentations and omissions to clients—tens of thousands of CenturyLink customers—have caused them to breach their arbitration contracts with CenturyLink, and thereby deprived CenturyLink of the opportunity to resolve their claims individually without incurring the expense of arbitration.  Unthank Decl. ¶¶ 71-73 & Ex. Y at 2; *cf.* Stay Denial at 19.  In addition, Keller's conflicted advice to its clients to opt out of the "bad deal" directly undermines the interests of CenturyLink (as well as the Consumer Plaintiffs and the Court) in the administration of the class settlement.  Further, Keller's misinformation deprives thousands of class members of their ability to make *fully-informed* decisions to opt out of or participate in the class settlement, free from misleading and conflicted advice.

## LEGAL STANDARD

Disqualification is an ethical, not a legal, matter, and is in both the public's and the client's interest.  *In re Potash Antitrust Litig.*, 1993 WL 543013, at *16 (D. Minn. Dec. 8,

1993).  An attorney can and should be disqualified where his actions "threaten[] to work a continuing taint on the litigation."  *Arnold v. Cargill Inc.*, 2004 WL 2203410, at *5 (D. Minn. Sep. 24, 2004).  Motions to disqualify are "subjected to particularly strict scrutiny," but "any legitimate doubts . . . must be resolved in favor of disqualification." *Gifford v. Target Corp.*, 723 F. Supp. 2d 1110, 1117 (D. Minn. 2010) (citations omitted); *accord Olson v. Snap Prods., Inc.*, 183 F.R.D. 539, 542 (D. Minn. 1998).

## ARGUMENT

The breadth and pervasiveness of Keller's misconduct should give the Court substantial doubt whether any Keller client can make an informed opt-out decision. Although disqualification may be disruptive, it is necessary to ensure that every class member is treated fairly and empowered to act in their own best interests.

## I.   THE COURT HAS INHERENT AUTHORITY TO REGULATE LAWYERS WHO APPEAR BEFORE IT

The Court has authority to determine—and CenturyLink has standing to request— that Keller should be disqualified from further representation of class members.

### A.   The Court Has Authority to Disqualify Keller

The Court has authority to disqualify counsel who appear in a matter before it, as part of its "inherent need to manage its bar and uphold the rules of professional conduct." *Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 931 (8th Cir. 2014).  In cases where an attorney's actions violate the applicable ethical rules, a court "may act on motion of an aggrieved party or may act *sua sponte* to disqualify."  *O'Connor v. Jones*, 946 F.2d 1395, 1299 (8th Cir. 1991).  The Court has a "duty to maintain public

confidence in the legal profession" as well as a "duty to insure the integrity of the judicial proceedings." *Arnold*, 2004 WL 2203410, at *5; *accord Gifford*, 723 F. Supp. 2d at 1122 (court should keep "[p]reservation of the public trust both in the scrupulous administration of justice and integrity of the bar . . . paramount").

These obligations are particularly acute in class actions. The Court "acts as a fiduciary" and "must serve as [a] guardian of the rights of absent class members." *In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747, 751-2 (8th Cir. 2003) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975)); *see also Abbott v. Kidder Peabody & Co.*, 42 F. Supp. 2d 1046, 1050 (D. Colo. 1999) (finding defendant had standing to raise disqualification because of "clear public policy issue regarding the ability of the Plaintiffs' attorneys to provide individual counsel" to 200 individuals).

### B.   CenturyLink Has Standing to Request Keller's Disqualification

Although the "general rule" is that only former clients can move for disqualification of opposing counsel, *Potash*, 1993 WL 543013, at *9, there are exceptions. *See Fed. Deposit Ins. Corp. v. Amundson*, 682 F. Supp. 981, 987 (D. Minn. 1988) ("some public interest or some wrong either committed or hidden" can give a non-client litigant standing to request disqualification). Standing can arise "where the interests of the public are . . . greatly implicated," as they are in this case, with a putative nationwide class of over 17 million CenturyLink customers. *Black v. Missouri*, 492 F. Supp. 848, 861 (W.D. Mo. 1980) (finding an opposing party had standing to request disqualification).

