UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

This document relates to Civil File Nos.
17-2832, 17-4613, 17-4614, 17-4615,
17-4616, 17-4617, 17-4618, 17-4619,
17-4622, 17-4943, 17-4944, 17-4945,
17-4947, 17-5046, 18-1562, 18-1565,
18-1572, 18-1573

MDL No. 17-2795 (MJD/KMM)

---

**DECLARATION OF WARREN POSTMAN IN OPPOSITION TO
CENTURYLINK'S MOTION TO DISQUALIFY COUNSEL
AND REQUIRE CORRECTIVE NOTICE**

---

I, Warren Postman, declare:

1.      I am a partner at the law firm of Keller Lenkner LLC ("Keller"), and serve as counsel for Proposed Intervenors and Movants Keisha Covington, Daniel Sokey, Tiffany Van Riper, James Watkins, Jaclyn Finafrock, and Kelly Johnson ("Proposed Intervenors").  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.  I submit this declaration in opposition to CenturyLink, Inc. and its Operating Companies' Motion to Disqualify Counsel and Require Corrective Notice.

**A.      Keller litigates individual arbitrations to vindicate consumer and employee rights.**

2.      Keller is a firm of 24 attorneys based in Chicago, Illinois, and its

principals are Ashley Keller, Travis Lenkner, Adam Gerchen, and me.  Over the past

two years, Keller has developed an extensive practice focused on pursuing the

claims of thousands of individual consumers and employees in individual

arbitration.  The premise of our practice is that, with sufficient resources, a firm

committed to litigating a large number of similar claims in arbitration can more

effectively vindicate claims that have long been passed over or severely discounted

by other firms due to the existence of class-action waivers.

3.      Keller has pursued claims for more than 200,000 arbitration claimants

in the past two years, the majority of whom were parties to agreements calling for

arbitration before the American Arbitration Association (AAA).  Our firm's ability to

pursue claims at this scale is built on two pillars.

4.      First, arbitration is designed to be streamlined and efficient.  Arbitral

rules typically allow "desk" arbitrations, which allow arbitrators to decide disputes

on the papers, without the need for depositions or live hearings.  And while

arbitration must remain individual, numerous similar claims can still be assigned to

the same arbitrator.

5.      Second, Keller has made extensive investments in human resources,

technology, and partnerships with other law firms to be able to litigate at this scale.

In addition to its 24 attorneys, Keller employs dozens of paralegals and client-

service professionals and three full-time technology experts, all of whom focus on

mass actions.  Keller has invested millions of dollars in proprietary software and

infrastructure to make litigating clients' claims more efficient by orders of magnitude.

6.      Keller has advanced more than $10 million in arbitration filing fees on behalf of its clients.  Under the terms of its engagement agreements with its clients, Keller will recover none of these fees—or any attorney's fees—except to the extent it obtains a recovery for its clients.

7.      Keller regularly partners with other firms to litigate its clients' claims. For example, we have repeatedly partnered with Quinn Emanuel Urquhart & Sullivan, LLP, which has over 800 lawyers and is the largest law firm dedicated to litigation in the world.  We have also partnered with Morgan and Morgan, a firm with over 500 attorneys dedicated to representing plaintiffs in litigation.  And we regularly partner with Troxel Law LLP, one of our co-counsel firms in this case, which likewise dedicates extensive human and technology resources to serving clients.

8.      Clients with questions about their cases receive prompt answers from our client-service professionals during regular business hours and, where legal advice is called for, are referred to an attorney who addresses their questions individually.

9.      More than a dozen defendants have raised objections to Keller's model of bringing many similar claims against the same defendant in arbitration.  AAA, which administers arbitrations brought by CenturyLink customers as well as the

large majority of consumers and employees across the country, has uniformly rejected those objections. Instead, AAA has held that every claimant for whom Keller has filed a demand has properly met their filing requirements and that, under the applicable arbitration agreements and AAA Rules, any objections must be presented to individual arbitrators.

10.     Courts have also repeatedly rejected arguments by defendants who have attempted to avoid arbitrating with Keller's clients by asserting that Keller's clients had failed to properly file individual arbitrations or that filing so many arbitrations was improper.

11.     In ordering DoorDash to arbitrate with 5,010 DoorDash workers represented by Keller, Judge William Alsup of the United States District Court for the Northern District of California, held:

> For decades, the employer-side bar and their employer clients have forced arbitration clauses upon workers, thus taking away their right to go to court, and forced class-action waivers upon them too, thus taking away their ability to join collectively to vindicate common rights. The employer-side bar has succeeded in the United States Supreme Court to sustain such provisions. The irony, in this case, is that the workers wish to enforce the very provisions forced on them by seeking, even if by the thousands, individual arbitrations, the remnant of procedural rights left to them. The employer here, DoorDash, faced with having to actually honor its side of the bargain, now blanches at the cost of the filing fees it agreed to pay in the arbitration clause. No doubt, DoorDash never expected that so many would actually seek arbitration. Instead, in irony upon irony, DoorDash now wishes to resort to a class-wide lawsuit, the very device it denied to the workers, to avoid its duty to arbitrate. This hypocrisy will not be blessed, at

least by this order.[1]

12.     In rejecting arguments by Postmates that it should not have to proceed

to arbitrate with Keller's clients, Judge Saundra Armstrong of the United States

District Court for the Northern District of California observed:

