# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

IN RE: CENTURYLINK SALES
PRACTICES AND SECURITIES
LITIGATION

MDL No. 17-2795 (MJD/KMM)

This Document Relates to
Civil File Nos. 17-2832, 17-4613,
17-4614, 17-4615, 17-4616, 17-4617,
17-4618, 17-4619, 17-4622, 17-4943,
17-4944, 17-4945, 17-4947, 17-5046,
18-1562, 18-1565, 18-1572, 18-1573,

**MEMORANDUM OF LAW & ORDER**

---

Carolyn G. Anderson, Brian C. Gudmundson, Bryce D. Riddle, and Hart L.
Robinovitch, Zimmerman Reed LLP, Plaintiffs' Interim Co- Lead and Liaison
Counsel; Mark M. O'Mara, Alyssa J. Flood, Channa Lloyd, and Caitlin Reese,
O'Mara Law Group, and Mark J. Geragos, Benjamin J. Meiselas, and Lori G.
Feldman, Geragos & Geragos, APC, Plaintiffs' Interim Co-Lead Counsel;
Daniel C. Hedlund and Michelle J. Looby, Gustafson Gluek PLLC, Plaintiffs'
Executive Committee Chair; Richard M. Hagstrom, Anne T. Regan, Nicholas S.
Kuhlmann, and Jason Raether, Hellmuth & Johnson, PLLC, Roxanne Barton
Conlin, Roxanne Conlin & Associates, PC, and Francois M. Blaudeau, W. Lewis
Garrison, Jr., Christopher B. Hood, and James F. McDonough, III, Heninger
Garrison Davis, LLC, Plaintiffs' Executive Committee; and T. Ryan Langley,
Hodge & Langley Law Firm, P.C., Michael Fuller, Olsen Daines PC, Brandon C.
Fernald, Fernald Law Group LLP, Bonner C. Walsh, Walsh PLLC, Alfred M.
Sanchez, and Orin Kurtz, Gardy & Notis, LLP, Counsel for Plaintiffs and the
Proposed Class.

Douglas P. Lobel, David A. Vogel, and Jeffrey M. Gutkin, Cooley LLP; Carolyn J.
Fairless, Michael T. Williams, Andrew Unthank, and Theresa Wardon Benz,

Wheeler Trigg O'Donnell LLP; and William A. McNab and David M. Aafedt, Winthrop & Weinstine, P.A., and Jerry W. Blackwell, Blackwell Burke P.A., Counsel for Defendant CenturyLink, Inc. and the Proposed Intervenors.

Warren D. Postman and Ashley C. Keller, Keller Lenkner LLC; and Robert J. Gilbertson, Samuel J. Clark, Faris Rashid, and Virginia R. McCalmont, Greene Espel PLLP; Counsel for Proposed Intervenors Keisha Covington, Daniel Sokey, Tiffany Van Riper, James Watkins, Jaclyn Finafrock, and Kelly Johnson.

---

## I.      INTRODUCTION

This matter is before the Court on CenturyLink, Inc. and Its Operating Companies' Motion to Disqualify Counsel and Require Corrective Notice. [Docket No. 634]  The Court heard oral argument on June 23, 2020.

The Court denies the motion.  CenturyLink cannot establish standing to bring a disqualification motion against Keller.  CenturyLink has not pointed to ethical breaches that "so infect[] the litigation in which disqualification is sought that it impacts the moving party's interest in a just and lawful determination of her claims."  Colyer v. Smith, 50 F. Supp. 2d 966, 971–72 (C.D. Cal. 1999).  The actions at issue here do not constitute ethical violations that are "manifest and glaring" such that they confront the court "with a plain duty to act."  Id. at 972 (citation omitted).  Concerns regarding Keller's clients' right to make an informed, individual decision to opt out of this litigation are adequately

addressed by enforcing the Court's prior orders and requiring opt-out requests
to be individually signed by each class member seeking to opt out.

## II.      BACKGROUND

### A.      Keller Lenkner LLC

Keller Lenkner LLC ("Keller") is a Chicago-based law firm with 24
attorneys, dozens of paralegals and client-services professionals, and three
technology experts.  (Postman Decl. ¶¶ 2, 5.)  Keller avers that its practice is
based on pursuing individual arbitrations in consumer and employee cases.  (Id.
¶ 2.)  It asserts that its strategy is that by "litigating a large number of similar
claims in arbitration [it] can more effectively vindicate claims that have long been
passed over or severely discounted by other firms due to the existence of class-
action waivers."  (Id.)  It notes that it can efficiently simultaneously represent
thousands of individuals in arbitrations because most arbitral rules allow "desk"
arbitrations, where arbitrators decide disputes on the papers without live
testimony and numerous similar claims are assigned to the same arbitrator.  (Id.
¶ 4.)

