# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |
| This Document Relates to Civil File No. 18-296 (MJD/KMM) | **MEMORANDUM OF LAW & ORDER** |

Patrick E. Gibbs, Douglas P. Lobel, David A. Vogel, Sarah M. Lightdale, Ryan Blair, and Dana A. Moss, Cooley LLP; William A. McNab, Thomas H. Boyd, and David M. Aafedt, Winthrop & Weinstine, P.A.; and Jerry W. Blackwell, Blackwell Burke P.A.; Counsel for Defendants CenturyLink, Inc., Glen F. Post, III, R. Stewart Ewing, Jr., David D. Cole, Karen Puckett, Dean J. Douglas, and G. Clay Bailey.

Michael D. Blatchley, John C. Browne, Michael Mathai, Amanda Boitano, and Richard D. Gluck, Bernstein Litowitz Berger & Grossmann LLP; Keith S. Dubanevich, Timothy S. DeJong, Keil M. Mueller, and Lydi Anderson-Dana, Stoll Stoll Berne Lokting & Shlachter P.C.; Special Assistant Attorneys General and Counsel for Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund, Counsel for Plaintiff Fernando Vildosola, and Lead Counsel for the Class; and Richard A. Lockridge, Gregg M. Fishbein, and Kate M. Baxter-Kauf, Lockridge Grindal Nauen P.L.L.P., Liaison Counsel for Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund and Plaintiff Fernando Vildosola.

## I.      INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel. [Docket No. 188]  Lead Plaintiff the State of Oregon by and through the Oregon State Treasurer and the Oregon Public Employee Retirement Board, on behalf of the Oregon Public Employee Retirement Fund ("Oregon") and named Plaintiff Fernando Alberto Vildosola, as trustee for the AUFV Trust U/A/D 02/19/2009 ("Vildosola," and collectively with Lead Plaintiff, "Plaintiffs"), move under Federal Rules of Civil Procedure 23(a) and 23(b)(3) to certify this action as a class action and to appoint Plaintiffs as Class Representatives, and, pursuant to Federal Rule of Civil Procedure 23(g), to appoint Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") and Stoll Stoll Berne Lokting & Shlachter P.C. ("Stoll Berne") as Class Counsel.  The Court heard oral argument on July 29, 2020.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   The Parties

Defendant CenturyLink, Inc. ("CenturyLink") is the country's third-largest telecommunications company with millions of customers.  ([Docket No. 143] Consolidated Securities Class Action Complaint ("Compl.") ¶¶ 28, 37.)  Glen F.

Post, III; R. Stewart Ewing, Jr.; David D. Cole; Karen Puckett; Dean J. Douglas; and G. Clay Bailey (collectively, the "Executive Defendants") held senior positions at CenturyLink during the relevant time.  (Id. ¶¶ 29-34.)

Oregon operates and oversees public funds for the benefit of retired public employees.  (Compl. ¶ 26.)  The Oregon Public Employee Retirement Fund is a state pension fund for retired public employees.  (Id.)  It had $77 billion in assets under management as of April 30, 2018.  (Id.)  Oregon purchased CenturyLink securities during the Class Period.  (Id.)

Vildosola is trustee for the AUFV Trust U/A/D 02/19/2009.  (Id. ¶ 27.) AUFV Trust U/A/D 02/19/2009 purchased CenturyLink's 7.60% Senior Notes due September 15, 2039 ("7.60% Senior Notes") during the Class Period.  (Id.)

### 2.    Allegations in Plaintiffs' Complaint

According to Plaintiffs, for a number of years, CenturyLink engaged in systemic "cramming" of customer accounts, by adding services to customers' accounts without authorization, deceiving customers about the prices they would be charged, and misquoting prices by failing to disclose that "bundles" included fees for optional services that the customers did not need or authorize. (Compl. ¶¶ 44, 64.)  CenturyLink potentially overbilled 3.5 million customers,

representing over half of its broadband subscribers and one-third of its 12 million wireline subscribers.  (Id. ¶¶ 65, 178.)

During the Class Period, Defendants told investors that CenturyLink's sales practices were aboveboard and represented that it would never "plac[e] or record[] an order for our products and services for a customer without that customer's authorization."  (Compl. ¶ 151.)  Defendants represented that CenturyLink's revenue growth in its consumer and small business segments was due to its focus on customer needs through its call centers, bundling service packages, and other strategies.  (Id. ¶¶ 58-61.)  These representations were important to investors because investors were concerned with CenturyLink's ability to generate dependable cash flows in the face of customers abandoning traditional wireline telephone services that were the historical core of CenturyLink's business.  (Id. ¶¶ 55-56.)  The representations were false because, in fact, CenturyLink's revenues were materially increased by cramming.  (Id. ¶¶ 93, 192.)

In May 2016, the Minnesota Attorney General issued a civil investigative demand to CenturyLink after receiving many consumer complaints of deceptive practices.  (Compl. ¶ 141.)  In October 2016, CenturyLink employee Heidi Heiser,

who had repeatedly raised concerns about CenturyLink's fraudulent business practices to her supervisors, asked Post, through an online message board, "why customers were being given multiple accounts and being billed for things they did not ask for." (Id. ¶ 146.) Two days later, Heiser was suspended and then fired for blowing the whistle. (Id. ¶ 147.)

On Friday, June 16, 2017, Bloomberg reported on Heiser's whistleblower lawsuit against CenturyLink, that she was fired after raising concerns about cramming with Post, and that she alleged that CenturyLink had charged many millions of dollars in unauthorized fees. (Compl. ¶¶ 152-53.) On Monday, June 19, 2017, Bloomberg reported on a consumer class action lawsuit on behalf of "potentially millions" of CenturyLink customers alleging billing misconduct that had been filed the day before. (Id. ¶¶ 158, 160.) On July 12, 2017, news reports disclosed that the Minnesota Attorney General had filed a fraudulent billing lawsuit against CenturyLink based on a year-long investigation that provided detail concerning CenturyLink's sales and billing practices and their financial impact. (Id. ¶¶ 163-68.)

Overall, Plaintiffs allege that Defendants made false and misleading statements on dozens of different dates during the Class Period and that 3

corrective disclosures were made, on June 16, 2017; June 19, 2017; and July 12, 2017.  (Id. ¶¶ 190–263 & App. A.)

### B.    Procedural History

On June 25, 2018, Lead Plaintiff Oregon and Plaintiff Vildosola filed a Consolidated Securities Class Action Complaint against Defendants CenturyLink and the Executive Defendants.  [Docket No. 143]  The Complaint alleges: Count 1: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (against Defendants CenturyLink, Post, Ewing, Cole, Puckett and Douglas); and Count 2: Violations of Section 20(a) of the Exchange Act (against Defendants Post, Ewing, Cole, Puckett, Douglas and Bailey).

On July 30, 2019, the Court denied Defendants' Motion to Dismiss in its entirety.  [Docket No. 180]  In re CenturyLink Sales Practices & Sec. Litig., 403 F. Supp. 3d 712 (D. Minn. 2019).

