UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In Re CenturyLink Sales Practices and Securities Litigation | MDL No. 0:17-02795-MJD-KMM |
| | **ORDER** |
| This Document Relates to: Civil No. 18-296 (MJD/KMM) | |

This matter is before the Court on the Defendants' Motion for a Protective Order Regarding Plaintiffs' Third-Party Subpoenas. [17md2795, Doc. No. 766; 18cv296, ECF No. 280.][1] Specifically, the defendants seek to prohibit the plaintiffs from serving eleven third-party subpoenas on ten debt collectors and one survey-management firm, all of which were engaged by CenturyLink during the period relevant to this securities-fraud litigation. For the reasons that follow, the defendants' motion is granted in part and denied in part.

**I.   Factual Background**

Because the parties dispute both the relevance and the proportionality of the discovery sought, the relevant factual background includes the plaintiffs' allegations, the defenses raised, and the specific requests at issue.

**The Complaint and Defenses**

The plaintiffs assert claims on behalf of a class of investors who purchased publicly traded securities issued by CenturyLink from March 2013 through July 2017. They allege that CenturyLink and several of its executives violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, which was promulgated by the Securities and Exchange Commission. The plaintiffs claim that CenturyLink and its senior leadership knowingly and recklessly made materially false and misleading statements and omissions about

---

[1]     Identical briefing and supporting documents were filed in the main MDL file and in *Craig v. CenturyLink*, Civil No. 18cv296. The Court cites to the briefing in the *Craig* file throughout this Order, and where page numbers are referenced, the Court cites to the pagination used by the parties rather than the page numbers generated by the Court's electronic filing system.

1

CenturyLink's billing practices. They accuse CenturyLink of engaging in a practice known as "cramming," which includes: adding services to customers' accounts without permission; misleading customers about the price charged for various services; and failing to disclose fees charged for unauthorized optional services. Plaintiffs claim that CenturyLink's cramming was widespread and systematic, and that the company's senior leadership condoned and encouraged cramming because of the significant revenue it generated. For example, CenturyLink's executives allegedly adopted very high sales quotas that led to the cramming issues with the company's customers.

According to the consolidated class-action complaint, CenturyLink did not disclose to the company's investors that it was engaged in cramming or that its periods of high revenues were dependent upon the additional income generated by the practice. Instead, the plaintiffs contend that CenturyLink told investors that it did not engage in deceptive sales practices like cramming. They claim that the defendants made false and misleading statements regarding an investigation by the Arizona Attorney General, which allegedly concluded that CenturyLink had engaged in cramming. The defendants also allegedly lied to investors by attributing periods of declining stock prices to business concerns (company reorganization, seeking more reliable customers, etc.), when the truth was that such dips in revenue were attributable to the company's efforts to stop the cramming practices.

CenturyLink's investors only learned about the company's alleged cramming as a result of a June 2017 whistleblower complaint made by a CenturyLink employee. In addition, the Minnesota Attorney General filed a lawsuit that same month alleging that CenturyLink's cramming practices violated state consumer-protection laws. The public filing of these and other lawsuits allegedly caused CenturyLink's publicly traded stock prices to plummet, and investors lost significant revenue.

The defendants deny that the company was engaged in cramming and that the senior leadership was responsible for customers being charged for services they did not authorize. The defense characterizes unauthorized charges for customers as sporadic errors, which are common in the telecommunications industry, and claims such charges were not the result of any company-wide policy. Defendants also deny that any unauthorized charges were blessed by the company's executives or the product of a scheme to use cramming to generate revenue. They claim that CenturyLink did not engage in systematic fraudulent billing

practices, its revenues were not materially affected by any alleged cramming, and none of the individual executives made false or misleading statements to the company's investors. In other words, the defendants dispute the plaintiffs' entire theory of the case.

### The Subpoenas

On June 11, 2020, the Plaintiffs issued the eleven subpoenas at issue. Ten of the subpoenas were directed to companies that served as CenturyLink's debt collectors. The other was issued to a business called "Great Place to Work Institute, Inc.," a survey-management company that studies employee satisfaction. Each of the debt-collector subpoenas includes the same four requests for production of documents and the Great Place to Work subpoena similarly includes four document requests.