CenturyLink, an opposing party, has standing to request disqualification because Keller's ethical issues interfere with the administration of justice, offend public policy, or otherwise taint the proceedings. *See, e.g.*, *DT Boring, Inc. v. Chicago Pub. Bldg. Comm'n*, 2016 WL 3580756, at *6 (N.D. Ill. June 28, 2016) ("[W]here the conflict is such as to clearly call in question the fair or efficient administration of justice, opposing counsel may properly raise the question." (internal quotes and marks omitted)); *Abbott*, 42 F. Supp. 2d at 1050 ("[C]ase law gives an opposing party standing to challenge where the interests of the public are so greatly implicated that an apparent conflict of interest may tend to undermine the validity of the proceedings."). As Judge Magnuson ruled in *Lutheran Brotherhood*, a lawyer's misleading communications with class members may "affect not only the parties' rights in this litigation," but "also affect the Court and its ability to control the fairness of this litigation and administer justice." 2002 WL 1205695, at *2.

In addition, CenturyLink has standing because Keller's ethical violations have directly harmed CenturyLink. Keller has caused its clients to materially breach their arbitration contracts, depriving CenturyLink of the opportunity to individually resolve claims. Keller also is interfering with CenturyLink's interest in having class members fairly consider CenturyLink's settlement offer. These immediate, concrete injuries more than suffice to give CenturyLink standing. *Cf. O'Connor*, 946 F.2d at 1400 (movant to disqualify must show "injury in fact").

## II.   KELLER VIOLATED NUMEROUS ETHICAL OBLIGATIONS

Keller's clients are not receiving the legal representation the law requires.  A

lawyer is supposed to:

- Offer "undivided loyalty" to the client and "faithfully represent" the client's interests, *Pine Island Farmers Coop v. Erstad & Riemer, P.A.*, 649 N.W.2d 444, 449 (Minn. 2002);

- Understand and advocate the client's unique interests, *e.g.*, *Matter of Panel File 96-35*, 570 N.W.2d 499, 501 (Minn. 1997) (lawyer must have "thoroughness and preparation reasonably necessary for the representation");

- Present "whatever information" the lawyer learns to the client, so the client can make a fully-informed decision, *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 77 (Minn. 2002); and

- Not "allow his own interests, financial or otherwise, to influence his professional advice," *Evans v. Jeff D.*, 475 U.S. 717, 728 n.14 (1986).[3]

Keller has violated **all** of these fundamental norms by providing generic, misleading, and

conflicted representations to its clients.

The Court does not have to rely solely on CenturyLink's analysis to order

disqualification.  A leading legal ethicist in the area of mass actions and class actions,

Professor Nancy Moore, has twice opined that Keller's conduct breaches ethical

obligations, and those breaches prevent Keller from adequately representing class

members.  *See generally* Moore Decl. ¶¶ 1-28; Moore Suppl. Decl. ¶¶ 1-13.

---

[3]     This Court relies on Minnesota's Rules of Professional Conduct to measure the ethical duties of attorneys who appear before it.  *Potash*, 1993 WL 543013, at *8.  The Court also can look to the ethical rules of the state where counsel are based—here, Illinois, for the Chicago-based Keller.  *Id.* at *8.  Minnesota and Illinois have adopted the Model Rules, with some variations not relevant here.

A.     <u>**Keller Has Misled Its Clients**</u>

Keller has misled its clients, so they will be more likely to arbitrate and less likely to participate in the class settlement, regardless of their individual best interests.  This violates the Minnesota and Illinois Rules.

**Rule 7.1** of the Minnesota and Illinois Rules prohibits a lawyer from providing false or misleading communications.  Likewise, **Rule 8.4(c)** states that it is "professional misconduct" for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

Keller's communications with its clients both contain misrepresentations and omit material information its clients were entitled to know.  *See* Facts, Part II, *supra*.  From the outset, Keller misled its clients into hiring the firm by falsely stating or implying: (1) arbitration is the sole method by which their claims could be pursued and failing to mention the class action; (2) Keller would pursue "individual," not mass, arbitration; (3) there were no known conflicts of interest; and (4) Keller's legal fees in arbitration would be paid by CenturyLink and not by the clients.  *See id.*; Moore Decl. ¶¶ 9-14, 25-26.

In emails Keller sent to its clients ***after preliminary approval***, it continued to mislead its clients:

- Keller misrepresents the terms of the class settlement by suggesting in one email that each class member will receive only $1.  Facts, Part II, *supra*.