> Postmates expends considerable energy accusing Petitioners of using
> the cost of the arbitration process as a means of coercing Postmates
> into settling their claims expeditiously.  However, under the Fleet
> Agreement drafted by Postmates which its couriers are required to
> sign, Petitioners had no option other than to submit their
> misclassification claims in the form of an arbitration demand—which is
> precisely what they did.  Since the Fleet Agreement bars class actions,
> each demand must be submitted on an individual basis.  Thus, the
> possibility that Postmates may now be required to submit a sizeable
> arbitration fee in response to each individual arbitration demand is a
> direct result of the mandatory arbitration clause and class action
> waiver that Postmates has imposed upon each of its couriers.[2]

13.     After rejecting similar arguments from Postmates that it should not

have to proceed to arbitration with another group of couriers, Judge Philip Gutierrez

of the Central District of California observed:

> Postmates complains that, in response to the recent wave of U.S.
> Supreme Court decisions (prompted by the employer-side bar)
> affirming the enforceability of class action waivers, and thus, in
> combination with Postmates' contract, preventing Postmates'
> employees from proceeding by class action in court and in arbitration,
> claimants' lawyers are "attempting to use arbitration agreements to
> coerce settlements" by filing too many individual arbitration demands.
> *See* FAC ¶ 40.  Now, Postmates is seeking to obtain an injunction and

---

[1]     *Abernathy v. DoorDash, Inc.*, --- F. Supp. 3d. ---, 2020 WL 619785, at *4 (N.D. Cal. Feb. 10, 2020).

[2]     *Adams v. Postmates, Inc.*, 414 F. Supp. 3d 1246, 1252 n.2 (N.D. Cal. 2019).

declaration from this Court, binding on 10,356 individual claimants in a single proceeding, preventing them from proceeding to arbitration. The irony is not lost on this Court.[3]

14.    In less than two years, Keller has secured settlements for over 90,000 clients totaling over $180 million.  In many of these cases, claims similar to those brought by Keller's clients were recently or subsequently resolved in a class proceeding; the amounts Keller's clients received were often more than 20 times higher than the amounts received by class members who did not have individual representation to pursue a claim in arbitration.

15.    CenturyLink has suggested that the Court consider a complaint filed against Keller in 2018, *Brown v. Keller Lenkner, LLC*, No. 1:18-cv-12423-NMG (D. Mass. Nov. 20, 2018), in which a Keller client alleged that Keller's advertising was misleading.  However, CenturyLink fails to disclose that this complaint was never even served on Keller, and that the attorney who filed it voluntarily dismissed the case after Keller explained to the attorney that allegations in the complaint were demonstrably false.  Keller did not enter into or offer the plaintiff any settlement of any kind.  The lawsuit was simply filed and then abandoned after we explained that it was meritless.

---

[3]    Order, *Postmates v. Greenwood*, No. 2:20-cv-02783-PSG-JEM (C.D. Cal, Apr. 20, 2020) [ECF 34] (attached as Exhibit A).

6

**B.**     **Keller stopped advertising for new clients before the parties executed the class-settlement agreement in this action.**

16.     Beginning in the spring of 2019, Keller and Troxel Law began online advertising to inform CenturyLink customers of potential claims they may have against CenturyLink.  When potential claimants responded to this advertising, Keller and Troxel Law asked them to answer a set of questions to assess their potential claims and, depending on their responses, sent certain potential claimants electronic-engagement agreements.

17.     Although Keller was aware that Class Plaintiffs had initiated this action against CenturyLink, no class had been certified by mid-2019, no settlement had been reached, and CenturyLink's position in this Court was that individual arbitrations were the proper forum for resolving customers' disputes.

18.     Both before and after clients retained Keller to pursue claims against CenturyLink, Keller regularly communicated with those clients to (a) provide additional detail on Keller's strategy for pursuing their claims and what the process would look like, (b) respond to client questions about the process, and (c) collect additional information regarding the clients' claims.

19.     CenturyLink has not introduced into the record in this case the overwhelming majority of Keller's attorney-client communications, the advice that Keller provided to our clients, or the additional information provided by clients to Keller.

20.     On May 14, 2019, Keller contacted CenturyLink's counsel, Wheeler Trigg O'Donnell LLP, and informed them that more than 9,000 clients had retained Keller to pursue claims against CenturyLink.  Keller explained that "[a]s required by the applicable service agreements, we are prepared to serve individual demands for arbitration on behalf of each client with the American Arbitration Association ('AAA')."[4]

21.     We also enclosed a draft arbitration demand as an example, which described the causes of action and relief sought, along with identifying information for our clients.  Recognizing the costs and inefficiency of bringing the individual arbitrations required by CenturyLink's contracts, we also offered to "explore whether we can agree on an alternative process for resolving our clients' claims."[5] Although CenturyLink equates this offer with a demand for an aggregate settlement, that is not what we said.  While we would have considered discussing the potential for an aggregate settlement, we also would have considered discussing ways to conduct individual arbitrations in a more streamlined manner.  Later that month, Keller informed CenturyLink that it had been retained by another 3,000 additional clients to pursue arbitration.[6]

22.     Keller and Troxel Law stopped all advertising with regard to

---

[4]   5-14-19 Keller letter (Unthank Decl. Ex. H) [ECF 512-8] at 3.
[5]   5-14-19 Keller letter (Unthank Decl. Ex. H) [ECF 512-8] at 3.
[6]   5-31-19 Keller letter (Unthank Decl. Ex. I) [ECF 512-9].

CenturyLink on August 12, 2019.  While a webpage related to CenturyLink claims remained saved on servers controlled by Troxel Law after these August 12, 2019, that webpage was intentionally marked as "non-indexed" so that it would not appear in any searches on Google or other search engines.  Accordingly, as a practical matter, it would have been virtually impossible for a new visitor to find the webpage in order to request an engagement letter.