Defendant CenturyLink, Inc. ("CenturyLink") asserts that Keller's
litigation strategy is to interfere with class actions by soliciting and stockpiling
thousands of class members whose claims Keller threatens to present collectively

3

in arbitration.  (Unthank Decl. ¶ 17.)  According to CenturyLink, Keller uses the

threat of tens of millions of dollars in arbitration fees as leverage to extract global

settlements from defendants.  (Id. ¶¶ 17, 32-34.)  Keller currently represents more

than 50,000 individual clients pursuing arbitrations.  (Id. ¶ 18.)  Keller can earn

substantial attorney's fees if Keller negotiates a mass "opt out" settlement in this

MDL.  (Id. ¶¶ 34, 48; Unthank Decl., Ex. M at 4.)  However, Keller earns no

attorney's fees if clients fail to opt out of the settlement class.  ([Docket No 571]

Feb. 20, 2020 Mot. Hearing Tr. 31–32 (stating that Keller gets no fees from clients

who fail to opt out of the class settlement); Sun Decl., Ex. E (telling clients that

they will owe Keller no money if they submit a claim in the settlement).)

Under Keller's law firm model, it advances arbitration filing fees on behalf

of its clients.  (Postman Decl. ¶ 6.)  Keller does not recover the filing fees and

collects no attorney's fees unless it obtains recovery for its clients.  (Postman

Decl. ¶ 6; Sun Decl., Ex. H, Duran Decl., Ex. 4, CenturyLink Compensation

Claims Retainer Agreement at 30.)

In the past 18 months, Keller has obtained more than $180 million in

settlement for more than 90,000 clients.  (Postman Decl. ¶ 14.)  It represents that,

in many of those cases, class-action attorneys brought similar claims, which

4

resulted in class settlements; however, Keller's clients often received recoveries that were 20 times higher than those received by class members.  (Id.)

### B.    Keller's Advertising Regarding CenturyLink Claims

During the spring of 2019, Keller and its co-counsel, Troxel Law LLP ("Troxel"), began advertising online regarding potential claims by CenturyLink customers.  (Postman Decl. ¶ 16.)  Keller decided whether to represent potential clients based on their responses to questionnaires.  (Id.)  It also had other communications with its clients, including advice it provided to clients and additional information provided by clients to Keller.  (Id. ¶ 19.)  Clients retained Keller by signing electronic engagement agreements.  (Id. ¶ 16.)  The retainer agreement stated: "At this time, your interests and the interest of other clients align.  We know of no conflicts of interest that would have an adverse impact on our representation of you."  ([Docket No. 513] Unthank Decl. ¶ 26, Retainer Agreement ¶ 8.)

Keller avers that it ceased actively advertising for new CenturyLink consumer clients on August 12, 2019.  (Postman Decl. ¶¶ 22-23, 38.)

### C.    Keller's Interactions with CenturyLink

Keller first contacted CenturyLink on May 14, 2019 on behalf of "[m]ore than 9,000" clients who had retained Keller to pursue consumer fraud arbitration

claims against CenturyLink.  ([Docket No. 599-2] Keller Decl., Ex. 2 at 1.)  The letter also stated: "As required by the applicable service agreements, we are prepared to serve individual demands for arbitration on behalf of each client with the American Arbitration Association ('AAA')."  (Id.)  Keller threatened to "to proceed with every arbitration simultaneously." (Id.)  Keller sought a mass settlement.  ([Docket No. 513] Unthank Decl. ¶ 34.)  It warned CenturyLink that, if it did not agree to a mass settlement, it would have to "pay AAA more than $30 million in initial fees and costs."  (Keller Decl., Ex. 2 at 1.)  Keller included a list of its clients with identifying information and an example arbitration demand to illustrate the types of causes of action and relief its clients intended to pursue. (Unthank Decl. ¶ 31.)  It did not provide any information on the clients' specific claims or recovery sought.

Two weeks later, Keller sent a letter to CenturyLink identifying "nearly 3,000 additional" claimants.  (Unthank Decl. ¶ 35; Unthank Decl., Ex. I.)  Movants Keisha Covington, Daniel Sokey, Tiffany Van Riper, James Watkins, Jaclyn Finafrock, and Kelly Johnson were on the client lists that Keller provided to CenturyLink on May 14, 2019; June 3, 2019; June 12, 2019; and September 24, 2019.  (Keller Decl. ¶ 6.)