Plaintiffs now seek to certify a class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), consisting of:

> all persons and entities that purchased or otherwise acquired publicly traded CenturyLink common stock or 7.60% Senior Notes due September 15, 2039, during the period between March 1, 2013 to July 12, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class").

The proposed Class excludes (i) Defendants; (ii) CenturyLink's affiliates and subsidiaries; (iii) the officers and directors of CenturyLink and its subsidiaries and affiliates at all relevant times; (iv) members of the immediate family of any excluded person; (v) heirs, successors, and assigns of any excluded person or entity; and (vi) any entity in which any excluded person has or had a controlling interest.

Plaintiffs also request that the Court appoint Bernstein Litowitz and Stoll Berne as Class Counsel.

## III.   DISCUSSION

### A.   Standard for Class Certification

The class action serves to conserve the resources of the Court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion.  Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 155 (1979).  Whether an action should be certified as a class action is governed by Rule 23 of the Federal Rules of Civil Procedure.

> To be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b).  The Rule 23(a) requirements for class certification are: (1) the putative class is so numerous that it makes joinder of all members impractical; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the

representative parties will fairly and adequately protect the interests
of the class.

In re St. Jude Med., Inc., 425 F.3d 1116, 1119 (8th Cir. 2005) (citing Fed. R. Civ. P.

23(a)) (footnote and other citations omitted).

Plaintiffs seek certification of a class under Rule 23(b)(3).  Rule 23(b)(3)

allows a class action when "the court finds that the questions of law or fact

common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."

The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the
prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the
controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of
the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Rule 23 does not set forth a mere pleading standard.  A party
seeking class certification must affirmatively demonstrate his
compliance with the Rule—that is, he must be prepared to prove

8

> that there are <u>in fact</u> sufficiently numerous parties, common
> questions of law or fact, <u>etc.</u>

<u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011).  At this stage, "[m]erits

questions may be considered to the extent – but only to the extent – that they are

relevant to determining whether the Rule 23 prerequisites for class certification

are satisfied."  <u>Amgen Inc. v. Conn. Ret. Plans and Trust Funds</u>, 568 U.S. 455, 466

(2013) (citations omitted).

### B.   Numerosity (Rule 23(a)(1))

Numerosity is met when the proposed class is "so numerous that joinder

of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).

Numerosity has been met because CenturyLink had approximately 567

million shares of common stock issued and outstanding on average during the

Class Period, and they were actively traded on the New York Stock Exchange

("NYSE") at a weekly average of over 27.8 million shares, with an average

weekly turnover of 4.9%.  The 7.60% Senior Notes were actively traded on open,

well-developed and efficient markets, had an amount outstanding of $800

million at the end of the Class Period, and were held by at least 120 institutional

investors.  (Blatchley Decl., Ex. C, Hartzmark Report ¶¶ 25, 99, 105, 128;

Hartzmark Report, Exs. I, XI.)  Defendants do not dispute that numerosity has

been met.

### C.       Commonality (Rule 23(a)(2))

Federal Rule of Civil Procedure 23(a)(2) requires that there are "questions

of law or fact common to the class."

> Commonality requires the plaintiff to demonstrate that the class
> members have suffered the same injury.  . . .  Their claims must
> depend upon a common contention . . . .  That common contention,
> moreover, must be of such a nature that it is capable of classwide
> resolution—which means that determination of its truth or falsity
> will resolve an issue that is central to the validity of each one of the
> claims in one stroke.

Wal-Mart Stores, Inc., 564 U.S. at 349–50 (citation omitted).  "In securities fraud

class actions, questions of misrepresentation, materiality and scienter are the

paradigmatic common question[s] of law or fact."  In re DaimlerChrysler AG Sec.

Litig., 216 F.R.D. 291, 296 (D. Del. 2003) (citation omitted).

Commonality has been met because Class members share a common legal

theory – securities law violations – and are part of a common group – purchasers

of CenturyLink shares or Notes.  Common questions include whether

Defendants' public representations and omissions violated federal securities law

and whether these misrepresentations and omissions caused Class members to

suffer a compensable loss.  (See, e.g., Compl. ¶ 271.)  Defendants do not dispute

that commonality has been met.

D.    **Typicality (Rule 23(a)(3))**

Typicality requires that "the claims or defenses of the representative

parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

"The burden is fairly easily met so long as other class members have claims

similar to the named plaintiff.  Factual variations in the individual claims will not

normally preclude class certification if the claim arises from the same event or

course of conduct as the class claims, and gives rise to the same legal or remedial

theory."  Alpern v. UtiliCorp United, Inc., 84 F.3d 1525, 1540 (8th Cir. 1996)

(citations omitted).

Typicality has been met because Plaintiffs and Class members share

common claims against Defendants.  Plaintiffs, like Class members, purchased

CenturyLink's publicly traded securities during the Class Period at prices

allegedly artificially inflated by Defendants' misrepresentations and omissions.

(Compl. ¶¶ 26-27, 270.)  Plaintiffs further assert that, like Class members, they

were then damaged when the price of those publicly traded securities declined

after public disclosure of Defendants' fraud.  (Id.)  Plaintiffs have claims that are

typical of the claims of the Class, bring claims under the same federal securities

law, and seek the same relief as other Class members; thus, the typicality requirement is satisfied.

The Court rejects CenturyLink's arguments that Oregon is atypical because it is subject to unique defenses:

### 1.      Investigation of CenturyLink's Billing Practices

Defendants assert that, while Plaintiff Oregon was purchasing CenturyLink securities, the Oregon Attorney General and Oregon Department of Justice were conducting a law enforcement investigation of the alleged sales and billing practices that it now claims CenturyLink concealed.  Thus, Defendants reason, throughout the Class Period, Oregon had unique access to information and an opportunity to uncover the alleged fraud.

There is no evidence that Plaintiff Oregon relied on nonpublic information in making its investment decisions with regard to CenturyLink.  First, case law establishes that the Oregon DOJ is treated as a separate entity from the Oregon Public Employee Retirement Fund as well as the Oregon State Treasurer and the Oregon Public Employee Retirement Board.  See Brown v. State of Or., Dep't of Corr., 173 F.R.D. 265, 268 (D. Or. 1997) ("Agencies of the State of Oregon are treated as separate entities [and] . . . knowledge of one agency is not imputed to

another agency."). See also Wyler v. Korean Air Lines Co., Ltd., 928 F.2d 1167, 1171 (D.C. Cir. 1991) (holding it improper to charge one federal agency with knowledge of another federal agency "simply because both are components of the same . . . government") (citations omitted). (See also Blatchley Decl., Ex. I, Viteri 30(b)(6) Dep. 24-25 (testifying that the Oregon Public Employee Retirement System Fund is its own legal entity).) Absent some evidence to the contrary, the knowledge of one entity is not imputed to another. Here, the only evidence in the record is that Plaintiff Oregon had no knowledge of the Oregon DOJ's investigation. (See Blatchley Decl., Ex. I, Viteri 30(b)(6) Dep. 208-11; Blatchley Reply Decl. ¶¶ 2-5; Blatchley Decl., Ex. K, Shull Decl. ¶¶ 2-3.)