After the plaintiffs provided notice of the subpoenas to the defense and served the subpoenas on the debt collectors and Great Place to Work, the defendants informed the plaintiffs and the subpoena respondents that they would be filing this motion for a protective order. [Hr'g Tr. (Aug. 17, 2020) at 41, 43, ECF No. 310.] As a result, the third parties ceased preliminary meet-and-confer discussions and informed the plaintiffs that they would await a ruling from the Court regarding the defendants' motion.

## II.   Legal Standard

A party may move for a protective order to prohibit or limit discovery sought from a third party through a Rule 45 subpoena. *Shukh v. Seagate Tech., LLC*, 295 F.R.D. 228, 236 (D. Minn. 2013). "[S]ubpoenas issued under Rule 45 are subject to the same 'constraints that apply to all of the other methods of formal discovery.'" *Id.* (quoting *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 177 F.R.D. 443, 443 (D. Minn. 1997)). When a party seeks a protective order regarding information sought under Rule 45, the issue becomes "'one of case management under Rules 16 and 26.'" *Id.* (quoting *Marvin Lumber*, 177 F.R.D. at 444).

Under Rule 26(c)(1), a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including…"prohibiting the discovery entirely or taking other actions to address appropriate concerns. Fed. R. Civ. P. 26(c)(1)(A)–(H). Good cause for a protective order may be established where the discovery sought is irrelevant to the parties' claims or defenses. *Shukh*, 295 F.R.D. at 237. There may also be good cause for a protective order where the discovery

3

sought from a third party is not "proportional to the needs of the case, considering the importance of the issues at state in the actions, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

In addition, a court is required to place limits on the "frequency or extent of discovery otherwise allowed by the[] rules … if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C). "The rule vests the district court with discretion to limit discovery if it determines, inter alia, the burden or expense of the proposed discovery outweighs its likely benefit." *Roberts v. Shawnee Mission Ford, Inc.*, 352 F.3d 358, 361 (8th Cir. 2003).

**III.    Discussion**

After careful consideration of the parties' briefing and the oral argument during the hearing on the defendants' motion, the Court concludes that, with one exception, there is good cause to enter a protective order prohibiting the plaintiffs from serving their subpoenas. As explained below, the Court finds that some of the information sought by the plaintiffs' subpoenas is irrelevant. Other information being requested is duplicative or cumulative of discovery that the plaintiffs have obtained or could obtain from the defendants themselves. And some of the third-party discovery is not proportional to the needs of the case. However, the Court concludes that the plaintiffs should be permitted to seek a limited subset of the information sought by the subpoenas to CenturyLink's debt collectors. Specifically, the plaintiffs may serve their subpoenas to obtain information from the debt collectors regarding CenturyLink's customers' communications with those parties regarding cramming issues.

### A. Debt Collector Subpoenas

In the debt-collector subpoenas, the plaintiffs make four requests:

**REQUEST NO. 1:**

All Documents concerning Your engagement by CenturyLink, including:
- a. All Documents concerning the nature or scope of any engagement(s) between You and CenturyLink;
- b. All Documents concerning any Master Agreement or Forward Flow Agreement or similar agreement between You and CenturyLink; and
- c. All Documents describing the work you performed and the results you obtained.

**REQUEST NO. 2:**

All Documents, including internal Communications or Communications with CenturyLink, concerning Disputed Collections, Cramming and Billing Issues or Sales and Billing Practices.

**REQUEST No. 3:**

All Documents reflecting any negotiation, dispute, repurchase or requested adjustment initiated or made by You in connection with any Master Agreement, Forward Flow Agreement or similar agreement arising from or relating to any Disputed Collections or breaches of representations and warranties concerning the accuracy or validity of any accounts due to Cramming and Billing Issues or Sales and Billing Practices.

**REQUEST No. 4:**

All Documents or Communications concerning how You or Your employees, contractors, or other personnel should respond to questions about CenturyLink's Sales and Billing Practices, Cramming and Billing Issues, the Heiser Lawsuit, the Minnesota AG Action, the Arizona AG Action, or any other Governmental Action.

[*E.g.*, Lightdale Decl., Ex. 1 (Subpoena to AFNI, Inc.), ECF No. 284.] These four requests may be summarized as seeking: (1) documents revealing the debt collectors' contractual relationship with CenturyLink; (2) the debt collectors' internal communications, communications with customers, and communications with CenturyLink regarding

5

cramming; (3) documents reflecting negotiations or adjustments to the debt collectors' contractual arrangements with CenturyLink relating to disputed collections; and (4) documents showing how the debt collectors' personnel should respond to debtors who raised cramming issues.