- In another email, Keller claimed class members would receive an "average" of $30, regardless of whether they make a documented or undocumented claim.  *Id.*

- 19 -

- Keller advises all clients, regardless of their individual circumstances, that the class settlement is a "bad deal" and makes an undifferentiated recommendation to opt out.  *Id.*

- Further, Keller misleadingly stated that CenturyLink refused to proceed with arbitration because of the class settlement, when, in fact, CenturyLink had terminated the arbitration contracts.  *Id.*

- Still further, Keller apparently failed to inform its clients that Keller, on its clients' behalf, materially breached their arbitration contracts, causing CenturyLink to revoke and terminate those contracts.  *Id.*

Keller thus violated Rules 7.1 and 8.4(c) of the Minnesota and Illinois Rules by providing misleading information to its clients in an effort to lead them to Keller's preferred outcome.  Moore Suppl. Decl. ¶¶ 6-8; Moore Decl. ¶¶ 9-14; *cf. Rice v. Perl*, 320 N.W.2d 407, 410 (Minn. 1982). Those breaches are grounds for disqualification.  *See, e.g.*, *Allred v. Pacificorp*, 2015 WL 12866208, at *5-6 (D. Utah Oct. 19, 2015) (disqualifying counsel for a number of ethical violations).

## B.   <u>Keller Is Not Providing Individualized Advice to 22,000 Clients</u>

A lawyer's overriding obligation to zealously represent a client's interest necessarily requires the lawyer to evaluate the client's individual situation, and to provide advice specific to that client's interests.  Keller breached this obligation in at least two ways:  by refusing to spend "15 minutes" to evaluate and discuss its clients' individual claims pre-arbitration, and by recommending that ***all*** of its more than 22,000 clients opt out of the settlement without regard to each client's individual circumstances.

**Rule 1.1** of the Minnesota and Illinois Rules of Professional Conduct mandates that a lawyer competently represent each client.  **Rule 1.2** requires that a lawyer abide by a client's decisions concerning the objectives of representation and consult with the

client as to the means by which they are to be pursued.  **Rule 1.3** provides that a lawyer must act with reasonable diligence, and comment [2] of that Rule states, "A lawyer's work load must be controlled so each matter can be handled competently." **Rule 1.4** requires a lawyer "to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."  Keller has violated all of these rules:

*First*, Keller's enrollment process requires a client to provide minimal information, and no supporting materials, before signing up a client to pursue arbitration. Unthank Decl. Ex. E.

*Second*, before retention, Keller fails to advise each client regarding the risks faced in pursuing arbitration.  *E.g.*, Unthank Decl. ¶¶ 22-26 & Ex. E; Sun Decl. Ex. H.

*Third*, after retention, Keller refused to evaluate and discuss its clients' individual claims before demanding arbitration, claiming it would be too much of a burden to spend "even 15 minutes" on each claim.  *Id.* ¶ 40 & Ex. K.

*Fourth*, Keller recommended that *all* clients opt out of the settlement without regard for whether opting out is in each client's best interest.

*Fifth*, Keller already has attempted an improper, mass opt out of approximately 2,000 class members, by letter from Mr. Postman to the Court.[4]  ECF Nos. 631-633.

---

[4]      Keller's letter does not comply with the Court's Preliminary Approval Order. Such mass, unsigned opt outs "are highly indicative of a conclusion that such counsel did not spend very much time evaluating the merits of whether or not to opt-out in light of the individual circumstances of each of their clients and in consultation with them." *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico*, 910 F. Supp. 2d 891,

Keller's failure to provide its clients with adequate individual representation violates Rules 1.1, 1.2, 1.3, and 1.4 and is grounds for disqualification. Moore Suppl. Decl. ¶¶ 19-27; *cf. Allred*, 2015 WL 12866208, at *6 (deciding to disqualify and relying on attorney's failure to communicate with clients); *Georgine v. Amchem Prods., Inc*., 160 F.R.D. 478, 490 (E.D. Pa. 1995) (lawyers must provide sufficient information to allow client to perform "independent analysis of their own self interest"); *STAR Ctrs.*, 644 N.W.2d at 77 (lawyers must provide "whatever information" they "obtain[] that may affect [the clients'] interests" (*quoting Selover v. Hedwall*, 184 N.W. 180, 181 (Minn. 1921))); *Rice*, 320 N.W.2d at 410 (recognizing attorney's duty to "disclose any material matters bearing upon the representation").