23.     While several dozen individuals who received engagement agreements before August 12, 2019, signed and returned them after that date, Keller and Troxel Law did not conduct any advertising or otherwise attempt to solicit any new clients after August 12, 2019.

24.     During the fall of 2019, the parties attempted to negotiate a framework for a mediation to resolve the claims of Keller's clients, but the parties could not agree on the parameters for a mediation, and the process broke down.[7]

25.     On October 8, 2019, CenturyLink's counsel told Keller that it was still "in the process of negotiating" a class settlement.[8]  The Class Plaintiffs and CenturyLink eventually executed a settlement on October 15, 2019, which was publicly disclosed on October 16, 2019.

26.     In December 2019, Keller filed arbitration demands against

---

[7]   *See, e.g.*, 9-6-19 Williams email (Unthank Decl. Ex. M) [ECF 513-1].
[8]   10-18-19 Williams letter (Unthank Decl. Ex. O) [ECF 512-15] at 4.

CenturyLink on behalf of 1,000 of its clients.

**C.    Keller accurately updated its clients regarding the class settlement.**

27.    On January 24, 2020, the Court issued an order preliminarily approving the settlement between Class Plaintiffs and CenturyLink.  As part of that order, the Court adopted the parties request that all class members be enjoined from pursuing any arbitrations against CenturyLink pending final approval of the class settlement.

28.    After this Court preliminarily approved the class settlement, we sent multiple updates to our clients.  We also shared with clients the Court's opinion regarding settlement and their right to opt out.

29.    As noted, CenturyLink has not introduced into the record in this case the vast majority of our communications with clients.

30.    One communication that CenturyLink has placed in the record is an email sent on or about February 7, 2020, in which we wrote that:

> As you may know, CenturyLink has been defending itself against a large consumer-fraud class action for a few years now.  Throughout that case—which Keller Lenkner LLC was not involved in—CenturyLink has argued that its customers could not bring claims in court, and instead had to go through arbitration, as you did.  But this summer, CenturyLink decided to settle the class action after all, paying $15 million to release the claims of approximately 15 million people. While the amount each class member receives will vary, that averages out to $1 per class member.  If you'd like to know more about the settlement, you will soon be able to review them at the settlement website.  In the meantime, you may view a copy of the proposed settlement notice here, and the settlement documents are available

here.[9]

31.     Every sentence of this statement is objectively true.  Keller wrote that

the settlement amount averages out to $1 *per class member*, which is correct as a

matter of basic math, and Keller also told its clients that the amount each class

member would actually receive would vary.  In that same paragraph, we also

provided our clients with the Court-approved settlement notice and related

documents.

32.     CenturyLink claims that Keller told its clients that "each class member

will receive only $1"[10] or that "clients will receive 'an average of $1' each."[11]

CenturyLink does not identify any Keller communications that say either of these

things, and I am not aware of Keller ever making either statement to its clients.

33.     In the same communication, Keller further wrote:

> We think the settlement violates your contract with CenturyLink, and
> we don't think an average of $1 per class member is nearly enough
> money.  Although we cannot promise any particular result, we believe
> we can do better than $1 per person if we bring individual arbitrations
> for our clients.[12]

34.     In another email, we provided clients with another summary of the

_____

[9]     2-7-20 Royer Facebook post (Sun Decl. Ex. F) [ECF 638-6] (emphasis to
indicate hyperlinks).
[10]    CenturyLink brief [ECF 636] at 19.
[11]    Moore Supp. Decl. ¶ 7.a.
[12]    2-7-20 Royer Facebook post (Sun Decl. Ex. F) [ECF 638-6].

settlement that used Court-approved language.  In that email, Keller similarly wrote that we believed we could do better for our clients than an average of $30 per class member.  And we again provided our clients with the class-settlement notice and related documents. [13]

35.    We advised our clients that we thought we could do better than the class settlement because we believed—and continue to believe—that to be true.  We chose to represent clients who we believed could recover more in arbitration than in a class settlement.  Our advice to our clients about the settlement is based on our knowledge of our clients' claims, our knowledge of the law and applicable contracts, our best judgment as attorneys, and our experience obtaining significant recoveries for nearly 100,000 people subject to individual arbitration agreements.

36.    In subsequent communications to our clients, Keller again provided clients with information regarding the proposed class settlement that prominently featured the description of the settlement proposed by the parties and approved by this Court.  The substance of the communications is privileged and confidential, and Keller is not waiving privilege over those or any other attorney-client communications.  However, counsel for Class Plaintiffs, Zimmerman Reed, have acknowledged that they were sent an example of those communications by a client

_____

[13]    2-18- 20 Sokanon Facebook post (Sun Decl. Ex. E) [ECF 638-5].

of Keller who had previously contacted Zimmerman Reed regarding a potential representation.[14]  In an initial phone conversation with me, counsel for Class Plaintiffs, Brian Gudmundson, stated that, in his opinion, the email was entirely appropriate and there was not a single sentence he would change.  In a subsequent call, Mr. Gudmundson stated that, upon a close review, there were some statements he might have phrased differently if he were writing the email himself, but he did not think there was anything inaccurate about the way we described the settlement.

### D. Keller offered to send additional information to its clients, but CenturyLink declined.

37.    On February 13, 2020, counsel for CenturyLink stated that CenturyLink intended to file a motion for a corrective notice with this Court because, among other assertions, CenturyLink claimed that Keller had misled clients by encouraging them to retain Keller without disclosing to them the existence of a class settlement. CenturyLink's counsel shared with me a proposed "corrective notice" that he said CenturyLink would ask the Court to order to be disseminated to Keller's clients.