On June 12, 2019, CenturyLink requested that Keller provide certain information about the claims that CenturyLink claims to need in order to evaluate and resolve each claim before proceeding to arbitration, as CenturyLink believed was required by the arbitration contracts.  (Unthank Decl. ¶ 38; Unthank Decl., Ex. J.)  CenturyLink asserted that Keller had breached the contractual pre-filing notice requirement by failing to identify customer account numbers, the conduct giving rise to the causes of action, and the relief sought.  (Id.)

Keller would not provide information such as account numbers, descriptions of individual claims, or the amount of actual damages sought be each claimant.  (Unthank Decl. ¶¶ 38-39.)  CenturyLink stated: "We would like to have a meaningful dialogue about each of your clients on an individual basis, as we all agreed to do in our contracts."  (Unthank Decl., Ex. J at 2.)  Keller did provide clients' names, "current physical addresses, email addresses, and phone numbers."  (Unthank Decl. ¶ 39; Unthank Decl., Ex. K.)  Keller stated that it would not spend "15 minutes" to discuss each claim "on an individual basis" with CenturyLink because "such a pre-demand 'dialogue' would consume more than 3,500 hours."  (Unthank Decl., Ex. K at 2.)  Keller threatened to

simultaneously file thousands of individual arbitrations "[i]f CenturyLink is unwilling to engage in a practical, pre-arbitration discussion that addresses all of our clients' claims." (Id.)

CenturyLink asserts that its initial review of Keller's clients' claims raised concerns and a need for more information. (Unthank Decl. ¶ 44.) For example, CenturyLink could not identify any potential customer account that could be connected with some of Keller's clients; some clients claimed to receive services at addresses in states in which CenturyLink does not provide services; and some clients owed money to CenturyLink and could be subject to counterclaims. (Id. ¶ 44; Unthank Decl. ¶ 62.c (providing that 34% of the first 1,000 arbitration demands by Keller's clients show that the clients owe CenturyLink money); Unthank Decl., Ex. L.) On July 10, 2019, CenturyLink again requested that Keller engage in individualized negotiations: "CenturyLink is interested in exploring with you whether there is any process by which your clients could comply with their contractual obligations to engage in individualized resolution discussions." (Unthank Decl., Ex. L at 3.)

Keller discussed the proposed MDL class settlement terms with CenturyLink's counsel in August 2019.  (Unthank Decl. ¶ 12; Unthank Decl., Ex. M at 3.)

CenturyLink provides evidence, such as a Facebook advertisement from January 2020, that Keller continued to solicit clients after learning of the proposed class settlement in this MDL.  (Unthank Decl. ¶ 21; Unthank Decl., Ex. M at 3.)  On September 24, 2019, Keller informed CenturyLink that it had acquired "8,293 additional . . . clients," for a total of more than 22,000 clients intending to pursue individual arbitrations against CenturyLink.  (Unthank Decl. ¶ 51; Unthank Decl., Ex. N.)

On October 8, 2019, CenturyLink informed Keller that it would soon be proposing a class settlement in this MDL.  (Unthank Decl., Ex. O at 4.)  On October 16, 2019, Plaintiffs filed their Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification.  [Docket No. 466]

In December 2019, Keller initiated 1,000 individual arbitrations on behalf of 1,000 individual clients by filing 1,000 separate demands against CenturyLink with the AAA.  (Postman Decl. ¶¶ 26, 59; Unthank Decl., Ex. R.)

**D.    Settlement of the Consumer MDL**

9

On October 16, 2019, Plaintiffs moved for an Order (1) granting
Preliminary Approval of the Settlement; (2) provisionally certifying the proposed
Settlement Class; (3) conditionally appointing the proposed Class
Representatives as the Settlement Class Representatives; (4) conditionally
appointing the proposed Class Counsel as the Settlement Class Counsel; (5)
approving the form and manner of notice, (6) ordering that notice be
disseminated to the Settlement Class; (7) establishing the deadlines for
Settlement Class Members to request exclusion from the Settlement Class, file
objections to the Settlement, or file Claims for a Settlement Award; and 8) setting
the proposed schedule for completion of further settlement proceedings,
including scheduling the final fairness hearing.  [Docket No. 466]  With that
motion, Plaintiffs filed a Proposed Order, which included a preliminary
injunction against the Releasing Parties from participating in, among other
things, arbitration relating to the Released Claims.  ([Docket No. 474] Proposed
Order ¶ 10.)  CenturyLink and the Proposed Intervenors filed a brief in support
of Plaintiffs' motion.  [Docket No. 481]

On January 10, 2020, CenturyLink also filed a Supplemental Brief in
support of the motion for preliminary approval addressing Plaintiffs' request

that the Court's Preliminary Approval Order contain a temporary injunction of all parallel proceedings, including arbitrations, by putative class members. [Docket No. 508]  CenturyLink specifically addressed the individual consumer arbitrations brought against CenturyLink by clients of the law firms of Keller and Troxel.  It represented that it would serve Keller and the AAA with a copy of its brief on January 10, 2020.  (<u>Id.</u> at 3 n.3.)