Second, Plaintiff Oregon made no trades in CenturyLink stock after the Oregon DOJ served the Civil Investigative Demand on CenturyLink and before the end of the Class Period. Thus, even if Oregon DOJ received pertinent, non-public information from CenturyLink and even if knowledge of that information were imputed to Plaintiff Oregon, it would be irrelevant for purposes of this lawsuit. (See Blair Decl., Ex. 5, June 21, 2017, Oregon Dept. of Justice Civil Investigative Demand to CenturyLink; Blair Decl., Ex. 7.)

## 2.    Information Available to Oregon's External Investment Managers

Defendants also assert that Oregon relied on nonpublic information to make its trades because, during the Class Period, Oregon relied on external investment managers to actively manage Oregon's assets who, in turn, relied on "unique data sources or research that potentially adds value."  (Blair Decl., Ex. 6, Viteri 30(b)(6) Dep. 129.)  Defendants note that Oregon's investment strategy relied on selecting "active managers" who "implement[] market strategies that exploit dislocation."  (Id. 149-50.)

The Court finds no merit in Defendants' argument.  In context, Oregon's 30(b)(6) deponent testified that Oregon's investment managers used "public information" and that the "unique data sources or research" he mentioned were "publicly available" sources such as "lesser known trade publications." (Blatchley Decl., Ex. I, Viteri 30(b)(6) Dep. 129-30.)  There is no evidence that Oregon had access to nonpublic information relevant to its purchases of CenturyLink shares.

## 3.    Oregon's Purchases after June 16, 2017

The Court rejects Defendants' claim that Oregon's purchases after the June 16, 2017 partial disclosure make it subject to unique non-reliance defenses, which

will prevent it from serving as an effective class representative.  Oregon

purchased very few shares of CenturyLink after the disclosures, relative to the

amount of shares it purchased before the disclosures.  (See Blair Decl., Ex. 7.)  In

any case, the great weight of the authority provides that purchasing shares after

a disclosure does not destroy typicality, because, in an efficient market, the

investor still relies on the fact that the disclosure information will be absorbed by

the market and reflected in the new share price.  See Weiner v. Tivity Health,

Inc., 334 F.R.D. 123, 130 (M.D. Tenn. 2020).  "This later purchase does not

undercut or diminish the argument that the same investor may have purchased

the security pre-disclosure relying on the fact that all information available at the

time was reflected in the then current price."  Id. (citation omitted).  "Courts

routinely certify a class with representatives who purchased stock during and

after a class period."  In re Select Comfort Corp. Sec. Litig., 202 F.R.D. 598, 607

n.12 (D. Minn. 2001).

### 4.    Oregon's Awareness of Defendants' Statements

The fact that Oregon did not personally read CenturyLink's SEC filings

but, instead, relied on outside investment managers and on the market price (see

Blair Decl., Ex. 6, Viteri 30(b)(6) Dep. 215-16) does not make Oregon atypical

15

when the Class theory is fraud-on-the-market.  Plaintiffs rely on a theory of liability and damages that depends on an efficient market that absorbs all of the information in CenturyLink's SEC filings into the market price.  The premise of the <u>Basic</u> presumption, which applies in an efficient market, is that direct reliance is not required.  Oregon's failure to personally read CenturyLink's filings is irrelevant and does not make Oregon different from a typical Class member.

### E.    Adequacy (Rule 23(a)(4))

Named Plaintiffs are adequate representatives if they "have common interests with the members of the class, and . . . will vigorously prosecute the interests of the class through qualified counsel."  <u>Paxton v. Union Nat. Bank</u>, 688 F.2d 552, 562–63 (8th Cir. 1982).

#### 1.    Adequacy of Plaintiffs

Plaintiffs have established adequacy.  Defendants' argument against adequacy is a reiteration of their typicality argument, which the Court has already rejected.  Plaintiffs' declarations demonstrate that they have diligently pursued this litigation and will continue to do so.  (<u>See</u> Blatchley Decl., Ex. D, De Haan Decl. ¶¶ 4-10; Blatchley Decl., Ex. E, Vildosola Decl. ¶¶ 4-10.)

Plaintiffs also have common interests with the proposed Class. Oregon purchased CenturyLink securities during the Class Period at prices that were allegedly artificially inflated by Defendants' misrepresentations and omissions. It then suffered significant damages when the price of CenturyLink's publicly traded securities declined when the truth was disclosed. Vildosola purchased CenturyLink's 7.60% Notes during the Class Period that were allegedly artificially inflated by Defendants' misrepresentations and omissions and was damaged when the price of those securities fell in response to corrective disclosures.

### 2.    Class Counsel

In appointing class counsel, the Court must consider "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

The Court appoints Bernstein Litowitz and Stoll Berne as Class Counsel. Both firms are highly qualified and have extensive experience in securities class

17

action litigation.  As demonstrated by the law firms' submissions, Stoll Berne and

Bernstein Litowitz are experienced in leading large securities class actions in

both trials and settlements and have obtained substantial recoveries for plaintiffs

in such lawsuits.  Both firms have demonstrated diligence and expertise in their

work in this case.  Defendants do not dispute that Bernstein Litowitz and Stoll

Berne are qualified to represent the class.

### F.      Predominance (Rule 23(b)(3))

"At the core of Rule 23(b)(3)'s predominance requirement is the issue of

whether the defendant's liability to all plaintiffs may be established with

common evidence."  Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir.

2010).

> If, to make a prima facie showing on a given question, the members
> of a proposed class will need to present evidence that varies from
> member to member, then it is an individual question.  If the same
> evidence will suffice for each member to make a prima facie
> showing, then it becomes a common question.

Id. (citations omitted).

> Rule 23(b)(3), however, does not require a plaintiff seeking class
> certification to prove that each elemen[t] of [her] claim [is]
> susceptible to classwide proof.  What the rule does require is that
> common questions predominate over any questions affecting only
> individual [class] members.

Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 469 (2013) (citations omitted).

Plaintiffs note that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625 (1997). The predominance inquiry looks to the elements of the underlying causes of action. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809-10 (2011) ("Halliburton I").

Because the Supreme Court has held that falsity, materiality, and loss causation are common issues to a class, Amgen, 568 U.S. at 474-75, predominance in a securities fraud action often turns on the reliance element. Halliburton I, 563 U.S. at 810.

## 1. Class-wide Reliance with the Basic Presumption

Plaintiffs have shown that they are entitled to a presumption of classwide reliance under the fraud-on-the-market theory established in Basic, Inc. v. Levinson, 485 U.S. 224, 247 (1988), and reaffirmed in Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 283-84 (2014) ("Halliburton II"). Plaintiffs may satisfy Section 10(b)'s reliance element by "invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient

19

market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Halliburton II, 573 U.S. at 283-84.  However, "defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." Id.