Generally speaking, the Court finds the plaintiffs' requests seek a scope of information that is far broader than what is really necessary to resolve the issues in dispute in this litigation. As drafted, the four requests in each of the subpoenas are expansive as to subject matter and include no time limits whatsoever. Even where some subset of the information sought falls within the broad concept of relevance for discovery purposes, the burden and expense that would be imposed on the subpoena respondents, as well as on the defendants and the plaintiffs who would have to review any document production, would outweigh the likely benefit of the discovery to the litigation.

With respect to the first document request in the subpoenas—seeking contracts between the debt collectors and CenturyLink—the Court finds the information at issue is not relevant to the claims and defenses in this litigation. A contract between a debt collector and CenturyLink likely reflects a bargain that the debt collector would receive payment in exchange for its efforts to recover sums CenturyLink believed it was owed by its existing or former customers. Such agreements are unlikely to reveal any information that could tend to prove or disprove: whether CenturyLink was engaged in cramming; whether the defendants made misrepresentations about cramming practices to CenturyLink's investors (*e.g.*, whether the defendants falsely claimed to investors that CenturyLink did not engage in fraudulent billing); whether any defendants made statements or omissions with the intent to deceive, manipulate, or defraud; or whether CenturyLink's senior leadership directed, or had the authority to direct, fraudulent billing practices to generate revenue for the company.[2]

---

[2] These considerations would have a bearing on the claims and defenses in this securities-fraud case. *See In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002) (listing the essential elements of section 10(b) and rule 10b-5 claims as: "(1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule; (2) causation, often analyzed in terms of materiality and reliance; (3) scienter on the part of the defendants; and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security"); *see also Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (quoting *Farley v. Henson*, 11 F.3d 827,

(footnote continued on following page)

Because the information likely to be obtained in response to these requests is not relevant, there is good cause to enter a protective order prohibiting the discovery plaintiffs seek.[3]

The third request in the debt collector subpoenas is incredibly overbroad. Request No. 3 seeks "all documents" concerning the debt collectors' attempts to modify their contractual relationships with CenturyLink based on "disputed collections." The plaintiffs' theory is that these documents would show that "disputed collections" over alleged CenturyLink debts were pervasive enough that the debt collectors sought to re-negotiate their deals with CenturyLink based on the poor quality of the debts at issue. If the debt collectors tried to rework their contracts due to significant cramming issues arising with the customers, then the plaintiffs suggest it is more likely that CenturyLink was engaged in cramming and knew it had an impact on revenue. Though such a theory places the discovery sought within the broad concept of relevance for discovery purposes, although tangentially, the Court finds that the request is overbroad and would result in undue burden. In particular, the Court notes that "disputed collections" is defined in the plaintiffs' subpoenas as

> any instance where any CenturyLink customer complained about, refused to pay, or otherwise disputed the accuracy or legitimacy of all or any part of any bill from or charge by CenturyLink, including any specific charges, fees, or services included on any such bill or charge, in connection with any collection effort undertaken by [the debt collector].

[*E.g.*, Subpoena to ANFI, Inc., General Definitions ¶ I.9.] Under this definition, the subpoena would result in searches for and productions of far broader swaths of information

---

835 (8th Cir. 1993)) (requiring a plaintiff to show the following for control-person liability: "(1) that a 'primary violator' violated the federal securities laws; (2) that 'the alleged control person actually exercised control over the general operations of the primary violator'; and (3) that 'the alleged control person possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated'").

[3]     Even if one could conceive of an agreement between CenturyLink and a debt collector having terms that could speak to the issues in this securities-fraud case, the Court finds the likelihood of such a revelation to be so remote that the burden and expense of production outweighs its likely benefit. Moreover, any possible relationship between such contracts and the parties' claims and defenses is so tangential that they are unlikely to be very important in resolving the issues.

than the theoretically relevant subset of information related to cramming. One can easily imagine that a very large number of customers contacted by debt collectors would "complain[] about" or "refuse[] to pay" for reasons totally unrelated to the cramming issues at the heart of this case. And even if communications regarding renegotiating a contract due in part to the volume of customers alleging cramming could be generally supportive of the plaintiffs' theory, sch relevance would be circumscribed and indirect, when weighed against the volume of information that would have to be reviewed and produced. The full scope of information sought by this request is, therefore, disproportionate to the needs of the case, and the Court will not authorize the plaintiffs to move forward with a subpoena so dramatically overbroad.