Keller's representation of thousands of clients is distinguishable from situations such as mass tort lawsuits, where a firm may represent hundreds or thousands of clients. *See, e.g.*, *In re Owens Corning*, 305 B.R. 175, 217 (D. Del. 2004) (noting the "uniqueness" and "complexity" of mass tort litigation). Even in mass tort cases, a firm still has the obligation to provide advice consistent with "traditional legal ethic rules . . . based on the one-attorney, one-client model." *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, 2009 WL 5195841, at *9 (D. Minn. Dec. 15, 2009). In mass tort cases, a firm can communicate individually with each client—even if they have thousands of clients—because the expected recoveries per client justify that investment

939 (E.D. La. 2012) (noting that "counsel for such mass opt-outs may have breached their fiduciary and ethical duties to their clients").

of time by counsel.  *See, e.g.*, *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 659

(E.D. La. 2010) (approving fee award from $4.8 billion settlement and finding the

562,000 hours that plaintiffs' law firms had spent on the litigation was reasonable); Karl

Stark, *Merck offers billions for Vioxx claims*, Philadelphia Inquirer, Nov. 10, 2007,

available at

https://www.inquirer.com/philly/news/homepage/20071110_Merck_offers_billions_for_

Vioxx_claims.html (last accessed Apr. 7, 2020) (noting average payout from settlement

could exceed $200,000 per claim).  Here, the recoveries per client are so minimal—even

as low as *$3* in actual damages—that even 15-minute calls for each client are not

economically feasible.  The leverage for a group settlement comes from the threat of

arbitration filing fees, not from the aggregate actual value of the clients' claims.  Because

it is not feasible or cost effective for Keller to provide individualized advice, Keller

cannot meet its ethical obligations.  *See Guidant Corp.*, 2009 WL 5195841, at *9

(sanctioning attorney $50,000 and referring him to numerous state bars for possible ethics

violations as a result of his failure to advise clients individually of the terms of a

settlement); *see also Blue Cross & Blue Shield of N.J. v. Philip Morris, Inc.*, 53 F. Supp.

2d 338, 340 (E.D.N.Y. 1999) (disqualifying firm from representing Philip Morris based

on merely the "appearance of impropriety").

### C.    Keller Has Non-Consentable Conflicts of Interest

Keller falsely represented to its clients in the Retainer Agreement that no known

conflicts of interest existed.  Unthank Ex. E.4 at ¶ 8.  Keller was wrong.

**Rule 1.7(b)** of the Minnesota and Illinois Rules requires that attorneys with a conflict of interest obtain informed consent from each client.  A client cannot consent to a conflict, however, if "under the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation."  Rule 1.7(b)(1), Comment 15.  *See also Doe v. Nielsen*, 883 F.3d 716, 718 (7th Cir. 2018) (disqualifying counsel where "court [could not] reasonably conclude that the lawyer will be able to provide competent and diligent representation" due to conflict of interest).

The mass representation of 22,000 class members presents two types of conflicts of interest that are non-consentable.

***Conflicts Between Keller and Its Clients*.**  Keller has undisclosed conflicts with all of its clients.  Keller earns fees only if a large number of its clients opt out so Keller can strike a settlement based not on the merits of individual claims, but on the *in terrorem* threat of massive arbitration fees.  Declaration of Ashley Keller ("Keller Decl.") Ex. 2 at 1, ECF No. 599-2.  This creates a conflict because Keller is incentivized to encourage all of its clients to opt out—something Keller already has done—to maximize its recovery.  Moore Suppl. Decl. ¶ 13.  Keller allowed its own financial interest to guide its conduct and advice.  *E.g.*, Sun Decl. Exs. E-G.  Keller thus violated its duty of loyalty to its individual clients under Rule 1.7 by providing advice tainted by its undisclosed financial interest.  *See Mendez v. Radec Corp.*, 907 F. Supp. 2d 353, 358 n.3 (W.D.N.Y. 2012) (lawyer is "ethically required to place the needs of [its] clients ahead of [its] own financial gain"); *see also In re Coleman*, 295 S.W.3d 857, 865 (Mo. 2009) (attorney had "a motivation to protect his financial interests" in recommending strategies to client).