38.    On February 13, 2020, Mr. Keller and I participated in a meet and confer discussion with Mr. Williams by phone.  Mr. Keller asked Mr. Williams what factual basis CenturyLink had to conclude that Keller had solicited or advertised for clients to retain Keller after the class settlement agreement was signed.

---

[14]    *See* Pls.' Resp. to Def.'s Mot. to Enforce Prelim. Approval Order at 5 n.2 [ECF 675].

Mr. Williams stated that CenturyLink believed the webpage to which advertisements had directed interested parties remained online after the settlement was signed. But Mr. Williams conceded that he did not know if Keller had continued advertising after October 15, 2019, or if any parties (besides CenturyLink's counsel) ever accessed the webpage after October 15, 2019. Mr. Williams also conceded that he did not believe Keller had an ethical obligation to inform clients or potential clients of a class settlement that not been signed.

39. Following this meet and confer discussion, I emailed counsel for CenturyLink to explain:

> As we touched on in our call, CenturyLink's supplemental brief accusing Keller Lenkner of ethical violations, as well as Professor Moore's declaration, rest on factual assumptions that you have no basis in knowledge to adopt and are, in fact, false. Nonetheless, while we have already communicated with our clients about the settlement and will continue to do so, we have no objection to sending most of the information contained in your notice to them verbatim.[15]

I accordingly attached a redline of the proposed corrective notice with a limited number of edits to address what I believed were incorrect and misleading statements of fact and law.[16] I then offered:

---

[15]   2-13-20 Postman email (Sun Decl. Ex. C) [ECF 638-3]. The redline proposed edits to the text of the notice but failed to edit the header of the document, which referred to this action and this Court. As I subsequently confirmed to counsel for CenturyLink, Keller did not intend to propose that it would include that header in any notice sent without Court approval.

[16]   2-13-20 Postman email (Sun Decl. Ex. C) [ECF 638-3].

> If we can agree on a version of the attached notice, we would happily send this to our clients directly, along with our own advice as their attorneys.  We want our clients to have a fully-informed and unhindered choice about whether or not to participate in the settlement.  And while we will ensure they have that regardless of what CenturyLink does, we are willing to send your draft notice as attached to avoid burdening the Court with an unnecessary motion.[17]

CenturyLink responded by suggesting several additional edits to the notice, most of which I stated we would accept.[18]  However, on February 17, 2020, counsel for CenturyLink informed me that CenturyLink would not be seeking a corrective notice at that time.[19]

### E.   Keller's clients are free to participate in the class settlement without penalty.

40.   In addition to providing our clients with multiple updates about the class settlement, including the full Court-approved settlement notice, we also asked our clients to make an affirmative decision as to whether they wished to opt out or not.

41.   As explained in Keller's letter to the Court, as of April 7, 2020, 1,933 Keller clients affirmatively decided that they wanted Keller to opt them out of the class settlement.[20]  Additional individuals continue to express their preferences to Keller.  Keller will submit additional opt outs if the Court allows opt outs in this

---

[17]   2-13-20 Postman email (Sun Decl. Ex. C) [ECF 638-3].
[18]   2-14-20 Postman email (Sun Decl. Ex. D) [ECF 638-4].
[19]   2-17-20 Williams email (attached as Exhibit B).
[20]   4-7-20 Letter from Keller [ECF 631].

manner.

42.     Conversely, a substantial number of clients have indicated that they want to participate in the settlement and no longer wish to pursue arbitration.  For all clients who make this decision, Keller terminates its engagement with that client and does not charge that client any fee.  In the course of representing hundreds of thousands of clients, Keller has naturally had some clients who decide to stop pursuing their claims for a variety of reasons.  Keller has never attempted to collect a fee from a single client who terminated his or her engagement prior to obtaining a recovery.  No Keller client who chooses to participate in the class settlement will face a financial penalty of any kind.

43.     Our engagement agreements with clients are clear that Keller will never collect a fee from a client unless that client recovers from CenturyLink, and that even then, Keller will never collect an unreasonable fee.[21]

44.     In subsequent communications, Keller was similarly clear that it would not collect attorney's fees unless the client recovered damages from CenturyLink.  In those emails, Keller confirmed that "under our agreement with you, you will never owe us any attorneys' fees out-of-pocket. You will only ever pay us attorneys' fees as part of any award or settlement you receive from CenturyLink."[22]

---

[21]     Duran Decl. (Sun Decl. Ex. H) [ECF 638-8] at 30.
[22]     2-18-20 Sokanon Facebook post (Sun Decl. Ex. E) [ECF 638-5].

45.     More broadly speaking, nothing about our representation prevents clients from deciding to participate in the class settlement, and if a client makes that choice, nothing about having first explored pursuing arbitration disadvantages that client's legal interests.  Put another way, a client that engages Keller but then decides to participate in the class settlement has given up nothing by first engaging us.

**F.      Keller provides effective and high-quality representation to its clients in individual arbitrations.**

**1.      Keller clients pursue individual arbitrations because that is what CenturyLink's contracts require.**

46.     Although Keller's engagement agreements with CenturyLink customers expressly note that Keller may pursue their claims in court, the agreements focus on arbitration as the primary means forum because CenturyLink requires its customers, including Keller's clients, to execute arbitration agreements and class-action waivers in exchange for service.

47.     At the time clients were retaining Keller to pursue arbitration against CenturyLink, CenturyLink was itself arguing before this Court to compel the class plaintiffs into arbitration.[23]

48.     Based on my assessment of applicable precedent, CenturyLink has strong arguments in favor of arbitration.  I agree with CenturyLink that

---

[23]     *See, e.g.*, Def.'s Mem. Supp. Mot. to Compel Arb. [ECF 124].