On January 22, 2020, the Court held a hearing regarding the motion for preliminary approval of the settlement.  [Docket No. 524]  None of Keller's clients appeared at the hearing; nor did they file any document in the MDL.

On January 24, 2020, the Court issued the Preliminary Approval Order, which included language temporarily enjoining class members from participating in any lawsuit or arbitration relating to the claims being released in the class settlement.  ([Docket No. 528] Preliminary Approval Order ¶ 10.)  The Preliminary Approval Order also included requirements for class members submitting requests to opt out of the settlement class, including that each opt-out request include the individual's signature.  (<u>Id.</u> ¶ 6.)

E.    **Keller's Actions Post-Preliminary Approval Order**

In a February 2020 email, Keller wrote to its clients:

11

On November 21, 2019, we filed 1,000 arbitration demands on behalf of our clients. We were preparing thousands more demands, including yours. We hoped that CenturyLink would honor its customer contracts and approach the arbitration process in good faith. But CenturyLink refused to go forward with the arbitrations at all, claiming they did not have to proceed with arbitrations because they were going to settle your claims in a class action settlement.

. . . CenturyLink decided to settle the class action after all, paying $15 million to release the claims of approximately 15 million people. While the amount each class member receives will vary, that averages out to $1 per class member. If you'd like to know more about the settlement, you will soon be able to review them at the settlement website. In the meantime, you may view a copy of the proposed class notice here, and the settlement documents are available here.

. . .

We think the settlement violates your contract with CenturyLink, and we don't think an average of $1 per class member is nearly enough money. Although we cannot promise any particular result, we believe we can do better than $1 per person if we bring individual arbitrations for our clients.

(Sun Decl., Ex. F.)

Also in February 2020, Keller sent another similar email to its clients. (Sun Decl., Ex. E.) This communication included an identical first paragraph. It also stated:

CenturyLink has described the amount of the settlement as follows:

12

If you are a member of the Class and claim you were overcharged and not reimbursed by CenturyLink, you are eligible to make a claim for $30 from the Settlement (subject to a pro rata adjustment up or down depending on how many valid claims are filed), or more (depending on whether you choose to provide additional explanation and documentation with your claim).

If you'd like to know more about the settlement, you may view a copy of the proposed class notice here, and the settlement documents are available here.

. . .

We think the settlement violates your contract with CenturyLink, and we don't think an average of $30 per class member is nearly enough money.  Although we cannot promise any particular result, we believe we can do better than $30 per person if we bring individual arbitrations for our clients.  And under our agreement with you, you will never owe us any attorneys' fees out-of-pocket.  You will only ever pay us attorneys' fees as part of any award or settlement you receive from CenturyLink.

Please also keep an eye on your inbox and your phone.  We'll be sending instructions for opting out of the settlement in the near future.

As much as we think the class settlement is a bad deal, we want to make clear that you are completely free to participate in the class settlement if you wish.  If you submit a claim in the settlement, you will not owe us any money.  If you would like to withdraw your claim for arbitration or would like assistance participating in the class settlement, please contact us . . . .

(Id.)  Keller avers that the claim that it can obtain a recovery of more than $30 per client is true and based on its substantial recoveries for other clients in other actions.  (Postman Decl. ¶ 35.)

Keller avers that "a substantial number" of its clients have decided to participate in the class settlement, and when that has occurred, Keller has terminated its engagement and charged the client no fee.  (Postman Decl. ¶ 42.)

On April 7, 2020, Keller filed a letter in this MDL that stated that the approximately 2,000 clients in the list attached to the letter were opting out of the class settlement.  [Docket Nos. 631-30]  No individual client signatures were included.  On June 23, after oral argument on the current motion, Keller filed a new letter attaching a list of approximately 14,500 "additional clients . . . who informed us that they would like to opt-out of the class-action settlement." [Docket Nos. 746, 747]  The attached list identifies each client by name, email address, telephone number, and mailing address.  [Docket No. 747]  The list does not include individual signatures.  CenturyLink's preliminary analysis of the list found that more than 250 of those individuals have also made a claim for payment from the settlement fund.  [Docket No. 753]

### F.    Current Motion

CenturyLink has now filed the current motion requesting that the Court disqualify Keller from representing clients with respect to this class action and the proposed settlement and order that corrective notice be sent to Keller's clients.  Keller and Plaintiffs' Lead Counsel oppose CenturyLink's motion.