To invoke the Basic presumption, Plaintiff must establish that (1) the alleged misrepresentations were public; (2) the stock traded in an efficient market; and (3) the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed.  Halliburton I, 563 U.S. at 811.  The Basic presumption substitutes for individualized proof of each buyer's reliance on the alleged misrepresentations.  Basic, 485 U.S. at 242.

The fraud-on-the-market presumption is based on the "fairly modest premise that market professionals generally consider most publicly announced material statements about companies;" therefore, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations."  Halliburton II, 573 U.S. at 268, 272

(citation omitted).  Thus, "a buyer of the security may be presumed to have relied on that information in purchasing the security."  <u>Amgen</u>, 568 U.S. at 458.

"<u>Basic</u> [] establishes that a plaintiff satisfies that burden [of showing predominance] by proving the prerequisites for invoking the presumption— namely, publicity, materiality, market efficiency, and market timing." <u>Halliburton II</u>, 573 U.S. at 276.   "<u>Basic</u> does afford defendants an opportunity to rebut the presumption of reliance with respect to an individual plaintiff by showing that he did not rely on the integrity of the market price in trading stock."  <u>Id.</u> "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."  <u>Id.</u>

Plaintiffs present evidence to show that the prerequisites for the <u>Basic</u> presumption – publicity, timing, and market efficiency – have been met. CenturyLink is a giant entity with millions of shares, closely followed by many analysts and traded on the NYSE.  There is no plausible argument that CenturyLink's statements were not publicly made, that Plaintiffs and Class members did not make trades after the statements were made but before the disclosures, or that CenturyLink stock was not traded in an efficient market.

### a)    Publicity

Plaintiffs meet the publicity prong because they allege that Defendants made material misrepresentations and omissions in their public statements to investors that artificially inflated or maintained the market price of CenturyLink's securities.  (Compl. ¶¶ 276-77.)

### b)    Timing

Plaintiffs meet the market timing prong because they allege that they purchased CenturyLink securities during the Class Period and suffered losses when the artificial inflation came out of the price of those securities when the truth was disclosed.  (Compl. ¶¶ 266-77.)

### c)    Market Efficiency

The markets for CenturyLink common stock and the 7.60% Senior Notes were efficient during the Class Period.

Courts analyze the efficiency of the market under the factors outlined in Cammer v. Bloom, 711 F. Supp. 1264, 1286 (D.N.J. 1989), and Krogman v. Sterritt, 202 F.R.D. 467, 478 (N.D. Tex. 2001).  The Cammer factors address: "(1) a stock's average weekly trading volume; (2) the number of security analysts following and reporting on the stock; (3) the extent to which market makers and

arbitrageurs trade in the stock; (4) whether the company is eligible to file an SEC

Form S-3; and (5) empirical facts showing a cause and effect relationship between

unexpected corporate events or financial releases and an immediate response in

the stock price."  Första AP-Fonden v. St. Jude Med., Inc., 312 F.R.D. 511, 518 (D.

Minn. 2015) (citing Cammer, 711 F. Supp. at 1286-87).  The Krogman factors are:

"(6) the company's market capitalization, (7) the bid-ask spread for stock sales,

and (8) float (the percentage of shares held by the public, as opposed to

insiders)."  Första AP-Fonden, 312 F.R.D. at 518 (citing Krogman, 202 F.R.D. at

478).  Courts also examine factors such as whether a stock shows

"autocorrelation," which measures "how predictable a stock's pricing is based on

historical data," and whether a stock is traded on a major stock exchange.  Id.

Here, throughout the Class Period, CenturyLink's common stock was

traded on the NYSE, a highly efficient securities market.  (Blatchley Decl., Ex. C,

Hartzmark Report ¶¶ 23, 37-38.)

The average weekly trading volume of the CenturyLink common stock

was 4.9% of outstanding shares. (Hartzmark Report ¶ 25; id., Ex. I.)  An

"[a]verage weekly trading volume of 2% or more of outstanding securities

justifies a 'strong presumption' of an efficient market for that security."  In re

Winstar Commc'ns Sec. Litig., 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citing

Cammer, 711 F. Supp. at 1286).  The 7.60% Senior Notes had an average weekly

turnover rate of 2.5%, with a median of 1.8%, and traded on all possible trading

days from the time it was issued during the Class Period.  (Hartzmark Report ¶¶

116-19; id., Exs. XI, XII.)  Courts have held that bond turnover over 2% justifies a

"strong presumption" of an efficient market.  Winstar, 290 F.R.D. at 447.

Heavy coverage of CenturyLink by analysts and the media weighs in favor

of market efficiency.  During the Class Period, analysts hosted 38 investor

conferences at which CenturyLink participated, and CenturyLink was discussed

in approximately 11,500 published articles.  (Hartzmark Report ¶¶ 29, 32; Ex. III-

C; Appendix C.)  During the Class Period, an average of 19 analysts covered

CenturyLink per week.  (Hartzmark Report ¶¶ 28, 31; Ex. II.)  The number of

analysts following CenturyLink was greater than at least 80% of the common

stocks on the NYSE and NASDAQ.  (Hartzmark Report ¶ 31.)  Analysts closely

watched CenturyLink, publishing over 1,000 reports and actively participating

on 17 conference calls during the Class Period.  (Hartzmark Report ¶¶ 28-29; Exs.

III-A, III-B.)  Analysts also issued numerous reports addressing CenturyLink's

debt securities.  (Hartzmark Report ¶¶ 122, 124.)

"The existence of market makers and arbitrageurs" is persuasive evidence of market efficiency because it "would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." Cammer, 711 F. Supp. at 1286-87. CenturyLink's common stock was actively traded on the NYSE by at least 1,668 institutional investors during the Class Period. (Hartzmark Report ¶¶ 39-40; id., Exs. IV, V.) There were opportunities for arbitrage throughout the Class Period, because the amount of short interest in CenturyLink common stock ranged from 24.1 million shares to 114.9 million shares, with an average of 47.3 million shares. (Hartzmark Report ¶¶ 41-42; id., Ex. VI.) There were at least 343 separate market makers for the 7.60% Senior Notes during the Class Period. (Hartzmark Report ¶¶ 115, 126; id., Ex. XV.) More than 120 institutional investors held at least 21-33% of the 7.60% Senior Notes at year-end from 2013 to 2016. (Hartzmark Report ¶ 128; id., Ex. XVI.)

Eligibility to file an abbreviated SEC Form S-3 is probative of efficiency. 17 C.F.R. § 239.13; see Cammer, 711 F. Supp. at 1287. CenturyLink filed at least three Forms S-3 during the Class Period. (Hartzmark Report ¶¶ 43-45; 130-32.)

"Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." Krogman, 202 F.R.D. at 478. Throughout the Class Period, CenturyLink's market capitalization averaged approximately $17.9 billion, with a high of $23.9 billion, meaning that CenturyLink's market capitalization was generally greater than 89-95% of common stocks on the NYSE and NASDAQ. (Hartzmark Report ¶¶ 47-50; Ex. VII.) The 7.60% Senior Notes also had a high market value ranging from $587 million to $844 million during the class period. (Hartzmark Report ¶ 134; id., Exs. XIV, XVII.)