Similarly, any potential relevance of Request No. 4—seeking documents relating to the way debt collectors' personnel should respond to debtors raising concerns about cramming and other related litigation—is tangential at best. How the debt collectors instructed their personnel to address such concerns when communicating with debtors does not have a strong tendency to prove that CenturyLink was engaged in cramming. Nor would such information be strong proof that the defendants made misrepresentations to CenturyLink's investors. Most importantly, if CenturyLink did, in fact, communicate with the debt collectors to tell them how to address customer complaints regarding billing practices, cramming, or the pending lawsuits referenced in Request No. 4, those communications would likely have been captured by CenturyLink in its own search for documents responsive to the plaintiffs' discovery requests. Seeking the same information from the debt collectors is improper here because it would be unreasonably duplicative or cumulative. Because the information sought is not directly linked to the issues in this litigation, the Court finds that the discovery is not proportional to the needs of the case, especially when considering the importance of the discovery and weighing the burden and expense of the proposed discovery against its likely benefit.

Request No. 2 presents a more complex question. The Court finds Request No. 2 to be overbroad, with one exception. This request asks the debt collectors to produce all of their internal communications, and their communications with CenturyLink, regarding "disputed collections," and cramming and billing issues. Requests for all communications with CenturyLink regarding cramming and billing issues seek information that is very likely duplicative and cumulative of discovery that the plaintiffs have obtained, or could more

8

properly obtain, from the defendants themselves. Likewise, given the breadth of the defined "disputed collections" term, every internal communication the debt collectors possess that relates to consumers complaining about or disagreeing with a charge would not be particularly relevant evidence. Therefore, ordering its production is not proportional to the needs of the case because the burden and expense it would cause outweighs its likely benefit. Accordingly, the Court will grant the protective order to the extent it seeks to prohibit this discovery from the debt collectors.

However, a subset of the information sought in Request No. 2 of the debt-collector subpoenas is relevant to this litigation. This subset of information consists of the debt collectors' communications with CenturyLink customers regarding cramming and unauthorized billing practices. These communications will go to the heart of an underlying dispute in this case: whether CenturyLink was engaged in cramming and unauthorized billing practices. For the plaintiffs to prevail on their claims, they will need to marshal proof that CenturyLink engaged in such fraudulent behavior so that they can demonstrate that statements to the contrary made to investors were false. The defendants adamantly dispute that CenturyLink had any such widespread practice, but a disagreement about the ultimate merits is not a basis to deny discovery that goes to the core of the case. The Court is also not persuaded by the defendants' argument that, even if there are very large numbers of customer complaints regarding cramming to be found in the debt collectors' files, the discovery on this topic would be redundant. [Hr'g Tr. at 12–13, ECF No. 310.] In particular, the Court accepts the plaintiffs' counsel's representation that in the document production received so far, they have seen some collection agencies communicating with CenturyLink's customers during the early part of the customers' relationship with the company, suggesting that the debt collectors were essentially responsible for fielding customer complaints. [*See id.* at 24–26.] And even where certain debt collectors did not begin the work until the customers' accounts were closed, it may be that customers did not complaint about cramming until the collection stage of their unpaid bills.

Accordingly, discovery of this subset of information is both relevant and proportional to the needs of the case. The plaintiffs should be permitted to pursue such information from the debt collection agencies at issue, but to do so, they must reframe the subpoenas so that Request No. 2 is limited in a way that is consistent with this Order. In addition, if the

plaintiffs choose to reissue their subpoenas consistent with this Order, they must also include a date range that corresponds to the class period at issue in this litigation.[4]

### B. Great Place to Work Subpoena

In the Great Place to Work subpoena, the plaintiffs seek production of the following information:

> **REQUEST NO. 1:** All Documents concerning Cramming and Billing Issues at CenturyLink, including all Documents concerning any survey, audit, review, summary, or other analysis of or relating to Cramming and Billing Issues conducted by You or shared with You, employee or customer experiences or perceptions of Cramming and Billing Issues, and any Communications concerning Cramming and Billing Issues with CenturyLink, any third party, or between or among Your employees.
>
> **REQUEST NO. 2:** All Documents concerning employee or customer experiences or perceptions of CenturyLink management credibility, integrity, honesty or similar attributes, as well as any Communications concerning CenturyLink management credibility, integrity, honesty or similar attributes with CenturyLink, any third party, or between or among Your employees.
>
> **REQUEST NO. 3:**
>
> All Documents concerning Your engagement by CenturyLink, including:
> - a. All Documents concerning the nature or scope of any engagement(s) between You and CenturyLink;
> - b. All Documents describing the work you performed and the results you obtained;
> - c. All Communications between You and CenturyLink about the engagement(s);
> - d. Documents sufficient to identify the personnel, employees, or contractors who worked for You or with whom you worked in connection with any such engagement(s);
> - e. All Documents concerning any surveys of CenturyLink employees conducted by or shared with You as part of Your engagement(s); and

---

[4] Should the plaintiffs choose to pursue the limited scope of discovery from the debt collection agencies that is permitted by this Order, nothing in this Order should be construed as prohibiting any third party from bringing a motion to quash such a subpoena as permitted by Fed. R. Civ. P. 45.

10

>   f.  All Documents concerning any surveys of CenturyLink customers or potential customers that You conducted or that were shared with You as part of your engagement(s).
>
> **REQUEST NO. 4:** All Documents that You issued, produced or provided, or that any Governmental Entity issued, produced or provided, in connection with any Governmental Action, including any civil investigative demand(s), interrogatories, requests for production, subpoenas, interview and deposition transcripts, or any other discovery, and responses thereto, including in connection with the Arizona AG Action and the Minnesota AG Action.

[Lightdale Decl., Ex. 11.]

The Court finds that there is good cause for a protective order prohibiting the plaintiffs from serving the Great Place to Work Subpoena. First, with respect to Request No. 4, which seeks information that Great Place to Work shared with governmental entities including the Arizona and Minnesota Attorneys General lawsuits, the Court notes that this approach suffers from a similar problem to the "cloned discovery" issue that the Court has previously addressed regarding discovery from the defendants themselves. Simply producing all of the documents and other information Great Place to Work provided to governmental entities in connection with civil investigative demands or the prosecution of litigation against CenturyLink, although it may make things easy for Great Place to Work, would likely result in the production of large chunks of information that is irrelevant to this lawsuit while not necessarily producing information that is. This request is, therefore, not proportional to the needs of the case and is overbroad.

The Court also finds that the plaintiffs should not be permitted to serve a subpoena on Great Place to Work for the information sought in the remaining three requests. In these requests, the plaintiffs seek: all of Great Place to Work's documents regarding cramming or billing issues; all documents relating to the work done for CenturyLink; and all documents and communications regarding CenturyLink's customers' and employees' perceptions of CenturyLink's honesty and integrity. The plaintiffs' attempt to obtain such information from Great Place to Work would result in discovery that is duplicative or cumulative of the discovery the plaintiffs already obtained or could have obtained from the defendants. For example, it is highly unlikely that if Great Place to Work received information from CenturyLink's employees regarding dissatisfaction with CenturyLink's sales and billing

practices, the company would not have disclosed that information to CenturyLink. Great Place to Work's communications with CenturyLink regarding cramming or billing issues would likewise be discoverable from the defendants. With respect to internal communications among Great Place to Work employees regarding CenturyLink's cramming and billing practices, the Court finds they would be only marginally relevant to the claims and defenses in this case, and the burden and expense associated with their production would swiftly outweigh their likely benefit. As a result, such discovery is disproportionate to the needs of the case.

For these reasons, the Court will grant the defendants' motion for a protective order to the extent it seeks to prohibit plaintiffs from obtaining information pursuant to the Great Place to Work subpoena.

### IV. Order

The defendants' motion for a protective order **(17md2795, ECF No. 766; 18cv296, ECF No. 280)** is **GRANTED IN PART** and **DENIED IN PART** as discussed above.

Date: October 28, 2020                         *s/Katherine Menendez*
                                                Katherine Menendez
                                                United States Magistrate Judge