*__Conflicts Between Clients__*.  Keller's 22,000 clients have divergent interests, which created conflicts of interest from the time of initial retention.  Facts, Part IV, *supra*; Moore Decl. ¶ 13.  Keller will have to choose to advance the interests of some clients over the best interests of others.  Moore Supp. Decl. ¶¶ 11-12; *see, e.g.*, *Abbott*, 42 F. Supp. 2d at 1050-51 (lawyer's agreement with 200 clients created non-waivable conflict under Rule 1.7 where all clients did not share the same interest in mass settlement); *cf. Nielsen*, 883 F.3d at 718-19 ("Having a duty to someone else obviously interfere[s] with the undivided loyalty [that] the attorney owes his client and ultimately detract[s] from achieving the most advantageous position for his client." (internal quotation marks omitted)); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 354 (6th Cir. 2009) (recognizing an attorney would have been in "an ethical quagmire had he represented class members and opted-out individuals").

*__Keller's Conflicts Are Non-Consentable__*.  The two types of conflicts in this case prevent Keller from ethically representing its 22,000 clients with respect to the class settlement.  The divergent interests between the lawyers and their clients, and between the clients themselves, are compounded by (i) the large number of clients, (ii) Keller's insistence that CenturyLink address "all" clients' claims on a collective basis, (iii) the fact that Keller is a small firm that concurrently represents more than 50,000 individual clients against many companies, and (iv) the existence of this class action, which provides an alternative, cost-free remedy for many of its clients.  Moore Decl. ¶¶ 19-23; *see First NBC Bank v. Murex, LLC*, 259 F. Supp. 3d 38, 57 (S.D.N.Y. 2017) (explaining clients are entitled to their lawyer's "undivided allegiance and faithful, devoted service").

- 25 -

Together, these limitations have left Keller with non-consentable conflicts that prevent it from providing competent representation in advising clients whether to participate in the class settlement or opt out. *AVR, Inc. v. Cemstone Prods. Co.*, 1993 WL 104933, at *3-9 (D. Minn. Mar. 25, 1993) (disqualifying attorney based on conflict of interest); *cf. In re World Trade Ctr. Disaster Site Litig.*, 769 F. Supp. 2d 650, 655-57 (S.D.N.Y. 2011) (appointing special counsel for a group of plaintiffs because the plaintiffs' firm's representation of clients with conflicting interests "compromised" the firm's ability to "provide loyal and zealous advocacy").

Even if Keller's clients could consent to the conflicts (they cannot), Keller falsely told its clients in the Retainer Agreement that it knew of no conflict of interest.  Unthank Decl. Ex. E at ¶ 8.  Thus, Keller could not have obtained informed consent at the time of retention as required by the Rules of Professional Conduct.  Moore Decl. ¶ 23; *cf. Healy v. Axelrod Constr. Co. Defined Benefit Pension Plan & Tr.*, 155 F.R.D. 615, 619-20 (N.D. Ill. 1994) (disqualifying conflicted counsel who had not disclosed nature of conflict to clients).

Keller has violated Rule 1.7 of the Minnesota and Illinois Rules by continuing to provide representation to 22,000 clients despite having non-consentable conflicts of interest.  Moore Suppl. Decl. ¶ 16; Moore Decl. ¶¶ 19-23.  As noted above, at least one other federal court had to disqualify Keller in a matter against Uber based on a conflict. *Diva Limousine*, 2019 WL 144589, at *14.  This Court should follow suit.

## III.   THE COURT SHOULD DISQUALIFY KELLER AND ORDER CORRECTIVE NOTICE TO ITS CLIENTS

Keller's multiple violations of fundamental ethical rules create an untenable situation for the Court:  22,000 class members have been misled about the class settlement and are receiving non-individualized, conflicted representation from a law firm that admitted it will not or cannot spend "15 minutes" to evaluate and discuss each client's claim pre-arbitration.  The solution is to disqualify Keller from continuing to represent class members in this proceeding and order corrective notice to Keller's clients to ensure they have been adequately informed.