CenturyLink's arbitration agreements, and the class-action waiver contained therein, are enforceable.

49.     On January 9, 2020, CenturyLink purported to revoke the arbitration agreements it entered into with our clients.[24]  CenturyLink's position is based on its argument that Keller's clients breached the terms of their contracts by not engaging in pre-arbitration negotiations on a per-client basis, and on the mistaken notion that Keller is pursuing collective action on behalf of its clients.  As explained in the motion to compel arbitration filed by Proposed Intervenors, there is no contractual requirement that Keller conduct individualized negotiations *before* commencing arbitration.  And as discussed in this declaration, Keller is not pursuing a class, representative, or consolidated action.

50.     As a result, Keller believes that CenturyLink's attempted revocation is ineffective, and that its argument that the arbitration agreements are no longer binding is meritless.  This view is consistent with Keller's experience, in which AAA and courts have refused to deny Keller's clients their right to arbitrate based on similar arguments by other defendants who claimed Keller improperly filed and pursued too many arbitrations.

51.     In my opinion, there is also no material risk that Keller's clients' claims will be moved to small claims court.  Keller previously brought thousands of

_____

[24]     1-9-20 Williams email (Unthank Decl. Ex. Y) [ECF 512-25].

18

arbitrations against three different defendants that each made this argument, and AAA rejected the argument each time.  As AAA Rules state, AAA has the conclusive authority to decide whether a claimant's claims should remain in arbitration or be moved to small claims court.

52.     In my opinion, the other risks and disadvantages that CenturyLink identifies are similarly unrealistic and unfounded.  For example, Keller certainly does not believe that its clients' claims are "groundless or submitted in bad faith or for the purpose of harassment," such that their arbitration agreements are unenforceable.[25]  Relatedly, Keller does not believe that there has is any material risk that any of its clients would be assessed with CenturyLink's costs.  Finally, Professor Moore states in her declaration that "Plaintiffs in arbitration are not typically entitled to any discovery as a matter of right."[26]  It is striking that CenturyLink has submitted a declaration arguing that the arbitration process it has required does not allow for the minimum procedures needed for customers to vindicate their claims.  It is also striking that Professor Moore has asserted Keller acted unethically by pursuing arbitration for its clients when she does not have an understanding of the applicable rules.  Principle 13 of AAA's Consumer Due Process

---

[25]     Moore Decl. ¶ 17.g.
[26]     Moore Decl. ¶ 17.a.

Protocol guarantees all consumer a right to reasonable discovery.[27]  In my experience, AAA and arbitrators take the Consumer Due Process Protocol extremely seriously, as they understand it is fundamental to preserving the legitimacy of private arbitration.  Indeed, the AAA will refuse to administer arbitrations for defendants who do not comply with the Consumer Due Process Protocol (and Keller has witnessed this in matters filed by the firm).[28]

53.     CenturyLink has, during these matters, raised more than a dozen obstacles and arguments that it believes should cause us to abandon our clients claims, but that we believe are meritless.  We do not believe we have an obligation to update our clients every time CenturyLink raises a new, untenable legal argument in an attempt to avoid its arbitration agreement.  An in-house attorney at a large corporation might expect to receive such updates from outside counsel.  But in my experience, a consumer client would not expect, and would not benefit from, a barrage of updates regarding dozens of meritless legal arguments.

### 2.   Keller has provided meaningful individual representation and is capable of arbitrating thousands of individual claims.

54.     Keller does not choose its clients at random.  Keller issues questionnaires to potential claimants, in multiple rounds, to identify clients that

---

[27]     *See* AAA Consumer Due Process Protocol Statement of Principles, https://www.adr.org/sites/default/files/document_repository/Consumer%20Due %20Process%20Protocol%20(1).pdf.

[28]     *See* https://adr.org/consumer.

Keller believes could recover a more substantial award in arbitration. CenturyLink has not placed all of these communications in the record, and we do not think it is appropriate or permissible for us to submit these attorney-client communications simply because CenturyLink has assumed without basis that they do not exist.

55.     As explained above, Keller has invested in technology and personnel to ensure that it can competently, diligently, and effectively represent thousands of clients bringing similar claims against a defendant. Once clients have engaged the firm, Keller regularly communicates with its clients, and has the capacity to quickly provide them with updates and advice as their claims proceed. That communication is also a two-way street: Keller regularly invites its clients to contact them with questions or to seek individual information or advice, and Keller's clients do in fact seek out and obtain individualized advice.

56.     Our firm collects detailed information from clients beyond the information we collect when a client initially engages us to bring a claim. If CenturyLink made a settlement offer of some kind, Keller could communicate those terms and related advice to each client, and also seek each client's input and decision regarding the settlement.

57.     We also put significant thought and effort into communicating with our clients in the most effective way. Keller's engagement agreements and other written communications are in plain English. We reach clients through multiple channels, including email, text messages, and telephone calls. In our experience, this approach

reflects the way that most of Keller's clients normally communicate, and is more effective than using legal jargon or issuing mass notices by mail, which consumers may not receive, read, or understand.  In my experience, many class members will never receive notice of a class settlement, let alone read it, understand it, and receive advice from legal counsel about it.  As the parties have acknowledged in discussing potential claims, the large majority of class members will fail to make a claim as part of a settlement and thus lose their claims against CenturyLink while receiving nothing in exchange.

58.     When we initiate arbitrations on behalf of our clients, we initiate those arbitrations individually.  Each arbitration demand states causes of action specific to each client and requests damages based on each client's specific injuries and damages.  Every one of the arbitrations we have filed against CenturyLink is based on individualized information received from each respective client.  Each arbitration can then be decided on its own merits without affecting any other client's claims.