III.   **DISCUSSION**

A.     **Standard for Disqualification**

"The grant of a motion to disqualify an attorney as trial counsel is reviewed for an abuse of discretion."  <u>Macheca Transp. Co. v. Philadelphia Indem. Co.</u>, 463 F.3d 827, 833 (8th Cir. 2006).  "Because of the potential for abuse by opposing counsel, disqualification motions should be subjected to particularly strict scrutiny."  <u>Id.</u> (citation omitted).  "A party's right to select its own counsel is an important public right and a vital freedom that should be preserved; the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary."  <u>Id.</u> (citation omitted).

"Naturally, a district court's inherent powers extend to managing its bar and disciplining attorneys that appear before it."  <u>Zerger & Mauer LLP v. City of Greenwood</u>, 751 F.3d 928, 931 (8th Cir. 2014).  "In cases where counsel is in violation of professional ethics, the court may act on motion of an aggrieved

party or may act <u>sua</u> <u>sponte</u> to disqualify." <u>O'Connor v. Jones</u>, 946 F.2d 1395,

1399 (8th Cir. 1991) (citation and footnote omitted).

### B.     Standing

#### 1.     Standard for Standing

"To show Article III standing, a plaintiff has the burden of proving: (1) that

he or she suffered an injury-in-fact, (2) a causal relationship between the injury

and the challenged conduct, and (3) that the injury likely will be redressed by a

favorable decision." <u>S.D. v. U.S. Dept. of Interior</u>, 665 F.3d 986, 989 (8th Cir.

2012) (citations omitted).  An "injury in fact" is "an invasion of a legally

protected interest which is (a) concrete and particularized, and (b) "actual or

imminent, not 'conjectural' or 'hypothetical.'" <u>Lujan v. Defs. of Wildlife</u>, 504 U.S.

555, 560 (1992) (citations and footnote omitted).

#### 2.     Standing Standard with Regard to Attorney Disqualification

A party moving to disqualify counsel must first show that it "has standing

to raise the issues in [its] disqualification motion." <u>O'Connor v. Jones</u>, 946 F.2d

1395, 1400 (8th Cir. 1991).  "[C]ase law gives an opposing party standing to

challenge where the interests of the public are so greatly implicated that an

apparent conflict of interest may tend to undermine the validity of the

proceedings." <u>Abbott v. Kidder Peabody & Co.</u>, 42 F. Supp. 2d 1046, 1050 (D.

Colo. 1999) (citations omitted).  See also DT Boring, Inc. v. Chicago Pub. Bldg.

Comm'n, No. 15 C 11222, 2016 WL 3580756, at *6 (N.D. Ill. June 28, 2016)

("[W]here the conflict is such as to clearly call in question the fair or efficient

administration of justice, opposing counsel may properly raise the question.")

(citation omitted).

### 3. Injury to CenturyLink

The Court concludes that, overall, CenturyLink does not have standing to

seek to disqualify Keller.  CenturyLink does not assert that it is a current or

former client of Keller.  Nor does it claim that Keller has obtained its confidential

information.  Generally, CenturyLink asserts that Keller has conflicts that harm

its clients, not CenturyLink, and that Keller gave its clients incompetent,

misleading, and non-individualized advice, which harms Keller's clients rather

than CenturyLink.  See, e.g., Simonca v. Mukasey, No. CIVS081453FCDGGH,

2008 WL 5113757, at *4 (E.D. Cal. Nov. 25, 2008) ("It is not sufficient that the

party moving for disqualification shows that the lawyer's client may be injured

by his counsel's continued involvement in the case.  The moving party must

show how the diminished quality of the representation of an opposing party

causes the movant injury.") (citations omitted).  Even if CenturyLink does have

an interest in class members fairly considering its settlement offer, that interest is protected by the Court-approved notice that was already sent to all class members and by enforcement of the Court's Preliminary Approval Order requirement that opt-out requests be individually signed by the class member. CenturyLink cannot show "the invasion of a legally protected interest" from Keller's representation of its clients, and certainly not one that is "not conjectural or hypothetical." Corn Plus Coop. v. Cont'l Cas. Co., No. 04-CV-4270 (DSD/SRN), 2006 WL 8443196, at *3 (D. Minn. Oct. 5, 2006), aff'd, No. 04CIV4270 (DSD/SRN), 2006 WL 8444456 (D. Minn. Nov. 3, 2006).