"In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." Krogman, 202 F.R.D. at 478. During the Class Period, the public float represented approximately 99.6% of CenturyLink's common stock, on average. (Hartzmark Report ¶ 52.) There is no evidence that any insiders held any positions in the 7.60% Senior Notes. (Hartzmark Report ¶ 138.)

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are

willing to sell their shares.  A large bid-ask spread is indicative of an inefficient

market, because it suggests that the stock is too expensive to trade."  <u>Krogman</u>,

202 F.R.D. at 478 (citations omitted).  During the Class Period, the average bid-

ask spread for companies on the NYSE and NASDAQ (0.70%) was 17 times

larger than the bid-ask spread for CenturyLink common stock (0.04%).

(Hartzmark Report ¶¶ 53-57.)  There are no reported bid-ask spreads for

corporate bond markets, so Plaintiff's expert, Michael Hartzmark analyzed

customer trades with reporting dealers and determined that the average bid-ask

spread for the 7.60% Senior Notes was 2.48%, and the median bid-ask spread was

2.55%.  (Hartzmark Report ¶¶ 140-41; <u>id.</u>, Ex. XVIII.)  He also analyzed potential

market-making trades between dealers and determined that the average bid-ask

spread for such trades was 1.09%, with a median bid-ask spread of 0.93%.

(Hartzmark Report ¶ 143; <u>id.</u>, Ex. XVII.)

Plaintiffs have "allege[d] empirical facts showing a cause and effect

relationship between unexpected corporate events or financial releases and an

immediate response in the stock price."  <u>Cammer</u>, 711 F. Supp at 1287.

Hartzmark conducted an event study.  (Hartzmark Report ¶¶ 61-65; Apps. C, D.)

"Event studies are 'regression analyses that seek to show that the market price of

the defendant's stock tends to respond to pertinent publicly reported events.'"
Första AP-Fonden, 312 F.R.D. at 520 n.4 (quoting Halliburton II, 573 U.S. 280).
Event studies are "considered prima facie evidence of the existence of this causal
relationship." Winstar, 290 F.R.D. at 448.

Hartzmark found that CenturyLink's common stock price exhibited
significant price movements nine times as frequently on "news" days than on
"no-news" days. (Hartzmark Report ¶ 73.) He found that there was no
statistically significant autocorrelation of CenturyLink's common stock abnormal
returns, which is consistent with the conclusion that CenturyLink common stock
reacts quickly to unexpected events. (Hartzmark Report ¶¶ 79-84.) He also
found statistically significant price movements in response to each corrective
disclosure, which is consistent with a security that trades in an efficient market.
(Hartzmark Report ¶¶ 80-84.) Hartzmark also concluded that new CenturyLink-
specific information and large price movements of the 7.60% Senior Notes were
related and could not be attributed to outside influences. Hartzmark Report ¶¶
153-83.) The 7.60% Senior Notes responded to information about CenturyLink's
credit rating in a manner consistent with a finding of an efficient market.
(Hartzmark Report ¶¶ 157-66.) The relationship between 7.60% Note price

volatility and common stock volume (a proxy for CenturyLink-specific information) was positive and highly statistically significant, which also supports a finding of market efficiency. (Hartzmark Report ¶¶ 167-70.) The 7.60% Note did not exhibit economically meaningful autocorrelation. (Hartzmark Report ¶¶ 171-77.) Each corrective disclosure was associated with significant price movement in the price of the Senior 7.60% Notes, another finding consistent with market efficiency. (Hartzmark Report ¶¶ 178-81; Ex. XXI.) Together, these analyses support a finding of market efficiency for CenturyLink's common stock and the 7.60% Notes during the Class Period. (Hartzmark Report ¶¶ 85-87, 182.)

### d)   Standard for Rebuttal of the <u>Basic</u> Presumption

The <u>Basic</u> presumption can be rebutted with evidence that the alleged misrepresentation did not affect the stock's market price. <u>Halliburton II</u>, 573 U.S. at 279, 284. <u>See also IBEW Local 98 Pension Fund v. Best Buy Co., Inc.</u>, 818 F.3d 775, 780 (8th Cir. 2016) (noting that "there is an additional question at the class certification stage — whether the Rule 10b–5 defendant can rebut the <u>Basic</u> presumption with evidence showing an absence of price impact"). "[T]he <u>Basic</u> presumption . . . c[an] be rebutted by appropriate evidence, including evidence that the asserted misrepresentation (or its correction) did not affect the market

29

price of the defendant's stock." Halliburton II, 573 U.S. at 279–280.  To prevail on

their argument of lack of price impact, Defendants must show that they have

"sever[ed] the link" between the alleged misrepresentations and any impact on

CenturyLink's stock price.  Basic Inc., 485 U.S. at 248; Halliburton II, 573 U.S. at

281-82 (holding that defendant must "show[] that the alleged

misrepresentation[s] did not actually affect the stock's market price").

     In Best Buy, the Eighth Circuit reversed class certification because the

defendants presented "overwhelming evidence of no 'front-end' price impact"

"by submitting direct evidence (the opinions of both parties' experts) that

severed any link between the alleged conference call misrepresentations and the

stock price at which plaintiffs purchased." Best Buy Co., 818 F.3d at 782-83.  In

its opinion, the Best Buy court stated: "We agree with the district court that,

when plaintiffs presented a prima facie case that the Basic presumption applies

to their claims, defendants had the burden to come forward with evidence

showing a lack of price impact." Id. at 782 (citing Fed. R. Evid. 301).  However,

"[t]he Eighth Circuit's statement appears to be dictum because the extent of the

burden was not at issue.  The Eighth Circuit ultimately concluded that the

'overwhelming evidence' in the case demonstrated that there had been no price

30

impact and that the <u>Basic</u> presumption had therefore been rebutted. Thus, the Eighth Circuit's ruling did not depend on the standard of proof." <u>Waggoner v. Barclays PLC</u>, 875 F.3d 79, 103 n.36 (2d Cir. 2017). In any event, even if the standard were a mere burden of production, in this case, Defendants have failed to meet that burden because they have failed to produce evidence to sever the link between the alleged misrepresentations and any impact on CenturyLink's stock price.

Because price impact can be observed on the "front-end" (i.e., misstatements causing or maintaining inflation) or on the "back-end" (i.e., a decline in price caused by the corrective disclosures), Defendants must affirmatively disprove both to satisfy their burden. <u>See</u> <u>Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc.</u>, 955 F.3d 254, 265–66, 271 (2d Cir. 2020) (rejecting argument that absence of price movement on misstatement days rebutted price impact because "inflation was demonstrated on the [corrective-disclosure] dates"); <u>In re Vivendi, S.A. Sec. Litig.</u>, 838 F.3d 223, 260 (2d Cir. 2016) (rejecting notion that price impact requirement means a "misstatement must be associated with an increase in inflation to have any effect on a company's stock price").