### A.   <u>Disqualification Is Appropriate to Protect Class Members</u>

The Court can disqualify counsel based on its violations of ethical rules.  *See Gifford*, 723 F. Supp. 2d at 1112; *Arnold*, 2004 WL 2203410, at *13; *Lutheran Bhd.*, 2002 WL 1205695, at *2; *Potash*, 1993 WL 543013 at *16; *AVR, Inc.*, 1993 WL 104933, *3-7.  Here, disqualification is necessary to protect class members who are being coaxed to opt out of the class settlement for Keller's financial benefit, but without regard to whether it is in the clients' best interests.  *See In re BankAmerica Corp.*, 350 F.3d at 752 (describing the court's duty to protect class members' interests).  Without disqualification, the Court cannot be assured that requests for exclusion from the settlement from Keller's clients are being given with full and individualized consideration, without the taint of Keller's ethics violations.

Facing similar circumstances, Judge Magnuson disqualified third-party counsel in *Lutheran Brotherhood.  See* 2002 WL 1205695, at *3-5.  After that court preliminarily

approved a class settlement, an outside attorney sent messages to thousands of class members misrepresenting the court's rulings.  *Id.* at *1.  The misstatements "affect[ed] the Court and its ability to control the fairness of this litigation and administer justice." *Id.* at *2.  Without passing judgment on the lawyer's subjective intent, Judge Magnuson barred the attorney and his colleagues from representing anyone who had responded to the misleading communication.  *Id.* at *4.  The court explained an attorney "must not be permitted to profit from misrepresentations about this Court and its rulings."  *Id.* at *3-4*; see also Clarke v. First Transit, Inc*., 2012 WL 12877865, at *13-14 (C.D. Cal. Nov. 2, 2012) (disqualifying third-party counsel who tried to "stake a claim to revenues generated by work performed by other counsel on behalf of class members").

The familiar response to a disqualification motion—that the Court should prioritize a client's choice of counsel—should not receive the same credit or weight here. *See, e.g.*, *Macheca Transp. Co. v. Philadelphia Indem. Co*., 463 F.3d 827, 833 (8th Cir. 2006) (normally, disqualification is disfavored because courts defend a client's selection of counsel).  Keller's relationships with the vast majority of its clients consist entirely of online or email communications with minimal specific information for each client. Where, as here, the engagement was formed solely over the internet, courts should not assume the client has made an informed selection of counsel.  *Cf. In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1239, 1244 (N.D. Cal. 2000) ("[W]hen the agreements are solicited by mass mailings and over the Internet, and when retaining separate counsel is as easy as pressing a 'Click Here' button on a web page, the prospects for abuse are simply too great.").  A client's right to choose his or her counsel "must yield to . . .

ethical considerations . . . which implicate the integrity of the judicial process." *Arnold*, 2004 WL 2203410, at *14.

Faced with misconduct similar to Keller's, including misleading communications to class members and conflicted mass representations, other courts have taken various remedial steps in addition (or as alternatives) to disqualification and corrective notice. For example, courts have assigned a special, independent attorney to advise affected clients. *E.g.*, *In re World Trade Ctr. Disaster Site Litig.*, 834 F. Supp. 2d 184, 118-119 (S.D.N.Y. 2011), *vacated in part on other grounds* 754 F.3d 114 (2d Cir. 2014) (appointing special counsel to advise group of plaintiffs in a mass action where conflicts prevented lead counsel from providing appropriate advice). Some courts have permanently enjoined a third party from assisting class members with settlement claims. *E.g.*, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 2014 WL 4966072, at *1, 31 (E.D.N.Y. Oct. 3, 2014). Other courts have permitted class members to void their attorney-client retention agreements. *McKesson*, 126 F. Supp. 2d at 1246 (in addition to corrective notice and requiring law firm to make specific disclosures in any future solicitations, court permitted class members to void their retention agreements with the law firm). Still others have required law firms to make specific disclosures to class members or to submit future client communications to the court for approval. *E.g.*, *id.*; *Lutheran Bhd.*, 2002 WL 1205695, at *3. Because this case is in its advanced stages with the class settlement preliminarily approved and the notice, opt-out, and claims processes underway, those additional (or alternative) measures would

be less efficient and inferior to the disqualification and corrective notice remedies CenturyLink seeks.

The integrity of the judicial process is at issue here.  To protect class members and ensure they make decisions free from the misguidance of conflicted counsel, the Court should exercise its discretion to disqualify Keller.