59.     Our individual representation of our clients is borne out by the arbitration demands filed to date.  On behalf of our clients, Keller filed 1,000 individual demands, and requested that AAA commence individual actions for each of our clients.  AAA's policy is that it will request filing fees from a respondent only

after it has concluded that the claimant has satisfied her initial filing requirements.[29]

AAA's request for payment from CenturyLink therefore reflected a determination

that Keller's clients had properly satisfied AAA's requirements for initiating

individual arbitrations.  AAA thus instituted 1,000 individual actions against

CenturyLink, each of which will be decided individually by an arbitrator.

60.     CenturyLink argues that we are using the "specter of tens of millions of

dollars in arbitration fees" to settle claims.[30]  This argument implicitly concedes that

we filed demands for individual arbitrations.  If we had filed a single collective

action for our clients, CenturyLink would not have faced separate filing fees for each

client's action.

### 3. Contrary to CenturyLink's assertions, Keller has sufficiently identified its clients and investigated their claims.

61.     CenturyLink claims that Keller is not individually representing its own

clients in part because, CenturyLink claims, Keller has not sufficiently identified or

investigated its claims.  This is incorrect.

62.     On or around August 1, 2019, Mr. Williams told my partner, Mr. Keller,

that CenturyLink had been unable to find in its records a significant number of the

---

[29]   *See* AAA, Consumer Arbitration Rules, Costs of Arbitration, *available at* https://adr.org/sites/default/files/Consumer_Fee_Schedule_1.pdf (stating that the business's filing fee is "due once the consumer claimant meets the filing requirements").

[30]   CenturyLink's brief [ECF 636] at 3.

accounts corresponding to Keller's clients.  CenturyLink's counsel conceded during a
telephone call that this difficulty could be caused in part by a lack of organization in
CenturyLink's own recordkeeping systems, but asked if Keller could provide
additional information to identify its clients.  Mr. Keller responded to Mr. Williams
by suggesting that CenturyLink provide Keller with a list of the clients whom the
company could not match to an account and stated that Keller would work to
provide supplemental information so that CenturyLink could identify their account.
Mr. Keller further represented to Mr. Williams that Keller would not pursue claims
for any client who could not substantiate their claims.

63.     Despite this offer, CenturyLink did not identify any clients for whom
CenturyLink claimed it could not find account information.

64.     On June 12, 2019, CenturyLink sent Keller a letter asserting that
Keller's prior notice of its clients' claims failed to comply with the pre-filing notice
requirement contained in clients' contracts with CenturyLink. That was supposedly
so because Keller's notice did not include (a) each client's account number; (b) each
client's service dates and service(s) ordered; (c) "the alleged conduct giving rise" to
each client's claim and "the relief sought"; and (d) each client's contract(s) with
CenturyLink.[31]

65.     In a letter dated June 19, 2019, my partner Mr. Keller informed

---

[31]     6-12-19 Cooley letter (Unthank Decl. Ex. J) [ECF 512-10].

CenturyLink that a majority of claimants had confirmed that their current addresses and phone numbers matched the address and phone numbers associated with their CenturyLink accounts.  Mr. Keller also enclosed an updated list of about 14,000 clients that included their current physical addresses, email addresses, and phone numbers, along with the addresses and phone numbers that their clients told them were associated with their CenturyLink accounts.[32]

66.    In his June 19 letter, Mr. Keller wrote:

The enclosed list should contain sufficient information to allow CenturyLink to identify our clients in its system, at which point CenturyLink will have access to our clients' account numbers, contracts, and services ordered. If CenturyLink is unable to identify any of our clients in its system after a good-faith investigation, please provide those clients' names and we can discuss further ways of identifying them."[33]

67.    CenturyLink did not request further identifying information from Keller for any specific individuals following this letter.

68.    On September 24, 2019, I wrote to CenturyLink's counsel, enclosing a draft demand for arbitration that included detailed information about the claims we intended to bring on behalf of another 8,293 clients.  I also provided a list of those clients' current physical addresses, email addresses, and phone numbers, along with the addresses and phone numbers those clients told us were associated with their

---

[32]   6-19-19 Keller letter (Unthank Decl. Ex. K) [ECF 512-11].
[33]   6-19-19 Keller letter (Unthank Decl. Ex. K) [ECF 512-11].

CenturyLink accounts.  I renewed our request that CenturyLink inform us if it was unable to identify any of our clients.[34]

69.     Yet again, CenturyLink did not identify any individuals for whom it lacked the information it needed to identify our clients, their contracts, or the services they ordered.

70.     To date, CenturyLink has refused to identify a single client whose account it cannot locate.  In my experience, this is a common tactic used by defendants facing a large number of arbitrations, perhaps because they prefer to be able to assert that Keller has brought claims improperly, without allowing Keller the opportunity to rebut that assertion or confirming that the remaining claimants do, in fact, have valid claims.

### 4. Keller's refusal to engage in pre-demand negotiations has nothing to do with its ability to individually represent its clients.