### C.   Alleged Ethical Violations

#### 1.   Applicable Ethical Rules

Under the District of Minnesota's Local Rules,

> [a]n attorney who is admitted to the court's bar or who otherwise practices before the court must comply with the Minnesota Rules of Professional Conduct, which are adopted as the rules of this court. An attorney commits misconduct by failing to comply with the Minnesota Rules of Professional Conduct.

Minn. L.R. 83.6(a).  Thus, the Court looks to the Minnesota Rules of Professional Conduct and, in some instances, to the professional rules in the jurisdiction in which the attorney is located and licensed.  See In re Potash Antitrust Litig., No. CIV. 3-93-197, 1993 WL 543013, at *8 (D. Minn. Dec. 8, 1993), opinion amended

on reconsideration, No. CIV. 3-93-197, 1994 WL 2255 (D. Minn. Jan. 4, 1994).

Here, the Keller firm is located in Illinois.  Both Minnesota and Illinois have

adopted the Model Rules of Professional Conduct, and their ethical rules are

identical for purposes at issue in this motion.

### 2.  Lack of Individualized Representation and Tailored Advice

CenturyLink asserts that Keller breached Rules 1.1, 1.2, 1.3, and 1.4, and its

ethical duty to zealously represent each client's interest by refusing to spend 15

minutes to evaluate and discuss its clients' individual claims pre-arbitration and

by giving a blanket recommendation that all of its 22,000 clients opt out of the

settlement without regard to their individual situations.  CenturyLink also

asserts that Keller's enrollment process requires a client to provide minimal

information and no supporting materials before Keller signs up the client to

pursue arbitration.  (Unthank Decl., Ex. E; Unthank Decl. ¶¶ 23-25.)  Before

retention, Keller does not advise each client on the risks of pursuing arbitration.

(See Unthank Decl. ¶¶ 22-26; Unthank Decl., Ex. E; Sun Decl., Ex. H.)

CenturyLink argues that this lack of individualized consultation served

Keller's interest in opting out as many class members as possible, but it violated

Keller's ethical obligations under Rules 1.1 through 1.4.  Thus, the Court cannot be confident that the opt-out decisions of Keller's clients were fully informed.

CenturyLink does not have standing to assert disqualification based on the foregoing allegations.  If Keller failed to inform, consult with, and provide competent representation to its clients, those actions harmed Keller's clients, not CenturyLink.  Keller's clients, not CenturyLink, have standing to raise these allegations.  Nor do these allegations sufficiently implicate the fair or efficient administration of justice in this class action lawsuit.  The Court has a strong interest in ensuring that each class member makes an informed and voluntary decision regarding whether to object, opt out, or file a claim.  The Court has put safeguards in place to guard that interest, regardless of whether Keller fulfilled its duty to provide competent, individualized representation; namely, the Court has ensured that each class member received clear, informative notice and has required that each opt-out request be individually signed by the class member seeking to opt out.  Thus, the threat to the administration of justice from the alleged actions taken or not taken by Keller is speculative.

### 3.    Conflicts

Model Rule 1.7(b) requires that attorneys with a concurrent conflict of interest obtain informed written consent from each client.  However, a client cannot consent to a conflict, "if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent representation."  Rule 1.7, Comment 15.

CenturyLink asserts that two types of non-waivable conflicts exist: Keller has a conflict with its clients based on its fee structure, and there is a conflict among Keller's clients because opting out and pursuing individual arbitrations and mass settlement benefits clients with strong claims at the expense of clients with weak or small claims.

### a)    Keller's Alleged Financial Conflict

CenturyLink argues that Keller faces a monetary incentive to encourage its clients to opt out – it recovers no fees or costs whatsoever if its clients fail to opt out, but it does recover attorney's fees if its clients opt out and settle outside of the class action or succeed in arbitration.  (See Moore Supp. Decl. ¶ 13; Sun Decl., Exs. E-G; Postman Decl. ¶¶ 84, 88.)  CenturyLink claims that Keller violated its duty of loyalty to its individual clients by providing advice tainted by its

21

undisclosed financial interest and that this violation harms CenturyLink by causing Keller clients to make uninformed decisions to opt out of the class action settlement.

Even if Keller's fee arrangement does constitute a conflict that should have been revealed to its clients, Keller's clients, not CenturyLink, have standing to raise this issue. Given the provision of Court-approved notice to all of Keller's clients, Keller's own provision of the settlement terms and class notice to its clients, and the Court's requirement that each opt-out request contain the individual's signature, CenturyLink's claim that this alleged conflict harms CenturyLink or the administration of justice is speculative. CenturyLink does not have standing to raise this claim.