**e)      Evidence of Front-End Price Impact**

Defendants' expert, Bruce Deal, opined that, on 48 out of the 52 days for which Plaintiffs allege CenturyLink's misrepresentations affected the price of CenturyLink securities, there was no statistically significant positive price movement in CenturyLink stock.  (Blair Decl., Ex. 1, Deal Report ¶ 72.)  He further opined that there was a statistically significant price increase on 4 dates and a statistically significant negative price movement on 8 of the 52 dates.  (Id. ¶ 77.)  He opined that, on 3 of the 4 dates showing a statistically significant increase, CenturyLink disclosed revenue and earnings-per-share figures that were more positive than the market expected.  (Id. ¶¶ 73-76.)

Defendants argue that, although Hartzmark opines that four abnormal positive returns are "four times as many as would be expected by chance," (Blatchley Reply Decl., Ex. F, Hartzmark Reply Report ¶ 115), he also opines that "unanticipated material information is more frequently and more systematically disclosed" on earnings disclosure "news days," leading to higher rates of abnormal returns, in the case of CenturyLink, 59% of the time (Blatchley Decl., Ex. C, Hartzmark Report ¶ 68; Hartzmark Report, Ex. IX).  Defendants conclude that, because 17 of the purported inflationary dates are "news days," the average

distribution by chance would likely include more positive abnormal returns that those among Hartzmark's purported inflationary dates.

The Court concludes that the fact that CenturyLink shares did not show a statistically significant increase on the majority of the dates of the alleged misstatements or omissions does not rebut the Basic presumption at this stage, where Plaintiffs are relying on a price maintenance theory.

First, Plaintiffs have provided evidence of back-end price impact. As the Seventh Circuit has noted, "the movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused." Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 415 (7th Cir. 2015). Instead, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward, on the assumption that the lie's positive effect on the share price is equal to the additive inverse of the truth's negative effect." Id. Here, as discussed in the next section, Plaintiffs have provided, and Defendants have failed to rebut, evidence of back-end price impact.

Second, Plaintiffs are proceeding under a price maintenance theory. As Defendants' expert admitted, misstatements or omissions can maintain artificial

inflation in a stock regardless of whether a stock's price increases significantly, decreases significantly, or does neither.  (Blatchley Decl., Ex. H, Deal Dep. 123-35.)  "The lack of statistically significant proof that a statement affected the stock price is not statistically significant proof of the opposite, i.e., that it did not actually affect the stock price."  Di Donato v. Insys Therapeutics, Inc., 333 F.R.D. 427, 444 (D. Ariz. 2019).  "[A] stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more."  Glickenhaus & Co., 787 F.3d at 415.  While the Eighth Circuit has not explicitly endorsed the price maintenance theory, it has not rejected the theory.  The underlying theory in Haliburton II was price maintenance, and the Supreme Court cited, with approval, Schleicher v. Wendt, which endorsed price maintenance.  618 F.3d 679, 684 (7th Cir. 2010), quoted in Halliburton II, 573 U.S. at 272.  After Halliburton II, 70% of securities plaintiffs in federal district court cases involving a defendant's attempt to rebut the Basic presumption proceeded on a price maintenance theory, and in every one of those cases, the district courts held that the defendants failed to rebut the presumption.  Goldman Sachs Group, Inc., 955 F.3d at 266 n.9.

Here, Plaintiffs allege that Defendants engaged in cramming in order "to meet the financial projections Defendants provided to Wall Street." (Compl. ¶¶ 2, 67.) Fees and charges were added to customer bills, including as "gap closure[s]" and to meet analyst estimates. (Blatchley Decl., Sealed Ex. U; Second Blatchley Decl. ¶¶ 6-7.) Additionally, the Complaint alleges that Defendants omitted negative material facts (see, e.g., Compl. ¶¶ 200, 203), which Deal agreed would not result in price increases. (Blatchley Decl., Ex. H, Deal Dep. 135; Blatchley Decl., Sealed Ex. F, Hartzmark Rebuttal Report ¶¶ 101-03.)

Third, Defendants bear the burden of producing evidence capable of rebutting the Basic presumption, yet their own expert testified that he did not opine that the alleged misstatements did not have a price impact. (See Blatchley Sur-sur-reply Decl., Ex. X, Deal Dep. 65.) Thus, Defendants did not produce evidence of a lack price impact. See, e.g., Vizirgianakis v. Aeterna Zentaris, Inc., 775 F. App'x 51, 53 (3d Cir. 2019) (noting that "plaintiffs do not have the burden to prove price impact (or lack thereof), so it was not surprising that their expert's report did no such thing").

f)      **Evidence of Back-End Price Impact**

Defendants have failed to rebut the <u>Basic</u> presumption because they are unable to rebut evidence of back-end price impact.

First, Defendants' expert admits that there were statistically significant price drops following two of the three disclosure dates. This is sufficient to prevent Defendants from "sever[ing] the link" between the alleged misrepresentations and any impact on CenturyLink's stock price. <u>See, e.g.,</u> <u>Monroe County Employees' Ret. Sys. v. S. Co.,</u> 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("This concession [that Defendants cannot rule out price impact because the stock price decline following at least one Class Period corrective disclosure was statistically significant] dooms Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period, not whether the stock price decline following individual corrective disclosures was caused by the alleged misrepresentations, which is a loss causation analysis not appropriate at this stage."). Deal admits that the price declines on June 16, 2017, and July 12, 2017, were statistically significant and that there was a negative abnormal decline on the third date, June 19, 2017. (Deal Report ¶¶ 141-45; Blatchley Decl., Ex. F, Hartzmark Rebuttal Report ¶¶ 21-22; Blatchley Decl., Ex. H, Deal Dep. 90-91

("[B]oth Dr. Hartzmark and I find statistically significant negative abnormal returns on June 16th and July 12th.").)  Deal did not identify any confounding information disclosed on the corrective disclosure dates and did not analyze whether any of the price decline on those days was unrelated to the fraud. (Blatchley Decl., Ex. F., Hartzmark Rebuttal Report ¶¶ 11-12, 46-68; Blatchley Decl., Ex. H, Deal Dep 164-65.)  Yet, under Basic, Defendants bear the burden of presenting evidence to show "that the entire price decline on the corrective-disclosure dates was due to something other than the corrective disclosures." Ark. Teacher Ret. Sys. v. Goldman Sachs Grp., Inc., 955 F.3d 254, 271 (2d Cir. 2020).  Even under a lesser burden of production, not persuasion, Defendants fail to rebut the Basic presumption.  See, e.g., KBC Asset Mgmt. NV v. 3D Sys. Corp., No. CV 0:15-2393-MGL, 2017 WL 4297450, at *8 (D.S.C. Sept. 28, 2017) ("On the record before it, the Court is unable to say Defendants have presented evidence sufficient to convince it there was no price impact associated with the May 6, 2015 disclosure.  In fact, 3D Systems's stock price decreased by over five percent on May 6, 2015.  Whether the stock price was caused by alleged misrepresentations or some other factor is for now an open question.") (applying Fed. R. Evid. 301 burden of production standard); Marcus v. J.C. Penney Co.,

CIVIL ACTION NO. 6:13-cv-736-MHS-KNM, 2016 WL 8604331, at *7-8 (E.D. Tex. Aug. 29, 2016) (concluding that the defendants failed to meet a "burden of production to rebut the presumption of reliance," even though there were no front-end price increases on misstatement dates, because the stock declined following corrective disclosures, thereby showing price impact, so it was "not necessary to reach the question of whether [defendants] also bear the burden of persuasion"), adopted, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017).