### B.        The Court Should Require Keller's Clients to Opt Out Individually

The Court also should require that Keller's clients opt out individually, without any involvement by, or further communication from, Keller.  Keller's mass opt-out recommendation is contrary to the well-established principle that the decision to opt out or participate in a class settlement is an individual one that cannot be made on a group basis.  *See, e.g.*, *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2012 WL 5055810, at *9 (D. Minn. Oct. 18, 2012) ("[D]ecision to opt out of a class action settlement is an individual decision and may not be made . . . on a mass or representative basis").  It is "essential" that Keller's clients' decisions whether to opt out or participate in the class settlement "be made on the basis of independent analysis of their own self interest." *Georgine*, 160 F.R.D. at 490.

The risks associated with mass opt outs are acute because Keller already refused to devote even "15 minutes" per client to discuss their claims pre-arbitration.  Unthank Decl. ¶ 40 & Ex. K.  Keller also has a record of treating its clients' silence as their rejection of a settlement offer. Sun Decl. Ex. K (Keller's settlement communication to DoorDash claimants stating:  "**If you would like us to reject this offer, you do not need to do anything.**"); Moore Suppl. Decl. ¶ 26.

The risks are further compounded because Keller made each client execute a Power of Attorney that purports to give Keller the ability to submit clients' opt-outs without clients' further participation.  That Power of Attorney is unenforceable under Illinois law because it is not witnessed and notarized, as required.  *See* 755 Ill. Comp. Stat. 45/3-3(b); *Johnson v. M.B. Fin. Bank, N.A.*, 2016 Ill. App. (1st) 151817-U, at *4 (2016).  But Keller's clients likely do not know that and may believe Keller can execute decisions on their behalf.[5]

Based on the heightened risks and Keller's misconduct, the Court should require Keller's clients to resubmit their request for exclusion, if any, after the date of the corrective notice to Keller's clients.  Further, the Court should deem invalid any opt outs that Keller's clients may have submitted before the date of the corrective notice.

### C.     The Court Should Order the Settlement Administrator to Send Corrective Notice to Keller's Clients, at Keller's Expense

CenturyLink recognizes that disqualification of counsel is a serious remedy. Regardless whether the Court disqualifies Keller, the Court should order that corrective notice be sent to Keller's clients.  *See* Ex. 1 (proposed Supplemental Notice); Ex. 2 (annotated version of Supplemental Notice, providing the legal and rational support for each paragraph of the notice).  The affected class members need additional information and guidance from the Court to correct Keller's misstatements and to ensure they make individualized decisions about settlement participation.

---

[5]      Keller may have relied, in part, on its illegal Power of Attorney when it sent a single letter to the Court today purporting to opt out *en masse* approximately 2,000 class members.  *See* ECF No. 631.

Courts regularly require corrective notices be sent to subsets of class members affected by misleading communications from third-party law firms:

- *Payment Card*, 2014 WL 4966072, at *1, 31 (ordering corrective notice to remedy misleading communications to class members by third-party claim-filing company);

- *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22701241, at *6-8 (S.D.N.Y. Nov. 17, 2003) (ordering corrective notice after law firm sent misleading communications to members of the settlement class encouraging class members to opt out and file individual actions);

- *Lutheran Bhd.*, 2002 WL 1205695, at *2 (ordering corrective communications and disqualifying counsel);

- *McKesson*, 126 F. Supp. 2d at 1246 (ordering pre-certification corrective notice, and permitting putative class members to void their retention agreements, where firm sent misleading solicitations to putative class members);

- *In re Synthroid Mktg. Litig.*, 197 F.R.D. 607, 609-11 (N.D. Ill. 2000) (ordering corrective notice to remedy misstatements by third party that offered to prepare and submit claims for absent class members);

- *Georgine*, 160 F.R.D. at 502 (striking thousands of improperly procured opt-outs, ordering curative notice, and establishing a new opt-out deadline for affected class members).

Keller's misleading statements are substantially similar to the kinds of statements by lawyers and other third parties that have prompted other federal courts to order corrective notice. *WorldCom*, 2003 WL 22701241, at *1, 7, 9; *McKesson*, 126 F. Supp. 2d at 1244-45.