71.     In its June 12, 2019 letter, CenturyLink suggested that, before Keller could even file its clients' demands for arbitration, Keller was required to provide additional detail regarding the claims it would raise in arbitration and engage in an individual discussion of each client's claims with CenturyLink.[35]

72.     In our experience, most defendants against whom we have filed

---

[34]   9-24-19 Keller email (Unthank Decl. Ex. N) [ECF 513-2].
[35]   6-12-19 Cooley letter (Unthank Decl. Ex. J) [ECF 512-10].

numerous arbitrations have engaged stall tactics to delay the point at which our

clients can begin arbitrating their claims.  For example, defendants have:

    a.  refused to move forward with arbitrations because they claimed that more than 20% of Keller clients could not be located in their records when, after a court ordered a proper search, the company located 97% of Keller clients in a matter of days, before even reviewing supplemental information provided by Keller;

    b.  asked us to send demands to their outside counsel, waited for weeks, and then argued that the demands were improperly filed because they were not mailed in hard copy to the company's headquarters;

    c.  asserted that many of our clients' claims were "fully time barred" even though their own records showed the claims to be timely under the statute of limitations applicable for willful violations;

    d.  asked AAA to delay commencement of arbitrations because "over 100" of our clients' claims had been released in bankruptcy but then producing a list of only 8 clients whose claims were allegedly released;

    e.  sought multiple extensions to pay AAA filing fees so that they could review the individual demands filed by Keller clients when, as suggested by later discovery, the defendant never intended to pay the filing fees and was negotiating with an alternative arbitral forum to which it hoped to shift the arbitrations;

    f.  asked us to delay our clients' claims in order to participate in a mediation only to refuse to make *any* offer on the day of the mediation and then refuse to pay filing fees to proceed at AAA;

    g.  waited months after demands were filed and then argued that they did not have to move forward because our firm sent AAA a single copy of the applicable arbitration agreement instead of sending thousands of copies of the same agreement; and

    h.  refused to pay filing fees to proceed with the case of *any* Keller client because they claimed they could not locate a small percentage of Keller clients in their records.

73.     In light of this experience, or firm is quite skeptical of proposals by

Defendants that would substantially delay the commencement of arbitration for our

clients.  We accordingly rejected CenturyLink's proposal, which we thought would

cause unjustified delay and which we do not believe is a condition to our clients'

pursuing their claims under their contracts with CenturyLink.  As my partner,

Ashley Keller, explained to CenturyLink in his June 19, 2019 letter:

> CenturyLink seems to conflate the contractual requirement that the
> parties individually arbitrate each claim with a contractual obligation
> to engage in pre-demand discussions on an individual basis.  There is
> no such contractual requirement.  And at 15 minutes per client, such a
> pre-demand "dialogue" would consume more than 3,500 hours, or the
> equivalent of 145 round-the-clock days.  Suffice it to say that we do not
> agree that such an exercise is necessary or would be in our clients' best
> interests.  If CenturyLink is unwilling to engage in a practical, pre-
> arbitration discussion that addresses all of our clients' claims, we will
> proceed to individual arbitrations.[36]

74.     CenturyLink now argues that Keller has acted unethically, and cannot

effectively represent its clients, because Keller declined to engage in "15 minutes" of

per-client negotiations.  CenturyLink repeats this argument at least 14 times.[37]

75.     The fact that we did not want to delay the filing of our client's

arbitrations does not say anything about the amount of time and effort we have

spent investigating our clients' claims or our willingness to individually litigate

---

[36]   6-19-19 Keller letter (Unthank Decl. Ex. K) [ECF 512-11] at 2.
[37]   Moore Decl. ¶¶ 11, 14.d, 17.d, 20 (twice), 22; Moore Supp. Decl. ¶ 17, 19;
CenturyLink's brief at 12, 20, 21, 23, 27, 30.

claims.  Keller is not aware of, nor has CenturyLink identified, any arbitration agreement that requires any of our clients to engage in pre-arbitration "dialogue." We did not inform our clients about CenturyLink's insistence on an arbitrary amount of pre-demand negotiation time because that request was not a meaningful settlement offer.  CenturyLink has not made any settlement offer to any of our clients.

### G. Keller has not attempted to litigate clients' claims on a consolidated basis.

76.     My partners and I have intended from the outset to pursue individual claims on behalf of our clients.  In our initial letter to CenturyLink's counsel, we were clear that we intended to pursue individual arbitrations against CenturyLink on behalf of our clients.  In our June and September 2019 communications, we included draft arbitration demands to illustrate what the individual demands would look like, but never stated or implied that we were going to submit a single demand for thousands of claimants.[38]

77.     To the extent some of our clients are subject to particular defenses or counterclaims, Keller can address those differences individually.

78.     Based on the information provided by our clients, we disagree that any of our clients' claims are time-barred or subject to other complete defenses.  But

---

[38]    6-19-19 Keller letter (Unthank Decl. Ex. K) [ECF 512-11]; 9-24-19 Keller email (Unthank Decl. Ex. N) [ECF 513-2].

even if that turns out to be the case for some of our clients, that would not affect the viability of any other client's claims.

79.     I also note that we have offered to confer with CenturyLink about time-barred claims or claims subject to similar defenses, but CenturyLink refused to substantiate the bases for these defenses or even identify the clients that CenturyLink believes do not have valid claims.

80.     Similarly, we do not concede that any of our clients may be subject to valid counterclaims.  But even if that were the case, we plan to proceed with arbitration on an individualized basis.  That one client might be subject to a counterclaim would not affect another client's claims.  If CenturyLink entered into settlement negotiations with us, we have the capacity to negotiate individual releases for clients who may be subject to debt-collection claims, and separately negotiate recoveries for clients who are not subject to such claims.  Indeed, our ability to negotiate valuable debt forgiveness in connection with the resolution of our clients' claims is a distinct advantage we can offer our clients as compared to a class settlement, which does not offer any class members debt forgiveness.

81.     While we were open to discussing alternate ways in which we could resolve our clients' claims, the parties did not even agree on the parameters for a mediation, let alone "negotiate a pre-filing collective settlement."[39]

---

[39]     Moore Decl. ¶ 13.d.ii.