### b)   Alleged Conflict Among Keller's Clients

CenturyLink argues that Keller cannot represent 22,000 clients in this class action lawsuit without conflict. (<u>See</u> Moore Supp. Decl. ¶ 12.) It asserts that Keller's goal is to to use the threat of large arbitration fees to force an aggregate settlement outside of the class settlement. CenturyLink reasons that, to ensure as large an aggregate settlement as possible, it benefits Keller and its clients with stronger claims to encourage opt outs from as many class members as possible,

while harming the interest of clients with weaker claims who would benefit from remaining in the settlement class. (Moore Supp. Decl. ¶¶ 11-12.) CenturyLink concludes that these conflicts bar Keller's continued representation of class members with respect to their decisions regarding the class settlement.

Whether each of Keller's clients chooses to pursue individual arbitration, settle individually, or participate in this class settlement will have no material effect on any other client. CenturyLink's allegation of a potential conflict among Keller's clients arises only if Keller seeks a mass settlement outside of this class action, in which case clients with weaker claims might benefit from obtaining a settlement in this MDL, while clients with stronger claims might benefit from all clients opting out en masse to potentially leverage a larger mass settlement. (Although, it is also possible that clients with weaker claims could still benefit if a larger mass settlement is achieved.) The possibility of this type of conflict was raised in Keller's retainer agreement. (See Sun Decl., Ex. H (noting that a conflict might arise if "[a] defendant offers to settle, but only if a certain percentage, or even all, of our clients accept the proposed settlement").)

Even if Keller's representation of 22,000 clients with regard to the decision of whether to remain in the class action or opt out constitutes a conflict, Keller's

clients, not CenturyLink, have standing to raise this issue.  Given the provision of

Court-approved notice to all of Keller's clients, Keller's own provision of the

settlement terms and class notice to its clients, and the Court's requirement that

each opt-out request contain the individual's signature, CenturyLink's claim that

this alleged conflict harms CenturyLink or the administration of justice is

speculative.  CenturyLink does not have standing to raise this claim.

### 4.      Misrepresentations

#### a)      Applicable Standard

Model Rule 7.1 prohibits a lawyer from providing "false or misleading

communications."  Likewise, Model Rule 8.4(c) states that it is "professional

misconduct" for a lawyer to "engage in conduct involving dishonesty, fraud,

deceit or misrepresentation."  CenturyLink asserts that Keller violated Rules 7.1

and 8.4(c) by providing misleading information to its clients to attempt to sway

them to Keller's preferred outcome of opting out.  (Moore Supp. Decl. ¶¶ 6-8.)

#### b)      Disclosure of Class Action Settlement

CenturyLink asserts that Keller violated the ethical rules by failing to

inform its clients of the material fact of this MDL and the potential class

settlement until after they had signed retainer agreements and after this Court

granted preliminary approval on January 24, 2020.

The available evidence indicates that Keller did not inform potential clients

or clients about the MDL and potential class settlement until the class and

settlement were preliminarily approved.  Soon after the class and settlement

were preliminarily approved, Keller did inform all of its clients of that fact and

provided a link to the Court-approved notice.  Keller also informed its clients

that they could remain in the settlement class and terminate Keller's

representation with no financial consequence.  Many of its clients have, in fact,

chosen to terminate Keller's representation and remain in the settlement class.  In

light of these facts and the provision of Court-approved notice to all of Keller's

clients, whether or not Keller violated ethical rules by failing to inform its clients

of the potential settlement, any harm to CenturyLink or the fairness and integrity

of this litigation is speculative.  CenturyLink does not have standing to assert this

claim.

### c)  Characterization of the Class Action Settlement

CenturyLink asserts that Keller misrepresented the class action settlement

to its clients by suggesting that each class member will only receive $1, by

claiming that class members would receive an average of $30, and by advising all clients, regardless of their individual circumstances, that the class settlement is a "bad deal."  (Sun Decl., Exs. E-F.)

CenturyLink can point to no blatant misrepresentations by Keller.  Keller stated: "CenturyLink decided to settle the class action after all, paying $15 million to release the claims of approximately 15 million people.  While the amount each class member receives will vary, that averages out to $1 per class member."  (Sun Decl., Ex. F.)  Keller's statement that the settlement averages out to approximately $1 per class member is technically true.  In the same email, Keller also noted that recovery amounts will vary and linked to the Court-approved class notice in the same communication.   Additionally, CenturyLink has not shown that Keller does not "believe [it] can do better than $1 per person." (Id.)

Keller's statement that it doesn't "think an average of $30 per class member is nearly enough money" and that it can do better than $30 per person is contained in an email that also explained that a $30 claim could be made, "subject to a pro rata adjustment up or down depending on how many valid claims are filed" or a claim for more money could be made with documentation.

(Sun Decl., Ex. E.)  And the email contained a link to the Court-approved notice. Thus, in context, the "average of $30" characterization is not misleading.