Second, Defendants' expert admits that there was a negative abnormal decline on June 19, 2017, but merely disagrees with Plaintiffs' expert regarding whether it is statistically significant, which depends on whether 94% confidence is considered sufficient and whether a one or two-day window is used. (Hartzmark Rebuttal Report ¶¶ 69-73.)  Plaintiffs' expert provides reasonable arguments regarding why a two-day window is appropriate for the June 19 disclosure, including that the disclosure was late in the day and made by a third party.  (See Hartzmark Rebuttal Report ¶¶ 74-94; Blatchley Decl., Ex. H, Deal Dep. 190-212.)

Third, the Court has already rejected Defendants' argument that, as a matter of law, the three disclosures were not actually disclosures.  See In re

CenturyLink Sales Practices & Sec. Litig., 403 F. Supp. 3d 712, 735-36 (D. Minn. July 30, 2019) ("Plaintiffs have adequately pled loss causation" in alleging the truth was revealed "through news reports on the lawsuits alleging systemic cramming at CenturyLink.").  Moreover, arguments about whether particular statements were actually disclosures, like arguments about loss causation and that the market already was aware of cramming allegations, are common questions that can be adjudicated on a class-wide basis at summary judgment or trial.  See, e.g., Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 475 (2013).  Similarly, at the class certification stage, a truth-on-the-market defense raises common class-wide issues.  See id. at 482.

Fourth, claims that other factors also contributed in part to the price drops are insufficient to rebut the Basic presumption.  "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security."  Waggoner v. Barclays PLC, 875 F.3d 79, 105 (2d Cir. 2017).  And, here, Deal does not opine that fear, uncertainty, and doubt caused all of the declines.  (Blatchley Decl., Ex. H, Deal Dep. 84-86, 162-65.)  He did not attempt to quantify the amount of the price drop that was caused by other factors.

### 2.   <u>**Affiliated Ute**</u> **Presumption**

Because the Court concludes that the <u>Basic</u> fraud-on-the-market

presumption applies, it need not reach Plaintiffs' alternative argument under

<u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 15354(1972).

### 3.   **Whether Common Issues of Damages Predominate**

The Court concludes that common issues of damages predominate.  To

establish predominance, Plaintiffs must show that "damages are susceptible of

measurement across the entire class."  <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 35

(2013).  Plaintiffs must put forward a damages model that is "consistent with

[their] liability case."  <u>Id.</u> (citations omitted).  "If the model does not even attempt

to do that, it cannot possibly establish that damages are susceptible of

measurement across the entire class for purposes of Rule 23(b)(3)."  <u>Id.</u>

Here, Plaintiffs propose a commonly accepted damages model for

securities fraud that is consistent with their theory of liability and calculates

damages on a classwide basis.  Plaintiffs rely on Hartzmark's out-of-pocket or

event study damages model, which "is the standard measurement of damages in

Section 10(b) securities cases."  <u>City of Miami Gen. Employees' & Sanitation</u>

<u>Employees' Ret. Tr. v. RH, Inc.</u>, No. 17-CV-00554-YGR, 2018 WL 4931543, at *3

(N.D. Cal. Oct. 11, 2018) (gathering cases).  Hartzmark's report "satisfies what

Comcast demands, that a viable calculation of damages can be made in this

case."  Beaver County Employees' Ret. Fund v. Tile Shop Holdings, Inc., No. 14-

786 (ADM/TNL), 2016 WL 4098741, at *11 (D. Minn. July 28, 2016) (footnote

omitted).  "It is sufficient for class certification that [Hartzmark] has specified a

damages model that can be used to establish damages using a common

methodology for all class members, even though certain of the inputs to that

model are not yet ascertainable."  Monroe County Employees' Ret. Sys. v. S. Co.,

332 F.R.D. 370, 399 (N.D. Ga. 2019).

    Hartzmark proposes an event study to create an inflation ribbon that

would measure the amount of fraud-related inflation in the price of

CenturyLink's securities on each day of the Class Period; this daily inflation

amount would provide the inputs for the out-of-pocket formula.  (Hartzmark

Report ¶¶ 188-89.)  Hartzmark admits that at this stage, he has not "pars[ed] and

scal[ed] the abnormal returns" in order to "[c]alculat[e] actual inputs into the"

out-of-pocket method, because determining loss causation is not necessary at the

class certification stage and "no matter which technique might be chosen at the

merits stage of this litigation to construct the inflation ribbon, the techniques

41

used to estimate the true price (and thus calculate artificial inflation) will be common to all putative class members and will be applied on a class-wide basis." (Id. ¶ 190 (footnote omitted).)

Defendants' criticisms of the specifics of which techniques will be used to construct the inflation ribbon and actually calculate losses with Hartzmark's damages model are premature. At the class certification stage, Plaintiffs need merely show, as Hartzmark has done, that "the techniques used to estimate the true price (and thus calculate artificial inflation) will be common to all putative class members and will be applied on a class-wide basis." (Hartzmark Report ¶ 190 (footnote omitted). See also Blair Decl., Ex. 2, Hartzmark Dep. 147 ("I can say whatever the inputs are, they would be applied classwide, and you would look at the inflation at the time of the purchase and the time of sale. It's very straightforward.").) As another district court explained:

> [D]efendants' argument that the plaintiffs' proposed method fails "to demonstrate how one would measure inflation using any 'standard tools of valuation' if it cannot be measured using an event study" is essentially an assertion that plaintiffs' method will result in incorrect calculations. However, this criticism prematurely addresses the quantification and allocation of damages, which courts consistently find are not appropriately raised at the class certification stage.

RH, Inc., 2018 WL 4931543, at *4.

Defendants' concerns that Hartzmark has not yet calculated an inflation

ribbon or adequately addressed disaggregation are loss causation disputes that

are not appropriate for resolution at class certification.  See, e.g., Amgen, 568 U.S.

at 475.

> Calculating the actual inputs into the out-of-pocket method by
> parsing and scaling the abnormal returns requires an analysis of loss
> causation.  For present purposes, one need only realize that the
> inflation-ribbon inputs will be common and applied classwide.
> Thus, the out-of-pocket method does not involve any individualized
> issues.

SEB Inv. Mgmt. AB v. Symantec Corp., No. C 18-02902 WHA, 2020 WL 2306490,

at *10 (N.D. Cal. May 8, 2020).