Because Keller's conduct has necessitated this, Keller should be required to pay all related costs. *See Great Rivers Co-op. v. Farmland Ind., Inc.*, 59 F.3d 764, 766 (8th Cir. 1995) (the costs of corrective notice should be "at the expense of those at fault"); *see*

*also Retiree Support Grp. v. Contra Costa Cty.*, 2016 WL 4080294, at \*11 (N.D. Cal. July 29, 2016); *Lutheran Bhd.*, 2002 WL 1205695 at \*4; *McKesson*, 126 F. Supp. 2d at 1247.

Consistent with these authorities, CenturyLink submits as Exhibit 1 its proposed Supplemental Notice, which includes the following substance and procedures:

***Disqualification.***  Keller's clients should be informed about the Court's findings of Keller's breaches of ethical rules, told that the Court has disqualified Keller from representing them with respect to the class settlement, and instructed not to communicate with Keller about the class settlement.

***Opt-Outs and Objections.***  If any of Keller's clients already submitted opt-outs or objections before receiving the corrective notice, the Court should disregard those opt-outs and objections.  The corrective notice should inform Keller's clients of this fact and instruct them to resubmit opt-outs or objections if they desire to do so.

***Deadlines.***  The corrective notice to Keller's clients will require a modest extension of the deadlines for the clients to submit opt outs and objections.  That extension should apply only to Keller's clients, so as not to confuse other class members.

***Mailing and Emailing.***  The Court should require CenturyLink and the Settlement Administrator to send them by mail or email, or both.  The Court should order Keller to provide CenturyLink with its most current and up-to-date list of client contact information for all class members within five days after entry of the Court's order.

## CONCLUSION

For these reasons, CenturyLink respectfully moves the Court to:  (1) disqualify Keller Lenkner LLC from representing class members in this proceeding and with respect

- 33 -

to the class settlement; (2) prohibit Keller from further communications with its clients regarding the class settlement and having any involvement with its clients' submissions of opt outs, and (3) order the Settlement Administrator to send the proposed Supplemental Notice (Ex. 1) to Keller's clients, at Keller's sole expense.

Dated: April 7, 2020                    Respectfully Submitted,

                                        s/ *Michael T. Williams*
                                        Carolyn J. Fairless (CO Bar No. 30214)
                                        Michael T. Williams (CO Bar No. 33172)
                                        Andrew M. Unthank (CO Bar No. 36832)
                                        Wheeler Trigg O'Donnell LLP
                                        370 Seventeenth Street, Suite 4500
                                        Denver, CO  80202-5647
                                        Telephone:  303.244.1800
                                        Facsimile:  303.244.1879
                                        Email:     fairless@wtotrial.com
                                                   williams@wtotrial.com
                                                   unthank@wtotrial.com

                                        Douglas P. Lobel (VA Bar No. 42329)
                                        David A. Vogel (VA Bar No. 48971)
                                        COOLEY LLP
                                        11951 Freedom Drive
                                        Reston, Virginia 20190
                                        Tel.: (703) 456-8000
                                        Fax: (703) 456-8100
                                        Email:     dlobel@cooley.com
                                                   dvogel@cooley.com

                                        Jeffrey M. Gutkin (CA Bar No. 216083)
                                        COOLEY LLP
                                        101 California Street, 5th Floor
                                        San Francisco, CA 94111
                                        Tel.: (415) 693-2000
                                        Fax: (415) 693-2222
                                        Email:     jgutkin@cooley.com

William A. McNab (MN Bar No. 320924)
WINTHROP & WEINSTINE, P.A.
Capella Tower, Suite 3500
225 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 604-6400
Fax: (612) 604-6800
Email:      wmcnab@winthrop.com

Jerry W. Blackwell (MN Bar No. 186867)
Blackwell Burke P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Tel.: (612) 343-3200
Fax: (612) 343-3205
Email: blackwell@blackwellburke.com

*Attorneys for Defendant CenturyLink, Inc. and Intervenors Qwest Corporation, Embarq Florida, Inc., Embarq Missouri, Inc., Carolina Telephone and Telegraph Company LLC, Central Telephone Company, CenturyTel of Idaho, Inc., CenturyTel of Larsen-Readfield, LLC, CenturyTel of Washington, Inc., CenturyTel Broadband Services, LLC, and Qwest Broadband Services, Inc.*

## **<u>CERTIFICATE OF SERVICE (CM/ECF)</u>**

I CERTIFY that on April 7, 2020, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to the parties listed on the Court's Service List.


*s/ Michael T. Williams*
Michael T. Williams