82.     Even so, Keller disclosed the possibility of an aggregate settlement to

every one of its clients in our engagement agreements:

> The attorneys intend to represent many clients with claims like yours. At this time, your interests and the interests of other clients align. We know of no conflicts of interest that would have an adverse impact on our representation of you. It is, however, possible that conflicts may arise in the future, including:

> We discover that there is a limited pool of assets from which recovery is reasonably likely (for example, an insurance policy), and those assets are insufficient to pay all of our clients the full value of their claims.

> A defendant offers an aggregate or "lump sum" settlement to all of our clients that does not specify the amount each client will receive.

> A defendant offers to settle, but only if a certain percentage, or even all, of our clients accept the proposed settlement.

> We may also be required by the applicable rules of professional conduct to share material information about your claims and negotiating position with our other clients with similar claims.

> While we will try to avoid these issues if it is practical to do so, they might occur. If any conflict of interest affecting you does arise, we will inform you promptly and work with you on how best to proceed in accordance with the applicable rules of professional conduct.[40]

83.     If at some point in the future CenturyLink made an aggregate offer,

Keller would advise its clients over the course of multiple communications about

any resulting conflicts caused by the offer, seek their informed consent, and ask each

client to make an individual decision regarding whether they want to accept the

offer.  However, our preferred settlement structure would be for CenturyLink to

---

[40]     Duran Decl. (Sun Decl. Ex. H) [ECF 638-8] at 32.

make each client an individual settlement offer that each client would be free to accept or reject without regard to the decision of other clients.

**H.    Keller has been transparent and fair about its attorney's fees.**

**1.    The amount of Keller's attorney's fees is reasonable.**

84.    Keller's engagement agreements establish a $750 flat fee for representing each client in an individual arbitration.  In our view, this is a reasonable fee.

85.    While we benefit from economies of scale in representing our clients, those efficiencies are only possible because our firm has invested millions of dollars in infrastructure to manage and represent thousands of clients at once.  Our representation of our clients also involves significant amounts of administrative burden and financial risk.  We are not aware of many, if any, firms in the country willing to represent our clients for a flat fee of $750.  While CenturyLink asserts that the value of our clients' claims is low, that does not reduce the cost of providing legal representation or mean that it is unreasonable for our clients to retain attorneys who will seek to recover attorney's fees from CenturyLink.  Indeed, the entire premise of the fee-shifting provisions in the consumer fraud statutes our clients invoke is that consumer fraud claims will not justify a consumer retaining counsel unless counsel can obtain fees from the defendant.

86.    My firm also has considerable experience with—and has done considerable analysis about—what a reasonable recovery might look like for our

clients.  The class settlement in this action is a poor comparator for our clients'

potential recoveries (and thus our earned attorney's fees).  For one thing, the class

settlement was likely steeply discounted due to the risk that the arbitration

provisions that CenturyLink imposed on customers are valid and enforceable.

87.     Keller's engagement agreements with our clients also state that

"[u]nder no circumstances will the attorneys collect an unreasonably large fee."[41]  If

we do not recover as much for its clients as we believe, we will reduce our fee.

### 2.     Keller has always been clear that its clients will not pay out of pocket for attorney's fees.

88.     As discussed above, Keller's engagement agreements with its clients

are clear that Keller will never require its clients to pay out of pocket for attorney's

fees.[42]  Keller has also repeatedly informed its clients in other communications that

clients will not pay for attorney's fees out of pocket.

89.     Each client's arbitration demand includes a deceptive trade practices

act claim that allows for the recovery of attorney's fees.  Moreover, if a client wins

their common-law fraud claim, they will have necessarily established the elements

of their parallel deceptive trade practices act claim.  Thus, as a practical matter, if a

client prevails at arbitration, they will have the right to recover attorney's fees.  Our

---

[41]   Duran Decl. (Sun Decl. Ex. H) [ECF 638-8] at 30.
[42]   Duran Decl. (Sun Decl. Ex. H) [ECF 638-8].

engagement agreements specifically address this scenario by stating: "If you win your claim, the law requires the Company to pay you these fees and costs in addition to the damages and penalties the Company owes you."[43]

90.     In August 2020, as part of the negotiation of a potential settlement framework, CenturyLink proposed paying Keller an amount for its attorney's fees separately from our clients' recoveries.  We thought that accepting a separate attorney's fee payment not provided for in our engagement agreement was improper and potentially unethical, so I responded that the amount we would collect was set by our existing fee agreements with clients.  My response was made as a margin comment to the confidential settlement framework proposed by CenturyLink.  CenturyLink's introduction of my response to a confidential settlement framework, in addition to being misleading is, in my opinion, a clear violation of Federal Rule of Evidence 408.  Indeed, CenturyLink quotes my statement but, in contrast to all other statements quoted in its filings, fails to attach the document it is quoting, presumably because CenturyLink's counsel *knew* they were improperly quoting inadmissible settlement discussions.

91.     CenturyLink's arbitration agreement requires a claimant to pay one-half of AAA's fees, up to $125.  Our engagement agreements state that this cost will be deducted from any amount recovered by the client.

---

[43]     Duran Decl. (Sun Decl. Ex. H) [ECF 638-8] at 30.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 15, 2020.        s/ Warren Postman
                             Warren Postman
                             Keller Lenkner LLC
                             1300 I Street, N.W.
                             Suite 400E
                             Washington, D.C. 2005
                             (202) 749-8334 (phone)
                             wdp@kellerlenkner.com

                             *Counsel for Proposed Intervenors and Movants*
                             *Keisha Covington, Daniel Sokey, Tiffany Van Riper,*
                             *James Watkins, Jaclyn Finafrock, and Kelly Johnson*