Keller's opinion that the class settlement is a "bad deal" (Sun Decl., Ex. E) is not objectively false – it is Keller's subjective opinion, which it is entitled to provide to its clients.

### d)     Breach of Arbitration Contracts

CenturyLink asserts that Keller erred by failing to inform its clients that it had materially breached their arbitration contracts and, as a result, CenturyLink revoked and terminated those contracts.  CenturyLink further argues that Keller misleadingly stated: "CenturyLink refused to go forward with the arbitrations at all, claiming they did not have to proceed with arbitrations because they were going to settle your claims in a class action settlement."  (Sun Decl., Ex. E.)

Keller's statement that "CenturyLink refused to go forward with the arbitrations at all, claiming they did not have to proceed with arbitrations because they were going to settle your claims in a class action settlement" is not blatantly untrue, because, initially, CenturyLink claimed that Keller's clients' arbitrations were stayed by this Court's injunction contained within the Preliminary Approval Order.

27

Whether Keller's alleged failure to inform its clients that CenturyLink terminated their arbitration agreements because they were in material breach violated ethical rules depends upon balancing a lawyer's duty to keep their clients reasonably informed with the fact that the ethical rules do not require a lawyer to describe litigation strategy in detail.  See Model Rule 1.4, cmt. 5 (Although a lawyer must "keep the client reasonably informed about the status of the matter, "a lawyer ordinarily will not be expected to describe trial or negotiation strategy in detail.").  Whether Keller violated the ethical rules and miscalculated regarding whether CenturyLink's claim to have terminated the arbitration agreements was material to its clients is an issue that belongs to Keller's clients, not CenturyLink.

Overall, the Court finds that the alleged misrepresentations by Keller do not reach the magnitude of the type of misrepresentations that go to the heart of this case, and they neither give CenturyLink standing nor justify sua sponte disqualification by the Court.  Cf. In re Lutheran Brotherhood Variable Insurance Products Co. Sales Practices Litigation, No. 99-MD-1309, 2002 WL 1205695, at *1-3 (D. Minn. May 31, 2002) (disqualifying attorney for "blatantly false" advertisement to non-client class members that contained "no fewer than three

egregious misrepresentations" regarding the court's rulings and the litigation). The misrepresentations alleged by CenturyLink are part of legal advice contained in communications from lawyers to their clients – not in solicitations to class members by unaffiliated lawyers.  Many are found within communications that provide a link to the Court-approved class notice.  Together, all of these facts diminish the chance of confusion by Keller's clients.  CenturyLink cannot show that it has been harmed by these actions sufficient to give it standing to assert this motion.  Nor do the allegations implicate the fair administration of this case.

### D.     Remedy

#### 1.     Disqualification

Overall, the Court finds that CenturyLink lacks standing to assert its motion for disqualification.  Additionally, for the reasons explained with regard to each asserted ground for disqualification, the Court concludes that, overall, any harm to the administration of justice in this case is speculative and does not support the Court acting sua sponte to disqualify Keller and deny its clients' their choice of counsel, particularly when considered in context with Keller's other statements and provision of the link to the Court-approved notice from this case.

The Court acknowledges that Keller faces a strong financial incentive to uniformly advise its clients to opt out, regardless of their individual circumstances.  This does not rise to the level of a conflict requiring <u>sua</u> <u>sponte</u> disqualification.  It does raise a concern about the validity of the mass opt-out requests it filed on behalf of more than 16,000 of its clients.  However, this concern is adequately addressed by enforcing this Court's Preliminary Approval Order requiring that opt-out requests  be individually signed.

The Court emphasizes that it is making no finding regarding whether or not Keller has violated ethical rules with regard to its representation of its clients. The Court merely holds that, in this action and on this record, CenturyLink has not established standing to seek disqualification of Keller and to disrupt Keller's clients' chosen attorney-client relationship.  Nor has CenturyLink raised allegations that support this Court interfering with the attorney-client relationship and <u>sua</u> <u>sponte</u> disqualifying Keller.

### 2.    Corrective Notice

Because the Court denies CenturyLink's request to disqualify Keller and because Keller's alleged misrepresentations regarding the class settlement are not blatantly misleading when viewed in the context of the other language in Keller's

communications and its provision of a link to the Court-approved notice, the

Court concludes that corrective notice is not warranted.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

CenturyLink, Inc. and Its Operating Companies' Motion to
Disqualify Counsel and Require Corrective Notice [Docket No. 634]
is **DENIED**.


Dated:   June 29, 2020                    s/ Michael J. Davis
                                          Michael J. Davis
                                          United States District Court

31