Defendants protest that it will be difficult and complex to calculate

damages because there are many dates with various alleged misrepresentations,

there was other information provided by CenturyLink that could have

influenced securities' prices, the alleged fraud increased and decreased as the

scheme changed over time, the telecommunications industry underwent changes

during this time that influenced the prices of securities, there was general fear

based on the Wells Fargo fraud, and the securities' prices changed over time.  All

of these criticisms go to the accuracy of the damages model and loss causation,

but do not prevent class certification because all of these alleged obstacles for

accurate calculation of the damages are the same if there is one plaintiff or one million plaintiffs. Defendants can argue the merits of Plaintiffs' proposed damages model at summary judgment or trial, but whether the Court certifies a class or not has no impact on those arguments. There is nothing about there being more plaintiffs that makes the damages model more or less accurate, because there is no argument here that damages would be individualized. See, e.g., Menaldi v. Och-Ziff Cap. Mgmt. Grp., LLC, 328 F.R.D. 86, 98-99 (S.D.N.Y. 2018) (disaggregation "goes beyond the Rule 23 inquiry" because "[t]he answer for the class will be the same as the answer for the hypothetical lone plaintiff").

### G.   Superiority (Rule 23(b)(3))

A class action is the superior method to fairly and efficiently adjudicate this controversy. In general, "securities cases easily satisfy the superiority requirement of Rule 23." In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (citation omitted).

Rule 23(b)(3) requires the Court to consider four factors when determining superiority: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action."

Fed. R. Civ. P. 23(b)(3).

This action meets all four factors. First, Plaintiffs seek to represent a class of thousands of CenturyLink securities purchasers whose individual damages might be too small to make the expense of litigation worthwhile. Second, there is no evidence of any other litigation concerning this controversy already begun by or against Class members. (Blatchley Decl. ¶ 3.) Third, concentrating the litigation in this forum will promote judicial efficiency by resolving the claims of thousands of shareholders in one case. Fourth, there are no manageability concerns.

### H.    Definition of the Class Period

The Court denies Defendants' request to shorten the Class Period by ending it on June 16, 2017, rather than on July 12, 2017. Defendants point to some evidence to support their claim that the thrust of the alleged fraud was revealed in the June 16 Bloomberg article. (See Blair Decl., Ex. 6, Viteri 30(b)(6) Dep. 204 (testifying that June 16, 2017, was the day that "the dam broke" and that the revelations "basically broke the trust of the investment community" in CenturyLink); id. 220 (testifying that, on June 16, "the market understands, as a whole, what was occurring at that point in time").) However, at the class

45

certification stage, the Court will not shorten the Class Period.  First, after the

June 16, 2017, disclosure, Defendants denied the allegations and continued the

alleged misrepresentations.  See In re Snap Inc. Sec. Litig., 334 F.R.D. 209, 225

(C.D. Cal. 2019) (refusing to shorten class period to end on date that lawsuit was

revealed because, after that date, it was alleged that defendant "continued to

make misrepresentations regarding the lawsuit;" thus, the court determined that

"any inquiry as to precisely when the truth was fully disclosed to the market is

best reserved for resolution on the merits").

Second, both Defendants' and Plaintiffs' expert found a statistically

significant drop in share price after the July 12, 2017 disclosure date.  See Monroe

County Employees' Ret. Sys. v. S. Co., 332 F.R.D. 370, 395–96 (N.D. Ga. 2019)

("[N]umerous courts addressing class certification have refused to shorten class

periods by dismissing subsequent corrective disclosures where some but not all

of the stock price declines following the alleged corrective disclosures were

statistically significant.  Instead, these courts found that the question of what

caused the stock price to decline is an ultimate merits question for which

plaintiffs bear the burden at trial, not at class certification.").  "[D]efendants'

arguments present loss causation issues that need not be decided at the class

certification stage as the issues would be common to the putative class." SEB

Inv. Mgmt. AB v. Symantec Corp., No. C 18-02902 WHA, 2020 WL 2306490, at *9

(N.D. Cal. May 8, 2020).  As in SEB Investment Management, Defendants' own

expert admits that "the [July 12] disclosure[] w[as] followed by [a] statistically

significant price decline[], indicating that the price had been inflated during the

time period prior to [July 12]."  Id.  (See Blatchley Sur-sur-reply Decl., Ex. X, Deal

Dep. 190  (testifying that the corrective disclosures showed they "do seem to

have . . . had some impact on the stock price" and that "we can't rule out

these").)

Third, the July 12 disclosure revealed new information such as the

Minnesota Attorney General's allegations that "maybe 1 out of 5" customers

were quoted correctly, a revelation that prompted analysts to downgrade their

ratings.  (Compl. ¶¶ 163-71; Blatchley Decl., Ex. F, Hartzmark Rebuttal Report ¶¶

40-43.)  Thus, the Minnesota Attorney General's lawsuit revealed more about the

scope of CenturyLink's billing fraud.  Defendant's expert admitted that investors

did not know these facts before the July 12 disclosure.  (See Blatchley Sur-sur-

reply Decl., Ex. X, Deal Dep. 87-89.)

Overall, the Court concludes that shortening the Class Period would be inappropriate at this time and notes that "arguments regarding the impact or lack of impact of different disclosures on the market are generally reserved for the merits stage, rather than class certification," In re Snap Inc. Sec. Litig., 334 F.R.D. at 225 (citing Amgen Inc., 568 U.S. at 470, 482), particularly when "when a securities class action defendant has [not] unequivocally disclaimed the prior assertion" id.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1. Plaintiffs' Motion for Class Certification, Appointment of Class Representatives and Appointment of Class Counsel [Docket No. 188] is **GRANTED**.

2. The following class (the "Class") is hereby certified pursuant to Federal Rule of Civil Procedure 23:

   All persons and entities that purchased or otherwise acquired publicly traded CenturyLink, Inc. ("CenturyLink") common stock or 7.60% Senior Notes due September 15, 2039, during the period between March 1, 2013 to July 12, 2017, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, CenturyLink's affiliates and subsidiaries, the officers and directors of CenturyLink and its subsidiaries and affiliates at all relevant times, members of the immediate family of any excluded person, heirs, successors, and assigns of any

excluded person or entity, and any entity in which any
excluded person has or had a controlling interest.

3.      Lead Plaintiff the State of Oregon by and through the Oregon
        State Treasurer and the Oregon Public Employee Retirement
        Board, on behalf of the Oregon Public Employee Retirement
        Fund ("Oregon") and Plaintiff Fernando Alberto Vildosola, as
        trustee for the AUFV Trust U/A/D 02/19/2009, are appointed
        as Class Representatives.

4.      Bernstein Litowitz Berger & Grossmann LLP and Stoll Stoll
        Berne Lokting & Shlachter P.C. are appointed as Class
        Counsel.

Dated:   September 14, 2020          s/ Michael J. Davis
                                     Michael J. Davis
                                     United States District Court